IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| BIDZIRK, LLC, DANIEL G. SCHMIDT, III, and JILL PATTERSON, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 6:06-CV-00109-HMH |
| PHILIP RUSS SMITH, | ) ) | MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION |
| Defendant. | ) | |

COMES NOW BidZirk, LLC ("BidZirk"), Daniel G. Schmidt, III ("Schmidt") and Jill Patterson ("Patterson"), Plaintiffs in the above-captioned action and, pursuant to Local Civil Rule 7.04 DSC, file this their memorandum of law in support of their motion for preliminary injunction, and show the Court as follows:

## **INTRODUCTION**

This is an action for injunctive relief and damages for violation of the Lanham Act, 15 U.S.C. § 1111 et seq.; and for damages for defamation and invasion of privacy. See Complaint. Defendant publishes an internet web site at www.jackwhispers.blogspot.com. Defendant also earns money by marketing and selling computers and computer-related equipment on an internet auction site known as eBay, which can be found at www.ebay.com. Schmidt and Patterson are principals in BidZirk, which operates an auction consignment business from multiple locations in South Carolina. See Affidavit of Daniel G. Schmidt, III, attached as Exhibit 1 at ¶ 3 (hereinafter "Schmidt ¶ 3"). BidZirk provides, for a fee, services related to eBay listing and auctions; to wit,

customers can drop off articles at a BidZirk location, sign a customer agreement, and BidZirk then administers an eBay auction of the customer's articles. BidZirk's services include photographing consigned items, arranging for items to be listed on the internet on eBay's web site, fielding email inquiries regarding listed items, conducting auctions, packing and shipping articles sold online and collecting monies from purchasers. Id. Commissions and fees charged by BidZirk are clearly set forth in the company's customer agreement. See Exhibit 2.

Defendant is a self-styled eBay "guru," and claims to be both a journalist and an intellectual property consultant to "major" corporations,[1] see Exhibit 3, despite the fact that Defendant's education is limited, upon information and belief, to his having obtained a high school graduate equivalent diploma, and includes no post-secondary school education. In March 2005, Defendant consigned a large number of items with BidZirk, which listed the items on eBay and proceeded to auction them. Schmidt ¶ 4. Defendant was ultimately dissatisfied with the price received for certain articles, and with the timing of payments to him following the sale of certain items. Id.

Defendant's response was to proceed to post a four-part diatribe on www.jackwhispers.blogspot.com in which he defamed Schmidt, invaded Schmidt's and Patterson's privacy, and made unauthorized use of BidZirk's trademarks. See Exhibit 3-6. BidZirk demanded in correspondence that Defendant cease his publication of BidZirk's name and logo on the jackwhispers.com web site. See Exhibit 7. Defendant refused. On January 11,

---

[1] Defendant's claim that he consults with "major" corporations on intellectual property issues came during a telephone conversation, which Defendant recorded as an .mp3 file, and which BidZirk will subpoena prior to any hearing on its motion.

2006, Plaintiffs commenced the instant action. <u>See</u> Complaint. On January 27, 2006, following Defendant's rude treatment of counsel during a telephone conference, Defendant was again offered an opportunity to resolve issues in this case, by removing offending material from the jackwhispers.com web site. <u>See</u> Exhibit 8. Defendant again refused, and the infringing material remains posted on the internet for viewing by the public. <u>See</u> Exhibit 9 (copy of www.jackwhispers.blogspot.com for February 10, 2006).

Because Defendant's web site includes unauthorized use of BidZirk's trademarks which results in dilution of those marks, Defendant's publication and posting on the internet of those marks is subject to injunction. Defendant's publication of BidZirk's trademarks results in actual dilution of those marks, through the tarnishing of BidZirk's reputation and the portrayal of BidZirk's trademarks in an unwholesome or unsavory context. For the reasons which follow, BidZirk is entitled to a preliminary injunction, its actual damages and an award of its attorneys' fees.

## **ARGUMENT**

I.    <u>Legal standards.</u>

The Lanham Act, at 15 U.S.C. § 1116(a), provides, in pertinent part:

> The several courts vested with jurisdiction of civil actions arising under this Act shall have the power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under subsection (a), (c), or (d) of [15 U.S.C. § 1125]. Any such injunction may include a provision directing the defendant to file with the court and serve on the plaintiff within thirty days after the service on the defendant of such injunction, or such extended period as the court may direct, a

3

report in writing under oath setting forth in detail the manner and form in which the defendant has complied with the injunction.

The Federal Trademark Dilution Act ("FTDA") is codified at 15 U.S.C. § 1125(c). The FTDA provides, in pertinent part:

> The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection . . . In an action brought under this subsection, the owner of the famous mark shall be entitled only to injunctive relief as set forth in [15 U.S.C. § 1116] unless the person against whom the injunction is sought willfully intended to trade on the owner's reputation or to cause dilution of the famous mark. If such willful intent is proven, the owner of the famous mark shall also be entitled to the remedies set forth in [15 U.S.C. §§ 1117(a) and 1118], subject to the discretion of the court and the principles of equity.

See 15 U.S.C. § 1125(c)(1)-(2). Damages available under 15 U.S.C. § 1117(a) for willful violations of 15 U.S.C. § 1125(c) include (1) the defendant's profits; (2) any damages sustained by the plaintiff, which may be trebled; and (3) costs of the action. In addition, the Court may "in exceptional cases award reasonable attorney fees to the prevailing party." See 15 U.S.C. § 1117(a).[2]

"Dilution" is a defined term within the Lanham Act: it means "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of (1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake or deception." See 15 U.S.C. § 1127. The Supreme Court of the United States has held that the FTDA requires proof of "actual dilution," rather than

---

[2] Under 15 U.S.C. § 1118, the Court may also order confiscation and destruction of infringing goods. This provision is inapplicable under the facts of the instant action.

4

a mere likelihood of dilution.  See Mosely v. V Secret Catalogue, Inc., 537 U.S. 418, 433 (2003), attached as Exhibit 10.  The "actual dilution" requirement is satisfied where a defendant uses a mark identical to the plaintiff's mark, as opposed to a mark that merely approximates the plaintiff's mark.  See 7-Eleven, Inc. v. McEvoy, 300 F. Supp. 2d 352, 357 (D. Md. 2004). Dilution under the FTDA occurs in two possible forms: blurring or tarnishment.  "Blurring" concerns the use or modification of a trademark to identify the defendant's products.  See Starbuck's Corp. v. Wolfe's Borough Coffee, Inc., 2004 U.S. Dist. LEXIS 19239 at *24 (S.D.N.Y. 2004), attached as Exhibit 11.  Dilution through "blurring" is not an issue in this action.

Dilution under the FTDA also may occur through "tarnishment."  In such case "a trademark is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context, with the result that the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods."  See Starbuck's, 2004 U.S. Dist. LEXIS at *25 citing Hormel Foods Corp. v. Jim Henson Prods., Inc., 73 F.3d 497, 507 (2d Cir. 1996), attached as Exhibit 12.  A trademark may also be tarnished if through infringement it ceases to become a "wholesome identifier of plaintiff's product."  See Hormel Foods, 73 F.3d at 507.

The FTDA also expressly provides three defenses to an action for trademark dilution: (1) fair use in comparative advertising; (2) noncommercial use of a mark; and (3) use of a mark in "news reporting and news commentary."  Defendant's jackwhispers.com web site is not involved in comparative advertising.  The Fourth Circuit has held that any connection between the

infringing use of a plaintiff's mark and the offering of goods and services deprives a defendant of the "noncommercial use" defense.   See People for the Ethical Treatment of Animals v. Doughney, 263 F.3d 359, 366 (4th Cir. 2001) ("PETA"), attached as Exhibit 13.  The FTDA does not define "news reporting and news commentary" but, as shown below, Defendant's use of BidZirk's trademarks does not occur in connection with the dissemination of "news reporting or "news commentary," as those terms are used in common parlance.

Defendant's use of BidZirk's trademarks on his jackwhispers.com web site tarnishes and dilutes the marks, and pursuant to 15 U.S.C. § 1116, such dilution should be enjoined.  Further, BidZirk has at least suffered nominal damages as a result of Defendant's unauthorized use of its marks and, as a consequence of Defendant's bad faith infringement, BidZirk should recover its attorneys' fees incurred in obtaining a preliminary injunction.

II.     Defendant's unauthorized use of BidZirk's trademarks constitutes dilution through tarnishment.

Defendant initially published a single depiction of BidZirk's trademarks, identical to the actual mark used by BidZirk.  See Exhibit 3.   After being contacted by counsel, Defendant gratuitously included five additional instances of BidZirk's trademarks on the jackwhispers.com website, including one which essentially thumbed its nose at BidZirk and depicted the trademark for no reason at all.  See Exhibit 4.  Defendant has since maintained the link on his web site to the all published defamatory and infringing materials, including Defendant's unauthorized use of BidZirk's trademarks.  See Exhibit 9.  Defendant should be enjoined from further publication of

or linking to the offending web pages, for the reason that publication of BidZirk's trademarks dilutes and tarnishes the marks.

The Court may grant a preliminary injunction, according to the principles of equity and upon such terms as the Court deems reasonable, under 15 U.S.C. § 1116(a); see also Thrifty Rent-A-Car Sys. v. Thrifty Auto Sales, 849 F. Supp. 1091, 1095 (D.S.C. 1993) (noting authority of court under Lanham Act to enjoin defendant and require defendant to file report regarding compliance with injunction); see also Maitland Co. v. Terra First, Inc., 1994 U.S. Dist. LEXIS 21597 at *6 (D.S.C. 1994) (noting power of court to apply equitable principles in entering injunction), attached as Exhibit 14. In the Fourth Circuit, a "balance of hardships" test is used to analyze a request for preliminary injunctive relief. See Augusta Nat'l, Inc., v. Executive Golf Mgmt., Inc., 996 F. Supp. 492, 496 (D.S.C. 1998) perm. injunction entered, Augusta Nat'l, Inc. v. Executive Golf Mgmt., Inc., 1998 U.S. Dist. LEXIS 11905 at *16-7 (D.S.C. 1998).

Under the "balance of hardships" test, the Court analyzes four factors: (1) the likelihood of irreparable harm to the plaintiff if the injunction is not entered; (2) the likelihood of harm to the defendant if the injunction is entered; (3) the plaintiff's likelihood of success on the merits; and (4) the public interest. See Blackwelder Furn. Co. of Statesville, Inc. v. Seilig Mfg. Co., 550 F.2d 189, 193-6 (4th Cir. 1977), attached as Exhibit 15. Further, the Court may also consider a defendant's bad faith in determining whether consumer confusion exists as a result of trademark infringement. See, e.g., TCPIP Holding Co. v. Haar Communications, 244 F.3d 88, 100 (2d Cir. 2001) (noting non-exclusive list of factors includes infringer's bad faith), attached as Exhibit 16. The "balance of hardships" test's factors are treated below:

A.     Irreparable harm.

Irreparable harm is presumed in cases of trademark infringement.  "[T]he irreparable harm to a plaintiff trademark owner arising from the conduct of an infringer is enormous, immediate, and presumed in law."   Augusta Nat'l, 996 F. Supp. at 496 citing Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc., 43 F.3d 922, 938-9 (4th Cir. 1995) (holding that "irreparable injury regularly follows from trademark infringement"), attached as Exhibit 17. It is well-established that

> If another uses [someone else's trademark], he borrows the owner's reputation, whose quality no longer lies within his own control.  This is an injury, even though the borrower does not tarnish it, or divert any sales by its use . . .

See Pizzeria Uno Corp. v. Temple, 747 F.2d 1522, 1535 (4th Cir. 1984), attached as Exhibit 18, citing Yale Electric Corp. v. Robertson, 26 F.2d 972, 974 (2d Cir. 1928) (Hand, J.), attached as Exhibit 19.  The harm done to a trademark holder by infringement is the loss of the control of quality over products and services that the trademark holder is entitled to maintain.  See Shell Oil Co. v. Commercial Petroleum, Inc., 928 F.2d 104, 107 (4th Cir. 1991), attached as Exhibit 20.  In the instant case, Defendant's use of BidZirk's trademarks (because the infringement occurs, inter alia, in the context of the easily-searchable internet) wrests control of BidZirk's offering of services from its owners, and necessarily harms BidZirk.

B.     Likelihood of harm to the defendant.

In this case, Defendant has not sought to market any product or service that competes with BidZirk; he has appropriated BidZirk's trademarks for the purpose of generating internet traffic to his own web site and to support his site through the sale of third parties' products.

Defendant's infringement is neither innocent, nor accomplished under a mistaken notion that Defendant has been granted a license to use BidZirk's marks. There is no investment made by Defendant that will be lost by the Court's enjoining Defendant's use of BidZirk's marks. The likelihood of harm to Defendant by enjoining his publication of BidZirk's trademarks is small, if not non-existent.

C.      Plaintiff's likelihood of success on the merits.

The FTDA provides that

The owner of a famous mark shall be entitled to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark.

15 U.S.C. § 1125(c)(1); Starbuck's, 2004 U.S. Dist. LEXIS 19239 at *22. Thus, BidZirk demonstrates a likelihood of success on the merits if it satisfies the Court that (1) its mark is "famous" and "distinctive," as those terms are defined under the FTDA; (2) Defendant's use of BidZirk's mark is "commercial" and "in commerce" as those terms are applied to the FTDA, and occurs after BidZirk's mark becomes "famous"; and (3) Defendant's infringement causes dilution of BidZirk's trademark. In addition, BidZirk must demonstrate that no defense available under the FTDA is applicable to Defendant's infringement of BidZirk's trademark. See 15 U.S.C. § 1125(c)(4)(C).

1.      BidZirk's trademark is "famous" and "distinctive," as those terms are defined in the FTDA.

The FTDA suggests an eight-factor test to determine whether a trademark is distinctive and famous. These factors include (a) the degree of inherent or acquired distinctiveness of the

mark; (b) the duration and extent of use of the mark in connection with the goods or services with which the mark is used; (c) the duration and extent of advertising and publicity of the mark; (d) the geographical extent of the trading area in which the mark is used; (e) the channels of trade for the goods and services with which the mark is used; (f) the degree of recognition of the mark in trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought; (g) the nature and extent of use of the same or similar marks by third parties; and (h) the registration status of the mark.  See 15 U.S.C. § 1125(c)(1)(A)-(H).  These factors are each considered below:

(a)     Degree of inherent or acquired distinctiveness.

BidZirk's trademark includes a distinctive green and purple logo, featuring a silhouette of a stylized monkey or chimpanzee, obviously in an excited state.  See Exhibit 21.  In addition, the name BidZirk is a pun, making use of the notion that buyers on eBay must bid on items they wish to purchase (since eBay manages auctions, rather than simple retail sales of products), as well as the notion that customers may become enthralled enough with the process to attain a "berserk" enthusiasm.  BidZirk is aware of no other trademark that approximates its logo, whether in color combination, artwork, wordplay or any combination of these attributes. BidZirk's trademark is unique, and clearly distinctive.  See Schmidt ¶ 6.

(b)     Duration and extent of use in connection with goods and services.

BidZirk began operations in 2005, and its trademarks have only ever been used in connection with the company's offering of eBay auction administration services.

(c)     Duration and extent of advertising and publicity of the mark.

Since its inception, BidZirk has engaged an advertising agency in Greenville, South Carolina to market and publicize its image and services.  During this engagement, the agency has caused BidZirk's trademark to be placed on a number of full-sized billboards in upstate South Carolina; the company has printed thousands of tri-fold brochures and employee business cards, all of which feature the BidZirk trademark; the company has spent approximately 80 hours creating and maintaining an internet web site; and the company operates two physical locations in high-traffic areas in Greenville, both of which feature prominent signage consistent with BidZirk's trademark green-and-purple monkey logo.  See Schmidt ¶ 6.  This campaign has permitted BidZirk's trademark to be widely disseminated and known in the communities targeted for publicity.  In fact, Defendant first approached BidZirk to do business with the company after seeing BidZirk's signage.  See Exhibit 3.

(d)     Geographical extent of the trading area wherein the mark is used.

BidZirk is physically located in upstate South Carolina, and has two locations there. However, BidZirk also operates an internet web site, www.bidzirk.com, which obviously has a world-wide reach.  BidZirk's trademarks are published on its web site for anyone to view.  The fact that BidZirk's corporate name is part of its internet domain extends the company's reach well outside South Carolina.  See, e.g., Pinehurst, Inc. v. Wick, 256 F. Supp. 2d 424, 431-2 (M.D.N.C. 2003) (noting "unique nature of domain names in electronic commerce"), attached as Exhibit 22.

(e)     Channels of trade for the goods and services with which the mark is used.

As indicated, BidZirk operates both in a traditional storefront (or "bricks and mortar") environment, and on the internet.  Locally, BidZirk has two locations in Greenville, South Carolina, and its website is available to anyone in the world with internet access and a computer.

(f)     Degree of recognition of the mark in trading areas and channels of trade used by BidZirk and Defendant.

In this case, there is no confusion regarding whose goods and services are being represented by the mark published on Defendant's web site – Defendant has used BidZirk's actual trademark, not a close approximation.  Defendant does not operate a competing service or, e.g., a company that utilizes an excited monkey in its logo.  Any recognition of BidZirk's mark, which is extensive in the channels of trade utilized by BidZirk, is due to the distinctiveness of the mark itself, and not due to any confusion with any mark owned or used by Defendant, who has simply misappropriated BidZirk's trademark for use on the jackwhispers.com website.

(g)     Nature and extent of the same or similar marks by third parties.

As indicated, BidZirk is aware of no trademarks, service marks or logos that approximate BidZirk's trademark.

(h)     Registration status.

BidZirk recently obtained a Notice of Allowance for registration of its trademark from the United States Patent and Trademark Office.  See Exhibit 23.  BidZirk's trademarks will soon be placed on the PTO's principal register.

In aggregate, analysis of the eight factors suggested by 15 U.S.C. § 1125(c)(1)(A)-(H) militates in favor of a finding that BidZirk's trademark is both distinctive and famous, as those terms are used in the FTDA. There can be no question that BidZirk's trademarks are entitled to protection under the FTDA.

2.      Defendant's infringement of BidZirk's trademarks constitutes a commercial use of the marks, in commerce, occurring at a time after BidZirk's trademarks became famous.

In the Fourth Circuit, there is no practical difference between the Lanham Act's requirement that actionable trademark infringement occur "in connection with the sale … of any goods and services," see 15 U.S.C. § 1114, and the FTDA's requirement that trademark dilution occur in connection with "commercial use in commerce of a mark or trade name." See 15 U.S.C. § 1225(c); Huthwaite, Inc. v. Sunrise Assisted Living, Inc., 261 F. Supp. 2d 502, 516 (E.D. Va. 2003), attached as Exhibit 24. Fourth Circuit law is equally clear that any linkage between Defendant's web site (including BidZirk's infringed trademarks) and an offering of goods and services constitutes commercial use, depriving Defendant of the "noncommercial" use defense. See, e.g., PETA, 263 F.3d at 366 (finding use of mark "in connection with" sale of goods and services where defendant's web site included links to "more than 30 commercial operations offering goods and services"); see also Note, THE PROSECUTION OF CYBERGRIPERS UNDER THE LANHAM ACT, 3 Cardozo Pub. L. Pol'y & Ethics, 269, 297 (2004) (noting that the Fourth Circuit in PETA established a "bright line" rule for commercial activity in connection with dilution claims under the FTDA), attached as Exhibit 25. [3]

_____

[3] Further, to the extent that Defendant argues that First Amendment concerns trump the provisions of the FTDA in restricting his supposed right to dilute BidZirk's trademarks and defame Plaintiffs, BidZirk notes that Defendant's

Defendant's web site, similar to the site operated by the defendant in <u>PETA</u>, includes links to a large number of commercial products available for purchase from third parties, including soda, DVDs, dental appliances, and shampoo. <u>See</u> Exhibit 3-6. These "click-thru" advertisements support and return income to Defendant's web site, a fact which Defendant has published on the internet. <u>See</u> Exhibit 3, p. 24-5. These links conclusively establish the commercial nature of Defendant's web site for FTDA dilution claim purposes. Further, the commercial use of BidZirk's trademarks definitively occurred after those marks became "famous," because the marks became "famous" in 2005, and Defendant's infringement and dilution continues.

3.    <u>Defendant's infringement dilutes BidZirk's trademarks.</u>

The FTDA defines "dilution" as "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of . . . (1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake or deception." <u>See</u> 15 U.S.C. § 1127. Under <u>Mosely</u>, dilution must be actual, rather than merely likely. <u>See</u> <u>Mosely</u>, 537 U.S. at 433. Proof of actual dilution does not require that the consequences of dilution, such as lost sales or diminished profits, must be proved. <u>See</u> <u>Pinehurst</u>, 256 F. Supp. 2d at 431. Actual dilution may be proved through circumstantial evidence. <u>Id.</u> Use of an owner's

---

web site, which unquestionably must be deemed commercial speech under <u>PETA</u>, is not subject to the full panoply of First Amendment protections. <u>See, e.g.</u>, <u>Edge Broadcasting Co. v. United States</u>, 5 F.3d 59, 61 (4th Cir. 1992) ("A lesser degree of First Amendment protection is accorded commercial speech than other constitutionally guaranteed expression"), attached as Exhibit 26. Commercial speech is <u>not</u> protected under the First Amendment if it is misleading, a quality inherent in speech published by Defendant which dilutes BidZirk's trademarks. <u>See</u> <u>Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York</u>, 447 U.S. 557 (1980), attached as Exhibit 27; <u>Burke v. City of Charleston</u>, 893 F. Supp. 589, 608 (D.S.C. 1995).

actual trademark is sufficiently reliable proof of actual dilution.  See, e.g., 7-Eleven, 300 F. Supp. 2d at 357 (noting that the "obvious case" of reliable circumstantial evidence of actual dilution is use of an identical mark by the infringer).  In this case, Defendant has without authorization used BidZirk's actual trademark; accordingly, the "actual dilution" standard of Mosely and the FTDA is satisfied.  Cf. Osem Food Indus., Ltd. v. Sherwood Foods, Inc., 917 F.2d 161, 165 n.8 (finding that intentional copying of trademark satisfies "likelihood of confusion" requirement for infringement action under Lanham Act), attached as Exhibit 28.

Further, the nature of Defendant's infringement generates actual dilution of BidZirk's marks.  Defendant's jackwhispers.com web site is indexed by Google and other sites, including Technorati, a web site that indexes blog sites (Defendant's site is largely a "web log," or "blog" site).  Google, like other major-market internet search engines,[4] ranks search results returned to users, based on a complicated algorithm that attempts to place the most relevant sites near the top of the list, in order to maximize the user's chances of quickly locating the exact internet links and information desired.  A search for the word "BidZirk" on Google generates a list of links to other internet web sites which include references to BidZirk.  In the list of results returned by Google from a search for "BidZirk," Defendant's defamatory publication appears ranked fourth in a list of 608 results.  See Exhibit 29.  Similarly, a search for "BidZirk" on Yahoo generates over 1300 potentially relevant internet links; Defendant's jackwhispers.com publication on BidZirk ranks seventh on this lengthy list.  See Exhibit 30.  The blog-specific search engine Technorati returns

---

[4] The prevalence of Google as an internet search engine cannot be underestimated.  The success of the application of Google's algorithm and web site indexing process produces near-instant search results.  Google's service has attained such wide notoriety and regular use by millions of internet users that the word "google" has actually become a verb in contemporary American English.

a list of six results regarding BidZirk, all of which are references to Defendant's jackwhispers.com web site and its infringing publication on BidZirk. See Exhibit 31. Without doubt, persons utilizing the internet for information on BidZirk will encounter Defendant's jackwhispers.com web site which, given the content of the web site, will necessarily result in dilution of BidZirk's trademarks. Cf. Fairbanks Capital Corp. v. Kenney, 303 F. Supp. 2d 583, 590 (D. Md. 2003) (noting that, due to infringement via the internet, "it is highly likely that large numbers of reasonably alert users . . . using commonly-available search engines, will land on defendant's website instead of [the plaintiff's]" ), attached as Exhibit 32.

The effects of Defendant's infringement of BidZirk's trademarks also issue into the marketplace in an area far larger than South Carolina, where BidZirk's stores are located. See, e.g., Johnson v. Sosebee, 2005 U.S. Dist. LEXIS 38031 at *10 n.1 (D.S.C. 2005) (noting that "[m]any businesses, especially those accessible over the internet, may transcend local boundaries. In such cases, this court agrees that a traditional Dawn Donut [Co. v. Hart's Food Stores, Inc., 267 F.2d 358 (2d Cir. 1959), the seminal case on territorial limitations of trademark protection] analysis would be inappropriate"), attached as Exhibit 33.

Further, the nature of BidZirk's business renders dilution of its trademarks by Defendant particularly widespread, harmful and obnoxious. BidZirk administers auctions through an affiliation with eBay, a web site with over 140 million registered members. See Schmidt ¶ 10. Many potential buyers in the eBay community research product sellers before deciding to do business with them online – eBay provides feedback fora which allow postings by members, and if a seller, e.g., fails to honor its posted price for an item, or misrepresents the quality of a

purchased item, word of that fact is available for others to view online.  Id.  In addition, buyers

considering doing business with BidZirk can locate the company on the internet through Google

or Yahoo, as indicated above.  Such searches would reveal, in addition to links to BidZirk's own

web site, links to Defendant's jackwhispers.com web site, containing the infringing use of

BidZirk's trademarks.  In this manner, Defendant's unauthorized use of BidZirk's trademarks in

effect superimposes Defendant's web site onto a list of search results obtained by potential

customers of BidZirk.  See Exhibit 29-31.  As a result, BidZirk's trademarks (including its

corporate name) become unwholesome or unsavory associations with jackwhispers.com, and its

defamatory and infringing content.  Such is the very essence of "dilution," as that term is defined

in the FTPA.  Defendant's commercial use of BidZirk's trademarks under the circumstances

presented, including BidZirk's unique business model and affiliation with eBay, as well as the

prominent appearance of Defendant's jackwhispers.com web site in ranked search results from

the major internet search engines, Google and Yahoo, makes clear that Defendant's infringement

of BidZirk's trademarks dilutes and tarnishes those marks.

4.     Defendant's infringement is not excused by any statutory defense.

        Under the FTDA, injunctive relief is not available to halt "noncommercial" use of a

mark, nor may a plaintiff obtain an injunction against use of a trademark in "news reporting or

news commentary."  See 15 U.S.C. § 1125(c)(4)(C).  Defendant may attempt to characterize

himself as a journalist, see Exhibit 3-6, but the facts demonstrate that he is no such thing.  The

FTDA does not define "news reporting" or "news commentary," and no reported federal case

includes a holding defining either of these terms.  Defendant's publication of BidZirk's

17

trademarks is in connection not with news reporting or news commentary, but with what has come to be known as "cybergriping." A number of courts have touched on the question of whether a blogger can be considered a journalist, and bloggers have attempted to wrestle with the issue as well. See, e.g., Hudson, BLOGGING from www.firstamendmentcenter.org/speech/internet (November 2005) (noting that "[t]he question of who is a journalist has confounded the public and the press for a long time") (Exhibit 34); Meyer, WHAT IS A JOURNALIST? from www.usatoday.com/news/opinion/2005-03-30-journalists_x.htm (March 30, 2005) (noting proliferation of shield laws protecting disclosure of journalists' sources, and noting that none define status of bloggers) (Exhibit 35); Hempel, ARE BLOGGERS JOURNALISTS? from www.businessweek.com/technology/content/mar2005/tc2005_037_7877_tc024.htm (March 7, 2005) (documenting interaction with well-known blogger who admitted he did not consider himself a journalist) (Exhibit 36); Hiler, ARE BLOGGERS JOURNALISTS? from www.microcontentnews.com/articles/bloggingjournalism.htm (April 11, 2002) (advocating for creation of bloggers' code of ethics to legitimize blogging as trustworthy) (Exhibit 37). None of these authorities has presented any compelling reason why bloggers should be considered journalists. Similarly, courts considering the issue are skeptical that bloggers should be included the definition of "journalist" in the internet age.

Courts in the District of Columbia Circuit have addressed the "who is a journalist?" question without answering it. In Lee v. Department of Justice, the court found that

> [t]he proliferation of communications media in the modern world makes it impossible to construct a reasonable and useful definition of who would be a "reporter" eligible to claim protection from a newly minted common law

privilege.  See In re Miller, 397 F.3d [964, 967 (D.C. Cir. 2005)] (Sentelle, J., concurring) (questioning whether the definition of "reporter" should include "the stereotypical 'blogger' sitting in his pajamas at his personal computer posting on the World Wide Web").  Reporters cannot be readily identified.  They do no have special courses of study of special degrees.  They are not licensed.  They are not subject to any form of organized oversight or discipline.

Lee v. Department of Justice, 401 F. Supp. 2d 123, 2005 U.S. Dist. LEXIS 27929 at *47-8 (D.D.C. November 15, 2005), attached as Exhibit 38.  Several states, including South Carolina, have journalist "shield" laws, which protect reporters from compulsory disclosure of news sources.  See S.C. Code § 19-11-100 (2005).  South Carolina's shield law, however, does not define the terms "journalist" or "reporter."

Employing a functional analysis, as recommended by some commentators and legislators, see, e.g., BLOGGING at 3 (quoting advocates of functional qualitative analysis of blogging), it is clear that Defendant's use of BidZirk's trademarks cannot be considered journalism under any currently-accepted definition.  Defendant, far from presenting an objective view of BidZirk's business, peppers his web site with sarcasm, invective and churlish epithets concerning BidZirk and its owners.  See Exhibit 3-6.  Defendant is no more a journalist than is a graffiti artist – he is bound by no ethical obligations with respect to the truth or fairness of what he publishes, none of his work is peer-reviewed or edited before it is published and the content is not verified accurate prior to publication.  Defendant has simply employed BidZirk's trademarks as a graphic enhancement to what is (aside from any trademark infringement) actionable libel.

In addition, Defendant all but admitted his lack of status as a journalist during his first telephone conversation with counsel, during which he offered to remove published material

concerning BidZirk in return for a payment of $500.  <u>See</u> Exhibit 39.  BidZirk is aware of no journalist entitled to the benefits and privileges of membership in that profession that would offer to "kill" a story in return for a cash payment.  In fact no such journalist exists – to condition withdrawal from publication on payment is the antithesis of a true journalist's occupation, which is to publish the confirmed truth.  Under the facts presented, Defendant cannot claim to be a journalist merely by posting vitriolic missives on the internet in a graphic, magazine-like format, and Defendant is most assuredly not entitled to the benefit of any defense against trademark dilution for "news reporting or news commentary" set forth in the FTDA.  <u>See</u> 15 U.S.C. § 1125(c)(4)(C).

BidZirk has satisfied each requirement to demonstrate a likelihood of success on the merits – that (1) its mark is "famous" and "distinctive," as those terms are defined in the FTDA; (2) Defendant's use of BidZirk's mark is "commercial" and "in commerce" as those terms are applied to the FTDA, and occurs after BidZirk's mark becomes "famous"; and (3) Defendant's infringement causes dilution of BidZirk's trademark.  In addition, no statutory defense to Defendant's dilution of BidZirk's mark is available – Defendant's use of BidZirk's mark is indisputably commercial under existing Fourth Circuit law, and Defendant cannot claim to be a journalist or news reporter under the facts presented in this action.

D.     <u>Public interest.</u>

It is a long-standing and "transcendent" principle that trademark laws exist to protect the public "from deception that results from a defendant's use of a plaintiff's mark."  <u>See</u> <u>Stahly, Inc. v. M.H. Jacobs Co.</u>, 183 F.2d 914, 917 (7th Cir. 1950) <u>cert. denied</u>, 340 U.S. 896 (1950),

attached as Exhibit 40.  Given that BidZirk has demonstrated a likelihood of success on the merits of its claim that its trademarks are infringed by Defendant's publication of them on the jackwhispers.com web site, harm to the public through the continuance of the infringement is apparent.  It is surely in the public's interest to be free from the deceptive and diluting use of BidZirk's marks on Defendant's web site.

III.    Relief requested.

BidZirk has met all standards for issuance of a preliminary injunction under the FTDA.[5] Under the circumstances, the Court has the authority to issue a preliminary injunction to prevent a violation under the FTDA "upon such terms as the court may deem reasonable."  See 15 U.S.C. § 1116.  BidZirk requests that the Court (1) enjoin Defendant from further publication of  or internet linking to BidZirk's trademarks, including its name; (2) require of Defendant that he file a report 30 days after the issuance of the Court's injunction detailing his compliance with the Court's order; and (3) order Defendant to pay at least nominal damages to BidZirk for Defendant's bad faith and willful infringement of its trademarks, and pay to BidZirk its reasonable attorneys' fees incurred in obtaining the preliminary injunction.  See 15 U.S.C. §§ 1117(a), 1125(c)(2); see also Ardex Labs., Inc. v. Cooperider, 319 F. Supp. 2d 507 (E.D. Pa. 2004) (finding defendant's bad faith an "exceptional" circumstance justifying award of attorneys' fees under 15 U.S.C. § 1117), attached as Exhibit 41.

---

[5] In addition to the factors analyzed above, BidZirk notes also that Defendant's bad faith in infringing its trademarks is apparent.  See, e.g., PETA, 263 F.3d at 368 (finding bad faith where the defendant exhibited intent to profit from his infringement).

## CONCLUSION

Based upon the foregoing, BidZirk prays that the Court grant its motion, issue a preliminary injunction against Defendant pursuant to the request set forth herein, and award BidZirk its actual damages and attorneys' fees.

This 13th day of February, 2006.

/s/ Kevin M. Elwell

_____

KEVIN M. ELWELL
USDC Bar No. 9706

K.M. ELWELL, P.C.
111 East North Street
Greenville, South Carolina 29601
(864) 232-8060
(404) 759-2124 e-facsimile
kmelwell@kmelwell.com

Attorneys for Plaintiffs BidZirk, LLC,
Daniel G. Schmidt, III and Jill Patterson

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

BIDZIRK, LLC, DANIEL G. SCHMIDT,　　　)
III, and JILL PATTERSON,　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　Plaintiffs,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　　　)　　　Civil Action No. 6:06-CV-00109-HMH
　　　　　　　　　　　　　　　　　　　)
PHILIP RUSS SMITH,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)　　　CERTIFICATE OF SERVICE
　　　　　Defendant.　　　　　　　　　　)
_____

This is to certify that I have this day served the foregoing MEMORANDUM OF LAW

IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION by hand delivery to:

Mr. Philip Russ Smith
601 Cleveland Street, Apartment 5-C
Greenville, South Carolina 29601

This 13th day of February, 2006.

/s/ Kevin M. Elwell
_____
KEVIN M. ELWELL
USCD Bar No. 9706

K.M. ELWELL, P.C.
111 East North Street
Greenville, South Carolina 29601
(864) 232-8060
(404) 759-2124 e-facsimile
kmelwell@kmelwell.com

Attorneys for Plaintiffs BidZirk, LLC,
Daniel G. Schmidt, III, and Jill Patterson