BidZirk LLC et al v. Smith                                                                    Doc. 6 Att. 13
Get a Document - by Citation - 73 F.3d 497
6:06-cv-00109-HMH    Date Filed 02/13/2006    Entry Number 6-14    Page 1 of 16

*73 F.3d 497, \*; 1996 U.S. App. LEXIS 338, \*\*;*
*37 U.S.P.Q.2D (BNA) 1516*

HORMEL FOODS CORPORATION, Plaintiff-Appellant, v. JIM HENSON PRODUCTIONS, INC. Defendant-Appellee.

Docket No. 95-7977

UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

73 F.3d 497; 1996 U.S. App. LEXIS 338; 37 U.S.P.Q.2D (BNA) 1516

October 31, 1995, Argued
January 4, 1996, Decided

**SUBSEQUENT HISTORY: [\*\*1]** As Amended January 18, 1996.

**PRIOR HISTORY:** Appeal from a judgment of the United States District Court for the Southern District of New York (Wood, J.) denying Hormel Foods Corporation a permanent injunction against Jim Henson Productions, Inc. that would have precluded the use of the character "Spa'am" in Henson's upcoming film and related merchandise as an infringement and/or dilution of Hormel's trademark in the luncheon meat SPAM.

**DISPOSITION:** Affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant sought review of the United States District Court for the Southern District of New York's judgment denying a permanent injunction against appellee in a trademark infringement and trademark dilution action.

**OVERVIEW:** Appellant, a producer of luncheon meat under the trademark name "SPAM," sought a permanent injunction against appellee, alleging trademark infringement and dilution for appellee's intended use of a character named "Spa'am" on merchandise related to appellee's film, "Muppet Treasure Island." Appellant then began merchandising items featuring "SPAM." The court denied appellant's motion for a permanent injunction. The appellate court affirmed. It held that appellee's clear intent to parody appellant's product, public familiarity with appellee's parodies, the strength of appellant's mark, and the superficial similarity of the marks weighed strongly against a likelihood of confusion. Furthermore, the court held that a finding that the marks were not closely proximate was not clearly erroneous and that proximity depended on identification with the primary product. Finally, the court held that there was no dilution of appellant's mark through blurring or tarnishment.

file:///C|/Documents%20and%20Settings/kmelwell.KMELWE...uments/Client%20Files/Schmidt/Smith/hormelopinion.htm (1 of 16)2/10/2006 Dockets.Justia.com

Exhibit 12, p.1

**OUTCOME:** The denial of appellant's motion for a permanent injunction against appellee for trademark infringement and dilution was affirmed since the evidence of appellee's clear intent to parody, appellant's mark strength, and the superficial similarity weighed against a likelihood of confusion. Furthermore, the court held that there was no dilution of appellant's mark.

**CORE TERMS:** merchandise, consumer, parody, likeness, trademark, dilution, luncheon meat, tarnishment, merchandising, blurring, featuring, distinctive, puppet, film, infringement, secondary, movie, sponsorship, widely recognized, similarity, confused, humorous, dilute, junior, wild boar, proximity, joke, pork, buy, food

## LexisNexis(R) Headnotes

Trademark Law > Infringement Actions > Standards of Review > General Overview
Trademark Law > Likelihood of Confusion > Consumer Confusion > General Overview
Trademark Law > Federal Unfair Competition Law > False Designation of Origin > General Overview

**HN1** A plaintiff's trademark is protected by federal law against infringement by use of colorable imitations of the mark which are likely to cause confusion, or to cause mistake, or to deceive. 15 U.S.C.S. § 1114(1). The central inquiry is whether there is a "likelihood of confusion," a likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question, or that there may be confusion as to plaintiff's sponsorship or endorsement of the junior mark.

Trademark Law > Infringement Actions > General Overview
Trademark Law > Likelihood of Confusion > Noncompeting Products > General Overview
Trademark Law > Likelihood of Confusion > Similarity > General Overview

**HN2** Claims for trademark infringement usually are analyzed under the eight factor Polaroid test.

Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review
Civil Procedure > Appeals > Standards of Review > De Novo Review
Trademark Law > Infringement Actions > Standards of Review > General Overview

**HN3** Although an appellate court reviews de novo a district court's comprehensive application of the Polaroid factors, a district court's determinations as to each of the factors are factual in nature. These findings will be disturbed only if clearly erroneous.

Evidence > Witnesses > Credibility & Impeachment
Civil Procedure > Appeals > Standards of Review > Standards Generally
Civil Procedure > Trials > Bench Trials

**HN4** When an appellate court reviews a district court's decision after a bench trial on the merits, an appellate court gives special deference to the determinations of witness credibility.

Trademark Law > Subject Matter > Names > General Overview
Trademark Law > Subject Matter > Strength

file:///C|/Documents%20and%20Settings/kmelwell.KMELWE...uments/Client%20Files/Schmidt/Smith/hormelopinion.htm (2 of 16)2/10/2006 4:31:10 PM

Exhibit 12, p.2

Trademark Law > Likelihood of Confusion > Consumer Confusion > General Overview

**HN5** The more deeply a plaintiff's trademark is embedded in a consumer's mind, the more likely it is that a defendant's mark will conjure up the image of plaintiff's product instead of that of a junior user.

Trademark Law > Likelihood of Confusion > Noncompeting Products > Parodies & Satires
Trademark Law > Subject Matter > Strength
Trademark Law > Likelihood of Confusion > Consumer Confusion > General Overview

**HN6** Where a plaintiff's mark is being used as part of a jest or commentary and both plaintiff's and defendant's marks are strong, well recognized, and clearly associated in a consumers' mind with a particular distinct ethic, confusion is avoided. Indeed, a parody depends on a lack of confusion to make its point. A parody must convey two simultaneous, and contradictory, messages: that it is the original, but also that it is not the original and is instead a parody.

Evidence > Relevance > Relevant Evidence
Trademark Law > Infringement Actions > Standards of Review > General Overview
Trademark Law > Likelihood of Confusion > Similarity > General Overview

**HN7** An inquiry into the degree of similarity between two marks does not end with a comparison of the marks themselves. The setting in which a designation is used affects its appearance and colors the impression conveyed by it. In this connection, placement of a mark next to other identifying, but dissimilar symbols is clearly relevant.

Trademark Law > Likelihood of Confusion > Noncompeting Products > General Overview
Trademark Law > Likelihood of Confusion > Consumer Confusion > General Overview
Trademark Law > Likelihood of Confusion > Similarity > General Overview

**HN8** Bridging the gap refers to a senior user's interest in preserving avenues of expansion and entering into related fields.

Evidence > Relevance > Relevant Evidence
Trademark Law > Likelihood of Confusion > Similarity > Appearance, Meaning & Sound > General Overview
Trademark Law > Federal Unfair Competition Law > False Designation of Origin > General Overview

**HN9** The quality of a junior user's product can be relevant in two ways: (1) an inferior product may cause injury to plaintiff trademark owner because people may think that senior and junior products came from the same source; or (2) products of equal quality may tend to create confusion as to source because of this very similarity.

Trademark Law > Infringement Actions > Remedies > Equitable Relief > General Overview
Trademark Law > Special Marks > Trade Names > Infringement
Trademark Law > Federal Unfair Competition Law > General Overview

**HN10** See N.Y. Gen. Bus. Law § 368-d (1984).

file:///C|/Documents%20and%20Settings/kmelwell.KMELWE...uments/Client%20Files/Schmidt/Smith/hormelopinion.htm (3 of 16)2/10/2006 4:31:10 PM

Exhibit 12, p.3

Trademark Law > Federal Unfair Competition Law > General Overview
Trademark Law > Subject Matter > Names > General Overview
Trademark Law > Likelihood of Confusion > Noncompeting Products > Dilution

**HN11** Dilution is grounded on the idea that a trademark can lose its ability to clearly and unmistakably distinguish one source through unauthorized use. It is a gradual whittling away of a distinctive trademark or name. In order to establish a dilution claim, two elements must be shown: (1) ownership of a distinctive mark, and (2) a likelihood of dilution. A likelihood of dilution can be established by a showing either of blurring or of tarnishment.

Trademark Law > Subject Matter > Distinctiveness > General Overview
Trademark Law > Infringement Actions > Standards of Review > General Overview
Trademark Law > Dilution of Famous Marks > General Overview

**HN12** Dilution by blurring occurs when customers or prospective customers see the plaintiff's mark used on a plethora of different goods and services. Thus, dilution by "blurring" may occur where a defendant uses or modifies a plaintiff's trademark to identify defendant's goods and services, raising the possibility that the mark will lose its ability to serve as a unique identifier of plaintiff's product. This injury to the mark's selling power need not involve any confusion as to source or sponsorship. The unauthorized pullulation itself causes the harm.

Trademark Law > Likelihood of Confusion > Noncompeting Products > Parodies & Satires
Trademark Law > Conveyances > General Overview
Trademark Law > Subject Matter > Names > General Overview

**HN13** In order to establish dilution by blurring, the marks must not only be similar, they must be "very" or "substantially" similar.

Trademark Law > Dilution of Famous Marks > General Overview

**HN14** Dilution may also occur by tarnishment. A trademark may be tarnished when it is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context, with the result that the public will associate the lack of quality or lack of prestige in a defendant's goods with a plaintiff's unrelated goods. The mark may also be tarnished if it loses its ability to serve as a "wholesome identifier" of plaintiff's product. Tarnishment can occur through a variety of uses. Some cases have found that a mark is tarnished when its likeness is placed in the context of sexual activity, obscenity, or illegal activity. However, tarnishment is not limited to seamy conduct.

Trademark Law > Dilution of Famous Marks > General Overview

**HN15** The sine qua non of tarnishment is a finding that plaintiff's mark will suffer negative associations through defendant's use.

Trademark Law > Likelihood of Confusion > Noncompeting Products > Parodies & Satires
Trademark Law > Dilution of Famous Marks > General Overview

file:///C|/Documents%20and%20Settings/kmelwell.KMELWE...uments/Client%20Files/Schmidt/Smith/hormelopinion.htm (4 of 16)2/10/2006 4:31:10 PM

Exhibit 12, p.4

HN16 A court must be careful not to broaden N.Y. Gen. Bus. Law § 368-d (1984) to prohibit all uses of a distinctive mark that an owner prefers not be made.

Governments > Courts > Court Records

HN17 "Dictum" generally refers to an observation that appears in an opinion of a court that is unnecessary to the disposition of the case before it. It is a statement in a judicial opinion that could be deleted without seriously impairing the analytical foundations of the holding.

**COUNSEL:** KEVIN C. JONES, Austin, Minnesota (Wiley, Rein & Fielding, Washington, D.C., Derfner & Mahler, LLP, New York, New York, of counsel), for Plaintiff-Appellant.

CAROL F. SIMKIN, New York, New York (Glenn Mitchell, Rose Auslander, Sara K. Stadler, Weiss Dawid Fross Zelnick & Lehrman, P.C., New York, New York, of counsel), for Defendant-Appellee.

William C. MacLeod, Karen M. Lockwood, Collier, Shannon, Rill & Scott, Washington, D.C., submitted a brief for Grocery Manufacturers of America, amicus curiae.

**JUDGES:** Before: VAN GRAAFEILAND, JACOBS and PARKER, Circuit Judges.

**OPINIONBY:** VAN GRAAFEILAND

**OPINION:**

[*500] VAN GRAAFEILAND, Circuit Judge:

Hormel Foods Corporation appeals from a judgment of the United States District Court for the Southern District of New York (Wood, J.) denying Hormel's [**2] request for a permanent injunction against Jim Henson Productions, Inc. after a full bench trial on the merits. Hormel originally contended that Henson's use of the character "Spa'am" in its upcoming movie and related merchandise would infringe and/or dilute Hormel's trademark in the luncheon meat SPAM, but now limits its argument to the merchandising use. With respect to that use, Hormel argues that the district court erred in finding no infringement and that it misinterpreted New York's anti-dilution statute, N.Y. Gen. Bus. Law § 368-d (McKinney 1984). For the reasons that follow, we affirm.

## BACKGROUND

Since 1937, Hormel has used the trademark name "SPAM" to market its luncheon meat. It is beyond dispute that SPAM is a distinctive, widely recognized mark. Under that name, Hormel has sold over five billion cans of meat in the United States alone and spent millions of dollars to advertise its product.

In February 1996, Henson plans to release the film Muppet Treasure Island which features Henson's widely popular cast of puppets, known collectively as the "Muppets." The film will use some of Henson's most familiar characters, including

file:///C|/Documents%20and%20Settings/kmelwell.KMELWE...uments/Client%20Files/Schmidt/Smith/hormelopinion.htm (5 of 16)2/10/2006 4:31:10 PM

Exhibit 12, p.5

Kermit the Frog, Miss Piggy, and **[\*\*3]** Fozzie Bear. A number of additional characters have been created **[\*501]** for this production, among whom is Spa'am, the subject of this litigation. The similarity between the name "Spa'am" and Hormel's mark is not accidental. In Henson's film, Spa'am is the high priest of a tribe of wild boars that worships Miss Piggy as its Queen Sha Ka La Ka La. Although the name "Spa'am" is mentioned only once in the entire movie, Henson hopes to poke a little fun at Hormel's famous luncheon meat by associating its processed, gelatinous block with a humorously wild beast.

However, the executives at Hormel are not amused. They worry that sales of SPAM will drop off if it is linked with "evil in porcine form." Complaint at P 16. Spa'am, however, is not the boarish Beelzebub that Hormel seems to fear. The district court credited and relied upon the testimony of Anne Devereaux Jordan, an expert in children's literature, to find that Spa'am is a positive figure in the context of the movie as a whole -- even if he is not "classically handsome." Hormel Foods Corp. v. Jim Henson Productions, Inc., 1995 U.S. Dist. LEXIS 13886, \*5, No. 95 Civ. 5473 (S.D.N.Y. Sept. 22, 1995). Indeed, Spa'am is a comic **[\*\*4]** character who "seems childish rather than evil." Id. at \*7. Although he is humorously threatening in his first appearance, he comes to befriend the Muppets and helps them escape from the film's villain, Long John Silver. By film's end, "Spa'am is shown sailing away with the other Muppets as good humor and camaraderie reign." Id. at \*5.

Hormel also expresses concern that even comic association with an unclean "grotesque" boar will call into question the purity and high quality of its meat product. But the district court found no evidence that Spa'am was unhygienic. At worst, he might be described as "untidy." Id. at \*6. Moreover, by now Hormel should be inured to any such ridicule. Although SPAM is in fact made from pork shoulder and ham meat, and the name itself supposedly is a portmanteau word for spiced ham, countless jokes have played off the public's unfounded suspicion that SPAM is a product of less than savory ingredients. For example, in one episode of the television cartoon Duckman, Duckman is shown discovering "the secret ingredient to SPAM" as he looks on at "Murray's Incontinent Camel Farm." In a recent newspaper column it was noted that "In one little **[\*\*5]** can, Spam contains the five major food groups: Snouts. Ears. Feet. Tails. Brains." Mike Thomas, Ready ? Set ? No !, The Orlando Sentinel, June 25, 1995, at 30. In view of the more or less humorous takeoffs such as these, one might think Hormel would welcome the association with a genuine source of pork. Nevertheless, on July 25, 1995, Hormel filed this suit alleging both trademark infringement and dilution.

The district court found that the presence of the character named "Spa'am" in the film constituted neither infringement nor dilution, and Hormel does not contest this conclusion here. Rather, this appeal concerns Henson's proposed use of the Spa'am likeness with and without the name "Spa'am" on movie-related merchandise. Henson plans to support the release of its film with a merchandising program, including licensed products depicting scenes and/or characters from the movie, and already has contracted to place Muppet Treasure Island vignettes on food, candy, and cereal boxes. In addition, Henson has plans to market clothing, books, and a CD-ROM computer game featuring the Muppet Treasure Island motif. Henson has shelved its plans to place the name "Spa'am" on its **[\*\*6]** Muppet Treasure Island merchandise

file:///C|/Documents%20and%20Settings/kmelwell.KMELWE...uments/Client%20Files/Schmidt/Smith/hormelopinion.htm (6 of 16)2/10/2006 4:31:10 PM

Exhibit 12, p.6

pending the outcome of this litigation. However, according to Henson's proposals, submitted below, if it were permitted to go ahead with its plans, the merchandise would carry only the Spa'am likeness or the Spa'am likeness beside the name "Spa'am." The name "Spa'am" would not appear alone. Moreover, any merchandise in which Spa'am appeared would clearly display the words "Muppet Treasure Island." Henson's plans nevertheless concern Hormel, which has begun merchandising items featuring SPAM. These secondary products include clothing, watches, golf balls, and toy cars -some of the same items Henson's licensees would like to issue. In addition, Hormel markets its luncheon meat with a  [*502]  character it calls "SPAM-man," essentially a giant can of SPAM with arms and legs. Hormel is worried that sales of merchandise featuring Spa'am will directly cut into the sales of secondary SPAM items. The district court found, however, that "purchasers of the secondary [SPAM] products are generally consumers of the luncheon meat and associate the secondary products with the luncheon meat." 1995 U.S. Dist. LEXIS 13886, *3.

Moreover, the Muppets are familiar to television and motion [**7]  pictures audiences, and they are "well-known for parodies of brand names, trademarks, television programs, fictional characters, and celebrities." Id. at *4. The district court found that "children who enjoy the Muppets are familiar with the Muppet brand of humor and are unlikely to think that the Muppets are sponsored by the products and celebrities who are the subject of their jokes." Id. at *4. This undoubtedly led to the court's further finding that "consumers of merchandise bearing the likeness and/or name of Spa'am will buy it because they like Spa'am, the Muppets, and/or Muppet Treasure Island -- not because they mistakenly think it is SPAM-related merchandise." Id. at *10.

Hormel points out that some newspaper accounts already have confused the names "SPAM" and "Spa'am." Hormel directed the district court's attention to several news articles which evidenced some confusion concerning the spelling, pronunciation, and use of the two words. However, each of them antedated the initial public showing of Muppet Treasure Island.

DISCUSSION

A. Trademark Infringement

HN1 A plaintiff's trademark is protected by federal law against infringement by use [**8]  of colorable imitations of the mark which are "likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1). The central inquiry is whether there is a "likelihood of confusion," a "likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question," Mushroom Makers, Inc. v. R.G. Barry Corp., 580 F.2d 44, 47 (2d Cir. 1978), cert. denied, 439 U.S. 1116, 59 L. Ed. 2d 75, 99 S. Ct. 1022 (1979), or that there may be confusion as to plaintiff's sponsorship or endorsement of the junior mark. See Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd., 604 F.2d 200, 204-05 (2d Cir. 1979).

In this circuit, HN2 claims for infringement usually are analyzed under the eight-factor Polaroid test. See Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492,

file:///C|/Documents%20and%20Settings/kmelwell.KMELWE...uments/Client%20Files/Schmidt/Smith/hormelopinion.htm (7 of 16)2/10/2006 4:31:10 PM

Exhibit 12, p.7

495 (2d Cir.), cert. denied, 368 U.S. 820, 7 L. Ed. 2d 25, 82 S. Ct. 36 (1961). In the instant case, the district court found that each of the eight factors favored Henson as to both use of the Spa'am likeness alone and use of the Spa'am likeness in conjunction with the name "Spa'am" on its merchandise. Finding no other circumstances tending to create confusion, **[\*\*9]** it concluded that there was no likelihood of confusion and rejected Hormel's claim. <sup>HN3</sup>Although we review de novo the district court's comprehensive application of the Polaroid factors, the district court's determinations as to each of the factors are factual in nature. See, e.g., DC Comics Inc. v. Reel Fantasy, Inc., 696 F.2d 24, 26 (2d Cir. 1982); American Int'l Group, Inc. v. London American Int'l Corp., 664 F.2d 348, 351 (2d Cir. 1981). These findings will be disturbed only if clearly erroneous. Moreover, <sup>HN4</sup>because we are reviewing the district court's decision after a bench trial on the merits, we give special deference to the court's determinations of witness credibility. Anderson v. City of Bessemer City, 470 U.S. 564, 575, 84 L. Ed. 2d 518, 105 S. Ct. 1504 (1985). With the foregoing in mind, we examine each of the Polaroid factors in turn.

## Strength of the Mark

There is little doubt that SPAM is a distinctive, widely recognized trademark. Hormel has sold over five billion cans of its luncheon meat under the SPAM mark and invested millions of dollars in advertising. As a result, Hormel has a 75 percent share of the canned meat market and SPAM is eaten in 30 percent of all American **[\*\*10]** homes. Thus, SPAM truly is a household name. In the **[\*503]** usual trademark case, such an undeniably strong mark would be a factor favoring the trademark plaintiff. <sup>HN5</sup>The more deeply a plaintiff's mark is embedded in the consumer's mind, the more likely it is that the defendant's mark will conjure up the image of the plaintiff's product instead of that of the junior user. See, e.g., McGregor-Doniger Inc. v. Drizzle Inc., 599 F.2d 1126, 1132 (2d Cir. 1979); MGM-Pathe Communications Co. v. Pink Panther Patrol, 774 F. Supp. 869, 874 (S.D.N.Y. 1991).

However, this does not always lead to confusion. As then District Judge Leval explained in Yankee Publishing Inc. v. News America Publishing Inc., 809 F. Supp. 267, 273 (S.D.N.Y. 1992), <sup>HN6</sup>"where the plaintiff's mark is being used as part of a jest or commentary . . . . [and] both plaintiff['s] and defendant's marks are strong, well recognized, and clearly associated in the consumers' mind with a particular distinct ethic . . . confusion is avoided . . . ." Indeed, a parody depends on a lack of confusion to make its point. "A parody must convey two simultaneous--and contradictory--messages: that it is the original, but also that it **[\*\*11]** is not the original and is instead a parody." Cliff Notes, Inc. v. Bantam Doubleday Dell Publishing Group, Inc., 886 F.2d 490, 494 (2d Cir. 1989) (emphasis in original).

Henson's use of the name "Spa'am" is simply another in a long line of Muppet lampoons. Moreover, this Muppet brand of humor is widely recognized and enjoyed. Thus, consumers of Henson's merchandise, all of which will display the words "Muppet Treasure Island," are likely to see the name "Spa'am" as the joke it was intended to be. Unlike the parody of a Michelob beer advertisement at issue in Anheuser-Busch, Inc. v. Balducci Publications, 28 F.3d 769 (8th Cir. 1994), cert. denied, 130 L. Ed. 2d 787, 115 S. Ct. 903 (1995), where the defendant "carefully designed the fictitious ad

file:///C|/Documents%20and%20Settings/kmelwell.KMELWE...uments/Client%20Files/Schmidt/Smith/hormelopinion.htm (8 of 16)2/10/2006 4:31:10 PM

Exhibit 12, p.8

to appear as authentic as possible" and "sought to do far more than 'conjure up' [the original]," id. at 774, Henson's parody is not particularly subtle.

We find, therefore, that the clarity of Henson's parodic intent, the widespread familiarity with Henson's Muppet parodies, and the strength of Hormel's mark, all weigh strongly against the likelihood of confusion as to source or sponsorship between Hormel's mark and the name "Spa'am." **[\*\*12]** Moreover, this reasoning applies to both use of the Spa'am character likeness alone and use of the likeness and name together on Henson's movie merchandise.

## Degree of Similarity Between the Marks

Although Henson's wild boar puppet in no way resembles Hormel's luncheon meat or SPAM-man, Hormel contends that depiction of the puppet alone will conjure up the name "Spa'am," because consumers will associate the name that appears in the movie and media with the figure on Henson's merchandise. Thus, Hormel argues, use of the puppet likeness alone is in essence no different than its use in conjunction with its name. However, even combined use of the name and likeness does not present a strong case of similarity. Viewed alone, of course, the names "Spa'am" and "SPAM" bear more than a passing resemblance. Indeed, Henson's parody depends on the correspondence between the two. However, there are also some significant differences. "Spa'am" is divided in two by an apostrophe and it contains two "a"s instead of one. In addition, Spa'am is pronounced as two distinct syllables, SPAM only one.

Moreover, HN7 "an inquiry into the degree of similarity between two marks does not end with a **[\*\*13]** comparison of the marks themselves . . . . 'the setting in which a designation is used affects its appearance and colors the impression conveyed by it.'" Spring Mills, Inc. v. Ultracashmere House, Ltd., 689 F.2d 1127, 1130 (2d Cir. 1982) (quoting McGregor-Doniger, supra, 599 F.2d at 1133 (quoting the Restatement of Torts § 729, Comment b at 593)). See also Jim Beam Brands Co. v. Beamish & Crawford Ltd., 937 F.2d 729, 735 (2d Cir. 1991), cert. denied, 502 U.S. 1094, 117 L. Ed. 2d 415, 112 S. Ct. 1169 (1992); Vitarroz Corp. v. Borden, Inc., 644 F.2d 960, 968-69 (2d Cir. 1981). In this connection, placement of the marks next to other identifying but dissimilar symbols is clearly relevant. Here, Henson plans to always use the name "Spa'am" next to a likeness of the wild boar **[\*504]** puppet. In addition, the words "Muppet Treasure Island" always will be prominently displayed wherever the name "Spa'am" appears. Thus, the two marks appear in strikingly different contexts and project wholly different visual displays. Moreover, the prominence of Henson's mark, widely recognized as a source of satire, will make it clear that the merchandise itself parodies Hormel's product, a message which depends for its success **[\*\*14]** on distinguishing Spa'am from SPAM. See Cliff Notes, supra, 886 F.2d at 494. Therefore, although the two marks are superficially similar, in all likelihood the parodic context in which the name "Spa'am" appears will distinguish the marks in the consumer's mind.

## Proximity of the Products

Our finding that the marks are dissimilar in practice is buttressed by the fact that

file:///C|/Documents%20and%20Settings/kmelwell.KMELWE...uments/Client%20Files/Schmidt/Smith/hormelopinion.htm (9 of 16)2/10/2006 4:31:10 PM

Exhibit 12, p.9

Henson and Hormel occupy distinct merchandising markets. The district court found that SPAM merchandise and Muppet merchandise featuring Spa'am "clearly . . . derive their associations from a primary product -- luncheon meat, in the case of SPAM, and a Muppet motion picture, in the case of Spa'am." 1995 U.S. Dist. LEXIS 13886, *17. It noted that "purchasers of SPAM merchandise would generally be consumers of the luncheon meat," id., and that "consumers of merchandise bearing the likeness and/or name of Spa'am will buy it because they like Spa'am, the Muppets, and/or Muppet Treasure Island." Id. at *10. Thus, the separation between the markets for luncheon meat and puppet entertainment carries over into the secondary merchandising market.

This finding is not clearly erroneous. Our opinion in Universal [**15] City Studios, Inc. v. Nintendo Co., 746 F.2d 112 (2d Cir. 1984) explains why. In that case, the competing marks "King Kong" and "Donkey Kong" appeared in different primary markets -motion pictures and video games respectively. As to secondary products featuring Donkey Kong, we noted that "since the videogame [Donkey Kong] is by far the dominant source of goodwill for these characters, consumer impressions of these other items are likely to be generated by the videogame, diminishing the possibility that the items will create more confusion among consumers than the videogame itself." Id. at 117 n.7. Likewise, the character Spa'am, even as he appears on merchandise, will be defined almost entirely by his appearance in Muppet Treasure Island. This connection will be strengthened by the presence of the Muppet Treasure Island logo. Thus, it is unlikely that consumers will confuse merchandise featuring Spa'am with similar items displaying the SPAM trademark.

## Bridging the Gap

HN8 Bridging the gap refers to the "senior user's interest in preserving avenues of expansion and entering into related fields." C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc., 753 [**16] F.2d 14, 18 (2d Cir. 1985). Hormel has shown no intention of entering the field of puppet entertainment with its attendant merchandising, see McGregor-Doniger, supra, 599 F.2d at 1135, and there is no evidence that consumers would relate Hormel to such an enterprise. See Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 799 F.2d 867, 874 (2d Cir. 1986). Because market proximity in the instant case depends on identification with the primary product, this factor too favors Henson.

## Actual Confusion

Hormel points to the misspellings and mispronunciations of Spa'am as SPAM in the media as evidence of actual confusion. However, in none of the articles Hormel cites is the source or sponsorship of the two marks confused. Indeed, there is no evidence that consumers, members of the media, or anyone else has mistaken Spa'am as a promotional figure for SPAM, or as a character sponsored by Hormel. Accordingly, the district court found that there was no actual confusion. Although misspellings may demonstrate a possibility of confusion, the vastly different contexts in which the marks at issue herein will appear militate against any possible confusion as to source or [**17] sponsorship.

## [*505] Bad Faith

file:///C|/Documents%20and%20Settings/kmelwell.KMELW...ments/Client%20Files/Schmidt/Smith/hormelopinion.htm (10 of 16)2/10/2006 4:31:10 PM

Exhibit 12, p.10

As noted above, Henson's parody depends on consumer recognition that Spa'am is a Muppet lampoon and not simply a modified version of the SPAM-man. As the court noted in Yankee Publishing, supra, "[Henson] would have absolutely nothing to gain from creating a confusion among [merchandise consumers] causing them to believe there was a business association between [Henson] and [Hormel]." 809 F. Supp. at 275. See also Jordache Enterprises, Inc. v. Hogg Wyld, Ltd., 828 F.2d 1482, 1486 (10th Cir. 1987). Indeed, the lack of subtlety in Henson's parody is evidence in itself that Henson intended no deceit. See Tetley, Inc. v. Topps Chewing Gum, Inc., 556 F. Supp. 785, 791-92 (E.D.N.Y. 1983). There is nothing to indicate that Henson acted in bad faith.

## Quality of the Products

HN9 The quality of a junior user's product can be relevant in two ways: (1) an inferior product may cause injury to the plaintiff trademark owner because people may think that the senior and junior products came from the same source; or (2) products of equal quality may tend to create confusion as to source because of this very similarity. See Nikon **[\*\*18]** Inc. v. Ikon Corp., 987 F.2d 91, 95 (2d Cir. 1993). Henson's Muppets, which now include Spa'am among their members, are high quality products, similar in this respect to Hormel's SPAM. However, similarity of quality as between SPAM and Spa'am is unlikely to cause confusion, because the products are not otherwise related as to makeup, usage, etc.

Yet, although Henson's Muppets present high quality entertainment, Hormel contends that Henson's Spa'am character will call into question the quality of its SPAM luncheon meat. However, Hormel overlooks the district court's findings that Spa'am is a positive character, that he is not unhygienic, and that a simple comic reference to the fact that SPAM is made from pork will not damage its image, especially in view of the lack of adverse effect from the numerous other humorous references to SPAM.

## Consumer Sophistication

The district court found that a child or adult who would be likely to buy merchandise featuring Spa'am would do so "because he likes the Muppets, not because he mistakenly thinks that it is a SPAM [product]." 1995 U.S. Dist. LEXIS 13886, *10. Hormel complains that the district court focused on consumers who want to purchase **[\*\*19]** Spa'am merchandise while overlooking possible confusion on the part of those who would like to buy SPAM products. However, although the district court did not discuss the latter consumers in its sophistication analysis, it found in its discussion of market proximity that consumers who want to purchase SPAM merchandise do so to affiliate themselves with Hormel's primary product and would not be confused by Henson's merchandise, all of which will prominently carry the Muppet Treasure Island mark. This finding is relevant in the sophistication analysis, especially because sophistication and market proximity are closely related concepts. See Vitarroz, supra, 644 F.2d at 967. Therefore, we find no error in the district court's reasoning.

## Likelihood of Confusion

file:///C|/Documents%20and%20Settings/kmelwell.KMELW...ments/Client%20Files/Schmidt/Smith/hormelopinion.htm (11 of 16)2/10/2006 4:31:10 PM

Exhibit 12, p.11

The elements of parody in Henson's Spa'am merchandise distinguish those products from ones manufactured by Hormel. The obvious, though inoffensive, nature of the parody and the prominence of the Muppet Treasure Island mark are strong evidence that consumers are not likely to be confused between merchandise carrying the SPAM logo and products featuring Spa'am. This is true both as to use of the **[\*\*20]** Spa'am likeness and use of the Spa'am name in conjunction with that likeness, as portrayed in Henson's plans submitted to the district court. We therefore conclude that Hormel's infringement claim is without merit.

## B. Trademark Dilution

Hormel asserts error in the district court's conclusion that use of the Spa'am likeness, both with and without the name "Spa'am," will not dilute Hormel's SPAM trademark under New York's anti-dilution statute, N.Y. Gen. Bus. Law § 368-d (McKinney 1984), which provides:

> **[\*506]** HN10 Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

HN11 Dilution is grounded on the idea that a trademark can lose its "ability . . . to clearly and unmistakably distinguish one source" through unauthorized use. 3 McCarthy on Trademarks and Unfair Competition § 24.13[1][a] at 24-106 (3d ed. 1995) (hereinafter "McCarthy"). **[\*\*21]** It is a "gradual whittling away of a firm's distinctive trade-mark or name." Allied Maintenance Corp. v. Allied Mechanical Trades, Inc., 42 N.Y.2d 538, 544, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (1977).

In order to establish a dilution claim, two elements must be shown: (1) ownership of a distinctive mark, and (2) a likelihood of dilution. Sally Gee, Inc. v. Myra Hogan, Inc., 699 F.2d 621, 625 (2d Cir. 1983). It is beyond dispute that SPAM is an extremely strong mark. Thus, this case turns on the question whether there is a likelihood of dilution. Such a likelihood can be established by a showing either of blurring or of tarnishment. Hormel contends that Henson's merchandise will dilute its mark under both theories. We disagree.

### Blurring

HN12 Dilution by blurring occurs when "customers or prospective customers . . . see the plaintiff's mark used on a plethora of different goods and services." 3 McCarthy §

file:///C|/Documents%20and%20Settings/kmelwell.KMELW...ments/Client%20Files/Schmidt/Smith/hormelopinion.htm (12 of 16)2/10/2006 4:31:10 PM

Exhibit 12, p.12

24.13[1][a][i] at 24-106. "Thus, dilution by 'blurring' may occur where the defendant uses or modifies the plaintiff's trademark to identify the defendant's goods and services, raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's **[\*\*22]** product." Deere & Co. v. MTD Prods., Inc., 41 F.3d 39, 43 (2d Cir. 1994) (emphasis in original). This injury to the mark's selling power need not involve any confusion as to source or sponsorship. Sally Gee, supra, 699 F.2d at 624. The unauthorized pullulation itself causes the harm. The legislative history of § 368-d underscores this understanding by giving examples of hypothetical violations: "DuPont shoes, Buick aspirin tablets, Schlitz varnish, Kodak pianos, Bulova gowns, and so forth." 1954 N.Y. Legis. Ann. 49-50.

There is very little likelihood that Henson's parody will weaken the association between the mark SPAM and Hormel's luncheon meat. Instead, like other spoofs, Henson's parody will "'tend[] to increase public identification'" of Hormel's mark with Hormel. See Jordache Enterprises, supra, 828 F.2d at 1490 (quoting Jordache Enterprises, Inc. v. Hogg Wyld, Ltd., 625 F. Supp. 48, 57 (D.N.M. 1985)). Henson's obvious parody is like the "Tetley Flea Bag" stickers Tetley sought to enjoin in Tetley, supra, where "the broad humor . . . employed served to prevent the type of blurring which might result from a more subtle or insidious effort at **[\*\*23]** humor at plaintiff's expense." 556 F. Supp. at 794.

This conclusion is strengthened when we consider that Henson's parody undermines any superficial similarities the marks might share. As we noted above, the name "Spa'am" will always appear next to the character likeness and the words "Muppet Treasure Island." This dissimilarity alone could defeat Hormel's blurring claim, for HN13 in order to establish dilution by blurring, the two marks must not only be similar, they "must be 'very' or 'substantially' similar." Mead Data Central, Inc. v. Toyota Motor Sales, U.S.A., Inc., 875 F.2d 1026, 1029 (2d Cir. 1989). Moreover, Henson is not using the name "Spa'am" as a product brand name. Rather, Spa'am is a character in products branded with Henson's own trademark "Muppet Treasure Island." This tends to dissipate the fear that SPAM will no longer be considered a unique product identifier. Viewed against the backdrop of Henson's transparent parodic intent and the contextual dissimilarity between the two marks, it is clear that use of the name "Spa'am" does not blur Hormel's mark.

 **[\*507]** Tarnishment

HN14 Dilution may also occur by tarnishment. A trademark may be tarnished when it is "linked **[\*\*24]** to products of shoddy quality, or is portrayed in an unwholesome or unsavory context," with the result that "the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods." Deere & Co., supra, 41 F.3d at 43. The mark may also be tarnished if it loses its ability to serve as a "wholesome identifier" of plaintiff's product. Id.

Tarnishment can occur through a variety of uses. Some cases have found that a mark is tarnished when its likeness is placed in the context of sexual activity, obscenity, or illegal activity. See, e.g., Eastman Kodak Co. v. Rakow, 739 F. Supp. 116 (W.D.N.Y. 1989); Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd., 467 F. Supp. 366 (S.D.N.Y.), aff'd, 604 F.2d 200 (2d Cir. 1979); Pillsbury Co. v. Milky Way Productions,

file:///C|/Documents%20and%20Settings/kmelwell.KMELW...ments/Client%20Files/Schmidt/Smith/hormelopinion.htm (13 of 16)2/10/2006 4:31:10 PM

Exhibit 12, p.13

Inc., 8 Media L. Rep. 1016, 215 U.S.P.Q. (BNA) 124 (N.D. Ga. 1981). However, tarnishment is not limited to seamy conduct. See, e.g., Chemical Corp. v. Anheuser-Busch, Inc., 306 F.2d 433 (5th Cir. 1962), cert. denied, 372 U.S. 965, 10 L. Ed. 2d 129, 83 S. Ct. 1089 (1963); Steinway & Sons v. Robert Demars & Friends, 210 U.S.P.Q. (BNA) 954 (C.D. Cal. 1981). Hormel argues that the image of Spa'am, as a "grotesque," **[\*\*25]** "untidy" wild boar will "inspire negative and unsavory associations with SPAM (R) luncheon meat." Both Hormel and Amicus Curiae rely heavily on our recent decision in Deere, supra, for the proposition that products that "poke fun at widely recognized marks of non-competing products, risk diluting the selling power of the mark that is made fun of." 41 F.3d at 44 (citation omitted). Their reliance is misplaced.

In Deere we addressed the question "whether the use of an altered version of a distinctive trademark to identify a competitor's product and achieve a humorous effect can constitute trademark dilution." Id. at 41. MTD produced a television commercial for its competing lawnmower tractor, altering the famous Deere trademark from a proud, majestic deer, to one that was cowardly and afraid. We found that there was no blurring because there was little risk of impairing the identification of Deere's mark with its products. Id. at 44. Noting that tarnishment "is usually found where a distinctive mark is depicted in a context of sexual activity, obscenity, or illegal activity," we held that the "blurring/tarnishment dichotomy does not necessarily represent the full **[\*\*26]** range of uses that can dilute a mark under New York law." Id. at 44. We found a violation of the anti-dilution statute because "alterations of that sort, accomplished for the sole purpose of promoting a competing product . . . risk the possibility that consumers will come to attribute unfavorable characteristics to a mark and ultimately associate the mark with inferior goods and services." Id. at 45. This holding mirrors the rationale of the tarnishment doctrine. Thus, although the court below understood Deere to create a new category of dilution, we find that our decision in Deere is better understood as a recognition of a broad view of tarnishment, where that doctrine had been sometimes narrowly confined.

HN15 The sine qua non of tarnishment is a finding that plaintiff's mark will suffer negative associations through defendant's use. Hormel claims that linking its luncheon meat with a wild boar will adversely color consumers' impressions of SPAM. However, the district court found that Spa'am, a likeable, positive character, will not generate any negative associations. Moreover, contrary to Hormel's contentions, the district court also found no evidence that Spa'am is **[\*\*27]** unhygienic or that his character places Hormel's mark in an unsavory context. Indeed, many of Henson's own plans involve placing the Spa'am likeness on food products. In addition, the court also noted that a simple humorous reference to the fact that SPAM is made from pork is unlikely to tarnish Hormel's mark. Absent any showing that Henson's use will create negative associations with the SPAM mark, there was little likelihood of dilution. See Tetley, supra, 556 F. Supp. at 794.

Moreover, unlike Deere, Henson's merchandise will not be in direct competition with that of Hormel. This is an important, even if not determinative, factor. "Dilution of this sort is more likely to be found when **[\*508]** the alterations are made by a competitor with both an incentive to diminish the favorable attributes of the mark and an ample opportunity to promote its products in ways that make no significant

file:///C|/Documents%20and%20Settings/kmelwell.KMELW...ments/Client%20Files/Schmidt/Smith/hormelopinion.htm (14 of 16)2/10/2006 4:31:10 PM

Exhibit 12, p.14

alteration." Deere, supra, 41 F.3d at 45. Here, Henson does not seek to ridicule SPAM in order to sell more of its competitive products; rather, the parody is part of the product itself. Without Spa'am, the joke is lost. Indeed, we were mindful of this problem in Deere when we noted **[\*\*28]** that "the line-drawing in this area becomes especially difficult when a mark is parodied for the dual purposes of making a satiric comment and selling a somewhat competing product." Id. Thus, in Deere we did not proscribe any parody or humorous depiction of a mark. Overall, we took a cautious approach, stating that *HN16* "we must be careful not to broaden section 368-d to prohibit all uses of a distinctive mark that the owner prefers not be made." Id. at 44.

Therefore, in the instant case, where (1) there is no evidence that Henson's use will cause negative associations, (2) Henson is not a direct competitor, and (3) the parody inheres in the product, we find that there is no likelihood of dilution under a tarnishment theory.

## C. Scope of the Appeal

Although we agree with the substantive conclusions of the district court, we disagree with the district court's footnote statement that, because Henson was delaying its merchandising use of Spa'am pending a favorable decision concerning the purported use, the court's "view" was in effect dictum. 1995 U.S. Dist. LEXIS 13886, *2 n.2. Although neither party raises an appealability issue in this Court, we nonetheless discuss it in order **[\*\*29]** to dispel any question about our ability to review the district court's decision in its entirety.

Hormel brought this suit seeking among other things an injunction against the merchandising use of the Spa'am name. The issues involved in the proposed use were thoroughly litigated, and Hormel's claims were denied. This ruling, and the district court's expressed "view" in support of it, were not dicta. *HN17* "'Dictum' generally refers to an observation which appears in the opinion of a court which was 'unnecessary to the disposition of the case before it'." Burroughs v. Holiday Inn, 621 F. Supp. 351, 353 (W.D.N.Y. 1985) (quoting 1B Moore's Federal Practice, P 0.402[2] at 40 (2d ed. 1984)). It is a "statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding . . . ." Sarnoff v. American Home Products Corp., 798 F.2d 1075, 1084 (7th Cir. 1986). Here, the issue of merchandise use was "before the court . . . ; was argued before the court; and was passed upon by the court." Gillespie v. United States Steel Corp., 321 F.2d 518, 530 (6th Cir. 1963), aff'd, 379 U.S. 148, 13 L. Ed. 2d 199, 85 S. Ct. 308 (1964); see Florida Central R. Co. **[\*\*30]** v. Schutte, 103 U.S. 118, 143, 26 L. Ed. 327 (1880). It was not dictum.

The district court's concern was really the existence vel non of a Case or Controversy; i.e., was the issue of merchandising use ripe for adjudication, or did it involve "nebulous future events so contingent in nature that there [was] no certainty they [would] ever occur." In re Drexel Burnham Lambert Group Inc., 995 F.2d 1138, 1146 (2d Cir. 1993); see Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 297-99, 60 L. Ed. 2d 895, 99 S. Ct. 2301 (1979). In the instant case, Henson awaits only a favorable judicial decision before proceeding with its clearly identified merchandising efforts. We hold that the issue was ripe for determination by the district court and for

file:///C|/Documents%20and%20Settings/kmelwell.KMELW...ments/Client%20Files/Schmidt/Smith/hormelopinion.htm (15 of 16)2/10/2006 4:31:10 PM

Exhibit 12, p.15

review by this Court. See Signorelli v. Evans, 637 F.2d 853, 856-58 (2d Cir. 1980).

We affirm the district court's denial of injunctive relief.

---

    Service: **Get by LEXSEE®**
   Citation: **73 F.3d 497**
      View: Full
Date/Time: Friday, February 10, 2006 - 4:30 PM EST

---

\* Signal Legend:
- 🔴 - Warning: Negative treatment is indicated
- 🟧 - Questioned: Validity questioned by citing refs
- 🔺 - Caution: Possible negative treatment
- 🔷 - Positive treatment is indicated
- 🅐 - Citing Refs. With Analysis Available
- 🅘 - Citation information available

\* Click on any *Shepard's* signal to *Shepardize®* that case.

---



About LexisNexis    |    Terms & Conditions
Copyright ©   2006 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Exhibit 12, p.16