*3 Cardozo Pub. L. Pol'y & Ethics J. 269, ***

Copyright (c) 2004 Cardozo Public Law, Policy & Ethics
Cardozo Public Law, Policy & Ethics Journal

December, 2004

3 Cardozo Pub. L. Pol'y & Ethics J. 269

**LENGTH:** 15502 words

SYMPOSIUM: HEGEL'S LOGIC OF THE CONCEPT: NOTE: THE PROSECUTION OF CYBERGRIPERS UNDER THE LANHAM ACT

**NAME:** Blossom Lefcourt*

**BIO:**
* J.D. candidate Benjamin N. Cardozo School of Law (June 2005). Senior Articles Editor, Cardozo Public Law, Policy, and Ethics Journal. I wish to express my thanks to Professor Barton Beebe, Assistant Professor of Law, Cardozo School of Law, and Professor Susan Crawford, Assistant Professor of Law, Cardozo School of Law, for their thoughtful comments on this note. I also wish to thank the superb staff of the Cardozo Public Law, Policy & Ethics Journal, especially Annie Ulevitch, for their efforts in bringing this note to publication.

**SUMMARY:**
... The modern value of a trademark lies not in the product but in what one commentator calls the "atmospherics" surrounding the mark itself. ... " The appellate court relied on precedent established in Jews for Jesus and Planned Parenthood when ruling that Doughney's unauthorized use of the PETA mark was "in connection with" goods and services because the use could intercept consumer attempts to access the pro-animal PETA's Web site. ... The reasoning followed by the PETA court has resulted in a federal dilution doctrine that presently finds noncommercial the use of the famous Barbie mark in the title of a vacuous "bubblegum" pop song that grossed millions of dollars for a megacorporation, but finds commercial the use of the PETA mark in the domain name of a parody Web site created by an individual person who derived little-to-no profit from the use of the mark. ... How can the use of a mark in the domain name of a Web site operated by an individual political activist be commercial, yet the use of a mark in the title of a pop song produced by a major corporate entity be noncommercial under the FTDA? This juxtaposition illustrates the unsoundness of using the commercial/noncommercial delineation as the controlling factor when determining whether an unauthorized use of a trademark is lawful. ...

**TEXT:**
**[*269]**

Introduction

The modern value of a trademark lies not in the product but in what one commentator calls the "atmospherics" surrounding the mark itself. [1] As the American capitalist system has matured, so has the scope of legal protection afforded owners of marks in exchange for their investment in creating the atmospherics. [2] To illustrate: an early twentieth century court found that dairy products bearing the same trade name - Borden's - but originating from different producers would not create consumer confusion because the goods, ice cream and condensed milk, were not in direct competition. [3] This outcome is hard to imagine under contemporary trademark jurisprudence, which prevents the use of the prefix Mc by entities other than the fast-food chain McDonalds, even by producers not in the restaurant industry, because other uses of those two letters devalues the immense investment the Golden Arches

Exhibit 25, p.1
Dockets.Justia.com

has made to distinguish itself in the marketplace. [4]

**[*270]** Owners of famous marks vigilantly protect the uniqueness of their brand identity by enforcing the federal property rights granted them under the Lanham Act. [5] Claims available to intellectual property owners include consumer confusion and unfair competition under 15 U.S.C. 1114 [6] and 1125(a), [7] and dilution [8] under the Federal Trademark **[*271]** Dilution Act (FTDA), 15 U.S.C. 1125(c). [9] More recent claims of trademark infringement on the Internet may also be filed under the Anti Cybersquatting Protection Act (ACPA) [10] and the Internet Corporation **[*272]** for Assigned Names and Numbers' (ICANN) Uniform Domain Name Dispute Resolution Policy (UDRP). [11]

The ease with which Web sites can be created and accessed presents a particular challenge for mark owners who strive to control the image of their brand. [12] The challenge has been particularly apparent in litigation arising from the unauthorized use of famous marks in Web site domain names; [13] an unauthorized use categorized as either "cybersquatting" or "cybergriping." Both cybersquatter and cybergriper Web sites typically contain the targeted entity's mark in the domain name, but the motivation behind the use of the mark is distinguishable. The intent of a cybersquatter is generally to profit from the unauthorized use of a mark by holding a domain name hostage from the owner of a mark, [14] **[*273]** whereas a cybergriper uses a mark in a domain name to aid in the dissemination of a negative message about the mark owner. [15]

A mark can be incorporated into the domain name of a cybergriper or cybersquatter Web site in two ways: either alongside a pejorative, such as walmartsucks.com and starbucked.com, [16] or simply as a stand-alone name, such as kmart.com. Courts deciding cases in which the unauthorized use of a mark in a domain name includes a pejorative have developed a bright-line rule, which states that such a use is permissible under the Lanham Act because the average consumer would obviously be aware that a company-sponsored Web site would not use a pejorative in its own domain name. [17] Thus no Lanham Act violation occurs because no consumer confusion arises. But what about those unauthorized uses of stand-alone marks? The jurisprudence surrounding litigation of this sort of infringement is much more muddled, especially when the mark in question signifies not the new-age religion of fast-food consumerism promoted by McDonalds but the age-old religion of Christianity promoted by Jews for Jesus. Here is where the synchronous functions of the Internet as a marketplace of ideas and a marketplace of consumerism meet.

In part I of this note, I discuss how courts examine cybergriper Web sites under the traditional likelihood of confusion analysis of 15 U.S.C. 1114 and 1125(a). [18] While courts deciding these cases are generally correct in finding a likelihood of confusion, the analyses are ultimately unsatisfying because the domain names and content of the Web sites are not considered components of one entity. The failure by courts to adopt a real-world approach that views a domain name as one component of a singular entity - a Web site - results in offending free expression concerns. I argue that a better approach would consider domain names analogous to titles of expressive works in traditional media, such as film or print.

In part II, I discuss the analyses used by courts in claims brought against cybergripers under the FTDA. In deciding cybergriper claims brought under the FTDA, courts have conflated two references to commerce **[*274]** contained in the Lanham Act: "use in commerce" for jurisdictional purposes under 1114 (1)(a) and 1125(a) and the "noncommercial use" exception to application of the FTDA under 1125(c)(4)(B). The interchangeable use of two distinct references to commerce has contributed to a perplexing FTDA jurisprudence that holds the unauthorized use of marks by cybergripers commercial and thus unlawful when there is even a de minimus commercial presence on a Web site, but the unauthorized use of marks in plainly commercial ventures such as pop songs, are noncommercial and therefore lawful. I argue that this confounding and inequitable rule can be remedied, and that the legislative intent behind the FTDA can be more fully realized, by abandoning the distinction

Exhibit 25, p.2

between commercial and noncommercial expression in favor of the balancing test endorsed in the Supreme Court's commercial expression doctrine.

I. Claims Brought under Traditional Trademark Infringement

A. Likelihood of Confusion under 1114 and 1125(a)

Mark owners bringing suit against cybergripers typically claim the cybergriper's use of the mark causes consumer confusion under both 1114 and 1125(a). [19] Section 1114 creates a cause of action for owners of registered marks against any person who makes an unauthorized use of the mark in commerce "in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive ... ." [20] Section 1125(a) essentially functions as a federal unfair competition regulation for common law marks. [21] Section 1125(a)(1)(A) protects both registered and unregistered marks against unauthorized "uses in commerce," which are "likely to cause confusion, [*275] or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities ... ." [22]

To prove infringement under both 1114 and 1125(a), a plaintiff must establish: "(1) that Plaintiff possesses the mark; (2) that Defendant uses the Plaintiff's mark; (3) that such use occurs in commerce; (4) in connection with the sale or offering for sale, distribution, or advertising of goods or services; and (5) in a way that is likely to cause confusion among consumers." [23] While 1125(a) has a commercial use requirement, 1114 has no commercial use requirement and applies only to registered marks. [24]

B. The Misapplication of 1114 and 1125(a) to Identical-Name Cybergriper Cases

Most courts deciding cybergriper cases analyze likelihood of confusion under 1114 and 1125(a) simultaneously. In cybergriper cases, the confusion between the first and secondary user arises because of the domain name. For example, the Web site www.porschev8.com may appear to be sponsored by the famous German sports-car manufacturer, but in reality the Web site sponsor is an individual with an avid interest in Porsches. [25] Existing case law indicates that a finding of likelihood of confusion may be predetermined in identical-domain-name cybergriper cases in which the cybergriper has no recognized legal interest in the use of the mark. [26] Indeed, some courts maintain that consumer interests are [*276] best served when the owner of a mark is the only entity allowed to use its mark in a domain name because consumers assume use of a mark in a domain name signifies a property interest in the mark. [27]

1. Planned Parenthood Federation of America v. Bucci [28]

In Planned Parenthood Federation of America v. Bucci, the well-known family-planning-services provider sought a preliminary injunction against an antiabortion activist who maintained the Web site www. plannedparenthood.com. At the time the case was brought, Planned Parenthood maintained its own Web site, www.ppfa.org. [29] Whereas Planned Parenthood's mission is to provide information about abortion counseling and services, the offending Web site bearing the organization's name advanced an antichoice ideology and promoted a book titled The Cost of Abortion. [30] Bucci, the defendant, admittedly chose to use the claimant's mark with the "specific intent to damage Planned Parenthood's reputation and to confuse unwitting users of the Internet" in an effort to spread his ideological message to a broad audience. [31] Indeed, the front page of Bucci's Web site intimated the site was the actual Planned Parenthood Web page. [32] Unsurprisingly, the New York district court found a likelihood of consumer confusion existed regarding the source of Bucci's Web site under 1114 and 1125(a)(1)(A). [33]

Exhibit 25, p.3

**[*277]** In analyzing whether the defendant violated 1114, the court had to decide if "defendant's use of plaintiff's mark is properly viewed as in connection with the distribution or advertising of goods or services." [34] The court found Bucci satisfied this requirement in three ways: Bucci's Web site promoted the sale of the antiabortion book; Bucci's Web site communicated that abortion was morally wrong, which constituted an "informational service"; and defendant's use of the mark would prevent some Internet users from reaching the Planned Parenthood Web site, which would constitute interference "in connection" with the plaintiff's distribution of services.

Bucci claimed an affirmative First Amendment defense in which he conceded his use of the Planned Parenthood mark but argued the use was exempt from prosecution because the domain name was part of a communicative message. [35] The court rejected Bucci's argument, finding that the use of the mark was not part of a communicative message but was instead a purely misleading identification of source. [36] In reaching its decision, the court analyzed the domain name separately from the content of the Web site because the court considered the domain name akin to a product label and thus it could not be part of an underlying expressive communication. [37]

The Planned Parenthood court was guided by the Second Circuit's distinction between use of a protected mark as a "communicative message" or as a source identifier, articulated in Yankee Publishing Incorporated v. News America Publishing Incorporated. [38] In that case, New York magazine was found to have made fair use of the trade dress [39] of The **[*278]** Farmer's Almanac for the cover of New York's annual Christmas shopping guide. New York appropriated the Almanac's trade dress to contrast the Almanac's association with "rusticity, thrift [, and] homespun good sense," with New York's "frivolous, trendy [, and] stylish" image. [40] While a consumer giving only a cursory glance to the special New York edition may have been misled into thinking they were looking at the Almanac, the court found that a look into the pages of New York would dispel any momentary confusion. [41]

The precedent of Yankee Publishing was not followed closely by the district court in Planned Parenthood because the later court failed to examine the offending use of the mark in its entirety. A proper analysis would have considered both the domain name and the content of Bucci's Web site as a whole, just as both the exterior and the interior of New York magazine were examined together. By taking into account just the stand-alone use of the Planned Parenthood mark in the domain name, the Planned Parenthood court was precluded from determining whether the use was in fact part of a communicative message because the domain name was isolated from the expressive content of the underlying Web site. Had the Planned Parenthood court correctly applied the mode of analysis established in Yankee Publishing, Bucci's First Amendment defense may have held because, as the Planned Parenthood court noted, "the First Amendment confers a measure of protection for the unauthorized use of trademarks when that use is a part of the expression of a communicative message." [42] Further, the district court may have determined that, like the cover of the New York Christmas shopping edition, any momentary confusion caused by the name of the defendant's Web site in Planned Parenthood would quickly be dismissed by a glance at the site's content. [43]

The court found Bucci's use of the Planned Parenthood mark also violated 1125(a)(1)(A) because the antiabortion information constituted "services" [44] and Bucci's solicitation of donations to fund his antiabortion activism constituted commercial activity. [45] In finding Bucci's **[*279]** antiabortion political activity was an "informational service" akin to Planned Parenthood's offer of "reproductive services," the district court applied a classic unfair competition analysis to services that are not in commercial competition, unless disparate ideological views are considered in competition with each other in the same sense as rival products in the commercial marketplace. While Planned Parenthood provides a tangible service (abortion and family planning) for a fee, Bucci provided an intangible service

Exhibit 25, p.4

(religious proselytizing) free of charge. In equating competing ideologies with competing market shares, the court allowed trademark law - a regime intended to prevent the public from being misled by deceitful manufacturers of goods [46] - to prevent the public from being misled by a (perhaps) deceitful manufacturer of ideas.

## 2. Jews for Jesus v. Brodsky [47]

Planned Parenthood was followed by another identical-name cybergriper case, Jews for Jesus v. Brodsky. Jews for Jesus is a religious organization that teaches Jesus is the Messiah of Israel and seeks to convert Jews to Christianity. [48] At the time of the suit, Jews for Jesus held an incontestable service mark [49] in the use of "Jews Jesus" and maintained the Web site, www.jews-for-jesus.org. [50] Like the offending Web site in Planned Parenthood, Brodsky's Web site promoted views antithetical to those espoused by the owner of the mark. Jews for Jesus alleged the defendant's Web site, www.jewsforjesus.org, infringed on the Jews for Jesus mark because the domain name was nearly identical. [51]

[*280]  Finding Jews for Jesus was likely to prevail on claims of unfair competition and false designation of origin under 1114 and 1125(a), the federal district court granted a preliminary injunction enjoining Brodsky's use of the domain name www.jewsforjesus.org. [52] The court declared Brodsky's use of the mark was "confusingly similar" to Jews for Jesus's registered service mark because the only difference between the two uses of the phrase "Jews for Jesus" was the omission of the Star of David symbol, which was technically impossible to include in a domain name. [53]

The court placed additional weight on Brodsky's intent to attract persons looking for the official Jews for Jesus Web site to his Web site. Brodsky created his Web site "to intercept potential converts before they have a chance to see the obscene garbage on the real J4J site." [54] Noting that virtually the same conflict arose in Planned Parenthood, the Jews for Jesus court agreed with the earlier case in finding that confusingly similar domain names that may prevent Internet consumers from reaching the mark owner's Web site are in violation of 1125(a). [55] The Jews for Jesus court held that the defendant had met the jurisdictional prerequisite of acting "in connection" with goods or services under 1125(a) because:
[*281]  (1) the defendant hyperlinked [56] to the Web site of Outreach Judaism, an organization critical of Jews for Jesus and one that promotes a competing ideology; and (2) the use of the Jews for Jesus mark was likely to prevent consumers from accessing the plaintiff's Web site. [57]

Having found that Brodsky used the Jews for Jesus mark in commerce in connection with goods or services, the court next considered whether there was likelihood of consumer confusion. The court determined that even though potential consumers of the Jews for Jesus ideology may be Internet savvy, consumers might be unsophisticated in regard to religious doctrine. The possibility that a hypothetical unsophisticated consumer may not be able to discern whether Jews for Jesus espoused Jesus as the Messiah - perhaps an obvious message given the name of the organization - or Brodsky's inapposite view was deemed harmful enough to the branding of Jews for Jesus to factor into the issue of an injunction against Brodsky. [58] Yet, as in Planned Parenthood, any momentary confusion experienced by the hypothetical unsophisticated consumer would have been dispelled once the consumer read the contents of Brodsky's Web site. [59]

Unlike the plaintiff organization in Planned Parenthood which provides tangible services (abortion counseling) the service provided by Jews for Jesus is an intangible service (religious proselytizing). Services under 1114 has been broadly defined to include ideological messages communicated because protecting the purity of source identification allows the consuming public to readily identify the ideology represented by the mark. Courts rationalize protecting the usurpation of ideological marks under the Lanham Act because the public good is served by preventing the perhaps lazy political consumer from being misled by deceptive

Exhibit 25, p.5

advertising. [60] The Second Circuit observed in United We Stand America, [*282] Inc. v. United We Stand America, New York, Inc. [61] that if "different [political] organizations were permitted to employ the same trade name in endorsing candidates, voters would be unable to derive any significance from an endorsement, as they would not know whether the endorsement came from the organization whose objectives they shared or from another organization using the same name." [62] However, as Jews for Jesus suggests, using the Lanham Act to realize this end can also have the adverse affect of preventing consumers from accessing the full marketplace of ideas because oftentimes the easiest way to get a new message across to a broad audience is to target those already consuming an associated message.

3. PETA v. Doughney [63]

In another dispute over the unauthorized identical use of a trademark in a domain name, the animal rights organization People for the Ethical Treatment of Animals (PETA) sued Michael Doughney, operator of the Web site www.peta.org, for Lanham Act violations. At the time PETA brought suit, PETA did not operate a Web site but did hold a registered service mark for "promoting the public awareness of the need to prevent cruelty and mistreatment of animals." [64] In marked contrast to PETA's dogma, Doughney's junior use of the PETA acronym stood for People Eating Tasty Animals, an organization that served as a "resource for those who enjoy eating meat, wearing fur and leather, hunting, and the fruits of scientific research." [65]

Pro-animal PETA was awarded summary judgment by the district court. [66] On appeal to the Fourth Circuit, the appellate court affirmed the lower court's finding that the junior use of the mark was "in connection with goods or services ... in a manner engendering a likelihood of confusion." [67] The appellate court relied on precedent established in Jews for Jesus and Planned Parenthood when ruling that Doughney's unauthorized use of the PETA mark was "in connection with" goods and [*283] services because the use could intercept consumer attempts to access the pro-animal PETA's Web site. [68]

Doughney conceded that the use of the mark as a domain name may create a likelihood of consumer confusion but claimed an affirmative fair use defense because his Web site was a parody of PETA. [69] As defined by the Fourth Circuit, "[a] parody must convey two simultaneous - and contradictory - messages: that it is the original, but also that it is not the original and is instead a parody." [70] The court of appeals held that use of the PETA mark in the domain name of the People Eating Tasty Animals Web site was not a parody because the mark did not appear at the same time as the content of Doughney's Web site; therefore no simultaneous and contradictory message was communicated. [71]

In PETA, the Fourth Circuit employed the same flawed method of analyzing Web sites pioneered in Planned Parenthood and followed in Jews for Jesus in which the name of the domain and the content of a Web site are considered separate components, rather than two elements of a unified message. Thus, in following the earlier courts' unrealistic interpretation of the consumer experience on the Internet, the Fourth Circuit inevitably rejected the defendant's parody defense because, as noted above, the target of a parody cannot be a parody without a communicative message from the parodist. The logic of the PETA decision stands for the proposition that a parodist who chooses to express herself on the Internet may never use the title of her Web site as part of her parodic message - quite a restraint on free expression, indeed.

[*284] Like earlier courts weighing in on the unauthorized use of marks in identical-domain-names, the Fourth Circuit ignored the fact that any momentary consumer confusion when viewing the PETA parody domain name apart from the content of the site would be dispelled the instant a consumer viewed the content and the domain name together. [72]

### 4. Taubman v. Webfeats [73]

In Taubman v. Webfeats, the Sixth Circuit declined to follow the precedent established in Planned Parenthood and its progeny. In Taubman, the defendant Mishkoff, was not a cybergriper, but a Web site designer who created and maintained, he claimed, a "fan [Web] site" that used the mark of a Texas mall called The Shops at Willow Bend. [74] The Web site provided information, such as directions to the mall and the stores one would find there. [75] Taubman, the plaintiff-mall owner, sued for infringement under 1114 and was granted a preliminary injunction at the district court level. [76] At the time the suit was brought, Mishkoff had links on his Web site to a T-shirt business, as well as his own Web-design company. These links were removed before the issuance of the preliminary injunction. [77]

Mishkoff appealed the preliminary injunction, claiming the injunction was a "prior restraint on his First Amendment right of Free Speech" because the Web site was noncommercial and therefore not subject to federal jurisdiction under the Lanham Act. [78] The questions considered on appeal were whether the defendant's Web site was commercial and, if so, was the site also misleading as to source. [79] The court found that because Mishkoff had removed the few commercial links from his Web site before the issuance of the preliminary injunction, the **[*285]** Web site did not meet the ongoing "in connection with the advertising of goods and services" requirement of 1114. [80] However, the court noted that had these links still existed, the requirement would have been satisfied. [81]

In Taubman, the Sixth Circuit diverged from Planned Parenthood and the cases that followed by refusing to hold that an unauthorized use of a protected mark in an identical-domain-name was enough in itself to meet the threshold requirement of use "in connection with the sale or advertising of goods or services" of 1114. [82] The Taubman court further departed from earlier cases in finding that Mishkoff's act of providing information on a Web site did not constitute a service under 1114. [83] The departure may be explained by the court's determination that the information provided on Mishkoff's Web site was a benefit to the mark owner, in contrast to the critical messages on the Web site of the defendant in Planned Parenthood and the cases that followed. The court found Mishkoff provided a benefit to Taubman, the owner of the Willow Bend mark and the Willow Bend mall, because his Web site help consumers find information about the mall, which did not have its own Web site at the time. [84] Thus, at least in the Sixth Circuit, the unauthorized use of a mark in an identical-domain-name is lawful so long as the underlying Web site is friendly to the mark owner.

The series of cases beginning with Planned Parenthood and ending with Taubman conceivably stand for the rule that an unauthorized identical use of a mark in a Web site domain name will be immune from Lanham Act prosecution if the content contained therein promotes the viewpoint of the mark owner. Conversely, the unauthorized identical use of a mark in a domain name of a Web site that contains information disparaging of the viewpoint of the mark holder will be subject to Lanham **[*286]** Act prosecution. Courts deciding whether Internet expression is lawful or unlawful based upon the viewpoint espoused by the speaker raise fundamental free expression concerns.

### C. Domain Names Should Be Read Like the Titles of Expressive Works

Domain names of communicative Web sites, such as those of cybergripers, should be afforded the same First Amendment protection as the titles of other expressive works. Web sites are no less communicative than a book, song, or other category of valued expression. [85] The likelihood of confusion test applied by courts in Planned Parenthood and the cases that followed does not adequately address free expression concerns because the test leaves no room for consideration of a domain name as a title of the underlying expressive content of a Web site. As observed by the Sixth Circuit Court of Appeals, the likelihood of confusion test is inadequate when dealing with expressive works because the test treats artistic titles as though they were "no different from the name of an ordinary commercial product" and

ignores the function of a title as a communicative message. [86]

In the seminal 1989 case Rogers v. Grimaldi, [87] the Second Circuit Court of Appeals fashioned a widely followed test [88] to determine whether "the public interest in avoiding consumer confusion" is outweighed by "the public interest in free expression" in disputes concerning the unauthorized use of a mark in an artistic title. [89] Rogers concerned the film Ginger and Fred, directed by the venerated Italian filmmaker, Federico Fellini. Starring Marcello Mastroianni and Fellini's wife, Guillieta Masina, Ginger and Fred told the story of the reunion of Amelia and Pippo, two performers famous for imitating Fred Astaire and Ginger Rogers. [90] Rogers claimed the film violated her right of celebrity under 1125(a) because the title created a "false impression that [*287] the film was about her or that she sponsored, endorsed, or was otherwise involved in the film ... ." [91]

The appellate court fashioned a two-pronged test under which allegedly misleading titles can be prosecuted under the Lanham Act only if: "the title has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the title explicitly misleads as to the source or the content of the work." [92] The title of an artistic work is not explicitly misleading under the Rogers test if the title relates to the content of the work. [93] Fellini's title was ultimately found to have made fair use of Rogers's name, even though the film had little to do with her. The appellate court found that because "titles with at least minimal artistic relevance to the work may include explicit statements about the content of the work that are seriously misleading," the title was not likely to confuse in a substantial enough manner to warrant an injunction, despite the possibility that a consumer may reasonably think that the film was about or sponsored by the famous dance team. [94]

The application of the Rogers test to Planned Parenthood and the cases that followed would lead to a more equitable application of the Lanham Act because the Rogers test properly regards the title of a work a signifier of the underlying content, rather than a signifier of nothing more than itself. Under the Rogers test, the unauthorized identical use of protected marks as domain names by cybergripers might be found to be lawful because the titles relate to the content of the Web sites and therefore are not explicitly misleading. In Planned Parenthood and the cases that followed, the primary - and in the PETA case, the only - indication that the mark owner might be associated with the offending Web site was simply the title of the domain name; "if this were enough [*288] to satisfy [the explicitly misleading] prong of the Rogers test, Rogers would be rendered a nullity." [95]

Treating domain names like the titles of other expressive works would remedy free expression concerns while protecting the vested rights of trademark owners from unfair competition and source confusion.

II. Claims Brought under 1125(c) (The FTDA)

A. History and Purpose of the FTDA

The Federal Trademark Anti-Dilution Act (FTDA) was amended to the Lanham Act when President Clinton signed the Act into law on January 16, 1996 after virtually no debate by Congress. [96] Codified as 15 U.S.C. 1125(c), the FTDA provides a dilution cause of action for both registered and common law marks. [97] During the swift passage of the FTDA in the Senate, Senator Patrick Leahy stated his "hope [was] that this antidilution statute can help stem the use of deceptive Internet addresses taken by those who are choosing marks that are associated [*289] with the products and reputations of others." [98] While the Lanham Act traditionally functioned for the mutually beneficial purpose of protecting both the consumer and the manufacturer from the harms of deceptive source identification, [99] the FTDA created a new cause of action that benefits the manufacturer's investment in the creation of brand identity without providing any residual benefit to the consumer.

Exhibit 25, p.8

The FTDA protects owners of famous marks from unauthorized junior uses that would dilute the strengths of the marks as source identifiers in the marketplace. The Act provides that:

the owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable,
to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has be-
come famous and causes dilution of the distinctive quality of the mark ... . [100]

The concept of trademark dilution originated in an influential 1927 article written by Frank Schechter, The Rational Basis of Trademark Protection. [101] Schechter described what is now called dilution as the junior use of a trademark that would cause "the gradual whittling away or dispersion of the identity and hold upon the public mind of the mark or name by its use upon non-competing goods." [102] The concept of the "whittling away" of the uniqueness of the mark as an identifier has become **[\*290]** the cornerstone of the dilution doctrine. [103] The FTDA defines dilution as "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of - (1) competition between owner of the famous mark and other parties, or (2) likelihood of confusion, mistake, or deception." [104]

To prove dilution, the senior mark holder must establish: "(1) a sufficient similarity of marks to evoke in consumers a mental association of the two that (2) causes (3) actual harm to the senior marks' economic value as a product-identifying and advertising agent." [105] Some courts hold that the only requirements for a finding of dilution is demonstration that the plaintiff's mark is famous, [106] and that the defendant's use is commercial and in commerce. [107] Further, "because the protection afforded a mark under the FTDA is much broader than that under a likelihood of confusion standard, the class of marks entitled to protection under the FTDA is limited to highly distinctive, famous trademarks which the public recognizes as signifying something unique, singular, or particular." [108]

**[\*291]** Traditionally, a famous mark's distinctiveness can be diluted in two ways: blurring and tarnishment. [109] Although blurring and tarnishment are not mentioned by name in the FTDA, the Committee on the Judiciary stated in a report that the purpose of the Act is "to protect famous trademarks from subsequent uses that blur the distinctiveness of the mark or tarnish or disparage it." [110] Blurring is the injury traditionally understood to occur when a junior use of the mark weakens the mark's ability to serve as a unique source identifier. [111] For example, if a fast-food chain called itself Nike Burger, this would lessen, or blur, the unique identification of the word "Nike" with high-quality athletic shoes and therefore harm the shoe manufacturer's investment in brand creation. [112] Tarnishment occurs "where the effect of the defendant's unauthorized use is to dilute by tarnishing or degrading positive associations of the mark and thereby to dilute the distinctive quality of the mark." [113] When a mark is tarnished, the goodwill of the senior user is negatively associated with the lesser-valued [114] product of the junior user. [115] For example, the goodwill of the toy store Toys "R" Us was found to be tarnished by the pornographic Web site www.adultsrus.com because consumers would associate a famous mark in the children's market with a Web site featuring adult entertainment. [116]

**[\*292]** The legislature in passing the FTDA recognized the tests for dilution and likelihood of confusion require independent analyses, [117] yet courts have sometimes confused dilution with the distinct and traditional claim of infringement by likelihood of confusion. [118] Likelihood of confusion occurs when unrelated marks are perceived to be from the same source, [119] whereas dilution occurs when the consumer unquestionably knows two marks are not related

but nevertheless perceives some sort of association. [120] Dilution of a mark and confusion about the source of a mark cannot exist simultaneously in the mind of the consumer because dilution arises when the consumer associates the junior user with the senior user, whereas confusion arises when the consumer mistakes the junior with actually being the senior user. [121] Therefore, for the senior mark to be diluted, the consumer must be able to identify the senior user as distinct from the junior user.

**[*293]**

B.

1125(c)(4)(B) - The Noncommercial Use Exception to the FTDA

1. History

The FTDA protects a mark owner against another person's unauthorized commercial use of the mark in commerce. [122] The FTDA also provides an exemption from prosecution for unauthorized "noncommercial uses" [123] of the mark. The repetitive language and legislative history of the FTDA suggest the drafters intended there be two distinct references to commercial use in the Act: one that defines use in commerce for jurisdictional purposes, [124] and another that requires a commercial use consistent with Supreme Court's First Amendment jurisprudence. [125]

Like 1114 and 1125, the FTDA requires that an offending mark be used in commerce to bring the Lanham Act into effect for jurisdictional purposes. [126] As in older provisions of the Lanham Act, the "use in commerce" requirement for jurisdictional purposes simply creates a federal cause of action for trademark violations. [127] The second reference to a form of commercial use in the FTDA comes under 1125(c)(4)(B), an exemption that prevents prosecution of an unauthorized, dilutive use of a famous mark when the use is "noncommercial." [128] As Judge Kozinksi of the Ninth Circuit observed, arguing there are not two specific definitions of commercial use under the Lanham Act does not make sense because "if a use has to be commercial in order to be dilutive, then how can it also be noncommercial so as to satisfy the exception of section 1125(c)(4)(B)?" [129]

The Senate committee hearings on the passage of the FTDA explain that the noncommercial use exception was intended to mirror First Amendment commercial expression doctrine. "Section 4(B) of the bill expressly incorporates the concept of 'commercial' speech from the 'commercial speech' doctrine, and proscribes dilution actions that seek **[*294]** to enjoin use of famous marks in 'non-commercial' uses ... ." [130] Senator Orrin Hatch, one of the sponsors of the Act, stated that the noncommercial use exception includes "parody, satire, editorial and other forms of expression that are not part of a commercial transaction." [131]

The Supreme Court defines purely commercial expression as that "which does no more than propose a commercial transaction." [132] Any court would be hard-pressed to hold that the inherently religious and political messages of the Web sites at issue in Jews for Jesus, Planned Parenthood, and PETA did no more than "propose a commercial transaction." [133] No clear demarcation exists between commercial and noncommercial expression. [134] First Amendment doctrine extends constitutional protection to commercial expression that contains a communicative message, even though the underlying expression is for the purpose of making a profit [135] because a communicative message "is not rendered commercial by the impact of the use on sales." [136] Thus, the "difficult question [in applying the 1125(c)(4)(B) exemption] is whether the First Amendment protects expression that includes the use of another's trademark when the expression can be characterized as neither purely commercial, nor purely communicative." [137]

**[*295]**

Exhibit 25, p.10

## 2. Reluctance to Allow the Noncommercial Use Exception in Cybergriper Cases

Despite the subtleties of the commercial speech doctrine, a bright-line rule developed in the cybergriper cases considering the FTDA. In Planned Parenthood the court held that, at least in regard to identical-domain-name cybergriper sites, a de minimus commercial purpose deems the use of the Web site the equivalent of purely commercial expression, and therefore ineligible for the noncommercial use exemption to the FTDA. [138] The court's black-and-white reading of commercial expression neglects the nuanced First Amendment theory of commercial expression developed by the Supreme Court, which holds that intent to profit is not enough to deem expression purely commercial. [139]

The plaintiff organization in Planned Parenthood claimed the offending cybergriper Web site diluted its famous mark. In response, Bucci, the defendant, argued his use of Planned Parenthood's mark was not subject to the FTDA because the use fell under the noncommercial use exception. [140] However, in discussing the FTDA, the Planned Parenthood court did not actually determine whether the mark was entitled to the noncommercial use exception, nor were the two distinct references to commercial use contained under the FTDA addressed. [141] Instead, in finding that Bucci diluted Planned Parenthood's mark, the court considered only whether Bucci's use of the mark was a use in commerce as a jurisdictional prerequisite under 1125(c)(1). [142]

The analysis of the noncommercial use exception to the FTDA by the Planned Parenthood court was flawed by reliance on precedent discussing commercial uses for jurisdictional purposes. As discussed above, a commercial use for jurisdictional purposes is an analysis distinct from **[*296]** a finding of noncommercial use. [143] When discussing commercial use under the FTDA, the court cited pre-FTDA cases in which junior uses of marks by nonprofit organizations were found to be uses in commerce for jurisdictional purposes under 1114 and 1125 of the Lanham Act. [144] Those pre-FTDA cases concerned situations in which the mark of a nonprofit entity was co-opted by a similar nonprofit competing for the same market share. [145] In those cases, the junior user was enjoined from using a mark because there was a likelihood of confusion under 1114 and 1125(a), not because the junior use was commercial under the FTDA. [146]

While the pre-FTDA cases relied on by the court in Planned Parenthood involved fact scenarios similar to those in Planned Parenthood, the earlier cases did not address the then-existing state claims of dilution. [147] Instead, the pre-FTDA cases examined whether the junior use of a mark was commercial for jurisdictional purposes and infringing under the likelihood of confusion standard: separate considerations within the Lanham Act that ultimately have little bearing on what constitutes noncommercial activity under the 1125(c) exception. [148]

In finding Bucci's unauthorized use of the Planned Parenthood mark commercial under the FTDA, the court determined that: "(1) defendant is engaged in the promotion of a book, (2) defendant is, in essence, a non-profit political activist who solicits funds for his activities, and (3) defendant's actions are designed to, and do, harm the plaintiff **[*297]** commercially." [149] The court's finding that Bucci's Internet activity was outside the noncommercial use exception to the Lanham Act simply because the activity garnered some profit simply ignores the intended framework of the FTDA. [150]

Under the standard of Planned Parenthood, which was followed by Jews for Jesus and PETA, all junior uses of marks in identical-name domain names are purely commercial expression because only a de minimus commercial use is necessary to render the use ineligible for the noncommercial use exception. [151] The reading of the FTDA by these courts offends Supreme Court commercial speech doctrine. [152]

Particularly troubling is the failure of the Fourth Circuit to allow the noncommercial use

*Planned Parenthood Fed'n of Am. v. Bucci, 42 USPQ 2d 1430 (S.D.N.Y. 1997)*

*(4th Cir. 2001)*
*263 F. 3d 359*
*The Effect of Reform*
*Doughney*
*v. PETA v. Doughney*
*See also*

exception in the PETA case. The legislative history of the FTDA makes plain that 1125(c)(4) was specifically intended to protect the unauthorized use of a trademark in parodies. [153] As discussed above, [154] courts deciding cybergriper cases have analyzed domain names as distinct from the content of a Web site, which makes parody in a domain name an impossibility. [155] Thus the PETA defendant's parody defense was dismissed because the court refused to consider that Internet consumers view the domain name and content of the Web site simultaneously. [156] The reasoning followed by the PETA court [*298] has resulted in a federal dilution doctrine that presently finds noncommercial the use of the famous Barbie mark in the title of a vacuous "bubblegum" pop song that grossed millions of dollars for a megacorporation, [157] but finds commercial the use of the PETA mark in the domain name of a parody Web site created by an individual person who derived little-to-no profit from the use of the mark.

Because the property owners in Planned Parenthood, Jews for Jesus, and PETA have recourse under the traditional infringement analysis found in 1114 and 1125, courts need not categorize expression with de minimus commercial intentions as, in essence, purely commercial speech entitled to no First Amendment protection.

3. Better Readings of the Noncommercial Use Exception: Mattel v. MCA and Mattel v. Walking Mountain

In the now-famous Ninth Circuit case Mattel v. MCA [158] decided in 2000, Mattel claimed the tongue-in-cheek pop song "Barbie Girl" by the Danish pop group, Aqua, diluted the famous Barbie mark because "it diminished the mark's capacity to identify and distinguish Mattel products." [159] The song lampooned the carefully cultivated image of Barbie with lyrics such as, "Life in plastic, it's fantastic. You can brush my hair, undress me everywhere." [160] The Ninth Circuit agreed with Mattel, finding the Aqua song dilutive because it blurred the delineation between the senior and junior uses of the mark. [161] Nevertheless, the court decided that Aqua's use of the Barbie mark in both the title and lyrics of the song was entitled to the noncommercial use exception under 1125(c)(4)(B) because the "commercial purpose was inextricably entwined with [the] expressive elements." [162] The court reasoned the song was entitled to the noncommercial use exception because only [*299] purely commercial expression is subject to prosecution under the FTDA. [163] To hold otherwise, the court observed, would offend the legislative intent that the noncommercial use exception to the FTDA conform to the commercial speech doctrine. [164]

The opinion of the Mattel court that the FTDA applies only to purely commercial speech was followed in the subsequent Ninth Circuit case Mattel v. Walking Mountain, [165] which also involved an appropriation of Barbie. At issue in Walking Mountain was an artist's use of the doll in a series of photographs entitled "Food Chain Barbie," which portrayed Barbie in scenarios involving sex, food, and destruction. [166] One typical image, "Heatwave," depicted an unclothed Barbie roasting on a "spit" inside a toaster oven. [167] Mattel claimed the artist's use of the Barbie mark in the titles of the work constituted dilution under the FTDA. [168] In his defense, the artist maintained that his purpose in using Barbie was to create a parody critical of the feminine ideals Barbie represents. Thus, the defendant argued, the use was not subject to the FTDA. [169] The Walking Mountain court seemed to concede that the use of the doll in this fashion constituted dilution of the Barbie mark. However, the court followed Mattel in finding that even though the secondary use may cause dilution, "Food Chain Barbie" was a work of noncommercial expression not subject to the FTDA because the FTDA applies only to "purely commercial speech." [170]

The method of analyzing titles of expressive works employed by the courts in Mattel and Walking Mountain comports with the Supreme Court commercial expression doctrine, and thereby the legislative intent of the FTDA. The Ninth Circuit recognizes that commercial expression can contain - and often does contain - expressive elements. Because the uses of Barbie in Mattel and Walking Mountain contained expressive [*300] communication, the

Exhibit 25, p.12

dissemination of which was in the public interest, the uses of the mark were not purely commercial. Thus, the unauthorized uses were entitled to the noncommercial use exception to the FTDA.

4. Solution: The Noncommercial Use Exception Should be Eradicated

The reading of the noncommercial use exception in Mattel and Walking Mountain is in direct conflict with the Planned Parenthood standard, which held that even a de minimus commercial element on the Web site brought the use of the mark outside the noncommercial use exception. [171] How can the use of a mark in the domain name of a Web site operated by an individual political activist be commercial, [172] yet the use of a mark in the title of a pop song produced by a major corporate entity [173] be noncommercial under the FTDA? [174] This juxtaposition illustrates the unsoundness of using the commercial/noncommercial delineation as the controlling factor when determining whether an unauthorized use of a trademark is lawful. Indeed, the Supreme Court, in their well-developed doctrine of the fair use defense to copyright infringement, has already acknowledged the minimal value of the commercial/noncommercial distinction because nearly all speech has both commercial and noncommercial elements. [175]

The noncommercial use exception to the FTDA should be abandoned in favor of the test fashioned by the Supreme Court in Central Hudson Gas v. Public Service Commission of New York. [176] The Central Hudson test is applied to determine whether commercial expression can be suppressed by governmental regulation. Instead of considering the false construct of commercial and noncommercial expression, the Central Hudson test balances the legitimate competing interests of the parties. The competing interests in disputes over the unauthorized use of marks in identical domain names are the same as those recognized by the legislature when passing the FTDA: that of the property owner who **[\*301]** has federal rights in the control of the mark and that of the public who has the right to appropriate the mark for expressive and other uses. [177] Because the legislature intended the noncommercial use exception to the FTDA to adhere to the commercial expression doctrine, [178] courts should simply consider the question within the framework set forth by the Supreme Court.

In Central Hudson, decided in 1980, the Court established a four-part analysis to determine whether government interest in suppressing commercial expression is outweighed by the public interest in receiving the communication:

At the outset, [the court] must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest. [179]

While all four prongs of the Central Hudson test would be important to determining whether dilution of a famous mark was permissible under the Lanham Act, the answer should hinge on the first prong: whether the use is for "lawful activity" and whether the use is "misleading." Thus, adopting the Central Hudson test would incorporate into the FTDA an aspect of trademark protection that historically has been the most important: ensuring the consumer is not misled by false designation of source. The application of the commercial speech test would thus actually balance the three competing interests in the dilution doctrine: the interest of the mark owner, the interest of the unauthorized user of the mark, and the public's interest in not being misled by false source designation.

Exhibit 25, p.13

## III. Conclusion

The mechanical reading of Internet domain names by courts deciding cybergriper cases has resulted in unsound holdings under the Lanham Act likelihood of confusion analysis. These results quixotically **[\*302]** consider a domain name to be standing alone in cyberspace, rather than signifying the underlying content of a Web site. The reading of domain names in this manner puts Internet authors at a distinct disadvantage when compared with authors publishing in traditional media because courts typically analyze an allegedly infringing title of a book or film in context of the relation of the title to the underlying content. Judicial prejudice against Internet authors could be remedied by a straight-thinking approach that properly regards a domain name as a title of an expressive work, a Web site. In considering a domain name to be isolated from the content of a Web site, courts will never see the domain name through the eyes of the consumer - whose interest is supposedly being protected by the Lanham Act - because the consumer normally views the domain name and content of the Web site together.

Internet authors are further discriminated against by the judge-made rule that has emerged under the FTDA that holds the unauthorized use of a mark in a domain name is commercial and thus infringing when used as the title of a Web site, but a comparable use of a mark in a song or film title is noncommercial and thus permissible. [180] This illogical incongruity could be remedied if courts deciding cybergriper cases abandoned the commercial/noncommercial expression dichotomy of the FTDA in favor of the Supreme Court's commercial speech doctrine. Analyzing the noncommercial use exception to the FTDA under the commercial speech doctrine would serve the public interest by allowing unauthorized uses of trademarks in expressive communication, while simultaneously barring unauthorized uses of trademarks that are truly misleading; goals that may be impossible under current FTDA jurisprudence.

The government has traditionally regulated trademark rights because preserving the unique identity of marks serves the public interest **[\*303]** in preventing consumer confusion in the marketplace. [181] The public interest rationale for trademark regulation does not support the use of the Lanham Act to thwart noncommercial uses of marks appropriated for political or religious expression on the Internet that may result in slight and ultimately insignificant consumer confusion. Only when courts begin to make more rational decisions will Internet authors be guaranteed the same free expression rights as authors in traditional media. And only then will the public interest in the Internet be truly protected by the Lanham Act.

## FOOTNOTES:

n1. See Jessica Litman, Breakfast with Batman: The Public Interest in the Advertising Age, 108 Yale L.J. 1717, 1728 (1999) ("Consumers have come to attach enormous value to trade symbols, and it is no longer uncommon to see the symbols valued far in excess of the worth of the underlying products they identify. In a very real sense, trade symbols are themselves often products ... ."). Commentator J. Thomas McCarthy calls this same phenomenon the "psychic load." 1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition 2:37 (4th ed. 1997).

n2. See Mark A. Lemley, The Modern Lanham Act and the Death of Common Sense, 108 Yale L.J. 1687, 1688 (1999).

n3. Borden Ice Cream Co. v. Borden's Condensed Milk Co., 201 F. 510 (7th Cir. 1912).

Exhibit 25, p.14

⚐n4. See, e.g., Quality Inns Int'l v. McDonald's Corp., 695 F.Supp. 198 (D. Md. 1988) (enjoining the use of "McSleep" for a chain of economy hotels because it infringed on McDonald's exclusive right to use the prefix "Mc" with a generic word). But see Rochelle Cooper Dreyfuss, Expressive Genericity: Trademarks as Language in the Pepsi Generation, 65 Notre Dame L. Rev. 397, 398 (1990) (observing that traditional trademark law does not "account for ... McDonald's claim to control non-food uses of the prefix 'Mc'... .").

⚐n5. A revision of the Trademark Act of 1905, the Lanham Trademark Act was signed into law by President Truman on July 5, 1946, and took effect on July 5, 1947:

The purpose of [the Lanham Act] is to place all matters relating to trade-marks in one statute and to eliminate judicial obscurity, to simplify registration and to make it stronger and more liberal, to dispense with mere technical prohibitions and arbitrary provisions, to make procedure simple, and relief against infringement prompt and effective.

S. Res. 1333, 79th Cong. (1946). McCarthy notes that in approving the Lanham Act, Congress had for the first time "passed a law creating substantive, as well as procedural, rights in trademarks and unfair competition." 1 McCarthy, supra note 1, 5:4.

⚐n6. 15 U.S.C. 1114 Remedies; infringement; innocent infringement by printers and publishers

(1) Any person who shall, without the consent of the registrant -

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive, ... .

15 U.S.C. 1114 (2004).

⚐n7. 1125 False designations of origin, false descriptions and dilution forbidden

Exhibit 25, p.15

1125(a)(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which -

1125(a)(1)(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or, 15 U.S.C. 1125(a)(1)(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services or commercial activities by another person.

15 U.S.C. 1125 (2004).

⚓n8. Dilution is the "lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of -

(1) competition between the owner of the famous mark and other parties, or

(2) likelihood of confusion, mistake, or deception." 15 U.S.C. 1127 (2004).

⚓n9. 15 U.S.C. 1125(c) Remedies for dilution of famous marks.

(1) The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection. In determining whether a mark is distinctive and famous, a court may consider factors such as, but not limited to -

(A) the degree of inherent or acquired distinctiveness of the mark;

(B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used;

(C) the duration and extent of advertising and publicity of the mark;

(D) the geographical extent of the trading area in which the mark is used;

(E) the channels of trade for the goods or services with which the mark is used;

(F) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought;

(G) the nature and extent of use of the same or similar marks by third parties; and

(H) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

(2) In an action brought under this subsection, the owner of the famous mark shall be entitled only to injunctive relief as set forth in Section 1116 of this title unless the person against whom the injunction is sought willfully intended to trade on the owner's reputation or to cause dilution of the famous mark. If such willful intent is proven, the owner of the famous mark shall also be entitled to the remedies set forth in sections 1117(a) and 1118, subject to the discretion of the court and the principles of equity.

(3) The ownership by a person of a valid registration under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register shall be a complete bar to an action against that person, with respect to that mark, that is brought by another person under the common law or a statute of a State and that seeks to prevent dilution of the distinctiveness of a mark, label, or form of advertisement.

(4) The following shall not be actionable under this section:

(A) Fair use of a famous mark by another person in comparative commercial advertising or promotion to identify the competing goods or services of the owner of the famous mark.

(B) Noncommercial use of a mark.

(C) All forms of news reporting and **news commentary.**

15 U.S.C. 1125(c) (2004).

☫n10. 15 U.S.C. 1125(d)(1)(A) Cyberpiracy prevention.

A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person (i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and (ii) registers, traffics in, or uses a domain name that - (I) in the case of a mark that is distinctive at the time of the registration of the domain name, is identical or confusingly similar to the mark; (II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar or dilutive of that mark; or (III) is a trademark, word, or name protected by reason of section 706 of Title 18 section 220506 of Title 36.

15 U.S.C. 1125(d) (2004).

☫n11. Implemented by ICANN in 1999, the UDRP enables the owner of a trademark to prevent the subsequent registration of a domain name if the mark owner can prove:

Exhibit 25, p.17

(i) [the registrant's] domain name is identical or confusingly similar to a trademark or service mark in which the complainant has rights; and (ii) [the registrant has] no rights or legitimate interests in respect of the domain name; and (iii) [the registrant's] domain name has been registered and is being used in bad faith.

Uniform Domain Name Dispute Resolution Policy, para. 4(a) ICANN (Oct. 24, 1999), available at http://www.icann.org/udrp/udrp-policy-24oct99.htm. Registrants of second-level domain names in generic top-level domains (such as .com, .net, .info, or .biz) must, as a precondition to domain name registration, agree to adhere to the terms of the UDRP. Id. at para 1. See also Cyberlaw 328 (Patricia Bellia, et al. eds., 2003).

⚓n12. See Trademark Law and The Internet 142 (Lisa E. Cristal & Neal S. Greenfield eds., 2nd ed., 2001) ("With the Internet, problems can multiply rapidly, given the sheer number of people using it. The difficulty of stopping on-line infringement, misuse, or dilution, is further compounded because the source of the infringement may be in a remote jurisdiction.").

⚓n13. A domain name is "[a] series of alphanumeric strings separated by periods, such as www. hmco.com, that is an address of a computer network connection and that identifies the owner of the address." American Heritage Dictionary of the English Language (4th ed. 2002).

⚓n14. "Cybersquatting involves the registration as domain names of well-known trademarks by non-trademark holders who then try to sell the names back to the trademark owners." Sporty's Farm, L.L.C. v. Sportsman's Market, Inc., 202 F.3d 489, 493 (2d Cir. 2000). See, e.g., Intermatic, Inc. v. Toeppen, 947 F.Supp. 1227 (N.D. Ill. 1996) (finding that the defendant's intent to sell the domain name intermatic.com to plaintiff constituted a commercial use of the domain name). But see 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition 24:69.1 (4th ed. 1997) (noting that since the advent of the ACPA, cybersquatting claims brought under trademark law may be obsolete). For an interesting discussion of the history of cybersquatting on the Internet see Jonathan Bands & Matthew Schuers, Toward a Brightline Approach to (Trademark)sucks.com, 20 Computer and Internet Lawyer 1 (2003).

⚓n15. See Thomas E. Anderson, Emerging Intellectual Property Issues in Cyberspace, 78 Mich. B. J. 1260, 1263 (1999).

⚓n16. Both Web sites were last viewed Jan. 24, 2004.

⚓n17. See, e.g., Bally v. Faber, 29 F.Supp. 2d 1161 (C.D. CA 1998); Ford Motor Co. v. 2600 Enters., 177 F.Supp. 2d 661 (E.D. Mich. 2001). See also Bands & Schuers, supra note 14.

⌘n18. The Lanham Act is codified at 15 U.S.C. (2004). This note will refer to sections of the Lanham Act by the U.S.C. designation, rather than the corresponding sections of the Act.

⌘n19. The opinions in the cybergriper cases discussed in this note did not formally address initial interest confusion, so the doctrine is accordingly not addressed at length herein. Initial interest confusion occurs when a mark is appropriated by an unauthorized secondary user in a manner that diverts consumers from seeking the primary source of the mark. See 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition 23:6 (4th ed. 1997). See, e.g., Brookfield Communications, Inc. v. West Coast Corp., 174 F.3d 1036 (9th Cir. 1999) (finding the use of the phrase "moviebuff" in the metatags of the Web site of a brick-and-mortar video store caused initial interest confusion among consumers seeking the trademarked Web site moviebuff.com).

⌘n20. 15 U.S.C. 1114(1)(a) (2004).

⌘n21. Coach Leatherware Co., Inc. v. Ann Taylor, Inc., 933 F.2d 162, 168 (2d Cir. 1991).

⌘n22. 15 U.S.C. 1125(a)(1)(A) (2004).

⌘n23. PETA v. Doughney, 113 F.Supp. 2d 915, 919 (E.D. Va. 2002).

⌘n24. 4 McCarthy, supra note 14, 25:76.

⌘n25. See http://www.porschev8.com/ (last visited Jan. 24, 2004). See details of the Web site owner's legal battles with the auto manufacturer at http://www.porschev8.com/battle.html. (both last visited Jan. 24, 2004).

⌘n26. But see 4 McCarthy, supra note 14, 25:76 n.20. Some courts examining identical-domain-name suits not involving complaint Web sites have found initial interest confusion on the Internet insufficient to meet the standards of trademark doctrine because the confusion is fleeting and actually eradicated when the consumer reads the content of the Web site. See, e.g., Hasbro, Inc. v. Clue Computing, Inc., 66 F. Supp. 2d 117, 124 (D. Mass 1999) (finding the junior use of clue.com for computing services does not infringe on the registered mark "Clue" for a board game because while "one, two or three people over four years may have expressed confusion between [the two users of the mark, that] does not constitute the level of actual confusion necessary to support a general finding of likelihood of confusion."). These cases, however, have concerned offending uses in which the user has an already-recognized property interest in the trade name.

⯅n27. See, e.g., Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc., 202 F.3d 489 (2d Cir. Conn. 2000).

For consumers to buy things or gather information on the Internet, they need an easy way to find particular companies or brand names. The most common method of locating an unknown domain name is simply to type in the company name or logo with suffix.com. ... A search engine will find all web pages on the Internet with a particular word or phrase. Given the current state of search engine technology, that search will often produce a list of hundreds of web sites through which the user must sort in order to find what he or she is looking for. As a result, companies strongly prefer that their domain name be comprised of the company or brand trademark and the suffix.com.

Id. at 493.

⯅n28. Planned Parenthood v. Bucci, 1997 WL 133313 (S.D.N.Y. Mar. 24, 1997), aff'd, 1998 WL 336163 (2d Cir. Feb. 9, 1998).

⯅n29. Id. at 1.

⯅n30. Id. at 1-2.

⯅n31. Id. at 2.

⯅n32. Id. at 1. "By using the mark as a domain name and home page address and by welcoming Internet users to [the homepage of Planned Parenthood], defendant identifies the web site and home page as being the product, or forum, of plaintiff." Id. at 10.

⯅n33. Id. at 7. The court applied the Second Circuit "Polaroid" factors in determining whether there was a likelihood of confusion. Polaroid Corp. v. Polaroid Elecs. Corp., 287 F.2d 492, 495 (2d Cir. 1961) (The factors include, but are not limited to: (1) the strength of the plaintiff's mark; (2) the degree of similarity between the two marks; (3) the competitive proximity of the products or services; (4) the likelihood that the plaintiff will bridge the gap between the two markets; (5) the existence of actual confusion; (6) the defendant's good faith in adopting the mark; (7) the quality of the defendant's product; and (8) the sophistication of the purchasers). Id. Judge Wood found it unnecessary to resolve whether Bucci engaged in "commercial advertising or promotion under 1125(a)(1)(B) because Bucci's activity fell under 1125(a)(1)(A). Id. Judge Wood did, however, take notice of the conflicting interpretation of

Exhibit 25, p.20

commercial activity in the courts. Id.

n34. Planned Parenthood, 1997 WL 133313, at 4.

n35. Id. at 11.

n36. Id. at 10.

n37. Id. at 11. The fault in this analysis is demonstrated infra pp. 278-79.

n38. 809 F. Supp. 267 (S.D.N.Y. 1992).

n39. Trade dress is a type of trademark that protects the "total look of a product and its packaging and even includes the design and shape of the product itself." 1 McCarthy, supra note 1, 8:4.

n40. Yankee Publishing, 809 F.Supp. at 271.

n41. Id. at 273. ("Even if the first glance at the cover were to cause momentary confusion, a further look into the magazine would dispel it.") Id.

n42. Id. at 275.

n43. See authorities discussed supra note 26.

n44. Planned Parenthood, 1997 WL 133313, at 6.

n45. In a unique reading of the Lanham Act, the court stated that the noncommercial use exception to the FTDA 1125(c)(4)(B), discussed in detail infra pp. 293-94, also applies to 1125(a)(1)(A). Id. at 7. This author found no case law or commentary to support the court's interpretation of 1125(c)(4)(B) as a "long arm" provision.

✦n46. See discussion supra p. 269.

✦n47. 993 F. Supp. 282 (D. N.J. 1998).

✦n48. Id. at 288. See also http://www.jewsforjesus.org (last viewed Mar. 27, 2004).

✦n49. A service mark is:

any word, name, symbol, or device, or any combination thereof - (1) used by a person, or (2) which a person has a bona fide intention to use in commerce and applies to register on the principal register established by this chapter, to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if that source is unknown.

15 U.S.C. 1127 (2004).

✦n50. Jews for Jesus, 993 F. Supp at 290. The defendant had previously registered a service mark for jews-for-jesus.com but had cancelled the registration by the time the case was brought. Id. at 287 n.4.

✦n51. Courts typically compare only the second-level domain name in analyzing likelihood of confusion. 4 McCarthy, supra note 14, 25:76.

✦n52. In considering the likelihood of confusion between Brodsky's use and Jews for Jesus's use of the trade name, the court employed the "Scott Factors." Jews for Jesus, 993 F. Supp. at 301. See Scott Paper Co. v. Scott's Liquid Gold, Inc., 589 F.2d 1225, 1229 (3d Cir. 1978). The Scott test for likelihood of confusion considers ten factors:

(1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of the public because of

Exhibit 25, p.22

the similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market.

Id.

n53. Jews for Jesus, 993 F. Supp. at 302. Brodsky claimed in his defense that his use of the phrase in the domain name was not an infringing use under 1114 because the registered service mark was Jews fr Jesus. The court dismissed Brodsky's defense, holding it would be technically impossible for the plaintiff organization, or anyone, to use a stylized symbol in a domain name.

n54. Id. at 291.

n55. Id. at 302.

n56. A hyperlink is "an element in an electronic document that links to another place in the same document or to an entirely different document. Typically, you click on the hyperlink to follow the link. Hyperlinks are the most essential ingredient of all hypertext systems, including the World Wide Web." http://www.Webopedia.com/TERM/H/hyperlink.html (last visited March 27, 2004).

n57. Jews for Jesus, 993 F. Supp. at 309.

n58. Id. at 303.

n59. See discussion supra at pp. 277-280.

n60. United We Stand America, Inc. v. United We Stand America, New York, Inc., 128 F.3d 86, 89 (2d Cir. 1997) ("The protection of the trademark or service mark of non-profit and public service organizations requires that the use of the mark by competing organizations be prohibited.").

n61. 128 F.3d 86, 89 (2d Cir. 1997).

☫n62. Id. at 90; cf. Planned Parenthood Federation of America v. Bucci, No. 97-7492, 1998 LEXIS 22179, at 2 (2d Cir. Feb. 9, 1998) (relying on United We Stand America when confirming the district court decision inBucci).

☫n63. 113 F. Supp. 2d 915 (E.D. Va. 2000), aff'd, 263 F.3d 359 (4th Cir. 2001).

☫n64. PETA, 113 F. Supp. 2d at 918.

☫n65. Id.

☫n66. Id. at 921.

☫n67. PETA, 263 F.3d at 365.

☫N68. Id. The court's finding presumes that Internet users would not continue searching after realizing that Doughney's Web site did not provide services about animal activism. But does the Lanham Act really serve as a guarantee that Internet users will reach what they expect to find when typing a trade name into the address bar on their browser or when entering an organizations' name into a search engine? An Internet user seeking information about animal activism would not likely end their search simply upon finding a Web site that supports an opposing viewpoint. Additionally, the court seems to ignore that fact that PETA did operate their own Web site, which was easily accessible to Internet consumers.

☫n69. Id. at 366.

☫n70. Id. (quoting Cliff Notes, Inc. v. Bantam Doubleday Dell Publ'g. Group, Inc., 886 F.2d 490, 494 (2d Cir. 1989)) (internal quotation marks omitted). See also Morrison & Foerster LLP v. Wick, 94 F. Supp. 2d 1125, 1134 (D. Colo. 2000) ("A parody must convey two simultaneous - and contradictory - messages: that it is the original, but also that it is not the original and is instead a parody.") (internal quotation marks omitted). Id.

☫n71. PETA, 263 F.3d 359, 366 (4th Cir. 2001).

☫n72. See supra note 41.

🐟n73. 319 F.3d 770 (6th Cir. 2003).

🐟n74. Id. at 772. After the lawsuit commenced, Mishkoff created Web sites, including "taubmansucks.com," disparaging the plaintiffs in the case. Id. Because .sucks Web sites are analyzed in a different manner, Taubman's .sucks sites are not discusssed here. See discussion supra pp. 1704-05.

🐟n75. Id.

🐟n76. Id. at 772-73.

🐟n77. Id. at 775.

🐟n78. Taubman, 319 F.3d at 774, 775.

🐟n79. Id. The court observed that if the answers to both questions were in the affirmative, then there would be no First Amendment protection because misleading commercial expression receives no constitutional protection. See discussion of the commercial expression doctrine infra pp. 300-02.

🐟n80. Taubman, 319 F.3d at 775.

🐟n81. Id. at 775-76. Purely commercial links such as Taubman's can be distinguished from those in Planned Parenthood, Jews for Jesus, and PETA because the links in those cases were to commercial products enabling one to "live" the ideology of the cybergriper. The links on Taubman's Web site had no discernible link to any ideology, unless that of pure consumerism, which may be appropriate given that the mark at issue was for a shopping mall.

🐟n82. Taubman, 319 F.3d at 772.

🐟n83. See discussion supra pp. 278-79.

Exhibit 25, p.25

⚓n84. Taubman, 319 F.3d at 776-77. See Bands & Schuers, supra note 14, at 6-7. ("A consumer who types shopsatwillowbend.com into her browser presumably is looking for useful information concerning the mall, such as its hours, location, and stores."). Another factor that weighed in favor of the defendant was a prominently placed disclaimer on the Web site stating it was not the official Web site of the Shops at Willow Bend. Taubman, 319 F.3d at 777.

⚓n85. See generally Geoffrey R. Stone et al., Constitutional Law 998-1003 (4th ed. 2001).

⚓n86. Rosa Parks v. LaFace Records, 329 F.3d 437, 449 (6th Cir. 2003). The plaintiff in Parks was the civil rights luminary Rosa Parks. Parks claimed the popular hip-hop group Outkast and their record company LaFace Records violated her right of celebrity under the Lanham Act by naming a song "Rosa Parks" without her authorization.

⚓n87. 875 F.2d 994 (2d Cir. 1989).

⚓n88. Parks, 329 F.3d at 450 (noting the adoption of the Rogers test by the Second, Fifth, and Ninth [and subsequently Sixth] Circuits).

⚓n89. Id.

⚓n90. Internet Movie Database, at http://www.imdb.com/title/tt0091113/ (last visited June 26, 2004).

⚓n91. Rogers, 875 F.2d at 996-97.

⚓n92. Id. at 999.

⚓n93. Id. at 1000. See also Parks, 329 F.3d at 459 ("If the finder of fact determines that the title is artistically relevant to the song's content, then the inquiry is at an end because the title is not explicitly misleading as to the content of the work.") (internal quotation marks omitted).

⚓n94. Rogers, 875 F.2d at 1000 (emphasis in the original).

Many titles with a celebrity's name make no explicit statement that the work is about that person in any direct sense; the relevance of the title may be oblique and may become clear only after viewing or reading the work. As to such titles, the consumer interest in avoiding deception is too slight to warrant application of the Lanham Act.

Id.

⫟n95. Mattel, Inc. v. MCA, 296 F.3d 894, 902 (9th Cir. 2002).

⫟n96. H.R. 1295, 104th Cong. (1995). 32 Weekly Comp. Pres. Doc. 81 (Jan. 19, 1996). Previous attempts to pass a dilution statute in the Trademark Law Revision Act of 1988 failed for fear of First Amendment concerns. H. R. 100-1028 to accompany H.R. 5372, October 3, 1988, 134 Cong. Rec., S16972-S16973 (daily ed. Oct. 20, 1988) (statement of Sen. DeConcini) (on consideration of S.1883). Contrast the FTDA, which passed the House after just one day of hearings on December 12, 1995 and passed the Senate on December 29, 1995 with a voice vote after no debate. 1996 DER 11 d13 (BNA), Jan. 18, 1996.

⫟n97. In creating the FTDA, Congress specifically afforded protection to both common law and registered marks to further the goal of influencing broad protection of famous marks in international intellectual property regimes. See 141 Cong. Rec. H14318 (daily ed. Dec. 12,1995) (statement of Rep. Patricia Schroeder):

Limiting the Federal remedy against trademark dilution to those famous marks that are registered is not within the spirit of the United States position as a leader setting the standards for strong worldwide protection of intellectual property. Such a limitation would undercut the United States' position with our trading partners, which is that famous marks should be protected regardless of whether the marks are registered in the country where protection is sought.

Id. See also 141 Cong. Rec. S19310 (daily ed. Dec. 29, 1995) (statement of Sen. Orrin Hatch):

[The FTDA] would ... assist the executive branch in its bilateral and multilateral negotiations with other countries to secure greater protection for the famous marks owned by U.S. companies. Foreign countries are reluctant to change their laws to protect famous U.S. marks if the United States does not afford special protection for such marks.

Id.

Exhibit 25, p.27

Get a Document - by Citation - 3 Cardozo Pub. L. Pol'y & Ethics J. 269
Page 28 of 37
6:06-cv-00109-HMH     Date Filed 02/13/2006     Entry Number 6-27     Page 28 of 37

⚓n98. 141 Cong Rec S19312 (daily ed. Dec. 29, 1995) (statement of Sen. Patrick Leahy).

⚓n99. McCarthy identifies the four primary functions of trademarks as being

1. To identify one seller's goods and distinguish them from goods sold by others; 2. To signify that all goods bearing the trademark come from or are controlled by a single, albeit anonymous, source; 3. To signify that all goods bearing the trademark are of an equal level of quality; and 4. As a prime instrument in advertising and selling the goods.

1 McCarthy, supra note 1, 3:2 (internal citations omitted).

⚓n100. 15 U.S.C. 1125(c) (2003). Judge Leval observes that "in passing the Dilution Act, Congress recognized that this law, heavily lobbied by big merchants, had the potential to become a Pandora's Box. Its requirements - fame, distinctiveness - are vague; its prescription - giving absolute exclusivity throughout all areas of commerce - is potentially very far-reaching." Pierre N. Leval, Trademark: Champion of Free Speech, 27 Colum.-VLA J.L. & Arts 187, 207-08 (2004).

⚓n101. Frank Schechter, The Rational Basis of Trademark Protection, 40 Harv. L. Rev. 813 (1927). See Jane C. Ginsburg et al., Trademark and Unfair Competition Law 689 (3d ed. 2001) (noting that "Schechter never actually referred to his theory as one protecting against 'dilution.'").

⚓n102. Shechter, supra note 101, at 825. See also 4 McCarthy, supra note 14, 24:70.

⚓n103. Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. Utah Div. of Travel Development, 170 F.3d 449, 456 (4th Cir. 1999).

⚓n104. 15 U.S.C. 1127 (2003).

⚓n105. Ringling Bros.,170 F.3d at 453. The Supreme Court followed the Ringling Bros. decision in holding that actual dilution, not just the likelihood of dilution, must be proven under the **FTDA. Moseley v. V Secret Catalogue, Inc., 537 U.S. 418, 434 (2003)**.

Exhibit 25, p.28

🖘n106. Factors considered in determining the fame of the mark are:

(A) the degree of inherent or acquired distinctiveness of the mark; (B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used; (C) the duration and extent of advertising and publicity of the mark; (D) the geographical extent of the trading area in which the mark is used; (E) the channels of trade for the goods or services with which the mark is used; (F) the degree of recognition of the mark in the trading area and channels of trade used by the marks' owner and the person against whom the injunction is sought; (G) the nature and extent of use of the same or similar marks by third parties; and (H) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C. 1125(c)(1)(A)-(H).

🖘n107. See e.g. Intermatic Inc. v. Toeppen, 947 F. Supp. 1227 (N.D.Ill. 1996) ("In order to state a cause of action under the Act a party must show that the mark is famous and that the complainant's use is commercial and in commerce which is likely to cause dilution."). Id. at 1238. See also Robert N. Klieger, Trademark Dilution: The Whittling Away of the Rational Basis for Protection, 58 U. Pitt. L. Rev. 789, 841 (1997) ("Once a court determines that the senior mark qualifies as 'famous,' it need only inquire into whether consumers will make the requisite mental connection between the senior and junior uses of the mark.").

🖘n108. 2002 Federal Trademark Dilution Act: Hearing Before the Subcomm. On Courts, the Internet, and Intellectual Property of the House Comm. On the Judiciary, 107th Cong. 26 (2002) (statement of Ethan Horwitz, Partner, Darby & Darby, P.C.) (internal citation and quotation marks omitted). But see Klieger, supra note 107 at 833. ("Limiting the classes of marks that qualify for dilution simply bestows a trademark right in gross upon less that the entirety of registerable marks.") Id.

🖘n109. 4 McCarthy, supra note 14, 24:95.

🖘n110. H.R. Rep. No. 104 -374, at 2 (1995).

🖘n111. 4 McCarthy, supra note 14, 24:94.

🖘n112. Nike has used its trade name to identify products other than sneakers, such as watches, MP-3 players, and "yoga gear." See http://niketown.nike.com (last visited May 23, 2004).

ⴲn113. 4 McCarthy, supra note 14, 24:95. But see **Moseley v. V Secret Catalogue, Inc., 537 U.S. 418, 432 (2003)** (in which Justice Stevens noted there may not even be a tarnishment cause of action under the FTDA).

ⴲn114. Value is, of course, in the eye of the beholder.

ⴲn115. See Hormel Foods v. Jim Henson, 73 F.3d 497, 507 (2d Cir. 1996) ("The sine qua non of tarnishment is a finding that plaintiff's mark will suffer negative associations through defendant's use.")

ⴲn116. Toys "R" Us v. Akkaoui, 1996 U.S. Dist. LEXIS 17090 (N.D. Cal. Oct. 29, 1996). But see Toys R Us v. Feinberg, 26 F. Supp. 2d 639 (S.D.N.Y. 1998) (holding that "gunsareus" does not tarnish the senior user's mark because the customer base is different and letter "r" is replaced with the word "are").

ⴲn117. See H.R. Rep. No.104-374, at 3 (1995) ("Dilution does not rely upon the standard test of infringement, that is, likelihood of confusion, deception or mistake. Rather, it applies when the unauthorized user of a famous mark reduces the public's perception that the mark signifies something unique, singular, or particular.") (citations omitted).

ⴲn118. See 4 McCarthy, supra note 14, 24:95 n.13 (discussing cases in which courts have mistakenly found that because there was a finding of likelihood of confusion, there was also a finding of dilution as resting on a non sequitur). McCarthy notes, "blurring and confusion are not stops along the same line: they are different lines altogether." 4 McCarthy, supra note 14, 24:70. See also Mattel, 296 F.3d at 903 ("Whereas trademark law targets 'interference with the source signaling function' of trademarks, dilution protects owners 'from an appropriation of or free riding on' the substantial investment that they have made in their marks.") (quoting I.P. Lund Trading ApS v. Kohler Co., 163 F.3d 27, 50 (1st Cir. 1998)).

ⴲn119. See discussion supra pp. 274-75.

ⴲn120. See Restatement (Third) of Unfair Competition 25 cmt. f.:

Prospective purchasers must make a mental connection between the plaintiff's mark and the designation used by the defendant. The connection, however, is not that which serves as the basis of liability for trademark infringement - the mistaken belief that the plaintiff is in some way associated with defendant's good - but rather is the accurate recognition that a mark associated with the plaintiff is now also in use as an identifying symbol by another.

Exhibit 25, p.30

Id.

⚓n121. 4 McCarthy, supra note 14, 24:70. "In no one person's mind can both perceptions occur at the same time. Either a person thinks that the similarly branded goods or services come from a common source ... or not. In that sense they are inconsistent states of customer perception." Id. (citations omitted).

⚓n122. 15 U.S.C. 1125(c)(1) (2003).

⚓n123. 15 U.S.C. 1125(c)(4)(B) (2003).

⚓n124. See H.R. Rep. No.104-374, at 7 (1995) ("The 'use in commerce' requirement reflects the fact that the bill, like the Lanham Act itself, requires some aspect of interstate commerce to be present before the dilution provision can be triggered.").

⚓n125. H.R. Rep. No.104-374, at 4 (1995).

⚓n126. 15 U.S.C. 1125(c)(1) (2003).

⚓n127. See generally Trademark and Unfair Competition, supra note 101, at 146-155.

⚓n128. 15 U.S.C. 1125(c)(4)(B) (2003).

⚓n129. Mattel, 296 F.3d at 904.

⚓n130. H.R. Rep. No.104-374, at 8 (1995).

⚓n131. 141 Cong. Rec. S19310 (daily ed. Dec. 29, 1995) (statement of Sen. Orrin Hatch). But see Richard B. Biagi, The Intersection of First Amendment Commercial Speech Analysis and the Federal Trademark Dilution Act: A Jurisprudential Roadmap, 91 Trademark Rep. 867, 885-86 (2001) (observing that Hatch's definition of noncommercial speech "seems to be founded on circular logic, namely, that noncommercial speech is that which does not involve

a commercial transaction.").

n132. Bolger v. Youngs Drug Prod. Co., 463 U.S. 60, 67 (1983) (citing Virginia Pharmacy Board v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 762 (1976)).

n133. Indeed, religious and political expression is generally held to be the most valuable to society. See generally Cass R. Sunstein, Low Value Speech Revisited, 83 Nw. U. L. Rev. 555 (1989) (summarizing categories of high and low value expression under the First Amendment).

n134. See, e.g. Hoffman v. Capital Cities/ABC, Inc., 255 F.3d 1180, 1184 (9th Cir. 2001) ("The boundary between commercial and noncommercial speech has yet to be clearly delineated... ")

n135. See Riley v. Nat'l Fed'n of the Blind of N.C., Inc., 487 U.S. 781, 796 (1988) (finding financially motivated speech does not retain "its commercial character when it is inextricably intertwined with otherwise fully protected speech."). Id.

n136. Dr. Seuss Enterprises v. Penguin Books USA, Inc., 924 F.Supp. 1559, 1574 (S.D. Cal. 1996).

n137. Biagi, supra note 131, at 874.

n138. The legislature did not establish how much commercial activity is necessary to bring a use out of the FTDA exception, but some commentators have held the intended standard was de minimus. Biagi, supra note 131, at 865. Judge Leval writes that the first sentence in the FTDA - "subject to the principles of equity and upon such terms as the court deems reasonable" - evinces a legislative intent that fair use exemptions to the FTDA are to be decided under equity principles. Leval, supra note 100, at 200.

n139. See discussion supra at p. 294.

n140. Planned Parenthood, 1997 WL 133313 at 5 (S.D.N.Y. Mar. 24, 1997), aff'd, 1998 WL 336163 (2d Cir. Feb. 9, 1998).

n141. See id. at 5-6 (the only reference to the commercial use requirement of the statute

Exhibit 25, p.32

comes at the top of 5).

✦n142. "If the term 'commercial use' had the same meaning in both provisions, this would eliminate one of the three statutory exemptions defined by [15 U.S.C. 1125(c)(4)(B)], because any use found to be dilutive would, of necessity, not be noncommercial." Mattel, 296 F.3d at 904.

✦n143. See Planned Parenthood, 1997 WL 133313 at 5-6.

✦n144. See cases discussed in Planned Parenthood, 1997 WL 133313 at 5-6. Representative cases relied on by the court include: MGM-Pathe Communications Co. v. The Pink Panther Patrol, 774 F. Supp. 869 (S.D.N.Y. 1991) (alleging trademark infringement under 1114, false designation of origin under 1125, and violation of dilution under New York Gen. Bus. Law 368-d); Cancer Research Institute, Inc. v. Cancer Research Society, Inc., 694 F. Supp. 1051 (S.D.N.Y. 1988) (alleging false designation of origin under 1125(a)); Brach van Houten Holding v. Save Brach's Coalition, 856 F. Supp. 472 (N.D.Ill. 1994) (alleging violations of 1114 and 1125).

✦n145. Planned Parenthood, 1997 WL 133313 at 6. Cases relied on include Cancer Research Institute, Inc., 694 F.Supp. 1051 and American Diabetic Assoc. v. National Diabetic Assoc., 533 F.Supp. 16 (E.D.Pa. 1981).

✦n146. See discussion of the difference between likelihood of confusion and dilution, supra p. 292.

✦n147. For example in Pink Panther Patrol, 774 F. Supp. at 869, the court found it unnecessary to reach the claim of dilution under New York state laws because the owner of the mark was entitled to a preliminary injunction under 1114 and 1125. Id. at 877.

✦n148. E.g., id. at 869 (holding that a likelihood of confusion as to source would result from a junior use of the famous Pink Panther mark by a gay and lesbian activist group).

✦n149. Planned Parenthood, 1997 WL 133313 at 5.

✦n150. A communicative message "is not rendered commercial by the impact of the use on sales." Dr. Seuss Enterprises v. Penguin Books USA, Inc., 924 F.Supp. 1559, 1574 (S.D. Cal. 1996). See discussion infra pp. 293-94.

n151. Judge Kozinksi observed of the use of the Mattel mark Barbie by the pop group Aqua that "the only indication that Mattel might be associated with the song is the use of Barbie in the title ... ." Mattel, 296 F.3d at 902 (9th Cir. 2002).

n152. See, e.g., Central Hudson Gas v. Public Service Comm'n of N.Y., 447 U.S. 557 (1980) (extending First Amendment protection to promotional advertising by a public-utility provider); Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748 (1976) (extending First Amendment protection to competitive advertising of prescription drug prices); Bigelow v. Virginia, 421 U.S. 809 (1975) (extending First Amendment protection to a newspaper advertisement for abortion services).

n153. 141 Cong. Rec. S19312 (daily ed. Dec. 29, 1995) (statement of Senator Patrick Leahy) ("I continue to believe, as our House colleagues also affirm, that parody ... will remain unaffected by the legislation.").

n154. See discussion supra pp. 282-84.

n155. See, e.g., Morrison & Foerster v. Wick, 94 F. Supp.2d 1125, 1134-35 (holding that the unauthorized use of a law firm's trademark in the domain name of several related Web sites was not a parody because "only by reading through the content of the sites could the user discover that the domain names are an attempt at parody.").

n156. PETA v. Doughney, 263 F.3d 359 (4th Cir. 2001). Because the court held that a parody must convey a simultaneous message that it is the original, but also not the original, Doughney's Web site did not constitute a parody because while "the domain name conveys the first message; the second message is conveyed only when the viewer reads the content of the website... . Thus the messages are not conveyed simultaneously and do not constitute a parody." Id. at 366-67.

n157. Mattel, 296 F.3d at 902.

n158. Id. at 894.

n159. Id. at 902.

n160. Id. at 901.

Exhibit 25, p.34

⚓n161. Id. at 903-04. "After the song's popular success, some consumers hearing Barbie's name will think of both the doll and the song, or perhaps of the song only." Id. at 904. Mattel also claimed the Aqua song tarnished Barbie because the "song [was] inappropropriate for young girls," but the Ninth Circuit did not reach this question in its analysis. Id. at 902-03.

⚓n162. Id. at 906 (quoting Hoffman v. Capital Cities/ABC, Inc., 255 F.3d 1180, 1185 (9th Cir. 2001)).

⚓n163. Id. See also Mattel, Inc. v. Walking Mountain, 353 F.3d 792, 812 (9th Cir. 2003) ("A dilution action only applies to purely commercial speech.").

⚓n164. Mattel, 296 F.3d at 906. See also discussion supra pp. 293-94.

⚓n165. 353 F.3d 792, 812 (9th Cir. 2003).

⚓n166. Id. at 796.

⚓n167. This photograph and the entire "Food Chain Barbie" series may be viewed on the artist's Web site at http://creativefreedomdefense.org (last visited Aug. 14, 2004).

⚓n168. Walking Mountain, 353 F.3d. at 812.

⚓n169. Id. at 796. (Stating the purpose of the artist's appropriation of Barbie was "an attempt to critique [] the objectification of women associated with [Barbie], and [] [to] lambast[] the conventional beauty myth and the social acceptance of women as objects because this is what Barbie embodies.") (internal quotation marks omitted). Id.

⚓n170. Id.

⚓n171. See discussion supra pp. 295-97.

Exhibit 25, p.35

✝n172. See discussion of Planned Parenthood, supra pp. 295-97.

✝n173. MCA Records is now owned by Geffen. See http://www.geffen.com/ (last visited Jul. 21, 2004).

✝n174. See discussion of Mattel supra pp. 298-99.

✝n175. Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569 (1994) (holding that the "commercial character of a use" does not bar a finding of fair use).

✝n176. 447 U.S. 557 (1980).

✝n177. See discussion supra pp. 288-92.

✝n178. See discussion supra pp. 293-94.

✝n179. Central Hudson Gas, 447 U.S. at 566.

✝n180. The incongruity is partly the result of the lack of consensus in the legal community as to the intended function of the Internet. The Supreme Court has compared the Internet to a sort of commercial library, see Reno v. ACLU, 521 U.S. 844, 853 (1997) ("The Web is ... comparable, from the readers viewpoint, to both a vast library including millions of readily available and indexed publications and a sprawling mall offering goods and services."), whereas advocates for trademark owners consider the Internet akin to a magazine with pages ripe for advertising. See 2002 Federal Trademark Dilution Act: Hearing Before the Subcomm. on Courts, the Internet, and Intellectual Property of the Comm. on the Judiciary, 107th Cong. 26 (2002) (statement of Ms. Sherry L. Jetter, Vice President, Intellectual Property, Polo Ralph Lauren Corporation) ("E-commerce and the Internet is just really another form of advertising, in a sense. It could be looked at as ... [an] online magazine.").

✝n181. See Biagi, supra note 131.

Service: **Get by LEXSEE®**
Citation: **3 Cardozo Pub. L. Pol'y & Ethics J. 269**
View: Full
Date/Time: Tuesday, February 7, 2006 - 11:51 PM EST

 **LexisNexis**®  About LexisNexis  |  Terms & Conditions

Copyright © 2006 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.