*447 U.S. 557, \*; 100 S. Ct. 2343, \*\*;*
*65 L. Ed. 2d 341, \*\*\*; 1980 U.S. LEXIS 48*

# CENTRAL HUDSON GAS & ELECTRIC CORP. v. PUBLIC SERVICE COMMISSION OF NEW YORK

## No. 79-565

## SUPREME COURT OF THE UNITED STATES

447 U.S. 557; 100 S. Ct. 2343; 65 L. Ed. 2d 341; 1980 U.S. LEXIS 48; 6 Media L. Rep. 1497; 34 P.U.R.4th 178

March 17, 1980, Argued
June 20, 1980, Decided

**PRIOR HISTORY:**

APPEAL FROM THE COURT OF APPEALS OF NEW YORK.

**DISPOSITION:** 47 N. Y. 2d 94, 390 N. E. 2d 749, reversed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant challenged a judgment from the Court of Appeals of New York that upheld as constitutional a regulation promulgated by appellee that completely banned promotional advertising by an electrical utility such as appellant. Appellant contended that the regulation impermissibly restrained commercial speech in violation of U.S. Const. amends. I and XIV.

**OVERVIEW:** Appellee promulgated a regulation that banned all promotional advertising by electric utility companies operating in the state. Appellant challenged a judgment from the state's highest court that ruled that the regulation did not violate U.S. Const. amends. I and XIV rights. On appeal, the Court reversed after applying the four-prong analysis relevant to commercial speech cases. The Court: (1) noted that appellee did not claim that the expression at issue either was inaccurate or related to unlawful activity; (2) ruled that appellant's promotional advertising was not unprotected commercial speech merely because appellant held a monopoly over electricity in its service area; (3) ruled that, while appellee's interests in energy conservation and ensuring fair and efficient energy rates were substantial, the link between the advertising ban and appellant's rate structure was, at most, tenuous, and; (4) ruled that, because the regulation reached all promotional advertising, it was more extensive than necessary to further appellee's interest in energy conservation. As such, the regulation impermissibly infringed appellant's First Amendment rights.

file:///C|/Documents%20and%20Settings/kmelwell.KMELWE...Client%20Files/Schmidt/Smith/centralhudsonopinion.htm (1 of 46)2/10/2006 2:38:11 PM

Exhibit 27, p.1
Dockets.Justia.com

**OUTCOME:** The Court reversed a judgment that upheld as constitutional appellee's regulation that completely banned promotional advertising by an electrical utility, such as appellant, because the regulation impermissibly restrained appellant's First Amendment right of free speech. Appellee's asserted state interest in ensuring fair and efficient utility rates was not sufficiently linked to the advertising ban.

**CORE TERMS:** advertising, commercial speech, ban, first amendment, promotional, energy, regulation, electricity, consumption, consumer, monopoly, electric, energy conservation, off-peak, conservation, suppression, promotion, suppress, advocacy, saving, marketplace, peak, governmental interest, informational, misleading, electrical, advertise, Fourteenth Amendments, protected speech, state interest

## LexisNexis(R) Headnotes

Constitutional Law > Fundamental Freedoms > Freedom of Speech > Commercial Speech
**HN1** Commercial speech is expression related solely to the economic interests of the speaker and its audience.

Constitutional Law > Fundamental Freedoms > Freedom of Speech > Commercial Speech
**HN2** The First Amendment, as applied to the states through the Fourteenth Amendment, protects commercial speech from unwarranted governmental regulation. U.S. Const. amends. I and XIV.

Constitutional Law > Fundamental Freedoms > Freedom of Speech > Commercial Speech
**HN3** Commercial expression not only serves the economic interest of the speaker, but also assists consumers and furthers the societal interest in the fullest possible dissemination of information. In applying U.S. Const. amend. I to this area, the United States Supreme Court has rejected the "highly paternalistic" view that government has complete power to suppress or regulate commercial speech. Even when advertising communicates only an incomplete version of the relevant facts, the First Amendment presumes that some accurate information is better than no information at all.

Constitutional Law > Fundamental Freedoms > Freedom of Speech > Commercial Speech
**HN4** United States Supreme Court decisions recognize a commonsense distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech. The Constitution of the United States therefore accords a lesser protection to commercial speech than to other constitutionally guaranteed expression. The protection available for particular commercial expression turns on the nature both of the expression and of the governmental interests served by its regulation.

Constitutional Law > Fundamental Freedoms > Freedom of Speech > Commercial Speech

Exhibit 27, p.2

*HN5* Commercial speech, although meriting some protection, is of less constitutional moment than other forms of speech. The failure to distinguish between commercial and noncommercial speech could invite dilution, simply by a leveling process, of the force of the First Amendment's guarantee with respect to the latter kind of speech.

Constitutional Law > Fundamental Freedoms > Freedom of Speech > Commercial Speech

*HN6* The First Amendment's concern for commercial speech is based on the informational function of advertising. Consequently, there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity. The government may ban forms of communication more likely to deceive the public than to inform it, or commercial speech related to illegal activity.

Constitutional Law > Fundamental Freedoms > Freedom of Speech > Commercial Speech

*HN7* Two features of commercial speech permit regulation of its content. First, commercial speakers have extensive knowledge of both the market and their products. Thus, they are well situated to evaluate the accuracy of their messages and the lawfulness of the underlying activity. In addition, commercial speech, the offspring of economic self-interest, is a hardy breed of expression that is not particularly susceptible to being crushed by overbroad regulation.

Constitutional Law > Fundamental Freedoms > Freedom of Speech > Commercial Speech

*HN8* If a commercial communication is neither misleading nor related to unlawful activity, the government's power to regulate that speech is more circumscribed. The state must assert a substantial interest to be achieved by restrictions on commercial speech. Moreover, the regulatory technique must be in proportion to that interest. The limitation on expression must be designed carefully to achieve the state's goal. Compliance with this requirement may be measured by two criteria. First, the restriction must directly advance the state interest involved, however, the regulation may not be sustained if it provides only ineffective or remote support for the government's purpose. Second, if the governmental interest could be served as well by a more limited restriction on commercial speech, the excessive restrictions cannot survive.

Constitutional Law > Fundamental Freedoms > Freedom of Speech > Commercial Speech

**Exhibit 27, p.3**

file:///C|/Documents%20and%20Settings/kmelwell.KMELWE...Client%20Files/Schmidt/Smith/centralhudsonopinion.htm (3 of 46)2/10/2006 5:02:20 PM

*HN9* The First Amendment mandates that speech restrictions be narrowly drawn. The regulatory technique may extend only as far as the interest it serves. The State cannot regulate speech that poses no danger to the asserted state interest, nor can it completely suppress information when narrower restrictions on expression would serve its interest as well. Not foreclosed is the possibility that some limited supplementation, by way of warning or disclaimer or the like, might be required in promotional materials. Not justified is the total suppression of advertising concerning contraceptives. Open is the possibility that the State can implement more carefully drawn restrictions.

Constitutional Law > Fundamental Freedoms > Freedom of Speech > Commercial Speech

*HN10* The court reviews with special care regulations that entirely suppress commercial speech in order to pursue a non speech-related policy.

Constitutional Law > Fundamental Freedoms > Freedom of Speech > Commercial Speech

*HN11* In commercial speech cases, a four-part analysis has developed. At the outset, a court must determine whether the expression is protected by U.S. Const. amend. I. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, a court asks whether the asserted governmental interest is substantial. If both inquiries yield positive answers, a court must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

Constitutional Law > Fundamental Freedoms > Freedom of Speech > Commercial Speech

*HN12* Even in monopoly markets, the suppression of advertising reduces the information available for consumer decisions and thereby defeats the purpose of the First Amendment.

Constitutional Law > Fundamental Freedoms > Freedom of Speech > Commercial Speech
Energy & Utilities Law > Electric Power Industry > State Regulation

*HN13* To the extent that the regulation of the Public Service Commission of the State of New York Commission that ordered electric utilities in New York State to cease all advertising that promoted the use of electricity suppressed speech that in no way impaired New York's interest in energy conservation, the Commission's order violated the First and Fourteenth Amendments and had to be invalidated.

Constitutional Law > Fundamental Freedoms > Freedom of Speech > Commercial Speech
Energy & Utilities Law > Administrative Proceedings > Public Utility Commissions

**Exhibit 27, p.4**

HN14 Administrative bodies empowered to regulate electric utilities have the authority, and indeed the duty, to take appropriate action to further the goal of energy conservation. When, however, such action involves the suppression of speech, U.S. Const. amends. I and XIV require that the restriction be no more extensive than is necessary to serve the state interest.

**DECISION:** State public service commission's regulation completely banning promotional advertising by electric utilities, held violative of First Amendment.

**SUMMARY:** During the winter, in the time of a fuel shortage, the Public Service Commission of the State of New York ordered electric utilities in the state to cease all advertising promoting the use of electricity because the state's interconnected utility system did not have sufficient fuel stocks or sources of supply to meet all customer demands for the winter. Three years later, once the fuel shortage had eased, the Commission proposed to continue the ban on advertising and sought comments from the public. Notwithstanding opposition to continuation of the ban by an electric utility in the state which argued that the advertising prohibition violated the First Amendment, the Commission extended the prohibition against "promotional" advertising (advertising intended to stimulate the purchase of utility services) on the basis of the state's interests in conserving energy and ensuring fair and effective rates for electricity. The utility thereafter challenged the ban on advertising in the New York state courts, claiming that the Commission had restrained commercial speech in violation of the First and Fourteenth Amendments. Ultimately, the Court of Appeals of New York upheld the prohibition on advertising, concluding that the governmental interests in the prohibition outweighed the limited constitutional value of the commercial speech at issue (47 NY2d 94, 390 NE2d 749).

On appeal, the United States Supreme Court reversed. In an opinion by Powell, J., joined by Burger, Ch. J., and Stewart, White, and Marshall, JJ., it was held that the ban on promotional advertising by electric utilities imposed by the Public Service Commission violated the First Amendment, as applied to the states through the Fourteenth Amendment, since despite the substantial nature of the state's asserted interests in prohibiting such advertising--which advertising was concededly neither inaccurate nor related to unlawful activity, and which was a species of commercial speech protected by the First Amendment, notwithstanding the monopoly power of electric utilities in the state over the sale of electricity--the link between the advertising prohibition and the state's interest in ensuring fair and efficient rates was too tenuous and speculative to justify the ban, and the prohibition, even though it directly related to the substantial state interest in conserving energy, was more extensive that necessary to further such state interest.

Brennan, J., concurring in the judgment, expressed the view that the Public Service Commission had prohibited more than mere proposals to engage in certain kinds of commercial transactions and therefore had violated the First and Fourteenth Amendments, but that even if it were assumed that the Commission had addressed only commercial speech, there were no differences between commercial speech and other forms of protected speech justifying the suppression of commercial speech in

file:///C|/Documents%20and%20Settings/kmelwell.KMELWE...Client%20Files/Schmidt/Smith/centralhudsonopinion.htm (5 of 46)2/10/2006 5:02:20 PM

**Exhibit 27, p.5**

order to influence public conduct through manipulation of the availability of information.

Blackmun, J., joined by Brennan, J., concurred in the judgment, agreeing that the Public Service Commission's ban on promotional advertising regarding electricity by utilities was inconsistent with the First and Fourteenth Amendments, but expressed the view that the four-part analysis applied by the court in reaching its decision--an analysis whereby a restraint on commercial communication that is neither misleading nor related to unlawful activity is subject to an intermediate level of scrutiny so that suppression is permitted whenever it directly advances a substantial governmental interest and is not more extensive than is necessary to serve that interest--was not the proper one to be applied when a state seeks to suppress information about a product in order to manipulate a private economic decision that the state cannot or has not regulated or outlawed directly.

Stevens, J., joined by Brennan, J., concurring in the judgment, expressed the views that the case at bar was not a "commercial speech" case, and that the Public Service Commission's ban on promotional advertising, in prohibiting all advocacy of the immediate or future use of electricity and curtailing expression by an informed and interested group of persons of their point of view on questions relating to the production and consumption of electrical energy, violated the First Amendment.

Rehnquist, J., dissenting, expressed the views that the monopoly power conferred by the state upon a utility justifies a state's wide-ranging supervision and control under the First Amendment, and that the restriction on "commercial speech" in the case at bar was not violative of the First Amendment, the ban on advertising falling within the scope of permissible state regulation of an economic activity by an entity that could not exist in corporate form or enjoy its monopoly status but for the laws of New York.

## LAWYERS' EDITION HEADNOTES:

### [***LEdHN1]
LAW §954
First Amendment -- commercial speech -- ban on utility's promotional advertising --
Headnote: [1A] *LEdHN(1A)* [1B] *LEdHN(1B)*

The First and Fourteenth Amendments are violated by a state public service commission's regulation, promulgated under nonemergency circumstances on the basis of the state's asserted interests in conserving energy and ensuring fair and efficient rates, which prohibits electric utilities from engaging in all promotional advertising (advertising designed to stimulate the purchase of utility services), where, despite the substantial nature of the state's asserted interest in prohibiting such speech--which speech is concededly neither inaccurate nor related to unlawful activity, and which is a species of commercial speech protected by the First Amendment, notwithstanding the monopoly power of electric utilities in the state over the sale of electricity--the link between the advertising prohibition and the state's interest in ensuring fair and efficient rates is too tenuous and speculative to justify the advertising ban, and the prohibition against advertising, even though it is directly related to the substantial state interest in conserving energy, is more extensive than

necessary to further such state interest in that it reaches all promotional advertising regardless of the impact of the promoted service on overall energy use without it having been shown that the state could not utilize a more limited regulation of electric utilities' commercial expression to protect the state's interest in conservation. (Rehnquist, J., dissented, and Stevens and Brennan, JJ., dissented in part, from this holding.)

### [***LEdHN2]
LAW §954
First Amendment -- commercial speech --
Headnote: [2] *LEdHN(2)*⬇

The First Amendment, as applied to the states through the Fourteenth Amendment, protects commercial speech--namely, expression related solely to the economic interest of the speaker and the speaker's audience--from unwarranted governmental regulation; the government does not have complete power to suppress or regulate commercial speech. (Stevens and Brennan, JJ., dissented in part from this holding.)

### [***LEdHN3]
LAW §954
First Amendment -- protection of utilities --
Headnote: [3A] *LEdHN(3A)*⬇ [3B] *LEdHN(3B)*⬇

Although utilities enjoy the full panoply of First Amendment protections for their direct comments on public issues, there is no reason for providing similar constitutional protection when the statements of utilities are made only in the context of commercial transactions; in such context, the state retains the power to ensure that the stream of commercial information flows cleanly as well as freely.

### [***LEdHN4]
LAW §954
protection of expression -- commercial speech --
Headnote: [4] *LEdHN(4)*⬇

The United States Constitution accords a lesser protection to commercial speech than to other constitutionally guaranteed expression, and the protection available for particular commercial expression turns on the nature both of the expression and of the governmental interests served by its regulation.

### [***LEdHN5]
LAW §954
First Amendment -- commercial speech -- governmental regulation --
Headnote: [5] *LEdHN(5)*⬇

Since the First Amendment's concern for commercial speech is based on the informational function of advertising, there can be no objection under the United States Constitution to the government's suppression of commercial messages that do not accurately inform the public about lawful activity; the government may ban forms of communication more likely to deceive the public than to inform it, and it may ban

file:///C|/Documents%20and%20Settings/kmelwell.KMELWE...Client%20Files/Schmidt/Smith/centralhudsonopinion.htm (7 of 46)2/10/2006 5:02:20 PM

**Exhibit 27, p.7**

commercial speech related to illegal activity.

## [***LEdHN6]
LAW §954
commercial speech -- governmental regulation -- requirement and criteria --
Headnote: [6] *LEdHN(6)* ⬇

If commercial speech is neither misleading nor related to unlawful activity, the government, in seeking to regulate such speech, must assert a substantial interest to be achieved by its restriction and employ a regulatory technique in proportion to that interest; compliance with the requirement may be measured by two criteria: (1) a regulation may not be sustained if it provides only ineffective or remote support for the government's purpose, rather than directly advancing the state interest involved, and (2) if the governmental interest could be served as well by a more limited restriction on commercial speech, the restriction cannot survive.

## [***LEdHN7]
LAW §954
First Amendment -- commercial speech -- governmental restriction --
Headnote: [7] *LEdHN(7)* ⬇

The First Amendment mandates that governmental restrictions upon commercial speech that are neither misleading nor related to unlawful activity be narrowly drawn and extend only so far as the interest they serve; the state cannot regulate speech that poses no danger to the asserted state interest, and it cannot completely suppress information when narrower restrictions on expression would serve its interest as well.

## [***LEdHN8]
LAW §930
STATUTES §17
overbreadth -- First Amendment --
Headnote: [8A] *LEdHN(8A)* ⬇ [8B] *LEdHN(8B)* ⬇

The overbreadth doctrine permits the invalidation of governmental regulations on First Amendment grounds even when the litigant challenging the regulation has engaged in no constitutionally protected activity; the doctrine derives from the recognition that unconstitutional restriction of expression may deter protected speech by parties not before the court and thereby escape judicial review.

## [***LEdHN9]
LAW §954
governmental regulation -- suppression of commercial speech -- pursuit of nonspeech-related policy --
Headnote: [9A] *LEdHN(9A)* ⬇ [9B] *LEdHN(9B)* ⬇

The United States Supreme Court reviews with special care governmental regulations that entirely suppress commercial speech in order to pursue a nonspeech-related policy.

**Exhibit 27, p.8**

**[\*\*\*LEdHN10]**
LAW §954
First Amendment -- commercial speech -- four-part standard of analysis --
Headnote: [10] *LEdHN(10)*⬇

In determining whether commercial speech has been unlawfully restrained by a governmental restriction in violation of the First Amendment, it must initially be determined whether the expression is protected by the First Amendment to the extent that it concerns lawful activity and is not misleading, and then, it must be determined whether the asserted governmental interest to be served by the restriction is substantial; if both inquiries yield positive answers, it must be determined whether the restriction directly advances the governmental interest asserted, and whether the restriction is not more extensive than is necessary to serve that interest. (Blackmun and Brennan, JJ., dissented in part from this holding.)

**[\*\*\*LEdHN11]**
ENERGY §19
electric utilities -- regulation to further national goal --
Headnote: [11] *LEdHN(11)*⬇

Administrative bodies empowered to regulate electric utilities have the authority, and the duty, to take appropriate action to further the goal of conserving energy, which, as well as the development of alternate energy sources, is an imperative national goal.

**SYLLABUS:** *Held*: A regulation of appellee New York Public Service Commission which completely bans an electric utility from advertising to promote the use of electricity violates the First and Fourteenth Amendments. Pp. 561-572.

(a) Although the Constitution accords a lesser protection to commercial speech than to other constitutionally guaranteed expression, nevertheless the First Amendment protects commercial speech from unwarranted governmental regulation. For commercial speech to come within the First Amendment, it at least must concern lawful activity and not be misleading. Next, it must be determined whether the asserted governmental interest to be served by the restriction on commercial speech is substantial. If both inquiries yield positive answers, it must then be decided whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest. Pp. 561-566.

(b) In this case, it is not claimed that the expression at issue is either inaccurate or relates to unlawful activity. Nor is appellant electrical utility's promotional advertising unprotected commercial speech merely because appellant holds a monopoly over the sale of electricity in its service area. Since monopoly over the supply of a product provides no protection from competition with substitutes for that product, advertising by utilities is just as valuable to consumers as advertising by unregulated firms, and there is no indication that appellant's decision to advertise was not based on the belief that consumers were interested in the advertising. Pp. 566-568.

(c) The State's interest in energy conservation is clearly substantial and is directly

file:///C|/Documents%20and%20Settings/kmelwell.KMELWE...Client%20Files/Schmidt/Smith/centralhudsonopinion.htm (9 of 46)2/10/2006 5:02:20 PM

**Exhibit 27, p.9**

advanced by appellee's regulations. The State's further interest in preventing inequities in appellant's rates -- based on the assertion that successful promotion of consumption in "off-peak" periods would create extra costs that would, because of appellant's rate structure, be borne by all consumers through higher overall rates -- is also substantial. The latter interest does not, however, provide a constitutionally adequate reason for restricting protected speech because the link between the advertising prohibition and appellant's rate structure is, at most, tenuous. Pp. 568-569.

(d) Appellee's regulation, which reaches all promotional advertising regardless of the impact of the touted service on overall energy use, is more extensive than necessary to further the State's interest in energy conservation which, as important as it is, cannot justify suppressing information about electric devices or services that would cause no net increase in total energy use. In addition, no showing has been made that a more limited restriction on the content of promotional advertising would not serve adequately the State's interests. Pp. 569-571.

**COUNSEL:** Telford Taylor argued the cause for appellant. With him on the briefs were Walter A. Bossert, Jr., and Davison W. Grant.

Peter H. Schiff argued the cause for appellee. With him on the brief was Howard J. Read. *

* Briefs of amici curiae urging reversal were filed by Cameron F. MacRae and Robert L. Baum for the Edison Electric Institute; by Burt Neuborne for Long Island Lighting Co.; by Edward H. Dowd and Myrna P. Field for the Mid-Atlantic Legal Foundation et al.; and by Edwin P. Rome and William H. Roberts for Mobil Corp.

**JUDGES:** POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, and MARSHALL, JJ., joined. BRENNAN, J., filed an opinion concurring in the judgment, post, p. 572. BLACKMUN, J., post, p. 573, and STEVENS, J., post, p. 579, filed opinions concurring in the judgment, in which BRENNAN, J., joined. REHNQUIST, J., filed a dissenting opinion, post, p. 583.

**OPINIONBY:** POWELL

**OPINION: [*558]  [***346]  [**2347]**  MR. JUSTICE POWELL delivered the opinion of the Court.

 **[***LEdHR1A]**  [1A] *LEdHR(1A)* This case presents the question whether a regulation of the Public Service Commission of the State of New York violates the First and Fourteenth Amendments because it completely bans promotional advertising by an electrical utility.

I

In December 1973, the Commission, appellee here, ordered electric utilities in New York State to cease all advertising that "[promotes] the use of electricity." App. to

file:///C|/Documents%20and%20Settings/kmelwell.KMELWE...Client%20Files/Schmidt/Smith/centralhudsonopinion.htm (10 of 46)2/10/2006 5:02:26 PM

**Exhibit 27  p.10**

Juris. **[*559]** Statement 31a. The order was based on the Commission's finding that "the interconnected utility system in New York State does not have sufficient fuel stocks or sources of supply to continue furnishing all customer demands for the 1973-1974 winter." *Id.*, at 26a.

Three years later, when the fuel shortage had eased, the Commission requested comments from the public on its proposal to continue the ban on promotional advertising. Central Hudson Gas & Electric Corp., the appellant in this case, opposed the ban on First Amendment grounds. App. A10. After reviewing the public comments, the Commission extended the prohibition in a Policy Statement issued on February 25, 1977.

The Policy Statement divided advertising expenses "into two broad categories: promotional -- advertising intended to stimulate the purchase of utility services -- and institutional and informational, a broad category inclusive of all advertising not clearly intended to promote sales." n1 App. to Juris. **[**2348]** Statement 35a. The Commission **[***347]** declared all promotional advertising contrary to the national policy of conserving energy. It acknowledged that the ban is not a perfect vehicle for conserving energy. For example, the Commission's order prohibits promotional advertising to develop consumption during periods when demand for electricity is low. By limiting growth in "off-peak" consumption, the ban limits the "beneficial side effects" of such growth in terms of more efficient use of existing powerplants. *Id.*, at 37a. And since oil dealers are not under the Commission's jurisdiction and **[*560]** thus remain free to advertise, it was recognized that the ban can achieve only "piecemeal conservationism." Still, the Commission adopted the restriction because it was deemed likely to "result in some dampening of unnecessary growth" in energy consumption. *Ibid.*

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -


n1 The dissenting opinion attempts to construe the Policy Statement to authorize advertising that would result "in a net energy savings" even if the advertising encouraged consumption of additional electricity. *Post*, at 604-605. The attempted construction fails, however, since the Policy Statement is phrased only in terms of advertising that promotes "the purchase of utility services" and "sales" of electricity. Plainly, the Commission did not intend to permit advertising that would enhance net energy efficiency by increasing consumption of electrical services.


- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The Commission's order explicitly permitted "informational" advertising designed to encourage "*shifts* of consumption" from peak demand times to periods of low electricity demand. *Ibid.* (emphasis in original). Informational advertising would not seek to increase aggregate consumption, but would invite a leveling of demand throughout any given 24-hour period. The agency offered to review "specific proposals by the companies for specifically described [advertising] programs that meet these criteria." *Id.*, at 38a.

**Exhibit 27**, p.11

When it rejected requests for rehearing on the Policy Statement, the Commission supplemented its rationale for the advertising ban. The agency observed that additional electricity probably would be more expensive to produce than existing output. Because electricity rates in New York were not then based on marginal cost, n2 the Commission feared that additional power would be priced below the actual cost of generation. The additional electricity would be subsidized by all consumers through generally higher rates. *Id.*, at 57a-58a. The state agency also thought that promotional advertising would give "misleading signals" to the public by appearing to encourage energy consumption at a time when conservation is needed. *Id.*, at 59a.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n2 "Marginal cost" has been defined as the "*extra* or incremental cost of producing an *extra* unit of output." P. Samuelson, Economics 463 (10th ed. 1976) (emphasis in original).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Appellant challenged the order in state court, arguing that the Commission had restrained commercial speech in violation of the First and Fourteenth Amendments. n3 The Commission's **[*561]** order was upheld by the trial court and at the intermediate appellate level. n4 The New York Court of Appeals affirmed. It found little value to advertising in "the noncompetitive market in which electric corporations operate." *Consolidated Edison Co*. v. *Public Service Comm'n*, 47 N. Y. 2d 94, 110, 390 N. E. 2d 749, 757 (1979). Since consumers "have no choice regarding the source of their electric power," the court denied that "promotional advertising of electricity might contribute to society's interest in 'informed and reliable' economic decisionmaking." *Ibid*. The court also observed that by encouraging **[***348]** consumption, promotional advertising would only exacerbate the current energy situation. *Id.*, at 110, 390 N. E. 2d, at 758. The court concluded that the governmental interest in **[**2349]** the prohibition outweighed the limited constitutional value of the commercial speech at issue. We noted probable jurisdiction, 444 U.S. 962 (1979), and now reverse.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n3 Central Hudson also alleged that the Commission's order reaches beyond the agency's statutory powers. This argument was rejected by the New York Court of Appeals, *Consolidated Edison Co.* v. *Public Service Comm'n*, 47 N. Y. 2d 94, 102-104, 390 N. E. 2d 749, 752-754 (1979), and was not argued to this Court.

n4 *Consolidated Edison Co.* v. *Public Service Comm'n*, 63 App. Div. 2d 364, 407 N. Y. S. 2d 735 (1978); App. to Juris. Statement 22a (N. Y. Sup. Ct., Feb. 17, 1978).

**Exhibit 27**, p.12

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

II

**[\*\*\*LEdHR2]**  [2]*LEdHR(2)* The Commission's order restricts only *HN1* commercial speech, that is, expression related solely to the economic interests of the speaker and its audience. *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council*, 425 U.S. 748, 762 (1976); *Bates* v. *State Bar of Arizona*, 433 U.S. 350, 363-364 (1977); *Friedman* v. *Rogers*, 440 U.S. 1, 11 (1979). *HN2* The First Amendment, as applied to the States through the Fourteenth Amendment, protects commercial speech from unwarranted governmental regulation. *Virginia Pharmacy Board*, 425 U.S., at 761-762. *HN3* Commercial expression not only serves the economic interest of the speaker, but also assists consumers and furthers the societal interest in the fullest possible  **[\*562]**  dissemination of information. In applying the First Amendment to this area, we have rejected the "highly paternalistic" view that government has complete power to suppress or regulate commercial speech. "[People] will perceive their own best interests if only they are well enough informed, and . . . the best means to that end is to open the channels of communication, rather than to close them. . . ." *Id.*, at 770; see *Linmark Associates, Inc.* v. *Willingboro*, 431 U.S. 85, 92 (1977). Even when advertising communicates only an incomplete version of the relevant facts, the First Amendment presumes that some accurate information is better than no information at all. *Bates* v. *State Bar of Arizona, supra*, at 374.

**[\*\*\*LEdHR3A]**  [3A]*LEdHR(3A)* **[\*\*\*LEdHR4]**  [4]*LEdHR(4)* Nevertheless, *HN4* our decisions have recognized "the 'commonsense' distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech. " *Ohralik* v. *Ohio State Bar Assn.*, 436 U.S. 447, 455-456 (1978); see *Bates* v. *State Bar of Arizona, supra*, at 381; see also Jackson & Jeffries, Commercial Speech: Economic Due Process and the First Amendment, 65 Va. L. Rev. 1, 38-39 (1979). n5  **[\*\*2350]**  The  **[\*563]**  Constitution therefore  **[\*\*\*349]**  accords a lesser protection to commercial speech than to other constitutionally guaranteed expression. 436 U.S., at 456, 457. The protection available for particular commercial expression turns on the nature both of the expression and of the governmental interests served by its regulation.

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n5 In an opinion concurring in the judgment, MR. JUSTICE STEVENS suggests that the Commission's order reaches beyond commercial speech to suppress expression that is entitled to the full protection of the First Amendment. See *post*, at 580-581. We find no support for this claim in the record of this case. The Commission's Policy Statement excluded "institutional and informational" messages from the advertising ban, which was restricted to all advertising "clearly intended to promote sales." App. to Juris. Statement 35a. The complaint alleged only that the "prohibition of promotional advertising by Petitioner is not reasonable regulation of Petitioner's commercial speech. . . ." *Id.*, at 70a. Moreover, the state-court opinions and the arguments of the parties before this Court also viewed this litigation as involving only commercial speech. Nevertheless, the concurring opinion of MR. JUSTICE STEVENS

file:///C|/Documents%20and%20Settings/kmelwell.KMELWE...Client%20Files/Schmidt/Smith/centralhudsonopinion.htm (13 of 46)2/10/2006 5:02:26 PM

**Exhibit 27**, p.13

views the Commission's order as suppressing more than commercial speech because it would outlaw, for example, advertising that promoted electricity consumption by touting the environmental benefits of such uses. See *post*, at 581. Apparently the opinion would accord full First Amendment protection to all promotional advertising that includes claims "relating to . . . questions frequently discussed and debated by our political leaders." *Ibid*.

**[\*\*\*LEdHR3B]**   [3B]*LEdHR(3B)*⬆Although this approach responds to the serious issues surrounding our national energy policy as raised in this case, we think it would blur further the line the Court has sought to draw in commercial speech cases. It would grant broad constitutional protection to any advertising that links a product to a current public debate. But many, if not most, products may be tied to public concerns with the environment, energy, economic policy, or individual health and safety. We rule today in *Consolidated Edison Co.* v. *Public Service Comm'n, ante*, p. 530, that utilities enjoy the full panoply of First Amendment protections for their direct comments on public issues. There is no reason for providing similar constitutional protection when such statements are made only in the context of commercial transactions. In that context, for example, the State retains the power to "[insure] that the stream of commercial information [flows] cleanly as well as freely." *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council*, 425 U.S. 748, 772 (1975). This Court's decisions on commercial expression have rested on the premise that *HN5* ⬆such speech, although meriting some protection, is of less constitutional moment than other forms of speech. As we stated in *Ohralik*, the failure to distinguish between commercial and noncommercial speech "could invite dilution, simply by a leveling process, of the force of the [First] Amendment's guarantee with respect to the latter kind of speech." 436 U.S., at 456.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

**[\*\*\*LEdHR5]**   [5]*LEdHR(5)*⬆*HN6*⬆The First Amendment's concern for commercial speech is based on the informational function of advertising. See *First National Bank of Boston* v. *Bellotti*, 435 U.S. 765, 783 (1978). Consequently, there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity. The government may ban forms of communication more likely to deceive the public than to inform it, *Friedman* v. *Rogers, supra*, at 13, 15-16; *Ohralik* v. *Ohio State Bar Assn., supra*, at 464-465, or **[\*564]**   commercial speech related to illegal activity, *Pittsburgh Press Co.* v. *Human Relations Comm'n*, 413 U.S. 376, 388 (1973). n6

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n6 In most other contexts, the First Amendment prohibits regulation based on the content of the message. *Consolidated Edison Co.* v. *Public Service Comm'n, ante*, at 537-540. *HN7*⬆Two features of commercial speech permit regulation of its content. First, commercial speakers have extensive knowledge of both the market and their products. Thus, they are well situated to evaluate the accuracy of their messages and the lawfulness of the underlying activity. *Bates* v. *State Bar of Arizona*, 433 U.S. 350,

file:///C|/Documents%20and%20Settings/kmelwell.KMELWE...Client%20Files/Schmidt/Smith/centralhudsonopinion.htm (14 of 46)2/10/2006 5:02:26 PM

**Exhibit 27** - **p.14**

381 (1977). In addition, commercial speech, the offspring of economic self-interest, is a hardy breed of expression that is not "particularly susceptible to being crushed by overbroad regulation." *Ibid.*

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

**[\*\*\*LEdHR6]**  [6]*LEdHR(6)* *HN8* If the communication is neither misleading nor related to unlawful activity, the government's power is more circumscribed. The State must assert a substantial interest **[\*\*\*350]**  to be achieved by restrictions on commercial speech. Moreover, the regulatory technique must be in proportion to that interest. The limitation on expression must be designed carefully to achieve the State's goal. Compliance with this requirement may be measured by two criteria. First, the restriction must directly advance the state interest involved; the regulation may not be sustained if it provides only ineffective or remote support for the government's purpose. Second, if the governmental interest could be served as well by a more limited restriction on commercial speech, the excessive restrictions cannot survive.

Under the first criterion, the Court has declined to uphold regulations that only indirectly advance the state interest involved. In both *Bates* and *Virginia Pharmacy Board*, the Court concluded that an advertising ban could not be imposed to protect the ethical or performance standards of a profession. The Court noted in *Virginia Pharmacy Board* that "[the] advertising ban does not directly affect professional standards one way or the other." 425 U.S., at 769. In *Bates*, the Court overturned an advertising prohibition that was designed to protect the "quality" of a lawyer's work. **[\*565]**  "Restraints on advertising . . . are an ineffective way of deterring shoddy work." 433 U.S., at 378. n7

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n7 In *Linmark Associates, Inc.* v. *Willingboro*, 431 U.S. 85, 95-96 (1977), we observed that there was no definite connection between the township's goal of integrated housing and its ban on the use of "For Sale" signs in front of houses.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

**[\*\*2351]**  **[\*\*\*LEdHR7]**  [7]*LEdHR(7)* **[\*\*\*LEdHR8A]**  [8A]*LEdHR(8A)* **[\*\*\*LEdHR9A]**  [9A]*LEdHR(9A)* The second criterion recognizes that *HN9* the First Amendment mandates that speech restrictions be "narrowly drawn." *In re Primus*, 436 U.S. 412, 438 (1978). n8 The regulatory technique may extend only as far as the interest it serves. The State cannot regulate speech that poses no danger to the asserted state interest, see *First National Bank of Boston* v. *Bellotti, supra*, at 794-795, nor can it completely suppress information when narrower restrictions on expression would serve its interest as well. For example, in *Bates* the Court explicitly did not "foreclose the possibility that some limited supplementation, by way of warning or disclaimer or the like, might be required" in promotional materials. 433 U.

file:///C|/Documents%20and%20Settings/kmelwell.KMELWE...Client%20Files/Schmidt/Smith/centralhudsonopinion.htm (15 of 46)2/10/2006 5:02:26 PM

Exhibit 27 p.15

S., at 384. See *Virginia Pharmacy* **[\*\*\*351]** *Board, supra*, at 773. And in *Carey* v. *Population Services International*, 431 U.S. 678, 701-702 (1977), we held that the State's "arguments . . . do not justify the total suppression of advertising concerning contraceptives." This holding left open the possibility that **[\*566]** the State could implement more carefully drawn restrictions. See *id.*, at 712 (POWELL, J., concurring in part and in judgment); *id.*, at 716-717 (STEVENS, J., concurring in part and in judgment). n9

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

**[\*\*\*LEdHR8B]**   [8B]*LEdHR(8B)*

n8 This analysis is not an application of the "overbreadth" doctrine. The latter theory permits the invalidation of regulations on First Amendment grounds even when the litigant challenging the regulation has engaged in no constitutionally protected activity. *E. g., Kunz* v. *New York*, 340 U.S. 290 (1951). The overbreadth doctrine derives from the recognition that unconstitutional restriction of expression may deter protected speech by parties not before the court and thereby escape judicial review. *Broadrick* v. *Oklahoma*, 413 U.S. 601, 612-613 (1973); see Note, The First Amendment Overbreadth Doctrine, 83 Harv. L. Rev. 844, 853-858 (1970). This restraint is less likely where the expression is linked to "commercial well-being" and therefore is not easily deterred by "overbroad regulation." *Bates* v. *State Bar of Arizona, supra*, at 381.

In this case, the Commission's prohibition acts directly against the promotional activities of Central Hudson, and to the extent the limitations are unnecessary to serve the State's interest, they are invalid.

**[\*\*\*LEdHR9B]**   [9B]*LEdHR(9B)*

n9 We *HN10* review with special care regulations that entirely suppress commercial speech in order to pursue a nonspeech-related policy. In those circumstances, a ban on speech could screen from public view the underlying governmental policy. See *Virginia Pharmacy Board*, 425 U.S., at 780, n. 8 (STEWART, J., concurring). Indeed, in recent years this Court has not approved a blanket ban on commercial speech unless the expression itself was flawed in some way, either because it was deceptive or related to unlawful activity.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

**[\*\*\*LEdHR10]**   [10]*LEdHR(10)* *HN11* In commercial speech cases, then, a four-part analysis has developed. At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive

file:///C|/Documents%20and%20Settings/kmelwell.KMELWE...Client%20Files/Schmidt/Smith/centralhudsonopinion.htm (16 of 46)2/10/2006 5:02:26 PM)

**Exhibit 27** p.16

than is necessary to serve that interest.

III

[***LEdHR1B]  [1B]*LEdHR(1B)*We now apply this four-step analysis for commercial speech to the Commission's arguments in support of its ban on promotional advertising.

A

The Commission does not claim that the expression at issue either is inaccurate or relates to unlawful activity. Yet the New York Court of Appeals questioned whether Central Hudson's advertising is protected commercial speech. Because appellant holds a monopoly over the sale of electricity in its service area, the state court suggested that the Commission's order restricts no commercial speech of any worth. The court stated that advertising in a "noncompetitive market" **[*567]** could not improve the **[**2352]** decisionmaking of consumers. 47 N. Y. 2d, at 110, 390 N. E. 2d, at 757. The court saw no constitutional problem with barring commercial speech that it viewed as conveying little useful information.

This reasoning falls short of establishing that appellant's advertising is not commercial speech protected by the First Amendment. Monopoly over the supply of a product provides no protection from competition with substitutes for that product. Electric utilities compete with suppliers of fuel oil and natural gas in several markets, such as those for home heating and industrial power. This Court noted the existence of interfuel competition 45 years ago, see *West Ohio Gas Co*. v. *Public Utilities Comm'n*, 294 U.S. 63, 72 (1935). Each energy source continues to offer peculiar advantages and disadvantages **[***352]** that may influence consumer choice. For consumers in those competitive markets, advertising by utilities is just as valuable as advertising by unregulated firms. n10

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n10 Several commercial speech decisions have involved enterprises subject to extensive state regulation. *E. g., Friedman* v. *Rogers*, 440 U.S. 1, 4-5 (1979) (optometrists); *Bates* v. *State Bar of Arizona*, 433 U.S. 350 (1977) (lawyers); *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council, supra*, at 750-752 (pharmacists).

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

*HN12*Even in monopoly markets, the suppression of advertising reduces the information available for consumer decisions and thereby defeats the purpose of the First Amendment. The New York court's argument appears to assume that the providers of a monopoly service or product are willing to pay for wholly ineffective advertising. Most businesses -- even regulated monopolies -- are unlikely to underwrite promotional advertising that is of no interest or use to consumers. Indeed, a monopoly enterprise legitimately may wish to inform the public that it has

**Exhibit 27  p.17**

file:///C|/Documents%20and%20Settings/kmelwell.KMELWE...Client%20Files/Schmidt/Smith/centralhudsonopinion.htm (17 of 46)2/10/2006 5:02:26 PM

developed new services or terms of doing business. A consumer may need information to aid his decision whether or not to use the monopoly service at all, or how much of the service he should purchase. In the absence of factors that would distort the decision to advertise, we **[\*568]** may assume that the willingness of a business to promote its products reflects a belief that consumers are interested in the advertising. n11 Since no such extraordinary conditions have been identified in this case, appellant's monopoly position does not alter the First Amendment's protection for its commercial speech.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n11 There may be a greater incentive for a utility to advertise if it can use promotional expenses in determining its rate of return, rather than pass those costs on solely to shareholders. That practice, however, hardly distorts the economic decision whether to advertise. Unregulated businesses pass on promotional costs to consumers, and this Court expressly approved the practice for utilities in *West Ohio Gas Co.* v. *Public Utilities Comm'n*, 294 U.S. 63, 72 (1935).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

B

The Commission offers two state interests as justifications for the ban on promotional advertising. The first concerns energy conservation. Any increase in demand for electricity -- during peak or off-peak periods -- means greater consumption of energy. The Commission argues, and the New York court agreed, that the State's interest in conserving energy is sufficient to support suppression of advertising designed to increase consumption of electricity. In view of our country's dependence on energy resources beyond our control, no one can doubt the importance of energy conservation. Plainly, therefore, the state interest asserted is substantial.

The Commission also argues that promotional advertising will aggravate inequities caused by the failure to base the utilities' rates on marginal cost. The utilities argued to the Commission that if they could promote the use of electricity in periods of low demand, they would improve their utilization of generating capacity. The Commission responded that promotion of off-peak consumption also would increase consumption **[\*\*2353]** during peak periods. If peak demand were to rise, the absence of marginal **[\*\*\*353]** cost rates would mean that the rates charged for the additional power would not reflect the true costs of expanding production. Instead, the extra costs would **[\*569]** be borne by all consumers through higher overall rates. Without promotional advertising, the Commission stated, this inequitable turn of events would be less likely to occur. The choice among rate structures involves difficult and important questions of economic supply and distributional fairness. n12 The State's concern that rates be fair and efficient represents a clear and substantial governmental interest.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

**Exhibit 27, p.18**

n12 See W. Jones, Regulated Industries 191-287 (2d ed. 1976).


- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

C

Next, we focus on the relationship between the State's interests and the advertising ban. Under this criterion, the Commission's laudable concern over the equity and efficiency of appellant's rates does not provide a constitutionally adequate reason for restricting protected speech. The link between the advertising prohibition and appellant's rate structure is, at most, tenuous. The impact of promotional advertising on the equity of appellant's rates is highly speculative. Advertising to increase off-peak usage would have to increase peak usage, while other factors that directly affect the fairness and efficiency of appellant's rates remained constant. Such conditional and remote eventualities simply cannot justify silencing appellant's promotional advertising.

In contrast, the State's interest in energy conservation is directly advanced by the Commission order at issue here. There is an immediate connection between advertising and demand for electricity. Central Hudson would not contest the advertising ban unless it believed that promotion would increase its sales. Thus, we find a direct link between the state interest in conservation and the Commission's order.

D

We come finally to the critical inquiry in this case: whether the Commission's complete suppression of speech ordinarily protected by the First Amendment is no more extensive than **[*570]** necessary to further the State's interest in energy conservation. The Commission's order reaches all promotional advertising, regardless of the impact of the touted service on overall energy use. But the energy conservation rationale, as important as it is, cannot justify suppressing information about electric devices or services that would cause no net increase in total energy use. In addition, no showing has been made that a more limited restriction on the content of promotional advertising would not serve adequately the State's interests.

Appellant insists that but for the ban, it would advertise products and services that use energy efficiently. These include the "heat pump," which both parties acknowledge to be a major improvement in electric heating, and the use of electric heat as a "backup" to solar and other heat sources. Although the Commission has questioned the efficiency of electric heating before this Court, neither the Commission's Policy Statement nor its order denying rehearing made findings on this issue. **[***354]** In the absence of authoritative findings to the contrary, we must credit as within the realm of possibility the claim that electric heat can be an efficient alternative in some circumstances.

The Commission's order prevents appellant from promoting electric services that would reduce energy use by diverting demand from less efficient sources, or that

file:///C|/Documents%20and%20Settings/kmelwell.KMELWE...Client%20Files/Schmidt/Smith/centralhudsonopinion.htm (19 of 46)2/10/2006 5:02:26 PM

**Exhibit 27** p.19

would consume roughly the same amount of energy as do alternative sources. In neither situation would the utility's advertising endanger conservation or mislead the public. **HN13** To the extent that the Commission's order suppresses speech that in no way impairs the State's interest in energy conservation, the Commission's order violates the First and Fourteenth Amendments and must be invalidated. See *First* **[\*\*2354]** *National Bank of Boston* v. *Bellotti*, 435 U.S. 765 (1978).

The Commission also has not demonstrated that its interest in conservation cannot be protected adequately by more limited regulation of appellant's commercial expression. To further **[\*571]** its policy of conservation, the Commission could attempt to restrict the format and content of Central Hudson's advertising. It might, for example, require that the advertisements include information about the relative efficiency and expense of the offered service, both under current conditions and for the foreseeable future. Cf. *Banzhaf* v. *FCC*, 132 U. S. App. D. C. 14, 405 F.2d 1082 (1968), cert. denied *sub nom. Tobacco Institute, Inc*. v. *FCC*, 396 U.S. 842 (1969). n13 In the absence of a showing that more limited speech regulation would be ineffective, we cannot approve the complete suppression of Central Hudson's advertising. n14

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n13 The Commission also might consider a system of previewing advertising campaigns to insure that they will not defeat conservation policy. It has instituted such a program for approving "informational" advertising under the Policy Statement challenged in this case. See *supra*, at 560. We have observed that commercial speech is such a sturdy brand of expression that traditional prior restraint doctrine may not apply to it. *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council*, 425 U.S., at 771-772, n. 24. And in other areas of speech regulation, such as obscenity, we have recognized that a prescreening arrangement can pass constitutional muster if it includes adequate procedural safeguards. *Freedman* v. *Maryland*, 380 U.S. 51 (1965).

n14 In view of our conclusion that the Commission's advertising policy violates the First and Fourteenth Amendments, we do not reach appellant's claims that the agency's order also violated the Equal Protection Clause of the Fourteenth Amendment, and that it is both overbroad and vague.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

IV

**[\*\*\*LEdHR11]**  [11] *LEdHR(11)* Our decision today in no way disparages the national interest in energy conservation. We accept without reservation the argument that conservation, as well as the development of alternative energy sources, is an imperative national goal. **HN14** Administrative bodies empowered to regulate electric utilities have the authority -- and indeed the duty -- to take appropriate action to further this goal. When, however, such action involves **[\*572]** the suppression of speech, the First and Fourteenth Amendments require that the restriction be no more

file:///C|/Documents%20and%20Settings/kmelwell.KMELWE...Client%20Files/Schmidt/Smith/centralhudsonopinion.htm (20 of 46)2/10/2006 5:02:26 PM

**Exhibit 27** p.20

extensive than is necessary to serve the state interest. In this case, the record before us fails to show that the total ban on **[\*\*\*355]** promotional advertising meets this requirement. n15

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n15 The Commission order at issue here was not promulgated in response to an emergency situation. Although the advertising ban initially was prompted by critical fuel shortage in 1973, the Commission makes no claim that an emergency now exists. We do not consider the powers that the State might have over utility advertising in emergency circumstances. See *State* v. *Oklahoma Gas & Electric Co.*, 536 P. 2d 887, 895-896 (Okla. 1975).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Accordingly, the judgment of the New York Court of Appeals is

*Reversed*.

**CONCURBY:** BRENNAN; BLACKMUN; STEVENS

**CONCUR: [\*\*\*355contd]**
[EDITOR'S NOTE: The page numbers of this document may appear to be out of sequence; however, this pagination accurately reflects the pagination of the original published document.]

MR. JUSTICE BRENNAN, concurring in the judgment.

One of the major difficulties in this case is the proper characterization of the Commission's Policy Statement. I find it impossible to determine on the present record whether the Commission's ban on all "promotional" advertising, in contrast to "institutional and informational" advertising, see *ante*, at 559, is intended to encompass more than "commercial speech." I am inclined to think that MR. JUSTICE STEVENS is correct that the Commission's order prohibits more than mere proposals to engage in certain kinds of commercial transactions, and therefore I agree with his conclusion that the ban surely violates the First and Fourteenth Amendments. But even on the assumption that the Court is correct that the Commission's order reaches only commercial speech, I agree with MR. JUSTICE BLACKMUN that "[no] differences between **[\*\*2355]** commercial speech and other protected speech justify suppression of commercial speech in order to influence public conduct through manipulation of the availability of information." *Post*, at 578.

Accordingly, with the qualifications implicit in the preceding **[\*573]** paragraph, I join the opinions of MR. JUSTICE BLACKMUN and MR. JUSTICE STEVENS concurring in the judgment.

MR. JUSTICE BLACKMUN, with whom MR. JUSTICE BRENNAN joins, concurring in the judgment.

file:///C|/Documents%20and%20Settings/kmelwell.KMELWE...Client%20Files/Schmidt/Smith/centralhudsonopinion.htm (21 of 46)2/10/2006 5:02:26 PM

**Exhibit 27**, p.21

I agree with the Court that the Public Service Commission's ban on promotional advertising of electricity by public utilities is inconsistent with the First and Fourteenth Amendments. I concur only in the Court's judgment, however, because I believe the test now evolved and applied by the Court is not consistent with our prior cases and does not provide adequate protection for truthful, nonmisleading, noncoercive commercial speech.

The Court asserts, *ante*, at 566, that "a four-part analysis has developed" from our decisions concerning commercial speech. Under this four-part test a restraint on commercial "communication [that] is neither misleading nor related to unlawful activity" is subject to an intermediate level of scrutiny, and suppression is permitted whenever it "directly advances" a "substantial" governmental interest and is "not more extensive than is necessary to serve that interest." *Ante*, at 564 and 566. I agree with the Court that this level of intermediate scrutiny is appropriate for a restraint on commercial speech designed to protect consumers from misleading or coercive speech, or a regulation related **[***356]** to the time, place, or manner of commercial speech. I do not agree, however, that the Court's four-part test is the proper one to be applied when a State seeks to suppress information about a product in order to manipulate a private economic decision that the State cannot or has not regulated or outlawed directly.

Since the Court, without citing empirical data or other authority, finds a "direct link" between advertising and energy consumption, it leaves open the possibility that the State may suppress advertising of electricity in order to lessen demand for electricity. I, of course, agree with the Court that, **[*574]** in today's world, energy conservation is a goal of paramount national and local importance. I disagree with the Court, however, when it says that suppression of speech may be a permissible means to achieve that goal. MR. JUSTICE STEVENS appropriately notes: "The justification for the regulation is nothing more than the expressed fear that the audience may find the utility's message persuasive. Without the aid of any coercion, deception, or misinformation, truthful communication may persuade some citizens to consume more electricity than they otherwise would." *Post* , at 581.

The Court recognizes that we have never held that commercial speech may be suppressed in order to further the State's interest in discouraging purchases of the underlying product that is advertised. *Ante*, at 566, n. 9. Permissible restraints on commercial speech have been limited to measures designed to protect consumers from fraudulent, misleading, or coercive sales techniques. n1 Those designed to deprive consumers of information about products or services that are legally offered for sale consistently have been invalidated. n2

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 See *Friedman* v. *Rogers*, 440 U.S. 1, 10 (1979) (Court upheld a ban on practice of optometry under a trade name as a permissible requirement that commercial information "'appear in such a form . . . as [is] necessary to prevent its being deceptive,'" quoting from *Virginia Pharmacy Board* v. *Virginia Consumer Council*, 425

file:///C|/Documents%20and%20Settings/kmelwell.KMELWE...Client%20Files/Schmidt/Smith/centralhudsonopinion.htm (22 of 46)2/10/2006 5:02:26 PM

**Exhibit 27** p.22

U.S. 748, 772, n. 24 (1976)); *Ohralik* v. *Ohio State Bar Assn.*, 436 U.S. 447 (1978).

n2 See *Bates* v. *State Bar of Arizona*, 433 U.S. 350 (1977); *Carey* v. *Population Services International*, 431 U.S. 678, 700-702 (1977); *Linmark Associates, Inc.* v. *Willingboro*, 431 U.S. 85 (1977); *Virginia Pharmacy Board* v. *Virginia Consumer Council*, 425 U.S. 748 (1976); *Bigelow* v. *Virginia*, 421 U.S. 809 (1975).

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

**[\*\*2356]** I seriously doubt whether suppression of information concerning the availability and price of a legally offered product is ever a permissible way for the State to "dampen" demand for or use of the product. Even though "commercial" speech is involved, such a regulatory measure strikes at the heart of the First Amendment. This is because it is a covert attempt **[\*575]** by the State to manipulate the choices of its citizens, not by persuasion or direct regulation, but by depriving the public of the information needed to make a free choice. As the Court recognizes, the State's policy choices are insulated from the visibility and scrutiny that direct regulation would entail and the conduct of citizens is molded by the information that government chooses to give them. *Ante*, at 566, n. 9 **[\*\*\*357]** ("We review with special care regulations that entirely suppress commercial speech in order to pursue a nonspeech-related policy. In those circumstances, a ban on speech could screen from public view the underlying governmental policy"). See Rotunda, The Commercial Speech Doctrine in the Supreme Court, 1976 U. Ill. Law Forum 1080, 1080-1083.

If the First Amendment guarantee means anything, it means that, absent clear and present danger, government has no power to restrict expression because of the effect its message is likely to have on the public. See generally Comment, First Amendment Protection for Commercial Advertising: The New Constitutional Doctrine, 44 U. Chi. L. Rev. 205, 243-251 (1976). Our cases indicate that this guarantee applies even to commercial speech. In *Virginia Pharmacy Board* v. *Virginia Consumer Council*, 425 U. S. 748 (1976), we held that Virginia could not pursue its goal of encouraging the public to patronize the "professional pharmacist" (one who provided individual attention and a stable pharmacist-customer relationship) by "keeping the public in ignorance of the entirely lawful terms that competing pharmacists are offering." *Id.*, at 770. We noted that our decision left the State free to pursue its goal of maintaining high standards among its pharmacists by "[requiring] whatever professional standards it wishes of its pharmacists." *Ibid.*

We went on in *Virginia Pharmacy Board* to discuss the types of regulation of commercial speech that, due to the "commonsense differences" between this form of speech and other forms, are or may be constitutionally permissible. We indicated that government may impose reasonable "time, **[\*576]** place, and manner" restrictions, and that it can deal with false, deceptive, and misleading commercial speech. We noted that the question of advertising of illegal transactions and the special problems of the electronic broadcast media were not presented.

file:///C|/Documents%20and%20Settings/kmelwell.KMELWE...Client%20Files/Schmidt/Smith/centralhudsonopinion.htm (23 of 46)2/10/2006 5:02:26 PM

**Exhibit 27, p.23**

Concluding with a restatement of the type of restraint that is not permitted, we said: "What is at issue is whether a State may completely suppress the dissemination of concededly truthful information about entirely lawful activity, fearful of that information's effect upon its disseminators and its recipients. . . . [We] conclude that the answer to this [question] is in the negative." *Id.*, at 773.

*Virginia Pharmacy Board* did not analyze the State's interests to determine whether they were "substantial." Obviously, preventing professional dereliction and low quality health care are "substantial," legitimate, and important state goals. Nor did the opinion analyze the ban on speech to determine whether it "directly [advanced], " *ante*, at 566, 569, these goals. We also did not inquire whether a "more limited regulation of . . . commercial expression," *ante*, at 570, would adequately serve the State's interests. Rather, we held that the State "may *not* [pursue its goals] by keeping the public in ignorance." 425 U.S., at 770.  **[**2357]**  (Emphasis supplied.)

Until today, this principle has governed.  **[***358]**  In *Linmark Associates, Inc.* v. *Willingboro*, 431 U.S. 85 (1977), we considered whether a town could ban "For Sale" signs on residential property to further its goal of promoting stable, racially integrated housing. We did note that the record did not establish that the ordinance was necessary to enable the State to achieve its goal. The holding of *Linmark*, however, was much broader. n3 We stated:

"The constitutional defect in this ordinance, however,  **[*577]**  is far more basic. The Township Council here, like the Virginia Assembly in *Virginia Pharmacy Bd.*, acted to prevent its residents from obtaining certain information . . . which pertains to sales activity in Willingboro. . . . The Council has sought to restrict the free flow of these data because it fears that otherwise homeowners will make decisions inimical to what the Council views as the homeowners' self-interest and the corporate interest of the township: they will choose to leave town. The Council's concern, then, was not with any commercial aspect of "For Sale" signs -- with offerors communicating offers to offerees -- but with the substance of the information communicated to Willingboro citizens." *Id.*, at 96.

The Court in *Linmark* resolved beyond all doubt that a strict standard of review applies to suppression of commercial information, where the purpose of the restraint is to influence behavior by depriving citizens of information. The Court followed the strong statement above with an explicit adoption of the standard advocated by Mr. Justice Brandeis in his concurring opinion in *Whitney* v. *California*, 274 U.S. 357, 377 (1927): "If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence. Only an emergency can justify repression." 431 U.S., at 97.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n3 In my view, the Court today misconstrues the holdings of both *Virginia Pharmacy Board* and *Linmark Associates* by implying that those decisions were based on the fact

file:///C|/Documents%20and%20Settings/kmelwell.KMELWE...Client%20Files/Schmidt/Smith/centralhudsonopinion.htm (24 of 46)2/10/2006 5:02:26 PM

**Exhibit 27**, p.24

that the restraints were not closely enough related to the governmental interests asserted. See *ante*, at 564-565, and n. 7. Although the Court noted the lack of substantial relationship between the restraint and the governmental interest in each of those cases, the holding of each clearly rested on a much broader principle.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

*Carey* v. *Population Services International*, 431 U.S. 678, 700-702 (1977), also applied to content-based restraints on commercial speech the same standard of review we have applied to other varieties of speech. There the Court held that a ban on advertising of contraceptives could not be justified **[\*578]** by the State's interest in avoiding "'legitimation' of illicit sexual behavior" because the advertisements could not be characterized as "'directed to inciting or producing imminent lawless action and . . . likely to incite or produce such action,'" *id.*, at 701, quoting *Brandenburg* v. *Ohio*, 395 U.S. 444, 447 (1969).

Our prior references to the "'commonsense differences'" between commercial speech and other **[\*\*\*359]** speech "'suggest that a different degree of protection is necessary to insure that the flow of truthful and legitimate commercial information is unimpaired.'" *Linmark Associates*, 431 U.S., at 98, quoting *Virginia Pharmacy Board*, 425 U.S., at 771-772, n. 24. We have not suggested that the "commonsense differences" between commercial speech and other speech justify relaxed scrutiny of restraints that suppress truthful, nondeceptive, noncoercive commercial speech. The differences articulated by the Court, see *ante*, at 564, n. 6, justify a more permissive approach to regulation of the manner of commercial speech for the purpose of protecting consumers from deception or coercion, and these differences explain why doctrines designed to prevent "chilling" of protected **[\*\*2358]** speech are inapplicable to commercial speech. No differences between commercial speech and other protected speech justify suppression of commercial speech in order to influence public conduct through manipulation of the availability of information. The Court stated in *Carey* v. *Population Services International*:

"Appellants suggest no distinction between commercial and noncommercial speech that would render these discredited arguments meritorious when offered to justify prohibitions on commercial speech. On the contrary, such arguments are clearly directed not at any commercial aspect of the prohibited advertising but at the ideas conveyed and form of expression -- *the core of First Amendment values*." 431 U.S., at 701, n. 28 (emphasis added).

 **[\*579]**  It appears that the Court would permit the State to ban all direct advertising of air conditioning, assuming that a more limited restriction on such advertising would not effectively deter the public from cooling its homes. In my view, our cases do not support this type of suppression. If a governmental unit believes that use or overuse of air conditioning is a serious problem, it must attack that problem directly, by prohibiting air conditioning or regulating thermostat levels. Just as the Commonwealth of Virginia may promote professionalism of pharmacists directly, so too New York may *not* promote energy conservation "by keeping the public in ignorance." *Virginia Pharmacy Board*, 425 U.S., at 770.

file:///C|/Documents%20and%20Settings/kmelwell.KMELWE...Client%20Files/Schmidt/Smith/centralhudsonopinion.htm (25 of 46)2/10/2006 5:02:26 PM

**Exhibit 27**  p.25

MR. JUSTICE STEVENS, with whom MR. JUSTICE BRENNAN joins, concurring in the judgment.

Because "commercial speech" is afforded less constitutional protection than other forms of speech, n1 it is important that the commercial speech concept not be defined too broadly lest speech deserving of greater constitutional protection be inadvertently suppressed. The issue in this case is whether New York's prohibition on the promotion of the use of electricity through advertising is a ban on nothing but commercial speech.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 See *Ohralik* v. *Ohio State Bar Assn.*, 436 U.S. 447, 456, quoted *ante*, at 563, n. 5. Cf. *Smith* v. *United States*, 431 U.S. 291, 318 (STEVENS, J., dissenting).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

In my judgment one of the two **[***360]** definitions the Court uses in addressing that issue is too broad and the other may be somewhat too narrow. The Court first describes commercial speech as "expression related solely to the economic interests of the speaker and its audience." *Ante*, at 561. Although it is not entirely clear whether this definition uses the subject matter of the speech or the motivation of the speaker as the limiting factor, it seems clear to me that it encompasses speech that is entitled to the maximum protection afforded by the First Amendment. Neither a labor leader's exhortation to **[*580]** strike, nor an economist's dissertation on the money supply, should receive any lesser protection because the subject matter concerns only the economic interests of the audience. Nor should the economic motivation of a speaker qualify his constitutional protection; even Shakespeare may have been motivated by the prospect of pecuniary reward. Thus, the Court's first definition of commercial speech is unquestionably too broad. n2

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 See Farber, Commercial Speech and First Amendment Theory, 74 Nw. U. L. Rev. 372, 382-383 (1979):

"Economic motivation could not be made a disqualifying factor [from maximum protection] without enormous damage to the first amendment. Little purpose would be served by a first amendment which failed to protect newspapers, paid public speakers, political candidates with partially economic motives and professional authors." (Footnotes omitted.)

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The Court's second definition refers to "'speech proposing a commercial transaction.'" *Ante*, at 562. A saleman's solicitation, a broker's offer, and a manufacturer's

file:///C|/Documents%20and%20Settings/kmelwell.KMELWE...Client%20Files/Schmidt/Smith/centralhudsonopinion.htm (26 of 46)2/10/2006 5:02:20 PM

**Exhibit 27, p.26**

publication of a price list or the terms of his standard warranty would unquestionably fit within this concept. n3 Presumably, **[\*\*2359]** the definition is intended to encompass advertising that advises possible buyers of the availability of specific products at specific prices and describes the advantages of purchasing such items. Perhaps it also extends to other communications that do little more than make the name of a product or a service more familiar to the general public. Whatever the precise contours of the concept, and perhaps it is too early to enunciate an exact formulation, I am persuaded that it should not include the entire range of communication that is embraced within the term "promotional advertising."

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n3 See *id.*, at 386-387.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

This case involves a governmental regulation that completely bans promotional advertising by an electric utility. This ban encompasses a great deal more than mere proposals to engage in certain kinds of commercial transactions. It prohibits all advocacy of the immediate or future use of electricity. **[\*581]** It curtails expression by an informed and interested group of persons of their point of view on questions relating to the production and consumption of electrical energy -- questions frequently discussed and debated by our political leaders. For example, an electric company's advocacy of the use of electric heat for environmental reasons, as opposed to wood-burning stoves, would seem to fall squarely within New York's promotional advertising ban and also within the bounds of maximum First Amendment protection. The breadth of the ban thus exceeds the boundaries of the commercial speech concept, however **[\*\*\*361]** that concept may be defined. n4

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n4 The utility's characterization of the Commission's ban in its complaint as involving commercial speech clearly does not bind this Court's consideration of the First Amendment issues in this new and evolving area of constitutional law.

Nor does the Commission's intention not to suppress "institutional and informational" speech insure that only "commercial speech" will be suppressed. The blurry line between the two categories of speech has the practical effect of requiring that the utilities either refrain from speech that is close to the line, or seek advice from the Public Service Commission. But the Commission does not possess the necessary expertise in dealing with these sensitive free speech questions; and, in any event, ordinarily speech entitled to maximum First Amendment protection may not be subjected to a prior clearance procedure with a government agency.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

file:///C|/Documents%20and%20Settings/kmelwell.KMELWE...Client%20Files/Schmidt/Smith/centralhudsonopinion.htm (27 of 46)2/10/2006 5:02:26 PM

Exhibit 27 p.27

The justification for the regulation is nothing more than the expressed fear that the audience may find the utility's message persuasive. Without the aid of any coercion, deception, or misinformation, truthful communication may persuade some citizens to consume more electricity than they otherwise would. I assume that such a consequence would be undesirable and that government may therefore prohibit and punish the unnecessary or excessive use of electricity. But if the perceived harm associated with greater electrical usage is not sufficiently serious to justify direct regulation, surely it does not constitute the kind of clear and present danger that can justify the suppression of speech.

**[\*582]**  Although they were written in a different context, the words used by Mr. Justice Brandeis in his concurring opinion in *Whitney* v. *California*, 274 U.S. 357, 376-377, explain my reaction to the prohibition against advocacy involved in this case:

"But even advocacy of violation, however reprehensible morally, is not a justification for denying free speech where the advocacy falls short of incitement and there is nothing to indicate that the advocacy would be immediately acted on. The wide difference between advocacy and incitement, between preparation and attempt, between assembling and conspiracy, must be borne in mind. In order to support a finding of clear and present danger it must be shown either that immediate serious violence was to be expected or was advocated, or that the past conduct furnished reason to believe that such advocacy was then contemplated.

"Those who won our independence by revolution were not cowards. They did not fear political change. They did not exalt order at the cost of liberty. To courageous, self-reliant men, with confidence  **[\*\*2360]**  in the power of free and fearless reasoning applied through the processes of popular government, no danger flowing from speech can be deemed clear and present, unless the incidence of the evil apprehended is so imminent that it may befall before there is opportunity for full discussion. If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence. Only an emergency can justify repression. Such must be the rule if authority is to be reconciled with freedom. Such, in my opinion, is  **[\*\*\*362]**  the command of the Constitution." (Footnote omitted.) n5

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n5 Mr. Justice Brandeis quoted Lord Justice Scrutton's comment in *King* v. *Secretary of State for Home Affairs ex parte O'Brien*, [1923] 2 K. B. 361, 382: "'You really believe in freedom of speech, if you are willing to allow it to men whose opinions seem to you wrong and even dangerous. . . .'" 274 U.S., at 377, n. 4.

See also *Young* v. *American Mini Theatres, Inc.*, 427 U.S. 50, 63 (opinion of STEVENS, J.).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

file:///C|/Documents%20and%20Settings/kmelwell.KMELWE...Client%20Files/Schmidt/Smith/centralhudsonopinion.htm (28 of 46)2/10/2006 5:02:26 PM

**Exhibit 27**, p.28

[*583] In sum, I concur in the result because I do not consider this to be a "commercial speech" case. Accordingly, I see no need to decide whether the Court's four-part analysis, *ante*, at 566, adequately protects commercial speech -- as properly defined -- in the face of a blanket ban of the sort involved in this case.

**DISSENTBY:** REHNQUIST

**DISSENT: [***362contd]**

[EDITOR'S NOTE: The page numbers of this document may appear to be out of sequence; however, this pagination accurately reflects the pagination of the original published document.]

MR. JUSTICE REHNQUIST, dissenting.

The Court today invalidates an order issued by the New York Public Service Commission designed to promote a policy that has been declared to be of critical national concern. The order was issued by the Commission in 1973 in response to the Mideastern oil embargo crisis. It prohibits electric corporations "from *promoting* the use of electricity through the use of advertising, subsidy payments . . . , or employee incentives." State of New York Public Service Commission, Case No. 26532 (Dec. 5, 1973), App. to Juris. Statement 31a (emphasis added). Although the immediate crisis created by the oil embargo has subsided, the ban on promotional advertising remains in effect. The regulation was re-examined by the New York Public Service Commission in 1977. Its constitutionality was subsequently upheld by the New York Court of Appeals, which concluded that the paramount national interest in energy conservation justified its retention. n1

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 The New York Court of Appeals stated:

"In light of current exigencies, one of the policies of any public service legislation must be the conservation of our vital and irreplaceable resources. The Legislature has but recently imposed upon the commission a duty 'to encourage all persons and corporations . . . to formulate and carry out long-range programs . . . [for] the preservation of environmental values and the conservation of natural resources' (Public Service Law, § 5, subd. 2). Implicit in this amendment is a legislative recognition of the serious situation which confronts our State and Nation. More important, conservation of resources has become an avowed legislative policy embodied in the commission's enabling act (see also, *Matter of New York State Council of Retail Merchants* v. *Public Serv. Comm. of State of N. Y.*, 45 N. Y. 2d 661, 673-674)." *Consolidated Edison Co.* v. *Public Service Comm'n*, 47 N. Y. 2d 94, 102-103, 390 N. E. 2d 749, 753 (1979).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*584] The Court's asserted justification for invalidating the New York law is the

file:///C|/Documents%20and%20Settings/kmelwell.KMELWE...Client%20Files/Schmidt/Smith/centralhudsonopinion.htm (29 of 46)2/10/2006 5:02:20 PM

**Exhibit 27, p.29**

public interest discerned by the Court to underlie the First Amendment in the free flow of commercial information. Prior to this Court's recent decision in *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council*, 425 U.S. 748 (1976), however, commercial speech was afforded no protection under the First Amendment whatsoever. See, *e. g., Breard* v. *Alexandria*, 341 U.S. 622 (1951); *Valentine* v. *Chrestensen*, 316 U.S. 52 (1942). Given what seems to me full recognition of the holding of *Virginia Pharmacy Board* that commercial speech is entitled to some **[\*\*\*363]** degree of First Amendment protection, I think the Court is nonetheless incorrect in invalidating the carefully considered state ban on promotional advertising **[\*\*2361]** in light of pressing national and state energy needs.

The Court's analysis in my view is wrong in several respects. Initially, I disagree with the Court's conclusion that the speech of a state-created monopoly, which is the subject of a comprehensive regulatory scheme, is entitled to protection under the First Amendment. I also think that the Court errs here in failing to recognize that the state law is most accurately viewed as an economic regulation and that the speech involved (if it falls within the scope of the First Amendment at all) occupies a significantly more subordinate position in the hierarchy of First Amendment values than the Court gives it today. Finally, the Court in reaching its decision improperly substitutes its own judgment for that of the State in deciding how a proper ban on promotional advertising should be drafted. With regard to this latter point, the Court adopts as its final part of a four-part test a "no more **[\*585]** extensive than necessary" analysis that will unduly impair a state legislature's ability to adopt legislation reasonably designed to promote interests that have always been rightly thought to be of great importance to the State.

I

In concluding that appellant's promotional advertising constitutes protected speech, the Court reasons that speech by electric utilities is valuable to consumers who must decide whether to use the monopoly service or turn to an alternative energy source, and if they decide to use the service how much of it to purchase. *Ante*, at 567. The Court in so doing "[assumes] that the willingness of a business to promote its products reflects a belief that consumers are interested in the advertising." *Ante*, at 568. The Court's analysis ignores the fact that the monopoly here is entirely state-created and subject to an extensive state regulatory scheme from which it derives benefits as well as burdens.

While this Court has stated that the "capacity [of speech] for informing the public does not depend upon the identity of its source," *First National Bank of Boston* v. *Bellotti*, 435 U.S. 765, 777 (1978), the source of the speech nevertheless may be relevant in determining whether a given message is protected under the First Amendment. n2 When the source of the speech is a state-created monopoly such as this, traditional First Amendment concerns, if they come into play at all, certainly do not justify the broad interventionist role adopted by the Court today. In *Consolidated Edison Co.* v. **[\*586]** *Public Service Comm'n, ante*, at 549-550, **[\*\*\*364]** MR. JUSTICE BLACKMUN observed:

"A public utility is a state-created monopoly. See, *e. g.*, N. Y. Pub. Serv. Law § 68

file:///C|/Documents%20and%20Settings/kmelwell.KMELWE...Client%20Files/Schmidt/Smith/centralhudsonopinion.htm (30 of 46)2/10/2006 5:02:26 PM

**Exhibit 27     p.30**

(McKinney 1955); Jones, Origins of the Certificate of Public Convenience and Necessity; Developments in the States 1870-1920, 79 Colum. L. Rev. 426, 458-461 (1979); Comment, Utility Rates, Consumers, and the New York State Public Service Commission, 39 Albany L. Rev. 707, 709-714 (1975). Although monopolies generally are against the public policies of the United States and of the State of New York, see, *e. g.*, N. Y. Gen. Bus. Law § 340 (McKinney 1968 and Supp. 1979-1980), . . . utilities are permitted to operate as monopolies because of a determination by the State that the public interest is better served by protecting them from competition. See 2 A. Kahn, **[\*\*2362]** The Economics of Regulation 113-171 (1971).

"This exceptional grant of power to private enterprises justifies extensive oversight on the part of the State to protect the ratepayers from exploitation of the monopoly power through excessive rates and other forms of overreaching. . . . New York law gives its Public Service Commission plenary supervisory powers over all property, real and personal, 'used or to be used for or in connection with or to facilitate the . . . sale or furnishing of electricity for light, heat or power.' N. Y. Pub. Serv. Law §§ 2 (12) and 66 (1) (McKinney 1955)."

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 In *Brown* v. *Glines*, 444 U.S. 348 (1980), for example, we recently upheld Air Force regulations that imposed restrictions on the free speech and petition rights of Air Force personnel. See also, *e. g., Parker* v. *Levy*, 417 U.S. 733 (1974) (commissioned officer may be prohibited from publicly urging enlisted personnel to disobey orders that might send them into combat); *Snepp* v. *United States*, 444 U.S. 507 (1980) (employees of intelligence agency may be required to submit publications relating to agency activity for prepublication review by the agency).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Thus, although *First National Bank of Boston* v. *Bellotti, supra*, holds that speech of a corporation is entitled to some First Amendment protection, it by no means follows that a utility with monopoly power conferred by a State is also entitled to such protection.

The state-created monopoly status of a utility arises from the unique characteristics of the services that a utility provides. As recognized in *Cantor* v. *Detroit Edison Co.*, 428 U.S. 579, 595-596 (1976), "public utility regulation typically **[\*587]** assumes that the private firm is a natural monopoly and that public controls are necessary to protect the consumer from exploitation." The consequences of this natural monopoly in my view justify much more wide-ranging supervision and control of a utility under the First Amendment than this Court held in *Bellotti* to be permissible with regard to ordinary corporations. Corporate status is generally conferred as a result of a State's determination that the corporate characteristics "enhance its efficiency as an economic entity." *First National Bank of Boston* v. *Bellotti, supra*, at 825-826 (REHNQUIST, J., dissenting). A utility, by contrast, fulfills a function that serves special public interests as a result of the natural monopoly of the service provided.

file:///C|/Documents%20and%20Settings/kmelwell.KMELWE...Client%20Files/Schmidt/Smith/centralhudsonopinion.htm (31 of 46)2/10/2006 5:02:20 PM

**Exhibit 27**, **p.31**

Indeed, the extensive regulations governing decisionmaking by public utilities suggest that for purposes of First Amendment analysis, a utility is far closer to a state-controlled enterprise than is an ordinary corporation. n3 Accordingly, I think a State **[***365]** has broad discretion in determining the statements that a utility may make in that such statements emanate from the entity created by the State to provide important and unique public services. And a state regulatory body charged with the oversight of these types of services may reasonably decide to impose on the utility a special duty to conform its conduct to **[*588]** the agency's conception of the public interest. Thus I think it is constitutionally permissible for it to decide that promotional advertising is inconsistent with the public interest in energy conservation. I also think New York's ban on such advertising falls within the scope of permissible state regulation of an economic activity by an entity that could not exist in corporate form, say nothing of enjoy monopoly status, were it not for the laws of New York. n4

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n3 In this regard the New York Court of Appeals stated:

"Public utilities, from the earliest days in this State, have been regulated and franchised to serve the commonweal. Our policy is 'to withdraw the unrestricted right of competition between corporations occupying . . . the public streets . . . and supplying the public with their products or utilities which are well nigh necessities' (*People ex rel. New York Edison Co.* v. *Willcox*, 207 N. Y. 86, 99; *Matter of New York Elec. Lines Co.*, 201 N. Y. 321). The realities of the situation all but dictate that a utility be granted monopoly status (see *People ex rel. New York Elec. Lines Co.* v. *Squire*, 107 N. Y. 593, 603-605). To protect against abuse of this superior economic position extensive governmental regulation has been deemed a necessary coordinate (see *People ex rel. New York Edison Co.* v. *Willcox, supra*, at pp. 93-94)." 47 N. Y. 2d, at 109-110, 390 N. E. 2d, at 757.


n4 The Commission's restrictions on promotional advertising are grounded in its concern that electric utilities fulfill their obligation under the New York Public Service Law to provide "adequate" service at "just and reasonable" rates. N. Y. Pub. Serv. Law § 65 (1) (McKinney 1955). The Commission, under state law, is required to set reasonable rates. N. Y. Pub. Serv. Law §§ 66 (2) and 72 (McKinney 1955); § 66 (12) (McKinney Supp. 1979). The Commission has also been authorized by the legislature to prescribe "such reasonable improvements [in electric utilities' practices] as will best promote the public interest. . . ." § 66 (2). And in the performance of its duties the Commission is required to "encourage all persons and corporations subject to its jurisdiction to formulate and carry out long-range programs, individually or cooperatively, for the performance of their public service responsibilities with economy, efficiency, and care for the public safety, the preservation of environmental values, and the conservation of natural resources." N. Y. Pub. Serv. Law § 5 (2) (McKinney Supp. 1979). Here I think it was quite reasonable for the State Public Service Commission to conclude that the ban on promotional advertising was necessary to prevent utilities from using their broad state-conferred monopoly power

file:///C|/Documents%20and%20Settings/kmelwell.KMELWE...Client%20Files/Schmidt/Smith/centralhudsonopinion.htm (32 of 46)2/10/2006 5:02:26 PM

**Exhibit 27** p.32

to promote their own economic well-being at the expense of the state interest in energy conservation -- an interest that could reasonably be found to be inconsistent with the promotion of greater profits for utilities.


- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

**[\*\*2363]**  II

This Court has previously recognized that although commercial speech may be entitled to First Amendment protection, that protection is not as extensive as that accorded to the advocacy of ideas. Thus, we stated in *Ohralik* v. *Ohio State Bar Assn.*, 436 U.S. 447, 455-456 (1978):

"Expression concerning purely commercial transactions has come within the ambit of the Amendment's protection **[\*589]** only recently. In rejecting the notion that such speech 'is wholly outside the protection of the First Amendment,' *Virginia Pharmacy, supra*, at 761, we were careful not to hold 'that it is wholly undifferentiable from other forms' of speech. 425 U.S., at 771, n. 24. We have not discarded the 'common-sense' distinction between speech proposing a commercial transaction, which occurs in an **[\*\*\*366]** area traditionally subject to government regulation, and other varieties of speech. *Ibid*. To require a parity of constitutional protection for commercial and noncommercial speech alike could invite dilution, simply by a leveling process, of the force of the Amendment's guarantee with respect to the latter kind of speech. Rather than subject the First Amendment to such a devitalization, we instead have afforded commercial speech a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, while allowing modes of regulation that might be impermissible in the realm of noncommercial expression." (Footnote omitted.)

The Court's decision today fails to give due deference to this subordinate position of commercial speech. The Court in so doing returns to the bygone era of *Lochner* v. *New York*, 198 U.S. 45 (1905), in which it was common practice for this Court to strike down economic regulations adopted by a State based on the Court's own notions of the most appropriate means for the State to implement its considered policies.

I had thought by now it had become well established that a State has broad discretion in imposing economic regulations. As this Court stated in *Nebbia* v. *New York*, 291 U. S. 502, 537 (1934):


"[There] can be no doubt that upon proper occasion and by appropriate measures the state may regulate a business in any of its aspects. . . .

**[\*590]** "So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose. The courts are without authority either to declare

**Exhibit 27 , p.33**

file:///C|/Documents%20and%20Settings/kmelwell.KMELWE...Client%20Files/Schmidt/Smith/centralhudsonopinion.htm (33 of 46)2/10/2006 5:02:26 PM

such policy, or, when it is declared by the legislature, to override it. If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders a court **[\*\*2364]** *functus officio*. . . . [It] does not lie with the courts to determine that the rule is unwise."

And Mr. Justice Black, writing for the Court, observed more recently in *Ferguson* v. *Skrupa*, 372 U.S. 726, 730 (1963):

"The doctrine . . . that due process authorizes courts to hold laws unconstitutional when they believe the legislature has acted unwisely -- has long since been discarded. We have returned to the original constitutional proposition that courts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws."

The State of New York has determined here that economic realities require the grant of monopoly status to public utilities in order to distribute efficiently the services they provide, and in granting utilities such status it has made them subject to an extensive regulatory scheme. When the State adopted this scheme and when its Public Service Commission **[\*\*\*367]** issued its initial ban on promotional advertising in 1973, commercial speech had not been held to fall within the scope of the First Amendment at all. *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council*, 425 U.S. 748 (1976), however, subsequently accorded commercial speech a limited measure of First Amendment protection.

 **[\*591]**  The Court today holds not only that commercial speech is entitled to First Amendment protection, but also that when it is protected a State may not regulate it unless its reason for doing so amounts to a "substantial" governmental interest, its regulation "directly advances" that interest, and its manner of regulation is "not more extensive than necessary" to serve the interest. *Ante*, at 566. The test adopted by the Court thus elevates the protection accorded commercial speech that falls within the scope of the First Amendment to a level that is virtually indistinguishable from that of noncommercial speech. I think the Court in so doing has effectively accomplished the "devitalization" of the First Amendment that it counseled against in *Ohralik*. I think it has also, by labeling economic regulation of business conduct as a restraint on "free speech," gone far to resurrect the discredited doctrine of cases such as *Lochner* and *Tyson & Brother* v. *Banton*, 273 U.S. 418 (1927). New York's order here is in my view more akin to an economic regulation to which virtually complete deference should be accorded by this Court.

I doubt there would be any question as to the constitutionality of New York's conservation effort if the Public Service Commission had chosen to raise the price of electricity, see, *e. g., Sunshine Anthracite Coal Co.* v. *Adkins*, 310 U.S. 381 (1940); *Old Dearborn Distributing Co.* v. *Seagram-Distillers Corp.*, 299 U.S. 183 (1936), to condition its sale on specified terms, see, *e. g., Nebbia* v. *New York, supra*, at 527-528, or to restrict its production, see, *e. g., Wickard* v. *Filburn*, 317 U.S. 111 (1942). In terms of constitutional values, I think that such controls are virtually

file:///C|/Documents%20and%20Settings/kmelwell.KMELWE...Client%20Files/Schmidt/Smith/centralhudsonopinion.htm (34 of 46)2/10/2006 5:02:26 PM

**Exhibit 27    p.34**

indistinguishable from the State's ban on promotional advertising.

An ostensible justification for striking down New York's ban on promotional advertising is that this Court has previously "rejected the 'highly paternalistic' view that government has complete power to suppress or regulate commercial speech. '[People] will perceive their own best interests if **[\*592]** only they are well enough informed and . . . the best means to that end is to open the channels of communication, rather than to close them. . . .'" *Ante*, at 562. Whatever the merits of this view, I think the Court has carried its logic too far here.

The view apparently derives from the Court's frequent reference to the "marketplace of ideas," which was deemed analogous to the commercial market in which a laissez-faire policy would lead to optimum economic decisionmaking under the guidance of the "invisible hand." See, *e. g.*, **[\*\*2365]** Adam Smith, Wealth of Nations (1776). This notion was expressed by Mr. Justice Holmes in his dissenting **[\*\*\*368]** opinion in *Abrams* v. *United States*, 250 U.S. 616, 630 (1919), wherein he stated that "the best test of truth is the power of the thought to get itself accepted in the competition of the market. . . ." See also, *e. g., Consolidated Edison* v. *Public Service Comm'n, ante*, at 534; J. Mill, On Liberty (1858); J. Milton, Areopagitica, A Speech for the Liberty of Unlicensed Printing (1644).

While it is true that an important objective of the First Amendment is to foster the free flow of information, identification of speech that falls within its protection is not aided by the metaphorical reference to a "marketplace of ideas." There is no reason for believing that the marketplace of ideas is free from market imperfections any more than there is to believe that the invisible hand will always lead to optimum economic decisions in the commercial market. See, *e. g.*, Baker, Scope of the First Amendment, Freedom of Speech, 25 UCLA L. Rev. 964, 967-981 (1978). Indeed, many types of speech have been held to fall outside the scope of the First Amendment, thereby subject to governmental regulation, despite this Court's references to a marketplace of ideas. See, *e. g., Chaplinsky* v. *New Hampshire*, 315 U.S. 568 (1942) (fighting words); *Beauharnais* v. *Illinois*, 343 U.S. 250 (1952) (group libel); *Roth* v. *United States*, 354 U.S. 476 (1957) (obscenity). It also has been held that the government has **[\*593]** a greater interest in regulating some types of protected speech than others. See, *e. g., FCC* v. *Pacifica Foundation*, 438 U.S. 726 (1978) (indecent speech); *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council, supra* (commercial speech). And as this Court stated in *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323, 344, n. 9 (1974): "Of course, an opportunity for rebuttal seldom suffices to undo [the] harm of a defamatory falsehood. Indeed the law of defamation is rooted in our experience that the truth rarely catches up with a lie." The Court similarly has recognized that false and misleading commercial speech is not entitled to any First Amendment protection. See, *e. g., ante*, at 566.

The above examples illustrate that in a number of instances government may constitutionally decide that societal interests justify the imposition of restrictions on the free flow of information. When the question is whether a given commercial message is protected, I do not think this Court's determination that the information will "assist" consumers justifies judicial invalidation of a reasonably drafted state restriction on such speech when the restriction is designed to promote a concededly

file:///C|/Documents%20and%20Settings/kmelwell.KMELWE...Client%20Files/Schmidt/Smith/centralhudsonopinion.htm (35 of 46)2/10/2006 5:02:26 PM

**Exhibit 27** p.35

substantial state interest. I consequently disagree with the Court's conclusion that the societal interest in the dissemination of commercial information is sufficient to justify a restriction on the State's authority to regulate promotional advertising by utilities; indeed, in the case of a regulated monopoly, it is difficult for me to distinguish "society" from the state legislature and the Public Service Commission. Nor do I think there is any basis for concluding that individual citizens of the State **[***369]** will recognize the need for and act to promote energy conservation to the extent the government deems appropriate, if only the channels of communication are left open. n5 Thus, even if I were **[*594]** to **[**2366]** agree that commercial speech is entitled to some First Amendment protection, I would hold here that the State's decision to ban promotional advertising, in light of the substantial state interest at stake, is a constitutionally permissible exercise of its power to adopt regulations designed to promote the interests of its citizens.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -


n5 Although the Constitution attaches great importance to freedom of speech under the First Amendment so that individuals will be better informed and their thoughts and ideas will be uninhibited, it does not follow that "people will perceive their own best interests," or that if they do they will act to promote them. With respect to governmental policies that do not offer immediate tangible benefits and the success of which depends on incremental contributions by all members of society, such as would seem to be the case with energy conservation, a strong argument can be made that while a policy may be in the longrun interest of all members of society, some rational individuals will perceive it to their own shortrun advantage to not act in accordance with that policy. When the regulation of commercial speech is at issue, I think this is a consideration that the government may properly take into account. As was observed in *Townsend* v. *Yeomans*, 301 U.S. 441, 451 (1937), "the legislature, acting within its sphere, is presumed to know the needs of the people of the State." This observation in my view is applicable to the determination of the State Public Service Commission here.


- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The plethora of opinions filed in this case highlights the doctrinal difficulties that emerge from this Court's decisions granting First Amendment protection to commercial speech. My Brother STEVENS, quoting Mr. Justice Brandeis in *Whitney* v. *California*, 274 U.S. 357, 376-377 (1927), includes Mr. Justice Brandeis' statement that "[those] who won our independence by revolution were not cowards. They did not fear political change. They did not exalt order at the cost of liberty." *Ante*, at 582. MR. JUSTICE BLACKMUN, in his separate opinion, joins only in the Court's judgment because he believes that the Court's opinion "does not provide adequate protection for truthful, nonmisleading, noncoercive commercial speech." *Ante*, at 573. Both MR. JUSTICE STEVENS, *ante*, at 582, and MR. JUSTICE BLACKMUN, *ante*, at 577, would apply the following formulation by Mr. Justice Brandeis of the clear-and-present-danger test to the regulation of speech at issue in this case:

file:///C|/Documents%20and%20Settings/kmelwell.KMELWE...Client%20Files/Schmidt/Smith/centralhudsonopinion.htm (36 of 46)2/10/2006 5:02:26 PM

Exhibit 27  p.36

"If there be time to expose through discussion the falsehood **[*595]** and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence. Only an emergency can justify repression." *Whitney* v. *California, supra*, at 377 (concurring opinion).

Although the Court today does not go so far as to adopt this position, its reasons for invalidating New York's ban on promotional advertising make it quite difficult for a legislature to draft a statute regulating promotional advertising that will satisfy the First Amendment requirements established by the Court in this context. See Part III, *infra*.

Two ideas are here at war with one another, and their resolution, although it be on a judicial battlefield, will be a very difficult one. The **[***370]** sort of "advocacy" of which Mr. Justice Brandeis spoke was not the advocacy on the part of a utility to use more of its product. Nor do I think those who won our independence, while declining to "exalt order at the cost of liberty," would have viewed a merchant's unfettered freedom to advertise in hawking his wares as a "liberty" not subject to extensive regulation in light of the government's substantial interest in attaining "order" in the economic sphere.

While I agree that when the government attempts to regulate speech of those expressing views on public issues, the speech is protected by the First Amendment unless it presents "a clear and present danger" of a substantive evil that the government has a right to prohibit, see, *e. g., Schenck* v. *United States*, 249 U.S. 47, 52 (1919), I think it is important to recognize that this test is appropriate in the political context in light of the central importance of such speech to our system of self-government. As observed in *Buckley* v. *Valeo*, 424 U.S. 1, 14 (1976):

"Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to **[*596]** such political expression in order 'to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'"

**[**2367]** And in *Garrison* v. *Louisiana*, 379 U.S. 64, 74-75 (1964), this Court stated that "speech concerning public affairs is more than self-expression; it is the essence of self-government."

The First Amendment, however, does not always require a clear and present danger to be present before the government may regulate speech. Although First Amendment protection is not limited to the "exposition of ideas" on public issues, see, *e. g., Winters* v. *New York*, 333 U.S. 507, 510 (1948) -- both because the line between the informing and the entertaining is elusive and because art, literature, and the like may contribute to important First Amendment interests of the individual in freedom of speech -- it is well established that the government may regulate obscenity even

file:///C|/Documents%20and%20Settings/kmelwell.KMELWE...Client%20Files/Schmidt/Smith/centralhudsonopinion.htm (37 of 46)2/10/2006 5:02:26 PM

Exhibit 27, p.37

though its does not present a clear and present danger. Compare, *e. g., Paris Adult Theatre I* v. *Slaton*, 413 U.S. 49, 57-58 (1973), with *Brandenburg* v. *Ohio*, 395 U.S. 444, 447 (1969). Indecent speech, at least when broadcast over the airwaves, also may be regulated absent a clear and present danger of the type described by Mr. Justice Brandeis and required by this Court in *Brandenburg. FCC* v. *Pacifica Foundation*, 438 U.S. 726 (1978). And in a slightly different context this Court declined to apply the clear-and-present-danger test to a conspiracy among members of the press in violation of the Sherman Act because to do so would "degrade" that doctrine. *Associated Press* v. *United States*, 326 U.S. 1, 7 (1945). Nor does the Court today apply the clear-and-present-danger test in invalidating New York's ban on promotional advertising. As noted **[\*\*\*371]** above, in these and other contexts the Court has clearly rejected the notion that there must be a free "marketplace of ideas."

If the complaint of those who feel the Court's opinion does not go far enough is that the "only test of truth is its ability **[\*597]** to get itself accepted in the marketplace of ideas" -- the test advocated by Thomas Jefferson in his first inaugural address, and by Mr. Justice Holmes in *Abrams* v. *United States*, 250 U.S. 616, 630 (1919) (dissenting opinion) -- there is no reason whatsoever to limit the protection accorded commercial speech to "truthful, nonmisleading, noncoercive" speech. See *ante*, at 573 (BLACKMUN, J., concurring in judgment). If the "commercial speech" is in fact misleading, the "marketplace of ideas" will in time reveal that fact. It may not reveal it sufficiently soon to avoid harm to numerous people, but if the reasoning of Brandeis and Holmes is applied in this context, that was one of the risks we took in protecting free speech in a democratic society.

Unfortunately, although the "marketplace of ideas" has a historically and sensibly defined context in the world of political speech, it has virtually none in the realm of business transactions. Even so staunch a defender of the First Amendment as Mr. Justice Black, in his dissent in *Breard* v. *Alexandria*, 341 U.S., at 650, n., stated:

"Of course I believe that the present ordinance could constitutionally be applied to a 'merchant' who goes from door to door 'selling pots.'"

And yet, with the change in solicitation and advertising techniques, the line between what Central Hudson did here and the peddler selling pots in Alexandria a generation ago is difficult, if not impossible to fix. Doubtless that was why Mr. Justice Black joined the unanimous opinion of the Court in *Valentine* v. *Chrestensen*, 316 U.S., at 54, in which the Court stated:

"This court has unequivocally held that the streets are proper places for the exercise of the freedom of communicating information and disseminating opinion and that, though the states and municipalities may appropriately regulate the privilege in the public interest, they may not unduly burden or proscribe its employment **[\*\*2368]** in these public **[\*598]** thoroughfares. *We are equally clear that the Constitution imposes no such restraint on government as respects purely commercial advertising*.

file:///C|/Documents%20and%20Settings/kmelwell.KMELWE...Client%20Files/Schmidt/Smith/centralhudsonopinion.htm (38 of 46)2/10/2006 5:02:26 PM

**Exhibit 27**, **p.38**

Whether, and to what extent, one may promote or pursue a gainful occupation in the streets, to what extent such activity shall be adjudged a derogation of the public right of user, are matters for legislative judgment." (Emphasis added.)

I remain of the view that the Court unlocked a Pandora's Box when it "elevated" commercial speech to the level of traditional political speech by according it First Amendment protection in *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council*, 425 U.S. 748 (1976). The line between "commercial speech," and the kind of speech that those who drafted the First Amendment had in mind, may not be a technically or intellectually easy one to draw, but it surely produced far **[\*\*\*372]** fewer problems than has the development of judicial doctrine in this area since *Virginia Pharmacy Board*. For in the world of political advocacy and *its* marketplace of ideas, there is no such thing as a "fraudulent" idea: there may be useless proposals, totally unworkable schemes, as well as very sound proposals that will receive the imprimatur of the "marketplace of ideas" through our majoritarian system of election and representative government. The free flow of information is important in this context not because it will lead to the discovery of any objective "truth," but because it is essential to our system of self-government.

The notion that more speech is the remedy to expose falsehood and fallacies is wholly out of place in the commercial bazaar, where if applied logically the remedy of one who was defrauded would be merely a statement, available upon request, reciting the Latin maxim "*caveat emptor*." But since "fraudulent speech" in this area is to be remediable under *Virginia Pharmacy Board, supra*, the remedy of one defrauded is a lawsuit or an agency proceeding based on common-law notions of fraud that are separated by a world of difference **[\*599]** from the realm of politics and government. What time, legal decisions, and common sense have so widely severed, I declined to join in *Virginia Pharmacy Board*, and regret now to see the Court reaping the seeds that it there sowed. For in a democracy, the economic is subordinate to the political, a lesson that our ancestors learned long ago, and that our descendants will undoubtedly have to relearn many years hence.

III

The Court concedes that the state interest in energy conservation is plainly substantial, *ante*, at 568, as is the State's concern that its rates be fair and efficient. *Ante*, at 569. It also concedes that there is a direct link between the Commission's ban on promotional advertising and the State's interest in conservation. *Ibid*. The Court nonetheless strikes down the ban on promotional advertising because the Commission has failed to demonstrate, under the final part of the Court's four-part test, that its regulation is no more extensive than necessary to serve the State's interest. *Ante*, at 569-571. In reaching this conclusion, the Court conjures up potential advertisements that a utility might make that conceivably would result in net energy savings. The Court does not indicate that the New York Public Service Commission has in fact construed its ban on "promotional" advertising to preclude the dissemination of information that clearly would result in a net energy savings, nor does it even suggest that the Commission has been confronted with and rejected such an advertising proposal. n6 **[\*\*2369]** The final part of the Court's test **[\*600]** thus **[\*\*\*373]** leaves room for so many hypothetical "better" ways that any

**Exhibit 27** **p.39**

ingenious lawyer will surely seize on one of them to secure the invalidation of what the state agency actually did. As MR. JUSTICE BLACKMUN observed in *Illinois Elections Bd.* v. *Socialist Workers Party*, 440 U.S. 173, 188-189 (1979) (concurring opinion):

"A judge would be unimaginative indeed if he could not come up with something a little less 'drastic' or a little less 'restrictive' in almost any situation, and thereby enable himself to vote to strike legislation down."

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n6 Indeed appellee in its brief states:

"[Neither] Central Hudson nor any other party made an attempt before the Commission to demonstrate or argue for a specific advertising strategy that would avoid the difficulties that the Commission found inherent in electric utility promotional advertising. The Commission, therefore, continued to enforce its ban on promotion which it had instituted in 1973." Brief for Appellee 15.

The Court makes no attempt to address this statement, or to explain why, when no state body has addressed the issue, the Court should nonetheless resolve it by invalidating the state regulation.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Here the Court concludes that the State's interest in energy conservation cannot justify a blanket ban on promotional advertising. In its statement of the facts, the Court observes that the Commission's ban on promotional advertising is not "a perfect vehicle for conserving energy." It states:

"[The] Commission's order prohibits promotional advertising to develop consumption during periods when demand for electricity is low. By limiting growth in 'off-peak' consumption, the ban limits the 'beneficial side effects' of such growth in terms of more efficient use of existing powerplants. [App. to Juris. Statement] 37a." *Ante*, at 559.

The Court's analysis in this regard is in my view fundamentally misguided because it fails to recognize that the beneficial side effects of "more efficient use" may be inconsistent with the goal of energy conservation. Indeed, the Commission explicitly found that the promotion of off-peak consumption would impair conservation efforts. n7 The Commission stated:

file:///C|/Documents%20and%20Settings/kmelwell.KMELWE...Client%20Files/Schmidt/Smith/centralhudsonopinion.htm (40 of 46)2/10/2006 5:02:26 PM

Exhibit 27 p.40

"Increased off-peak generation, . . . while conferring **[*601]** some beneficial side effects, also consumes valuable energy resources and, if it is the result of increased sales, necessarily creates incremental air pollution and thermal discharges to waterways. More important, any increase in off-peak generation from most of the major companies producing electricity in this State would not, at this time, be produced from coal or nuclear resources, but would require the use of oil-fired generating facilities. The increased requirement for fuel oil to serve the incremental off-peak load created by promotional advertising would aggravate the nation's already unacceptably high level of dependence on foreign sources of supply and would, in addition, frustrate rather than encourage conservation efforts." App. to Juris. Statement 37a. n8

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n7 In making this finding, the Commission distinguished "between promotional advertising designed to shift existing consumption from peak to off-peak hours and advertising designed to promote additional consumption during off-peak hours." App. to Juris. Statement 58a, n. 2. It proscribed only the latter. *Ibid.*

n8 And in denying appellant's petition for rehearing, the Commission again stated:

"While promotion of off-peak usage, particularly electric space heating, is touted by some as desirable because it might increase off-peak usage and thereby improve a summer-peaking company's load factor, we are convinced that off-peak promotion, especially in the context of imperfectly structured electric rates, is inconsistent with the public interest, even if it could be divorced in the public mind from promoting electric usage generally. As we pointed out in our Policy Statement, increases in generation, even off-peak generation, at this time, requires the burning of scarce oil resources. This increased requirement for fuel oil aggravates the nation's already high level of dependence on foreign sources of supply." *Id.*, at 58a (footnotes omitted).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The **[***374]** Court also observes, as the Commission acknowledged, that the ban on promotional advertising can achieve only "piecemeal conservationism" because oil dealers are not under the Commission's jurisdiction, and they remain free to advertise. Until I have mastered electrical engineering and marketing, I am not prepared to contradict by virtue of my judicial office those who assume that the ban will be successful in making a substantial contribution to conservation efforts. **[*602]** And I doubt that any of **[**2370]** this Court's First Amendment decisions justify striking down the Commission's order because more steps toward conservation could have been made. This is especially true when, as here, the Commission lacks authority over oil dealers.

The Court concludes that the Commission's ban on promotional advertising must be struck down because it is more extensive than necessary: it may result in the suppression of advertising by utilities that promotes the use of electrical devices or

file:///C|/Documents%20and%20Settings/kmelwell.KMELWE...Client%20Files/Schmidt/Smith/centralhudsonopinion.htm (41 of 46)2/10/2006 5:02:26 PM

Exhibit 27   p.41

services that cause no net increase in total energy use. The Court's reasoning in this regard, however, is highly speculative. The Court provides two examples that it claims support its conclusion. It first states that both parties acknowledge that the "heat pump" will be "a major improvement in electric heating," and that but for the ban the utilities would advertise this type of "energy [efficient]" product. n9 The New York Public Service Commission, however, considered the merits of the heat pump and concluded that it would most likely result in an overall increase in electric energy consumption. The Commission stated:

"[Installation] of a heat pump means also installation of central air-conditioning. To this extent, promotion of off-peak electric space heating involves promotion of on-peak summer air-conditioning as well as on-peak usage **[\*603]** of electricity for water heating. And the price of electricity to most consumers in the State does not now fully reflect the much higher marginal costs of on-peak consumption in summer peaking markets. In these circumstances, there would be a subsidization of consumption on-peak, and consequently, higher rates for all consumers." App. to Juris. Statement 58a.

Subsidization of peak consumption not only may encourage the use of scarce energy resources during peak periods, but also may lead to larger reserve generating capacity requirements for the State.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n9 As previously discussed, however, it does not follow that because a product is "energy efficient" it is also consistent with the goal of energy conservation. Thus, with regard to the heat pump, counsel for appellees stated at oral argument that "Central Hudson says there are some [heat pumps] without air conditioning, but . . . they have never advised us of that." Tr. of Oral Arg. 32-33. The electric heat pump, he continued, "normally [carries] with it air conditioning in the summer, and the commission found that this would result in air conditioning that would not otherwise happen." Id., at 33. This is but one example of the veritable Sargasso Sea of difficult nonlegal issues that we wade into by adopting a rule that requires judges to evaluate highly complex and often controversial questions arising in disciplines quite foreign to ours.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The Court next asserts that electric heating as a backup to solar and other heat may be **[\*\*\*375]** an efficient alternative energy source. *Ante*, at 570. The Court fails to establish, however, that an advertising proposal of this sort was properly presented to the Commission. Indeed, the Court's concession that the Commission did not make findings on this issue suggests that the Commission did not even consider it. Nor does the Court rely on any support for its assertion other than the assertion of appellant. Rather, it speculates that "[in] the absence of authoritative findings to the contrary,

**Exhibit 27** **p.42**

we must credit as within the realm of possibility the claim that electric heat can be an efficient alternative in some circumstances." *Ibid.* n10

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n10 Even assuming the Court's speculation is correct, it has shown too little. For the regulation to truly be "no more extensive than necessary," it must be established that a more efficient energy source will serve only as a means for saving energy, rather than as an inducement to consume more energy because the cost has decreased or because other energy using products will be used in conjunction with the more efficient one.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Ordinarily it is the role of the State Public Service Commission to make factual determinations concerning whether a device or service will result in a net energy savings and, if so, whether and to what extent state law permits dissemination of information about the device or service. Otherwise, **[*604]** as here, this Court will have no factual basis for its assertions. And the State will never have an opportunity to consider the issue **[**2371]** and thus to construe its law in a manner consistent with the Federal Constitution. As stated in *Barrows* v. *Jackson*, 346 U.S. 249, 256-257 (1953):

"It would indeed be undesirable for this Court to consider every conceivable situation which might possibly arise in the application of complex and comprehensive legislation. Nor are we so ready to frustrate the expressed will of Congress or that of the state legislatures. Cf. *Southern Pacific Co.* v. *Gallagher*, 306 U.S. 167, 172."

I think the Court would do well to heed the admonition in *Barrows* here. The terms of the order of the New York Public Service Commission in my view indicate that advertising designed to promote net savings in energy use does not fall within the scope of the ban. The order prohibits electric corporations "from *promoting the use of electricity* through the use of advertising, subsidy payments . . . , or employee incentives." App. to Juris. Statement 31a (emphasis added). It is not clear to me that advertising that is likely to result in net savings of energy is advertising that "[promotes] the use of electricity," nor does the Court point to any language in the Commission order that suggests it has adopted this construction. Rather, it would seem more accurate to characterize such advertising as designed to "discourage" the use of electricity. n11 Indeed, I think it is quite likely that the Commission **[*605]** would view advertising **[***376]** that would clearly result in a net savings in energy as consistent with the objectives of its order and therefore permissible. n12 The Commission, for example, has authorized the dissemination of information that would result in *shifts* in electrical energy demand, thereby reducing the demand for electricity during peak periods. *Id.*, at 37a. n13 It has also indicated a willingness to consider at least some other types of "specific proposals" submitted by utilities. *Id.*, at

file:///C|/Documents%20and%20Settings/kmelwell.KMELWE...Client%20Files/Schmidt/Smith/centralhudsonopinion.htm (43 of 46)2/10/2006 5:02:26 PM

**Exhibit 27, p.43**

37a-38a. And it clearly permits informational as opposed to promotional dissemination of information. *Id.*, at 43a-46a. Even if the Commission were ultimately to reject the view that its ban on promotional advertising does not include advertising that results in net energy savings, I think the Commission should at least be given an opportunity to consider it.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n11 This characterization is supported by the reasoning of the New York Court of Appeals, which stated:

"[Promotional] advertising . . . seeks . . . to encourage the increased consumption of electricity, whether during peak hours or off-peak hours. Thus, not only does such communication lack any beneficial informative content, but it may be affirmatively detrimental to the society. . . . Conserving diminishing resources is a matter of vital State concern and increased use of electrical energy is inimical to our interests. Promotional advertising, if permitted, would only serve to exacerbate the crisis." 47 N. Y. 2d, at 110, 390 N. E. 2d, at 757-758.

n12 At oral argument counsel for appellant conceded that the ban would not apply to utility advertising promoting the nonuse of electricity. Tr. of Oral Arg. 6. Indeed, counsel stated: "If the use reduces the amount of electricity used, it is not within the ban. The promotional ban is defined as anything which might be expected to increase the use of electricity." *Ibid.* And counsel for appellee stated that "the only thing that is involved here is the promotion by advertising of electric usage." *Id.*, at 30. "And if a showing can be made that promotion in fact is going to conserve energy," counsel for appellee continued, "which . . . has never been made to us, the commission's order says we are ready to relax our ban, we're not interested in banning for the sake of banning it. We think that is basically a bad idea, if we can avoid it. In gas, we have been relaxing it as more gas has become available." *Id.*, at 40.

n13 By contrast, as previously discussed, the Public Service Commission does not permit the promotion of off-peak consumption alone. *Supra*, at 600-601, and n. 8.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

It is in my view inappropriate for the Court to invalidate the State's ban on commercial advertising here, based on its speculation that in some cases the advertising may result in a net savings in electrical energy use, and in the cases in which it is clear a net energy savings would result from utility advertising, the Public Service Commission would apply its **[\*606]** ban so as to proscribe such advertising. Even assuming **[\*\*2372]** that the Court's speculation is correct, I do not think it follows that facial invalidation of the ban is the appropriate course. As stated in *Parker* v. *Levy*, 417 U.S. 733, 760 (1974), "even if there are marginal applications in which a statute would infringe on First Amendment values, facial invalidation is inappropriate

file:///C|/Documents%20and%20Settings/kmelwell.KMELWE...Client%20Files/Schmidt/Smith/centralhudsonopinion.htm (44 of 46)2/10/2006 5:02:26 PM

**Exhibit 27**, p.44

if the 'remainder of the statute . . . covers a whole range of easily identifiable and constitutionally proscribable . . . conduct. . . .' *CSC* v. *Letter Carriers*, 413 U.S. 548, 580-581 (1973). " This is clearly the case here.

For the foregoing reasons, I would affirm the judgment of the New York Court of Appeals.

**REFERENCES:** Return To Full Text Opinion

Go to Supreme Court Briefs

Go to Oral Argument Transcript

3 Am Jur 2d, Advertising 6; 26 Am Jur 2d, Electricity, Gas, and Steam 11

USCS, Constitution, 1st and 14th Amendments

US L Ed Digest, Constitutional Law 954

L Ed Index to Annos, Advertising; Freedom of Speech, Press, Religion, and Assembly; Public Utilities

ALR Quick Index, Electricity and Electric Companies; Freedom of Speech and Press

Federal Quick Index, Electricity; Freedom of Speech and Press

Annotation References:

Supreme Court's views as to overbreadth of legislation in connection with First Amendment rights. 45 L Ed 2d 725.

Applicability to advertisements of First Amendment's guaranty of free speech and press. 37 L Ed 2d 1124.

The Supreme Court and the right of free speech and press. 93 L Ed 1151, 2 L Ed 2d 1706, 11 L Ed 2d 1116, 16 L Ed 2d 1053, 21 L Ed 2d 976 .

---

Service: **Get by LEXSEE®**
Citation: **447 U.S. 557**
View: Full
Date/Time: Friday, February 10, 2006 - 5:01 PM EST

* Signal Legend:
🔴 -   Warning: Negative treatment is indicated
🟨 Q -   Questioned: Validity questioned by citing refs
⚠️ -   Caution: Possible negative treatment
➕ -   Positive treatment is indicated

file:///C|/Documents%20and%20Settings/kmelwell.KMELWE...Client%20Files/Schmidt/Smith/centralhudsonopinion.htm (45 of 46)2/10/2006 5:02:20 PM

**Exhibit 27**, p.45

6:06-cv-00109-HMH     Date Filed 02/13/2006     Entry Number 6-29     Page 46 of 46

**A** - Citing Refs. With Analysis Available

**I** - Citation information available

* Click on any *Shepard's* signal to *Shepardize®* that case.



About LexisNexis | Terms & Conditions
Copyright ©  2006 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

file:///C|/Documents%20and%20Settings/kmelwell.KMELWE...Client%20Files/Schmidt/Smith/centralhudsonopinion.htm (46 of 46)2/10/2006 5:02:26 PM

**Exhibit 27, p.46**