**Speech topic - Internet & First Amendment**

# Blogging
**By David L. Hudson Jr.**
First Amendment Center research attorney

For years the Internet has been hailed as a First Amendment fantasyland where freedom of expression could reach its zenith. U.S. District Judge Stewart Dalzell wrote in *ACLU v. Reno,* a leading Internet free-speech case that later reached the U.S. Supreme Court and dealt with the regulation of online pornography, that the Internet was "the most participatory form of mass speech yet developed" and "a far more speech-enhancing medium than print."

Blogs, or Web logs, fulfill this "participatory, speech-enhancing" function, allowing individuals to become one-person online outlets of information covering subjects in detail. Blogs are online journals or diaries where individuals can post daily entries about the subjects of their choice. Bloggers write about everything from the appellate courts to bankruptcy law to video games to their favorite television shows to the sporting world. There are blogs on almost every subject imaginable. The Pew Internet and American Life Project released a report showing that at least 8 million U.S. adults have created blogs and that 27% of Americans read blogs. According to their surveys, blog readership increased by 58% in 2004.

Not everyone agrees on the definition of a blog. Robert A. Cox, president of the Media Bloggers Association, describes the word "blogging" as "terrible." He explains: "It is worse than useless because it is an empty vessel into which people can — and do — pour whatever meaning suits them at the time. This breeds confusion and stands in the way of what I believe is the most important development in the media over the past several years — the growth of what is often referred to as 'citizens media' or 'grassroots journalism.' ... Blogging is writing. Period."

Some Web sites call themselves news forums, bulletin boards or chat sites. The activity of participants/members of those sites — posting news, other information and views — is included by many in the term "blogging."

Just as with any mode of communication, blogs can implicate a variety of First Amendment interests. Should bloggers who gather and report news be considered journalists in reporter-privilege laws? Should bloggers who post messages anonymously that others consider defamatory be able to keep their identities unknown? Can public employers discipline their employees for making critical or off-color comments about their workplace or fellow employees? Should bloggers be subject to campaign-finance laws? Do some bloggers take First Amendment freedoms too far by engaging in what First Amendment Center Ombudsman Paul K. McMasters has termed a "blog-mob mentality"?

### Are bloggers journalists?
A major legal issue dealing with bloggers and the First Amendment concerns whether bloggers should be treated as reporters for purposes of the proposed federal reporter-shield law. Is a blogger who reports about a large computer company's products before they are released to the public violating a trade-secrets law or is he engaging in First Amendment-protected activity? Would the blogger be covered by a state shield law?

The question of who is a journalist has confounded the public and the press for a

long time. The U.S. Supreme Court recognized this difficulty in its 1972 decision *Branzburg v. Hayes.* "The administration of a constitutional newsman's privilege would present practical and conceptual difficulties of a high order," wrote Justice Byron White. "Sooner or later, it would be necessary to define those categories of newsmen who qualified for the privilege, a questionable procedure in light of the traditional doctrine that liberty of the press is the right of the lonely pamphleteer who uses carbon paper or a mimeograph just as much as of the large metropolitan publisher who utilizes the latest photocomposition methods."

White added:

> "Freedom of the press is a 'fundamental personal right' which 'is not confined to newspapers and periodicals. It necessarily embraces pamphlets and leaflets. ... The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion.' ... The informative function asserted by representatives of the organized press in the present cases is also performed by lecturers, political pollsters, novelists, academic researchers, and dramatists."

Some bloggers have broken stories of large public import. Kurt Opsahl, staff attorney for the Electronic Frontier Foundation and an expert on the law related to bloggers, says there have been many instances where bloggers scooped the mainstream media. "Bloggers hammered on the Trent Lott story (Lott's comments about Strom Thurmond) until mainstream media was forced to pick it up again," he said. "Three amateur journalists at the Powerline.com blog were primarily responsible for discrediting the documents used in CBS's rush-to-air story on President George Bush's National Guard service. And the list goes on."

Cox lists several other national-headline stories affected greatly by reporting from blogs, including: Dan Rather and the Texas Air National Guard memos, the White House giving press credentials to James Guckert/Jeff Gannon, the resignation of CNN news executive Eason Jordan after publicity surrounding his remarks at the World Economic Forum and the John Kerry-Swift Boat Veterans for Truth controversy.

Congress is debating several bills that would provide for a federal shield law for reporters. In October 2005, the Senate Judiciary Committee held a second hearing on such proposed legislation. At the hearing Sen. John Cornyn, R.-Texas, said that there needed to be a "serious discussion of what constitutes the term 'reporter.'"

"At our last hearing, one of our witnesses described bloggers as the modern-day equivalent of the revolutionary pamphleteer who passed out news bulletins on the street corner," Cornyn said.

"However, the relative anonymity afforded to bloggers, coupled with a certain lack of accountability, as they are not your traditional brick-and-mortar reporters who answer to an editor or publisher, also has the risk of creating a certain irresponsibility when it comes to accurately reporting information."

Sen. Patrick Leahy, D-Vt., recognized the issue, stating: "Efforts have been made from time to time to codify a reporters' privilege in federal law, but these attempts have failed, in part because supporters of the concept found it difficult to agree on how to define the scope of what it means to be a 'journalist.' With bloggers now

participating fully in the 24-hour news cycle, we might face similar challenges in defining terms today."

"It is a very tough issue whether you include bloggers in a federal shield law," says Robert O'Neil, founder of the Thomas Jefferson Center for the Protection of Free Expression. "It is a tough issue because often you don't know where to draw lines between bloggers and everyone else. If bloggers are protected, does that dilute the value of protection for mainstream journalists? There is a commendable desire to make the shield law meaningful by confining its scope to those who need it most. I share the ambivalence that some express on this difficult question."

Gregg Leslie, legal defense director for the Reporters Committee for Freedom of the Press, says that asking whether bloggers are journalists is the wrong question. "'Bloggers' is a vague, amorphous term like 'telephone users,'" he says. "Just like some telephone users are journalists and some are not; the same thing with bloggers. The medium doesn't answer the question. It has more to do with the function that the person is performing. That's how we have approached the shield law question. If the bloggers' involvement is to report information to the public and to gather information for that purpose openly then they should be treated like a journalist."

"There should be a functional analysis in addition to or instead of the current analysis of what medium you are writing in," Leslie said.

"As the courts have confirmed, what makes journalism journalism is not the format but the content," says Opsahl. "Where news is gathered for dissemination to the public, it is journalism — regardless of whether it is printed on paper or distributed through the Internet."

**Unmasking anonymous bloggers**
The Supreme Court has made clear that anonymous speech deserves First Amendment protection. In *Talley v. California,* the Court wrote: "Anonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind." Several Founding Fathers published historic political articles anonymously. James Madison, John Jay and Alexander Hamilton wrote the 85 essays in *The Federalist Papers* under the pen name "Publius."

Individuals who post messages anonymously, criticizing companies, bosses, public officials and others, often make valid criticisms. Other times their speech could contain damaging false statements of fact that cross the line into defamation. Online libel remains a risk for those who blog, as it does for any writer or reporter in any medium.

The question becomes, how does the legal system protect the First Amendment-based right to anonymous speech while still affording a remedy to individuals whose reputations have been trashed unfairly online?

One problem is that some companies have resorted to defamation suits that resemble Strategic Lawsuits Against Public Participation (SLAPP suits). They want to unmask anonymous speakers and retaliate against them. However, other times someone files a legitimate libel suit, seeking to uncover the identity of the online flamethrower.

"It is essential that bloggers can participate in the public discourse without fear that

someone can file a meritless lawsuit and then use the power of the courts to discover their identities," Opsahl said. "The possibility that a frivolous claim could pierce the veil of anonymity might silence a blogger and remove a valuable voice from the debate.

Accordingly, a plaintiff must be held to a strict standard, and first produce sufficient evidence to support each element of its cause of action."

Leslie pointed out that it would be "very hard to come up with a consistent standard that will both protect those who need to know the identity of an anonymous poster and those who have a legitimate interest in speaking anonymously."

"The courts are starting to come around with a fairly protective standard in that there has to be a pretty good prima facie case of a libel claim," he said. "We don't want people filing suits simply to identify and then retaliate against anonymous speakers."

In September 2005, the Delaware Supreme Court set a high standard for identity disclosure in *Cahill v. Doe.* In that case, a public official sought to force an Internet service provider, Comcast, to unmask an online critic named "Proud Citizen." The public official had sued John Doe for defamation but needed the identity to pursue the suit. The Delaware high court wrote that "before a defamation plaintiff can obtain the identity of an anonymous defendant through the compulsory discovery process he must support his defamation claim with facts sufficient to defeat a summary judgment motion."

The public official argued that the Delaware high court should adopt, as the lower court had, a lower standard such as the good-faith standard. This standard simply means that the plaintiff has a reasonable, good-faith belief that the suit is valid. The state high court would not adopt that lower standard, writing that "allowing a defamation plaintiff to unmask an anonymous defendant's identity through the judicial process is a crucial form of relief that if too easily obtained will chill the exercise of First Amendment rights to free speech."

This area of the law is still developing. Not all courts have reached the standard articulated by the Delaware Supreme Court. Some courts do apply the good-faith standard. A federal judge in Louisiana in *In Re Baxter* (2001) said the proper standard was whether there was a "reasonable possibility of recovery on the defamation claim."

"The good-faith standard is too low because there are many times when anonymous speech is justified," Leslie said. "We have to remember that some of our Founding Fathers used anonymous speech."

O'Neil agreed that the good-faith standard was too low. "I rather like the summary judgment standard from the Delaware Supreme Court in *Cahill v. Doe,*" he said. "I am comfortable with setting a high standard given the value and interest in anonymous speech on the Internet."

O'Neil gave several reasons for favoring a high standard for online-identity disclosure.

"First, those who post anonymous communications perhaps naively but in reasonably good faith assume they will have substantial protection of their identity,"

he said. "Second, in an electronic world, there are fewer alternatives or equivalents to the various forms of communication in a print world. In the online world you are either identified or not unmasked and there is nothing in between. There is nothing like printing posters or hiring someone to post them up for you in the online world.

"Some of the great promise of the Internet as a democratizing, speech-enhancing medium does depend on some level of protection for the anonymous critic whether it be in the corporate context or the political context," O'Neil said.

**Losing jobs from blogging**
Another developing area of the law implicating blogging and the First Amendment concerns employees who suffer consequences for expressing themselves on blogs. What if an employee of a department of corrections blasts her supervisors online and criticizes brutality against inmates? Would the First Amendment protect the public employee? Dan Cordtz wrote in a July 2005 article for *The Recorder,* a California-based legal publication, that employee comments on blogs are "becoming a growing legal and personnel headache for employers across the nation."

Private employees do not receive the protections of the First Amendment because there is no trigger of state action. The provisions in the Bill of Rights, including the First Amendment, apply as limitations only against government actors, such as public employers. Private employees would need to rely on contractual-based remedies or a state statute that might provide protection.

However, public employers are subject to the First Amendment. Many public-employee cases are governed by the so-called *Pickering-Connick* test. In *Pickering v. Board of Education* (1968) and *Connick v. Myers* (1983), the U.S. Supreme Court made clear that public employees can speak out on matters of public concern. If an employee's speech touches on a matter of public concern — issues such as racial discrimination or governmental corruption — then the courts apply a balancing test. The employee's interest in free-expression is weighed against the employer's efficiency interests. If the expression causes disruption at the workplace, many courts will tip the scales in favor of the employer.

"If you work for any level of government, your employer's right to fire you is also limited by the First Amendment's protection of your right to free speech," Opsahl said. "However, your free-speech rights as an employee are more limited than they are as a member of the general public. If you were to challenge your termination on First Amendment grounds, courts would balance your employer's legitimate interest in delivering efficient government services against your interest as a citizen in commenting on a matter of public concern. So if you blog about something important to the public, you have greater protection. But if your blog's content could disrupt the workplace, your protection diminishes."

In a 2003 article in the *Columbia Journal of Law and Arts,* commentator Paul S. Gutman wrote that public employees "may safely discuss politics, criticize current policies, or even discuss topics like sexual proclivities that might be distasteful to others on their blogs, so long as the topics are 'of public concern.'" He added that "it is even possible that criticism of others' work habits might be considered a public concern, though considerations of workplace camaraderie might pull a blog under the prohibition against impeding the employer's effectiveness."

What if a public employee writes material for his blog off-duty? Employers have broad power to regulate employee activity on the job premises, but shouldn't a blogger have free-speech protection for expression created on his or her own time?

It depends. Some courts have ruled that public employers can discipline employees for their off-duty expression. In 2000, the Supreme Judicial Court of Massachusetts ruled in *Pereira v. Commissioner of Social Services* that the state's Department of Social Services could fire an investigator for telling a racial joke at a dinner honoring retired city council members.

This is a developing area of the law that merits close attention.

**Conclusion**
Blogging is a phenomenon that is here to stay. Millions create blogs, and millions more read them. Just as with any other medium of communication, the regulation of blogging presents many important First Amendment issues. Only time will tell where the legal lines will be drawn on whether bloggers are journalists, when anonymous bloggers can be unmasked and when public employees can be disciplined for the content of their expression made on a blog.

*Posted November 2005*