# New York Law Journal

*Serving the Bench and Bar Since 1888*

Web address: http://www.law.com/ny

VOLUME 229—NO. 77      WEDNESDAY, APRIL 23, 2003

## Intellectual Property Litigation

BY LEWIS R. CLAYTON

### 'Cybergriping': Ripping a Firm on a Web Site Created Just for That

FEW THINGS can be more annoying for a corporate client than "cybergriping," the practice of using an Internet "complaint name" — typically the client's trademark followed by the phrase "sucks.com" — that is devoted to criticism of the company. The "generalmotorssucks.com" site proudly announces that it has been featured on network television news programs and visited millions of times since 1999.

*The Taubman Co. v. Webfeats*, 319 F3d 770 (6th Cir. 2003), decided on Feb. 7, 2003, is the first Court of Appeals decision to address cybergriping. It continues the trend of several district court opinions that have taken a tolerant approach to the practice, at least where it is not engaged in by competitors or for commercial purposes.

Henry Mishkoff, the defendant in *Taubman*, is a Web designer who originally set up what he called a "fan site" entitled "shopsatwillowbend.com" after the Taubman Co. announced its was building a shopping mall called "The Shops at Willow Bend" near Mr. Mishkoff's



home. Mr. Mishkoff's site had information about the mall and links to Web sites of tenant stores. It also had a disclaimer, and a link to Taubman's official site, "theshopsatwillowbend.com." While Mr. Mishkoff denied that the site had a commercial purpose, he also included a link to the Web site of his girlfriend's shirt business. When Taubman complained about Mr. Mishkoff's site, he reacted by registering a group of complaint names, such as "taubmansucks.com," "shopsatwillowbendsucks.com" and even a complaint name targeted at Taubman's lawyers. A Michigan federal district court enjoined use of all of these sites, finding trademark infringement under the Lanham Act.

The U.S. Court of Appeals for the Sixth Circuit reversed, lifting the injunction. Where the "fan site" was concerned, the Court of Appeals noted that, after Taubman complained and before the injunction was issued, Mr. Mishkoff removed the link to his girlfriend's business. Assuming that Mr. Mishkoff eliminated all "commercial links" on the site, the court held that the site was not used in connection with the advertising of goods or services and thus not within the reach of the Lanham Act. The court also found no likelihood of confusion between Mr. Mishkoff's goods and Taubman's goods, particularly in view of the "conspicuous disclaimer" on Mr. Mishkoff's site.

The court also found that the cybergriping sites were noncommercial, and that the "qualifying moniker 'sucks'" "removes any confusion as to source" of the parties' goods. The court rejected Taubman's argument, based on *Planned Parenthood Fed'n of Amer., Inc. v. Bucci*, 1997 WL 133313 (SDNY March 24, 1997), aff'd, 152 F3d 920 (2d Cir. 1998), that use of the site was commercial, because Mr. Mishkoff intended to harm Taubman economically.

The court found that, "although economic damage may be an intended effect of Mr. Mishkoff's expression, the First Amendment protects critical commentary when there is no confusion as to source, even when it involves criticism of a business." The court continued: "Taubman concedes that Mishkoff is 'free to shout "Taubman sucks" from the rooftops …' Essentially, this is what he has done in his domain name. The rooftops of our

---

**Lewis R. Clayton** *is a litigation partner at Paul, Weiss, Rifkind, Wharton & Garrison and co-chair of the firm's intellectual property litigation group.* **Susanna M. Buergel,** *an associate at the firm, assisted in the preparation of this column.*

past have evolved into the Internet domain names of our present."

Several district courts have reached similar results. A recent example is *Bear Stearns Companies, Inc. v. Lavalle*, 2002 WL 31757771 (N.D. Tex. Dec. 3, 2002), which enjoined use of sites such as "BearStearnsShareholders.Com" as confusing; but allowed use of "unmistakably critical" sites such as "BearStearnsCriminals.Com."

The *Taubman* decision is unlikely to apply, however, where a Web site is used to sell products or services, or by a competitor of the plaintiff. In those cases, commercial use is likely to be present and courts are more willing to find confusion, particularly on the basis of the "initial interest confusion" doctrine, which prohibits confusion that induces a consumer to visit a Web site, even if that confusion is dispelled by the content of the site. See, *OBH, Inc. v. Spotlight Magazine, Inc.*, 86 FSupp2d 176 (W.D.N.Y. 2000).

### Trademarks

Resolving a split in the circuits, the Supreme Court held in *Moseley v. V Secret Catalogue, Inc.*, 123 SCt 1115 (March 4, 2003), that a plaintiff under the Federal Trademark Dilution Act must make a showing of actual dilution, rather than a mere likelihood of dilution (by contrast, an infringement claim requires only proof of likelihood of confusion). The opinion does not, however, give guidance on how actual dilution — defined in the act as "the lessening of the capacity of a famous mark to identify and distinguish goods or services" — may be proved. Where the two marks at issue are not identical, courts are likely to require some evidence — a consumer survey, adequately supported expert testimony, or sufficient anecdotal evidence of consumer or trade reaction — that the power of the famous mark to distinguish its owner's goods, or the association of the mark with its owner, has somehow been weakened. Where identical marks are concerned, however, the Court left open the possibility that no direct evidence of dilution is necessary. Adding to the confusion, the Court mentioned in dictum an issue not raised in the certiorari petition — it speculated that, contrary to the expectations of many courts and commentators, tarnishment (use of the mark in a derogatory context or in association with low quality goods) may not be covered by the act.

---

*The court: Copyrighted works, including works merely controlling access to or operation of a device, are protected by the Digital Millennium Copyright Act.*

---

In another dilution case, the U.S. Court of Appeals for the Fifth Circuit held that only a trademark owner — not an exclusive licensee — has standing to sue under the Dilution Act. *ICEE Distributors, Inc. v. J&J Snack Foods Corp.*, 2003 WL 1405726 (5th Cir. March 21, 2003). The Dilution Act grants a claim to the "owner" of a famous mark. Plaintiff ICEE argued that its exclusive right to use the marks in a designated territory, its license for the life of the marks, its exclusive right to sue for infringement in the territory and its unconditional right to transfer or assign its rights, amounted to an assignment. Rejecting that view, the Fifth Circuit held that according a licensee the status of an assignee must be done with "caution." Noting that the license agreement did not exclude the trademark owner itself from using the marks in the territory, and reserved to the owner the right to monitor quality control and the responsibility to maintain trademark registrations, it found that the licensee was not an "owner" under the act.

### Copyright

Two U.S. Court of Appeals for the Ninth Circuit decisions illustrate the limited protection given to "thin" copyrights, which cover works with only a limited number of original features. In *Satava v. Lowry*, 323 F3d 805 (9th Cir. 2003), the court reversed a preliminary injunction enjoining copying of lifelike glass-in-glass jellyfish sculptures. While certain features of the works — the "distinctive curls" of jellyfish tendrils or the "arrangement of certain hues" — were sufficiently original, the others were simply reflections of jellyfish physiology or common methods of presenting glass-in-glass sculptures. The court recognized that a combination of otherwise unprotectable elements may qualify for copyright protection, but only "if those elements are numerous enough and their selection and arrangement original enough that their combination constitutes an original work of authorship." Similar principles were applied in affirming summary judgment dismissing a copyright claim based on a "product shot" of Skyy's iconic blue vodka bottle. *Ets-Hokin v. Skyy Spirits, Inc.*, 323 F3d 763 (9th Cir. 2003). While the lighting, angles, background and certain other elements of a product shot are copyrightable, those features were not copied by defendant's work.

In a case that attracted dozens of amici, a Kentucky district court

sustained a controversial application of the Digital Millennium Copyright Act (DMCA). *Lexmark Int'l Inc. v. Static Control Components, Inc.*, 2003 WL 912614 (E.D. Ky. Feb. 27, 2003). The court held that Lexmark, a manufacturer of printers and toner cartridges, could invoke the anti-circumvention provisions of the DMCA that prohibit the circumvention of technological measures used to restrict access to copyrighted works to prevent a competitor, Static Control, from marketing toner cartridges designed for use with Lexmark printers. In order for Static Control's cartridges to function, they had to use a microchip that defeated an authentication sequence used in the printer to control access to software that drives the printer and interfaces with the cartridge. Looking to the plain language of the statute, the court rejected the argument that the anti-circumvention prohibitions of the DMCA are limited to the protection of creative copyrighted items such as literary and audiovisual works that have "independent market value." It found that any copyrighted work — including works that merely control access to or operation of a useful device — is protected by the DMCA. These issues will undoubtedly receive attention on appeal.

## Patents

To have a patent declared unenforceable for inequitable conduct, a challenger must meet the heavy burden of showing, by clear and convincing evidence, that the patentee misrepresented material facts with intent to mislead the patent office. In *Hoffman-La Roche v. Promega Corp.*, 2003 WL 1634054 (Fed. Cir. March 31, 2003), a bitterly divided U.S. Court of Appeals for the Federal Circuit upheld two district court findings of inequitable conduct concerning an important patent claiming a method of duplicating DNA. One of those findings determined that the inventors had misled the examiner by describing a purification protocol given as an example in the application in the past tense, when in fact the protocol had not actually been carried out as stated. It was instead a combination of two separate procedures that had been performed. The Federal Circuit found this to be inequitable conduct although the protocol as stated actually yields the claimed results, and had been given to potential contractors for commercial production. Decrying "litigation-induced assaults on the conduct of science and scientists," the dissent accused the majority of returning to a "misbegotten era" that "led judges to suspect that all scientists are knaves and all patent attorneys jackals."

In a significant case concerning the duties of patent applicants who take part in industry standard-setting activities, the Federal Circuit vacated a jury verdict against Rambus, a developer of computer memory technology. *Rambus Inc. v. Infineon Tech. AG*, 318 F3d 1081 (Fed. Cir. 2003). The jury found that Rambus committed common-law fraud by failing to disclose pending patent claims to an electronics standard-setting organization of which Rambus was a member. There was evidence that Rambus repeatedly amended its claims based on information it learned at meetings of the organization. The Court of Appeals nevertheless read the organization's policy strictly, holding that it required only the disclosure of claims that are necessarily infringed by practicing a standard adopted by the organization. Rambus' claims did not fall in that category. The *Rambus* opinion contains advice for industry bodies concerned about these issues: "When direct competitors participate in an open standards committee, their work necessitates a written patent policy with clear guidance on the committee's intellectual property position. A policy that does not define clearly what, when, how, and to whom the members must disclose does not provide a firm basis for the disclosure duty necessary for a fraud verdict."

Two years ago, in *Group One, Ltd. v. Hallmark Cards*, 254 F3d 1041 (Fed. Cir. 2001), the Federal Circuit held that only "an offer which rises to the level of a commercial offer for sale" under contract law constitutes an offer for sale sufficient to trigger the on-sale bar of §102(b) of the Patent Act. Declaring the need for a clear and uniform national standard, the *Group One* court further held that federal, not state, law governed this question and that federal courts should look to the Uniform Commercial Code for guidance. In *Lacks Indus., Inc. v. McKechnie Vehicle Components USA, Inc.*, 322 F3d 1335 (Fed. Cir. 2003), the Federal Circuit held that, in accord with UCC §1-205, evidence of course of dealing and industry practice may be considered in determining when an offer for sale has been made. A dissent complained that admitting evidence of "individual variations in industry practice" would subvert the goal of uniformity that underlies the *Group One* rule.

This article is reprinted with permission from law.com
Copyright © 2003 NLP IP Company. All rights reserved.