IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION
C.A. #6-06-CV-00109-HMH


BIDZIRK, LLC, DANIEL G.
SCHMIDT, III, AND JILL
PATTERSON,

     Plaintiffs

vs.

PHILIP J. SMITH,

     Defendant.

_____/



---

**VIDEOTAPED & STENOGRAPHIC**

**DEPOSITION OF PHILIP J. SMITH**

---

PURSUANT TO THE NOTICE OF DEPOSITION AND/OR

AGREEMENTS IN THE ABOVE-ENTITLED CASE, THE DEPOSITION OF

**PHILIP J. SMITH** WAS TAKEN ON THURSDAY, SEPTEMBER 14TH,

2006, COMMENCING AT 10:34 A.M. AT THE OFFICES OF KEVIN M.

ELWELL, ESQUIRE, 111 EAST NORTH STREET, GREENVILLE, SOUTH

CAROLINA.


*KAREN BELANGER*
*CERTIFIED VERBATIM REPORTER*

---

*FOOTHILLS COURT REPORTING*

---

*SERVING THE UPSTATE OF SOUTH CAROLINA*
*(864) 836-2290*


**Exhibit 2**

Dockets.Justia.com

APPEARANCES:

FOR THE PLAINTIFF:

      KEVIN M. ELWELL, Esquire
      111 EAST NORTH STREET
      GREENVILLE, SOUTH CAROLINA   29601

FOR THE DEFENDANT:

      PHILIP J. SMITH, APPEARING PRO SE

VIDEOGRAPHER:   JACK M. MARKS
               THREE POINT OH!
               306 RIDGELAND DRIVE
               GREENVILLE, SOUTH CAROLINA   29601

ALSO PRESENT:  DANIEL G. SCHMIDT

STIPULATIONS:  THE DEPOSITION WAS TAKEN PURSUANT TO THE

FEDERAL RULES OF CIVIL PROCEDURE.

NONWAIVER:  EXAMINATION AND READING OF THE DEPOSITION ARE

RESERVED BY THE WITNESS AND BY THE PARTIES.

<u>**INDEX**</u>

                                                              <u>**PAGE**</u>

EXAMINATION BY MR. ELWELL ...................... 4

CERTIFICATE OF REPORTER ....................... 77

<u>**EXHIBITS**</u>

EXHIBIT NO. 1  (DEPOSITION NOTICE) ............. 41

EXHIBIT NO. 2  (INTERROGATORIES) ............... 48

EXHIBIT NO. 3  (REQUEST FOR PRODUCTION OF
               DOCUMENTS) .................... 51

EXHIBIT NO. 4  (REQUEST FOR ADMISSIONS) ........ 55

EXHIBIT NO. 5  (RESPONSE TO COMPLAINT) ......... 59

REPORTERS NOTE:  EXHIBITS NOT ATTACHED TO TRANSCRIPT.
                 WITNESS ABRUPTLY LEFT DEPOSITION
                 WITH EXHIBITS IN HAND.

1    THE WITNESS WAS DULY SWORN TO TELL THE TRUTH, THE

2    WHOLE TRUTH AND NOTHING BUT THE TRUTH CONCERNING THE

3    MATTER HEREIN:

4    **PHILIP J. SMITH**,

5    BEING FIRST DULY SWORN, TESTIFIED UNDER OATH AS

6    FOLLOWS:

7    **EXAMINATION BY MR. ELWELL**:

8    Q.    HAVE YOU GIVEN A DEPOSITION PREVIOUSLY?

9    A.    NO, NOT WITH YOU.

10   Q.    AT ANY TIME IN YOUR LIFE?

11   A.    YES.

12   Q.    HOW MANY DEPOSITIONS HAVE YOU BEEN IN?

13   A.    TWO.

14   Q.    TELL ME ABOUT THE FIRST ONE YOU WERE IN.

15   A.    ONE WAS FOR A DIVORCE CASE, AND ANOTHER ONE WAS

16         FOR A PATENT ISSUE.

17   Q.    ON THE DIVORCE CASE, WERE YOU A PARTY IN THAT

18         CASE?

19   A.    PARTY BY WHAT?

20   Q.    WERE YOU GETTING DIVORCED?

21   A.    NO.

22   Q.    YOU WERE A WITNESS FOR ONE OF THE PARTIES?

23   A.    YES.

24   Q.    WHEN WAS THAT DEPOSITION GIVEN?

25   A.    EIGHT YEARS AGO.

| | | |
|---|---|---|
| 1 | Q. | THE PATENT CASE, DID YOU REPRESENT ONE OF THE |
| 2 | | PARTIES IN THAT CASE? |
| 3 | A. | NO, I PROVIDED TESTIMONY AS A CONSULTANT. |
| 4 | Q. | WHO WERE THE PARTIES INVOLVED? |
| 5 | A. | THE MATTER WAS SETTLED.  SO I WOULD PREFER NOT TO |
| 6 | | SAY. |
| 7 | Q. | IT DOESN'T MATTER WHAT YOU PREFER.  WHO WAS THE |
| 8 | | CUSTOMER? |
| 9 | A. | I'M PREFERRING NOT TO SAY. |
| 10 | Q. | YOU'RE REFUSING TO ANSWER THE QUESTION? |
| 11 | A. | I'M REFUSING TO SAY WHO IT WAS, BECAUSE THE CASE |
| 12 | | WAS SETTLED AND THAT'S NOT A MATTER OF PUBLIC |
| 13 | | RECORD. |
| 14 | Q. | THE PARTIES TO A LAWSUIT IS A MATTER OF PUBLIC |
| 15 | | RECORD. |
| 16 | A. | OKAY, THAT COULD BE DISCLOSED LATER AT ANOTHER |
| 17 | | DATE, AFTER I CONFIRM THAT I CAN SAY THAT. |
| 18 | Q. | IF YOU'RE REFUSING TO ANSWER THE QUESTION, THEN I |
| 19 | | CAN GET THE JUDGE TO REQUIRE THAT YOU ANSWER THE |
| 20 | | QUESTION.  YOU DON'T EVEN WANT TO TELL ME WHO THE |
| 21 | | PARTIES TO A CASE WAS THAT YOU WEREN'T A PARTY TO? |
| 22 | A. | I CONSULTED FOR A FIRM THAT I -- OR I CONSULTED IN |
| 23 | | A CASE FOR A FIRM THAT I CONSULTED FOR ON PATENT |
| 24 | | ISSUES THAT I HAD MYSELF CONTRIBUTED TO THE |
| 25 | | INVENTION OF.  THEY WERE SUED FOR THAT.  I AM NOT |

```
 1        REQUIRED -- BECAUSE THAT CASE WAS SETTLED, I AM

 2        NOT REQUIRED TO SAY WHO THAT IS.  BECAUSE IF THAT

 3        MATTER GOES ON PUBLIC RECORD, AS THIS DEPOSITION

 4        MIGHT, I COULD GET IN TROUBLE.

 5   Q.   WAS THE LAWSUIT FILED?  WAS THERE A LAWSUIT?

 6   A.   THERE WAS A LAWSUIT FILED.

 7   Q.   IT WAS IN FEDERAL COURT?

 8   A.   YES.

 9   Q.   WHEN WAS IT FILED?

10   A.   TWO YEARS AGO.

11   Q.   IT IS ON PUBLIC RECORD RIGHT NOW.

12   A.   IT'S BEEN SETTLED.  SO I NEED TO CONSULT --

13   Q.   IT DOESN'T MATTER.

14   A.   DON'T BADGER ME, PLEASE.  I AM PURPOSELY TELLING

15        YOU NOW THAT I WILL PROVIDE THAT TESTIMONY AT A

16        LATER DAY AFTER I CONSULT WITH THIS FIRM THAT I'M

17        ALLOWED TO SAY WHO WAS INVOLVED IN THIS SUIT.

18        THIS MATTER WAS SETTLED.  SO IF IT WERE NOT

19        SETTLED, I WOULD BE WILLING TO PROVIDE --

20   Q.   WHY DO YOU THINK IT MAKES A DIFFERENCE THAT IT WAS

21        SETTLED?

22   A.   THIS IS NOT AN ISSUE THAT -- LET'S SKIP TO THE

23        NEXT QUESTION.  YOU CAN SAY THAT I REFUSE --

24   Q.   NO.

25   A.   OKAY, THIS DEPOSITION IS DONE THEN, IF YOU'RE
```

```
1         GOING TO DO THIS OVER AND OVER.  I'M TELLING YOU,
2         JUST AS IF I HAD AN ATTORNEY HERE AND HE SAID NOT
3         TO ANSWER THAT QUESTION, THAT'S WHAT I'M SAYING
4         RIGHT NOW.
5    Q.   DO YOU UNDERSTAND EVEN IF YOU HAD AN ATTORNEY HERE
6         AND HE ADVISED YOU NOT TO ANSWER A QUESTION, AND
7         YOU TOOK HIS ADVICE AND THAT TURNED OUT TO BE
8         WRONG ADVICE, YOU CAN STILL BE COMPELLED TO ANSWER
9         THE QUESTION?
10   A.   FINE.
11   Q.   THIS IS A DISCOVERY DEPOSITION.
12   A.   FINE.
13   Q.   THESE ARE BACKGROUND QUESTIONS RELATED TO THE VERY
14        BASIC ISSUE OF HOW MANY DEPOSITIONS YOU'VE BEEN
15        INVOLVED IN PREVIOUSLY.  AND YOU WON'T DISCLOSE
16        THE --
17   A.   I'VE BEEN IN TWO, AND I'VE TOLD YOU --
18   Q.   -- NAMES OF THE PARTIES?
19   A.   I'VE TOLD YOU THE MATTER AT HAND.  THAT'S ALL I
20        CAN SAY FOR NOW.
21   Q.   ON THE RECORD, YOU'RE REFUSING TO ANSWER A
22        QUESTION ABOUT A TWO-YEAR-OLD FEDERAL LAWSUIT ON
23        THE GROUNDS THAT SOMEHOW THE IDENTITY OF THE
24        PARTIES IS CONFIDENTIAL?
25   A.   THAT'S CORRECT.
```

```
 1    Q.   WAS THE MATTER SEALED, TO YOUR KNOWLEDGE?
 2    A.   NOT TO MY KNOWLEDGE, BUT I HAVE TO CONFIRM THAT
 3         WITH THAT PARTY.
 4    Q.   YOUR ONLY GROUNDS FOR REFUSING TO ANSWER THE
 5         QUESTION IS THAT THE CASE SETTLED, AND YOU SOMEHOW
 6         FEEL THAT'S RELEVANT TO WHETHER OR NOT YOU CAN
 7         DISCLOSE THEIR IDENTITY?
 8    A.   THAT'S CORRECT.
 9    Q.   THAT'S ABSOLUTELY INCORRECT.  JUST FOR THE RECORD,
10         WE'VE ATTEMPTED TO EXTRACT AN ANSWER FROM YOU AND
11         YOU CONTINUE TO REFUSE.
12    A.   I HAVEN'T CONTINUED TO REFUSE.
13    Q.   IF YOU'RE NOT CONTINUING TO REFUSE, THEN TELL ME
14         THE NAME OF THE PARTIES.
15    A.   PLEASE, I MEAN, LET'S GO ON.  I MEAN, I'M ON A
16         TIME FRAME HERE.  I MEAN, WE'RE NOT BADGERING ME
17         OVER THIS ONE LITTLE ISSUE.  YOU'VE GOT SEVERAL
18         ISSUES TO GO.  LET'S GO.
19    Q.   WHAT IS YOUR TIME FRAME THAT YOU'RE ON TODAY?
20    A.   YOU KNOW, I NEED TO THIS DONE OVER AS QUICKLY AS
21         POSSIBLE.  I'M MISSING A CUSTOMER RIGHT NOW.
22    Q.   THIS WILL GO MUCH QUICKER IF YOU SIMPLY ANSWER
23         QUESTIONS AS THEY'RE POSED TO YOU AND DON'T ARGUE
24         ABOUT EVERY QUESTION.
25    A.   I HAVEN'T ARGUED ABOUT EVERY QUESTION.  YOUR FIRST
```

```
 1              QUESTION WAS NOT NECESSARY.  GO AHEAD, PLEASE.
 2    Q.    WHERE DO YOU LIVE NOW?
 3    A.    I LIVE WITH MY GIRLFRIEND CURRENTLY, AND I MAKE
 4          RESIDENCE AT 601 CLEVELAND STREET, 5-C,
 5          GREENVILLE, SOUTH CAROLINA, 29601.
 6    Q.    DOES SOMEBODY ELSE LIVE AT 601 CLEVELAND STREET,
 7          5-C?
 8    A.    NO ONE LIVES AT THAT PARTICULAR CONDO.  IT'S A
 9          CONDO COMPLEX WITH 64 RESIDENTS.
10    Q.    AND 5-C THOUGH, THAT'S THE UNIT THAT YOU OWN?
11    A.    THAT'S CORRECT.
12    Q.    WHERE DO YOU LIVE NOW, IF YOU DON'T LIVE THERE?
13    A.    I LIVE WITH MY GIRLFRIEND.
14    Q.    I DIDN'T ASK YOU WHO YOU LIVED WITH.  I SAID
15          WHAT'S YOUR ADDRESS.
16    A.    MY PERMANENT ADDRESS IS AT 601 CLEVELAND STREET,
17          5-C, GREENVILLE, SOUTH CAROLINA.
18    Q.    SO FOR PURPOSES OF THIS LAWSUIT, YOU WOULD
19          REPRESENT TO THE COURT THAT 601 CLEVELAND STREET,
20          APARTMENT 5-C, IS YOUR ADDRESS, AND YOU WOULD
21          CONTINUE TO RECEIVE MAIL AND NOTICES ABOUT THIS
22          CASE AT THAT ADDRESS?
23    A.    YES.  AND AS I NOTED PREVIOUSLY IN THE INJUNCTION
24          HEARING, I CHECK THE MAIL THERE ONCE A WEEK.  I AM
25          HARDLY EVER AT THIS RESIDENCE, BUT I DO RECEIVE
```

```
 1            MAIL THERE, AND JUST AS IF YOU RECEIVED MAIL AT A

 2            POST OFFICE BOX.  THAT'S HOW I REPRESENT THAT,

 3            THAT RESIDENCE.

 4    Q.      YOU'RE NOT CONTENDING THAT YOU'RE SOMEHOW EXEMPT

 5            FROM NOTICES IN THIS CASE BECAUSE YOU DON'T CHECK

 6            YOUR MAIL AS OFTEN AS MOST PEOPLE DO?

 7    A.      NO, I'M NOT.

 8    Q.      WHAT IS THE ADDRESS WHERE YOUR GIRLFRIEND LIVES?

 9    A.      THAT'S IRRELEVANT.

10    Q.      IT ISN'T FOR YOU TO SAY WHAT'S IRRELEVANT.  THIS

11            IS A DISCOVERY DEPOSITION.  WHAT ADDRESS DOES YOUR

12            GIRLFRIEND LIVE AT?

13    A.      THAT'S IRRELEVANT.  I MEAN, IF WE'RE GOING TO

14            CONTINUE TO BADGER ME OVER QUESTIONS THAT I'M NOT

15            ANSWERING, THEN WE NEED TO END THIS IMMEDIATELY.

16    Q.      WHAT IS YOUR GIRLFRIEND'S NAME?

17    A.      THAT'S ALSO IRRELEVANT.  SHE IS --

18    Q.      IT'S NOT, BECAUSE I CANNOT PUT HER ON THE JURY IN

19            THIS CASE.  WHAT IS HER NAME?

20    A.      JILLIAN HEARN.

21    Q.      WHERE DOES SHE LIVE?

22    A.      SHE IS WITHIN GREENVILLE COUNTY.

23    Q.      WHERE DOES SHE LIVE?  WHAT IS HER MAILING ADDRESS?

24    A.      CAN YOU PRESENT QUESTIONS TO ME IN A PROFESSIONAL

25            MANNER?  I'M AN ADULT.  YOU'RE THE ONE THAT'S NOT
```

```
1              ACTING LIKE AN ADULT HERE.  ADDRESS ME AS AN
2              ADULT.  I'M A PROFESSIONAL.  YOU'RE A
3              PROFESSIONAL.  QUIT BADGERING ME, PLEASE.
4        Q.    WHERE DOES MS. HEARN LIVE?
5        A.    1002 WINWOOD CIRCLE, GREENVILLE, SOUTH CAROLINA,
6              29607.
7        Q.    HOW LONG HAVE YOU RESIDED THERE WITH HER?
8        A.    FOUR MONTHS.  I WANT TO NOTE ON THE RECORD THAT
9              I'M VERY UPSET THAT I WAS BADGERED TO SAY THAT,
10             BECAUSE SHE IS A COURT PERSON.
11       Q.    SHE'S A WHAT?
12       A.    I MEAN SHE'S A PARALEGAL.  AND THAT UPSETS ME THAT
13             I HAD TO SAY THAT.
14       Q.    DO YOU HAVE ANY RELATIVES BY BLOOD OR MARRIAGE
15             THAT LIVE IN THIS PART OF GREENVILLE COUNTY OR
16             THIS PART OF THE STATE?
17       A.    THIS PART OF THE STATE, YES.
18       Q.    WHO ARE YOUR RELATIVES THAT WOULD LIVE IN THIS --
19       A.    FATHER AND BROTHER.
20       Q.    WHAT'S YOUR FATHER'S NAME?
21       A.    JUNIOR SMITH.
22       Q.    WHERE DOES HE LIVE?
23       A.    SIX MILE.
24       Q.    AND WHAT'S YOUR BROTHER'S NAME?
25       A.    JUNIOR SMITH.
```

```
 1    Q.   AND WHERE DOES HE LIVE?

 2    A.   SIX MILE.

 3    Q.   IS HE MARRIED?

 4    A.   YES.

 5    Q.   WHAT'S HIS WIFE'S NAME?

 6    A.   ROBIN.

 7    Q.   DO THEY HAVE ANY CHILDREN THAT ARE OF VOTING AGE?

 8    A.   NO.

 9    Q.   IS YOUR MOTHER LIVING?

10    A.   YES.

11    Q.   SHE DOESN'T LIVE IN SOUTH CAROLINA?

12    A.   I DO NOT KNOW WHERE SHE IS AT THIS TIME.  THERE

13         WAS A RECENT DEATH IN MY FAMILY, AND I DON'T KNOW

14         WHETHER SHE'S MOVED TO WASHINGTON, OR WHAT.  SHE'S

15         NOT RESIDING IN SOUTH CAROLINA.

16    Q.   HOW OLD ARE YOU NOW?

17    A.   THIRTY-TWO.

18    Q.   AND HOW FAR DID YOU GO IN SCHOOL?

19    A.   SOME COLLEGE.

20    Q.   WHERE DID YOU GRADUATE HIGH SCHOOL?

21    A.   DANIEL HIGH SCHOOL IN CENTRAL.

22    Q.   WHAT YEAR DID YOU GRADUATE?

23    A.   '92.

24    Q.   AND WHAT YEAR DID YOU START ATTENDING DANIEL HIGH

25         SCHOOL?
```

```
1    A.    '89.
2    Q.    DID YOU ATTEND ANY OTHER HIGH SCHOOLS?
3    A.    NO.
4    Q.    IS IT THE CASE THAT YOU DROPPED OUT OF HIGH
5          SCHOOL?
6    A.    NO.
7    Q.    WHAT SORT OF DIPLOMA DO YOU HAVE NOW FROM DANIEL?
8    A.    HIGH SCHOOL DIPLOMA.
9    Q.    DO YOU HAVE A GRADUATE EQUIVALENCY DEGREE?
10         DIPLOMA, RATHER.
11   A.    I ALSO HAVE A GED.
12   Q.    WHY WOULD YOU NEED MORE THAN ONE?
13   A.    I WANTED TO TAKE THE GED FROM GREENVILLE TECH TO
14         DO A STORY THAT I DID.
15   Q.    DID YOU ATTEND DANIEL HIGH SCHOOL FOUR YEARS
16         CONSECUTIVELY?
17   A.    THREE YEARS CONSECUTIVELY.
18   Q.    THREE YEARS CONSECUTIVELY?
19   A.    YES.
20   Q.    AND YOU GRADUATED IN 1992?
21   A.    CORRECT.
22   Q.    DID YOU ATTEND YOUR COMMENCEMENT?
23   A.    YES.
24   Q.    AND YOU HAVE A DIPLOMA?
25   A.    YES.
```

```
 1    Q.   AND YOU WENT AND OBTAINED A GED?

 2    A.   FROM GREENVILLE TECH ALSO.

 3    Q.   WHEN WAS THAT?

 4    A.   '93.

 5    Q.   AND WHAT WAS THE REASON THAT YOU OBTAINED A GED

 6         AFTER YOU ALREADY HAD A GRADUATE DIPLOMA FROM HIGH

 7         SCHOOL?

 8    A.   FOR A STORY PURPOSE, TO SEE HOW DIFFICULT THE GED

 9         WAS.

10    Q.   DID YOU PUBLISH A STORY?

11    A.   YES, I DID.

12    Q.   WHEN WAS THAT PUBLISHED?

13    A.   IN 1993.

14    Q.   IN WHAT MEDIUM?

15    A.   FOR THE TIGER CLEMSON UNIVERSITY PAPER.

16    Q.   YOU SAID YOU HAD SOME COLLEGE.  WHERE DID YOU

17         ATTEND COLLEGE?

18    A.   CLEMSON AND GREENVILLE TECH.

19    Q.   WHEN DID YOU GO TO CLEMSON?

20    A.   FROM '93 TO LATE '93, AND GREENVILLE TECH FROM '93

21         TO '94.

22    Q.   WHAT DID YOU STUDY AT CLEMSON?

23    A.   PSYCHOLOGY.

24    Q.   WHY DID YOU LEAVE CLEMSON?

25    A.   IT WASN'T FOR ME.
```

| 1  | Q. | WHY WASN'T IT FOR YOU? |
|----|----|----|
| 2  | A. | I WAS DOING WELL ENOUGH ON MY OWN TO SURVIVE, AND |
| 3  |    | I CHOSE NOT TO BE IN SCHOOL ANYMORE. |
| 4  | Q. | WHEN DID YOU ATTEND GREENVILLE TECH? |
| 5  | A. | '93 TO '94. |
| 6  | Q. | WHAT DID YOU STUDY THERE? |
| 7  | A. | PSYCHOLOGY. |
| 8  | Q. | WHY DID YOU LEAVE GREENVILLE TECH? |
| 9  | A. | WASN'T FOR ME, SAME REASON. |
| 10 | Q. | YOU SAID YOU WERE DOING WELL ENOUGH ON YOUR OWN, |
| 11 |    | MEANING YOU HAD EMPLOYMENT OUTSIDE OF SCHOOL? |
| 12 | A. | THAT'S CORRECT. |
| 13 | Q. | THAT WAS MAKING MONEY? |
| 14 | A. | THAT'S CORRECT. |
| 15 | Q. | HAVE YOU ATTENDED ANY OTHER COLLEGES? |
| 16 | A. | I PUT MY GIRLFRIEND -- MY EX-GIRLFRIEND THROUGH |
| 17 |    | THE UNIVERSITY OF GEORGIA, THROUGH JOURNALISM |
| 18 |    | SCHOOL.  AND I ATTENDED THE MAJORITY OF HER |
| 19 |    | CLASSES AND ASSISTED HER WITH WORK. |
| 20 | Q. | DID YOU AUDIT THOSE CLASSES? |
| 21 | A. | NO.  I HELPED HER WITH HER DAILY ASSIGNMENTS.  I |
| 22 |    | FILMED HER REPORTS FOR THE GEORGIA TELEVISION -- I |
| 23 |    | MEAN THE UNIVERSITY OF GEORGIA TELEVISION STATION. |
| 24 |    | I ASSISTED HER WITH RESEARCH AND DOCUMENTARIES |
| 25 |    | THAT SHE MADE FOR THE UNIVERSITY OF GEORGIA AS |

```
 1            WELL.

 2    Q.    WHAT'S HER NAME?

 3    A.    LISA RAMSEY.

 4    Q.    WHERE DOES SHE LIVE NOW?

 5    A.    IN PORTLAND, OREGON.  SHE'S THE LEAD ANCHOR FOR

 6          NBC IN PORTLAND, OREGON.

 7    Q.    BEGINNING WITH THE EARLIEST JOB, CAN YOU GO

 8          THROUGH YOUR EMPLOYMENT HISTORY?

 9    A.    I WORKED FOR MY FATHER ON HIS FARM DOING

10          BLUEBERRIES, OR PICKING BLUEBERRIES.  AND I MOVED

11          TO CLEMSON AND I WORKED AT TIGER SPORTS SHOP,

12          WHERE I ACHIEVED MANAGER VERY QUICKLY.  AFTER THAT

13          POINT I WENT TO WORK FOR MY FATHER AGAIN.  AND ALL

14          DURING JUNIOR HIGH AND HIGH SCHOOL, PRE-21, PRE-

15          22, I HAD WORKED ON WEB DESIGN AND WRITING STORIES

16          ON THE INTERNET FOR MONEY.  I HAVE ALWAYS WRITTEN

17          FOR TECHNOLOGY WEBSITES SUCH AS SINA AND EWEEK,

18          MAC WEEK, MAC WORLD, MAC CENTRAL.

19    Q.    DOES YOUR FATHER'S BUSINESS HAVE A NAME?

20    A.    YES, BLUEBERRY HILL.

21    Q.    IT'S IN SIX MILE?

22    A.    YES.

23    Q.    DOES HE STILL OPERATE THAT BUSINESS?

24    A.    YES.

25    Q.    WERE YOU EVER INCORPORATED WHEN YOU WERE WRITING
```

```
 1          STORIES?
 2     A.   NO, FREELANCE.
 3     Q.   AND WHEN DID YOU BEGIN WRITING STORIES THAT PAID
 4          YOU?
 5     A.   THAT DEPENDS.  I MEAN, I GOT PAID SEVERAL HUNDRED
 6          DOLLARS WHEN I WAS IN FOURTH GRADE.  SO, I MEAN,
 7          I'VE BEEN WRITING ALL MY LIFE.
 8     Q.   WELL, HOW ABOUT ON THE INTERNET?
 9     A.   I'D SAY '99.
10     Q.   AND WERE YOU SUPPORTING YOURSELF EXCLUSIVELY BY
11          WRITING BETWEEN THE TIME YOU LEFT SCHOOL?
12     A.   NO, I RUN AN APPLE COMPUTER SERVICE AND REPAIR
13          BUSINESS NOW.
14     Q.   IS THAT INCORPORATED?
15     A.   NO, THAT'S CONTRACT.
16     Q.   HOW LONG HAVE YOU OPERATED THAT BUSINESS?
17     A.   CLOSE TO NINE YEARS, SINCE '97.
18     Q.   WHEN DID YOU MOVE TO GREENVILLE?
19     A.   IN 1997.
20     Q.   WHY DID YOU MOVE HERE?
21     A.   BIG CITY.
22     Q.   HAVE YOU LIVED AT ANY OTHER ADDRESSES BESIDES
23          CLEVELAND STREET AND THE PLACE YOU'RE STAYING NOW?
24     A.   YES, I LIVED AT ASHTON WOODS.  I THINK IT'S 4001
25          PELHAM ROAD.
```

```
 1   Q.   IS THAT THE ONLY PLACE?
 2   A.   THOSE ARE THE TWO PLACES THAT I'VE LIVED IN
 3        GREENVILLE.
 4   Q.   WHAT ARE YOUR PLANS FOR THE CONDO THAT YOU OWN?
 5   A.   TO SELL IT.
 6   Q.   IS IT FOR SALE NOW?
 7   A.   SORT OF.  I MEAN I'M PITCHING IT PRIVATELY RIGHT
 8        NOW, BUT I'M FIXING IT UP TO GET RID OF IT.
 9   Q.   WHAT IS THE VALUE OF THE CONDO?
10   A.   THE TAX VALUE IS 42,000.
11   Q.   WHAT ARE YOU ASKING FOR IT?
12   A.   DON'T KNOW YET.  THEY'RE GOING ANYWHERE FROM
13        THIRTY TO FIFTY-FIVE.
14   Q.   DO YOU OWN IT CLEAR, OR DO YOU HAVE A MORTGAGE ON
15        THAT PROPERTY?
16   A.   I OWN IT CLEAR, BUT MY FATHER HAS ASSISTED FOR
17        WHICH I'M PAYING HIM BACK.
18   Q.   WHO'S ON THE DEED?
19   A.   ME.
20   Q.   JUST YOU?
21   A.   YES.
22   Q.   HOW MUCH DO YOU OWE YOUR FATHER?
23   A.   THIRTY-FIVE THOUSAND.
24   Q.   IS THAT EVIDENCED BY A PROMISSORY NOTE?
25   A.   YES.
```

1    Q.   IS THAT ON FILE AT THE COURTHOUSE?

2    A.   YES.

3    Q.   WHAT IS YOUR INCOME CURRENTLY?

4    A.   MY TAXES WERE FILED FOR 27,000.

5    Q.   THAT'S EARNED ON '05?

6    A.   YES.

7    Q.   HAVE YOU EARNED MUCH MORE OR LESS THAN THAT SINCE

8         YOU OPENED YOUR BUSINESS, OR HAS IT ALWAYS BEEN

9         ABOUT THAT MUCH?

10   A.   IT'S BEEN ROUGHLY THAT MUCH.

11   Q.   WHAT'S THE NAME OF YOUR APPLE CONSULTING BUSINESS?

12   A.   IT'S RECENTLY CHANGED NAMES, BUT IT'S BEEN A-D-Z-

13        O-O-X, ADZOOX.

14   Q.   WHAT IS THE NAME NOW?

15   A.   THE APPLE PEOPLE.

16   Q.   WHY DID YOU CHANGE NAMES?

17   A.   I DIDN'T LIKE THAT NAME ANYMORE.

18   Q.   WHY NOT?

19   A.   I'VE HAD IT FOR A LONG TIME.  I'VE HAD IT SINCE

20        HIGH SCHOOL.  AND I DECIDED TO MOVE AWAY FROM THAT

21        NAME BECAUSE IT HAD CERTAIN CONNOTATIONS

22        ASSOCIATED WITH IT, AND I DIDN'T WANT TO HAVE IT

23        ANYMORE.

24   Q.   WHAT WERE THE ASSOCIATIONS THAT YOU DID NOT WANT

25        TO HAVE?

```
 1    A.   FOR ONE, THIS LEGAL MATTER HAS OPENED ME UP VERY

 2         PUBLICLY TO A TAX ON THE INTERNET.  AND THIS

 3         PARTICULAR LEGAL MATTER HAS CAUSED ME LOCAL

 4         EMBARRASSMENT.  AND SO I DECIDED TO CHANGE FROM

 5         ADZOOX TO THE APPLE PEOPLE.

 6    Q.   ADZOOX IS NOT A PARTY TO THIS CASE, IS IT?

 7    A.   WHAT DO YOU MEAN?

 8    Q.   NOBODY HAS SUED ADZOOX, RIGHT?

 9    A.   NO, BUT I ENTERED INTO THE CONTRACT WITH MR.

10         SCHMIDT AND BIDZIRK AS ADZOOX, BECAUSE I DEAL IN

11         I.T. SURPLUS AS PART OF THAT BUSINESS.

12    Q.   IS ADZOOX INCORPORATED?

13    A.   NO, IT'S A PRIVATE CONTRACT.

14    Q.   WHAT DOES IT HAVING A PRIVATE CONTRACT HAVE TO DO

15         WITH WHETHER IT'S INCORPORATED OR NOT?

16    A.   I CONTRACT OUT TO PEOPLE.  I DON'T -- I MEAN I'M

17         SELF-EMPLOYED.  I'M THE ONLY EMPLOYER -- I'M THE

18         ONLY ONE EMPLOYED BY MY BUSINESS.  I'M SELF-

19         EMPLOYED.

20    Q.   THERE IS NO OTHER ENTITY REGISTERED WITH THE

21         SECRETARY OF STATE'S OFFICE AS ADZOOX, INC., OR

22         ADZOOX, LIMITED, OR ANYTHING LIKE THAT?

23    A.   THAT'S CORRECT.

24    Q.   SO THIS IS A PROPRIETORSHIP?

25    A.   THAT'S CORRECT.
```

```
 1    Q.   AND IS THE APPLE PEOPLE ALSO A PROPRIETORSHIP?

 2    A.   YES.

 3    Q.   ARE YOU A PRINCIPAL IN ANY INCORPORATED ENTITIES?

 4    A.   NO, I'M NOT.

 5    Q.   DO YOU HAVE ANY PARTNERS IN YOUR BUSINESS?

 6    A.   NO, I DO NOT.  I HAVE CONTRACT LABORERS, BUT

 7         THEY'RE NOT PARTNERS.

 8    Q.   HOW MANY CONTRACT LABORERS DO YOU HAVE?

 9    A.   TWO.

10    Q.   WHO ARE THEY?

11    A.   DAVID BUZZELL, FOR WHICH YOU IMPROPERLY SERVED IN

12         JANUARY, AND WILLIAM POTEET.  HE'S IN CHARLESTON.

13         THEY'RE PURELY CONTRACT LABOR.

14    Q.   AND YOUR CONTRACTS WITH THOSE INDIVIDUALS SPECIFY

15         WHAT, IN TERMS OF HOW THEY'RE PAID?  JUST BY THE

16         HOUR?

17    A.   IF I RECEIVE A JOB IN THEIR AREA OR THAT I CANNOT

18         HANDLE ON MY OWN, I LET THEM HAVE THE JOB.  I

19         RECEIVE LITTLE TO NO MONEY OFF OF EITHER ONE OF

20         THEM.

21    Q.   WHAT DOES YOUR BUSINESS GROSS IN A YEAR?  I KNOW

22         YOU SAID YOUR TAXES WERE 27.  OR TAXABLE INCOME,

23         RATHER, WAS 27.

24    A.   ROUGHLY 100,000.

25    Q.   WHAT SORT OF OVERHEAD DOES YOUR BUSINESS HAVE?  DO
```

```
1           YOU MAINTAIN AN OFFICE?

2      A.   I'M SELF-EMPLOYED.  SO I WORK OUT OF MY HOME, AND

3           I CLAIM THAT ON MY TAXES AS MY HOME OFFICE.

4      Q.   AND WHEN YOU SAY YOU WORK OUT OF YOUR HOME, EVERY

5           DAY WHEN YOU GET UP AND GO TO WORK, DO YOU GO TO

6           CLEVELAND STREET?  IS THAT STILL YOUR OFFICE?

7      A.   VARIOUS PLACES I CAN CALL MY OFFICE.  I MEAN, MY

8           MAIN HEADQUARTERS IS OBVIOUSLY MY HOME.  I'M SELF-

9           EMPLOYED.

10     Q.   I'M SELF-EMPLOYED AND I DON'T WORK AT MY HOME.

11          THE CLEVELAND STREET OFFICE IS SET UP AS AN OFFICE

12          NOW?

13     A.   YES, IT IS.

14     Q.   AND WHEN YOU GO TO WORK, IS THAT WHERE YOU GO?

15     A.   AGAIN, I GO TO DIFFERENT PLACES.  I HAVE DIFFERENT

16          OFFICES SET UP IN DIFFERENT PLACES.

17     Q.   WHERE ARE YOUR OTHER OFFICES?

18     A.   BEFORE THIS MATTER I HAD ONE AT COMPUTER CLINIC,

19          FOR WHICH THIS MATTER HAS BROUGHT ME VERY SERIOUS

20          PROBLEMS WITH THEM.  I NO LONGER HAVE AN OFFICE UP

21          THERE.  I DID HAVE AN OFFICE UP THERE UNTIL EIGHT

22          WEEKS AGO.  AND I HAVE AN OFFICE AT JILL HEARN'S

23          HOUSE, AND I HAVE AN AREA THAT I CAN GO TO IN

24          SEVERAL OF MY CUSTOMERS' PLACES.

25     Q.   WHAT CUSTOMERS DO YOU HAVE OFFICES AT?
```

| | | |
|---|---|---|
| 1 | A. | I'M GOING TO REFUSE TO ANSWER THE REST OF THAT. |
| 2 | | THAT'S -- THEY'RE NOT A PARTY TO THIS, AND NOR |
| 3 | | WILL THEY BE CONTACTED FOR THIS MATTER.  SO -- |
| 4 | Q. | WHY IS THAT? |
| 5 | A. | MY CLIENTS WILL NOT BE CONTACTED FOR THIS MATTER. |
| 6 | Q. | WHY DO YOU SAY THAT? |
| 7 | A. | BECAUSE THIS HAS ALREADY RUINED MY LIFE.  I JUST |
| 8 | | LOST MY JOB UP AT COMPUTER CLINIC TWO MONTHS AGO |
| 9 | | BECAUSE OF THIS ISSUE.  AND I NO LONGER CONTRACT |
| 10 | | OUT TO THEM.  SO I REFUSE TO DO THIS ANY FURTHER, |
| 11 | | TO GIVE YOU MY CLIENTS, MY BUSINESS ASSOCIATES, SO |
| 12 | | THAT YOU CAN GO IN AND TELL THEM THAT I'M INVOLVED |
| 13 | | IN SOME LEGAL MATTER WHERE I'M NOT IN TROUBLE, BUT |
| 14 | | IT IMPLIES THAT I'M IN TROUBLE.  AND THAT IT ALSO |
| 15 | | IMPLIES BY YOUR TESTIMONY AND YOUR COURT |
| 16 | | APPEARANCES THAT I LACK IN INTELLIGENCE AND THAT |
| 17 | | I'M NOT A PROFESSIONAL.  I REFUSE TO GIVE YOU ANY |
| 18 | | MORE CLIENTS.  THEY ARE IRRELEVANT TO THIS CASE. |
| 19 | | THEY MAKE NO DIFFERENCE IN THIS MATTER. |
| 20 | Q. | YOU'VE MADE CLAIMS FOR DAMAGES RELATED TO LOST |
| 21 | | BUSINESS INCOME IN THIS CASE? |
| 22 | A. | YES. |
| 23 | Q. | DO YOU DISAGREE THAT YOUR INCOME BEFORE AND AFTER |
| 24 | | THIS CASE IS RELEVANT TO THOSE DAMAGES? |
| 25 | A. | I ACTUALLY AM IMPLYING THAT HAD MR. SCHMIDT COME |

1    THROUGH ON HIS SIDE OF THE DEAL, THAT WE HAD
2    SIGNIFICANT CAPITAL TO COME FROM THAT WHERE I HAD
3    SEVERAL BUSINESS MODELS SET UP WITH BUSINESS
4    PARTNERS TO WORK OUT.  SINCE MR. SCHMIDT DID NOT
5    DELIVER AND BECAUSE HE HAS WASTED MY TIME
6    SIGNIFICANTLY OVER THE PAST SIX TO EIGHT MONTHS, I
7    HAVE NOT BEEN ABLE TO PURSUE THOSE MATTERS.
8    Q.   YOU DID NOT RESPOND TO MY QUESTION.  ARE YOU
9    CONTENDING THEN, THAT YOUR BUSINESS INCOME BEFORE
10   AND YOUR BUSINESS INCOME AFTER THIS LAWSUIT ARE
11   NOT RELEVANT TO YOUR DAMAGE CLAIMS?
12   A.   I'M NOT CONTENDING THAT AT ALL.  I'M SAYING THAT
13   THEY ARE RELEVANT, THAT COME NEXT YEAR I WILL NOT
14   HAVE THE COMPUTER CLINIC AS BUSINESS.  THEY HAVE
15   OFFICIALLY TAKEN OVER ALL MY APPLE CUSTOMERS.
16   Q.   HAVE YOU LOST ANY OTHER BUSINESS RELATED TO THIS
17   LAWSUIT, OR IS THAT CONFINED TO THE COMPUTER
18   CLINIC?
19   A.   THAT'S UNKNOWN AT THIS TIME.  I HAVE SEVERAL
20   PEOPLE THAT MIGHT BE UPSET ABOUT THIS, ESPECIALLY
21   IF I LOSE.
22   Q.   WHO ARE THEY?
23   A.   THAT'S IRRELEVANT AT THIS TIME.
24   Q.   YOUR JUDGMENTS ABOUT WHETHER IT'S IRRELEVANT DON'T
25   MAKE ANY DIFFERENCE.

1    A.    OKAY.

2    Q.    AGAIN THIS IS A DISCOVERY DEPOSITION.  IF YOU'RE

3          CONTENDING THAT YOU LOST BUSINESS INCOME DUE TO

4          THIS LAWSUIT --

5    A.    THEN YOU CAN SAY THAT I REFUSE TO ANSWER THE

6          QUESTION.  THANK YOU.

7    MR. ELWELL:

8          THE RECORD WILL REFLECT THEN, THAT HE'S REFUSING

9          TO ANSWER QUESTIONS ABOUT HIS BUSINESS LOSSES.

10   EXAMINATION RESUMED BY MR. ELWELL:

11   Q.    HOW MANY CLIENTS DO YOU CURRENTLY HAVE?

12   A.    ROUGHLY 20.  I MEAN I HAVE -- I MEAN, I OBVIOUSLY

13         HAVE PEOPLE THAT CALL ME BY WORD OF MOUTH AND

14         CUSTOMER REFERRALS, AND EVERYTHING ELSE.  BUT

15         ROUGHLY 20 ON A REGULAR BASIS.

16   Q.    ALL IN THIS AREA?

17   A.    YES.

18   Q.    HOW MUCH WORK DID YOU SEND OUT TO MR. POTEET LAST

19         YEAR?

20   A.    ROUGHLY TEN.

21   Q.    THOUSAND?

22   A.    YES.

23   Q.    AND SO FAR THIS YEAR, HOW MUCH?

24   A.    ROUGHLY FIVE.

25   Q.    AND MR. BUZZELL, HOW MUCH DID YOU SEND HIM LAST

```
 1        YEAR?
 2   A.   ROUGHLY 15.
 3   Q.   AND HOW ABOUT THIS YEAR SO FAR?
 4   A.   I CAN'T REALLY ESTIMATE THAT.  I DON'T KNOW,
 5        BECAUSE WE'VE BEEN HANDLING THINGS DIFFERENTLY
 6        SINCE THIS ISSUE DIDN'T COME THROUGH FOR US.
 7   Q.   HOW ARE YOU HANDLING THINGS DIFFERENTLY?
 8   A.   WE HAD CAPITAL TIED UP IN THIS INVENTORY.  AND
 9        SINCE IT DIDN'T EVEN GET A FOURTH OF THE APPRAISED
10        VALUE, WE WERE NOT ABLE TO PURSUE OUR MATTERS.
11        AND SO WE'VE WORKED OUT THINGS KIND OF IN TRADE.
12        SO I CAN'T REALLY ESTIMATE THAT UNTIL TAXES COME
13        AROUND.
14   Q.   DO YOU HAVE AN ACCOUNTANT?
15   A.   NO, I DO NOT.
16   Q.   YOU DO YOUR OWN TAXES?
17   A.   MY GRANDFATHER WAS A TAX ATTORNEY.  MY FATHER IS A
18        VERY EXPERIENCED TAX PREPARER.  HE HAS BEEN
19        PREPARING MY TAXES FOR ALL OF MY LIFE.  AND MY
20        FATHER DOES SOME OF MY ACCOUNTING, NOT ALL OF IT.
21   Q.   WHO DOES THE REMAINDER OF YOUR ACCOUNTING?
22   A.   I DO.
23   Q.   DOES THE BUSINESS OWN ANY ASSETS IN ITS OWN NAME?
24   A.   NOT BESIDES LIQUID INVENTORY, NO.
25   Q.   WHAT ARE YOU REFERRING TO BY LIQUID INVENTORY?
```

1    A.    PARTS.

2    Q.    ASIDE FROM YOU PERSONALLY, HAVE YOU PURCHASED

3          ANYTHING IN THE NAME OF THE BUSINESS?

4    A.    WELL, I HAVE.  I MEAN, I'M SELF-EMPLOYED.  I DO

5          DEPRECIATION, LIKE ANY SELF-EMPLOYED PERSON DOES.

6          SO, I MEAN, OBVIOUSLY I PURCHASE THINGS TO USE FOR

7          MY BUSINESS.

8    Q.    YOU'RE PERSONALLY LIABLE THOUGH, FOR ALL THOSE

9          PURCHASES?  FOR INSTANCE, YOU DON'T DO THEM IN THE

10         NAME OF SOME OTHER ENTITY?

11   A.    YES, BUT THEY'RE EITHER LIQUID OR THEY HAVE

12         RELATIVELY NO VALUE.

13   Q.    DO YOU HAVE A FACILITY THAT YOU STORE INVENTORY

14         IN?

15   A.    I DID UNTIL I LOST IT.

16   Q.    DID YOU JUST HAVE ONE FACILITY?

17   A.    I HAD SOME IN MY CONDO, AND I HAD SOME IN A

18         WARE -- I HAD TWO WAREHOUSES ACROSS THE CITY HERE.

19   Q.    WHAT WERE THOSE TWO WAREHOUSES?

20   A.    ONE WAS ON CONGAREE ROAD, SHARED WITH A FRIEND OF

21         MINE.  AND ANOTHER ONE WAS IN BEREA, ALSO SHARED

22         WITH THAT SAME FRIEND.

23   Q.    WHICH FRIEND IS THAT?

24   A.    FRANK WATTS.

25   Q.    WHERE DID THE INVENTORY COME FROM THAT WAS IN

1              THERE?

2      A.     VARIOUS SURPLUS.

3      Q.     DID YOU PURCHASE IT OR WAS IT GIVEN TO YOU?

4      A.     BOTH.

5      Q.     ROUGHLY WHAT PERCENTAGE OF IT WAS DONATED TO YOU?

6      A.     TEN PERCENT, 20 PERCENT.

7      Q.     AND YOU ACQUIRED THE REST OF IT IN THE COURSE OF

8             WHAT, JUST NORMAL OPERATION OF YOUR BUSINESS?

9      A.     YES, THROUGH SURPLUS, TRADE FOR LABOR.

10     Q.     WHICH SURPLUS CARRIERS DO YOU DEAL WITH?

11     A.     THAT WOULD BE PROPRIETARY INFORMATION TO MR.

12            SCHMIDT, WHICH I PREFER NOT TO PUT HIM IN CONTACT

13            WITH.

14     Q.     AGAIN THIS IS A DISCOVERY DEPOSITION.

15     A.     I'M NOT GOING TO TELL YOU WHO I DEAL SURPLUS WITH,

16            BECAUSE HE --

17     Q.     DO YOU UNDERSTAND YOU'RE GOING TO COME BACK AND DO

18            THIS AGAIN?

19     A.     -- RUNS AN E-BAY BUSINESS.

20     Q.     YOU'RE GOING TO COME BACK AND DO THIS AGAIN.  DO

21            YOU UNDERSTAND THAT?

22     A.     THAT'S FINE.  HE RUNS AN E-BAY BUSINESS, WHICH HE

23            COULD CONTACT THOSE SURPLUS ENTITIES AND RECEIVE A

24            SURPLUS CONTRACT.  THAT'S WHAT HE DOES FOR A

25            LIVING.  I'M NOT -- I REFUSE TO -- I -- HE'S -- IF

1     HE DIDN'T PAY ATTENTION BEFORE, I TOLD HIM THE

2     SERVICES BEFORE.  SO HE SHOULD BE ABLE TO TELL YOU

3     THAT IF HE REMEMBERS.

4   Q.  YOU'RE REFUSING TO ANSWER THE QUESTION?

5   A.  YES, SIR.  THAT'S PROPRIETARY INFORMATION TO MR.

6     SMITH.  I MEAN TO ME VERSUS MR. SMITH.  HE DEALS

7     IN SURPLUS.

8   Q.  HOW MUCH INVENTORY DO YOU HAVE POSSESSION OF NOW?

9   A.  THAT'S UNDETERMINABLE RIGHT NOW, BECAUSE I AM

10    LIQUIDATING IT OR DONATING IT.  SO IT'S

11    UNDETERMINABLE.  I'M CHANGING THE WAY THAT I DO

12    BUSINESS RIGHT NOW, AWAY FROM SURPLUS BECAUSE OF

13    THE NEGATIVE EXPERIENCE WITH MR. SCHMIDT.

14  Q.  WHERE IS THIS INVENTORY STORED?

15  A.  IN BEREA AND MY CONDO.

16  Q.  AND IN YOUR CONDO?

17  A.  YES.

18  Q.  AND IS THERE ANYTHING IN THE WAREHOUSE ON CONGAREE

19    ROAD?

20  A.  NO, THAT'S BEEN EMPTIED.

21  Q.  ARE YOU STILL PAYING WAREHOUSE FEES AT CONGAREE

22    ROAD?

23  A.  NO, I'M NOT.

24  Q.  AND THE FACILITY IN BEREA, WHAT TYPE OF FACILITY

25    IS IT?

1    A.   IT WAS AN OLD CHURCH.

2    Q.   IS IT A BONDED WAREHOUSE?

3    A.   I MEAN IT'S -- WHAT DO YOU MEAN, BONDED WAREHOUSE?

4    Q.   DO OTHER PEOPLE STORE THINGS THERE?

5    A.   THIS FRIEND DID.  I MEAN IT'S BEING LIQUIDATED AS

6        WE SPEAK.  I DONATED A LOT TO GOODWILL LAST WEEK.

7    Q.   DOES MR. WATTS OWN THE CHURCH?

8    A.   HE WAS LEASING TO OWN.  BUT BECAUSE THIS INCOME

9        DIDN'T COME THROUGH FROM MR. SCHMIDT, WE HAVE

10       BASICALLY SEVERED TIES WITH EACH OTHER.  AND IT

11       HAS BECOME MY RESPONSIBILITY AS PART OF MY FOLLOW-

12       UP TO TRY TO MAKE THINGS RIGHT WITH HIM TO

13       LIQUIDATE THIS INVENTORY, HOWEVER I CAN, SO THAT

14       IT CAN REVERT BACK TO THE ORIGINAL OWNER.

15    Q.   WERE YOU PAYING RENT TO MR. WATTS?

16    A.   I WAS PAYING PART OF THE RENT, YES.

17    Q.   HOW MUCH WAS THAT?

18    A.   ONE SEVENTY-FIVE A MONTH.

19    Q.   HOW MANY SQUARE FEET DID YOU LEASE?

20    A.   THAT'S UNDETERMINABLE.  I DON'T KNOW THAT EITHER.

21       I MEAN, I HAVE IT ALL OVER.  IT'S A LARGE, VERY

22       LARGE WAREHOUSE.

23    Q.   AND THIS IS ACTUALLY THE BASEMENT IN THE CHURCH?

24    A.   NO.  IT WAS AN OLD LIKE EVANGELICAL CHURCH THAT, I

25       GUESS, WAS ABANDONED, AND THE OWNER BOUGHT IT AND

```
 1          TOOK ALL THE PEWS OUT.
 2    Q.    SO YOUR THINGS ARE SOLD IN THE SANCTUARY, WHAT
 3          USED TO BE A SANCTUARY?
 4    A.    SANCTUARY, THE CLUB ROOM, THE MEETING ROOM, THE
 5          BATHROOM, EVERYWHERE.  I MEAN, LIKE I SAID, THIS
 6          IS KIND OF IRRELEVANT TOO, BECAUSE THAT'S GOING TO
 7          BE EMPTIED BY THE END OF THE WEEKEND.
 8    Q.    AND HOW MUCH INCOME WILL YOU REALIZE FROM
 9          LIQUIDATING THAT INVENTORY?
10    A.    WELL, GOODWILL TOOK A LOT OF IT A COUPLE DAYS
11          BACK.  SO --
12    Q.    HOW MUCH DID YOU VALUE THAT DONATION?
13    A.    $4,000.
14    Q.    DO YOU HAVE A RECEIPT FROM GOODWILL?
15    A.    YES, I DO.
16    Q.    DID THEY GIVE IT TO YOU IN BLANK?
17    A.    YES, THEY DID.
18    Q.    AND DID THEY GIVE IT TO YOU WITH A SIGNATURE, AND
19          YOU SIMPLY WROTE $4,000 ON IT?
20    A.    I LISTED THE INVENTORY, ITEMIZED, AND I WENT
21          THROUGH ON VARIOUS ONES AND LISTED THE E-BAY VALUE
22          OF EACH ONE TO DETERMINE THAT AMOUNT.
23    Q.    AND HOW MUCH IS LEFT IN THE WAREHOUSE NOW, IN THE
24          CHURCH?
25    A.    APPROXIMATELY TEN PERCENT OF WHAT WAS THERE.
```

```
 1    Q.   WHAT PERCENTAGE DID YOU GIVE AWAY TO GOODWILL THE

 2         OTHER DAY?

 3    A.   ABOUT 30 PERCENT.

 4    Q.   SO ASSUMING IT'S ALL VALUED THE SAME, YOU WOULD BE

 5         ASKING FOR A GOODWILL RECEIPT FOR ABOUT $1,300 FOR

 6         WHAT REMAINS?

 7    A.   CORRECT.  AND THE OTHER WAS LIQUIDATED BY A

 8         SURPLUS COMPANY THAT CAME DOWN THE OTHER DAY.

 9    Q.   WHAT SURPLUS COMPANY CAME BY AND LIQUIDATED THAT

10         INVENTORY?

11    A.   ASSET RECOVERY IN ATLANTA.

12    Q.   AND DID THEY PAY YOU FOR IT?

13    A.   NO.

14    Q.   DID THEY GIVE YOU ANY KIND OF RECEIPT?

15    A.   NO.  I MEAN, THEY GAVE ME A RECEIPT, BUT THEY CAME

16         AND PICKED UP AND ITEMIZED WHAT THEY PICKED UP AS

17         WELL.

18    Q.   WAS THERE A VALUE ATTACHED TO THAT?

19    A.   YES, 15,000.  THEY EXPECT TO RECEIVE MORE THAN

20         THAT, AND THAT'S NOT BEEN DETERMINED YET.  THEY

21         HAVE NOT MELTED IT DOWN, AS BEING MELTED DOWN.

22    Q.   WHAT KIND OF INVENTORY WAS THAT?

23    A.   I.T. INVENTORY, LIKE SERVERS AND --

24    Q.   SO IT'S NOT ACTUALLY GOING TO BE PHYSICALLY

25         SUBJECTED TO HIGH HEAT AND MELTED?  IT'S GOING TO
```

```
 1          BE SOLD?
 2     A.   NO, IT WILL BE MELTED.
 3     Q.   WHAT ARE THEY GOING TO MAKE OUT OF IT?
 4     A.   THEY EXTRACT COPPER, GOLD, PLATINUM, SILVER,
 5          TUNGSTEN.
 6     Q.   IT'S A SCRAP METAL OUTFIT, THEN?
 7     A.   YEAH.  I MEAN THEY -- YEAH.
 8     Q.   DO YOU HAVE ANY OTHER BUSINESS RELATIONSHIPS NOW
 9          THAT GENERATE INCOME FOR YOU?
10     A.   I SELL ON E-BAY.
11     Q.   WHAT DO YOU SELL?
12     A.   APPLE COMPUTER PARTS MAINLY, AND --
13     Q.   WHERE DO YOU OBTAIN THOSE FOR SALE?
14     A.   VARIOUS PLACES, TRADE, SURPLUS.
15     Q.   IS THAT ALL?  TRADING FOR THEM AND SURPLUS?
16     A.   YEAH.  I MEAN, YOU KNOW, A CUSTOMER WILL COME IN,
17          OR COME TO ME AND SAY, "I HAVE THIS OLD I-MAC."
18          AND I'LL SAY, "HERE, I'LL GIVE YOU $40 OFF YOUR
19          SERVICE WORK."  AND I GET THEM FROM THE SURPLUS
20          SOURCES, WHICH I'M PROBABLY NOT DEALING WITH
21          ANYMORE.
22     Q.   ARE YOU GOING TO STILL BE IN THE E-BAY BUSINESS
23          AFTER YOU GET RID OF ALL THE INVENTORY THAT YOU
24          HAVE?
25     A.   I'M NOT CERTAIN OF THAT.
```

```
 1    Q.   HOW MUCH DID YOU EARN FROM SELLING E-BAY LAST
 2         YEAR?
 3    A.   ROUGHLY 18,000, HALF MY INCOME.  CLOSE TO HALF MY
 4         INCOME.
 5    Q.   WELL, 18,000 IS HALF OF 36.  YOU INDICATED YOU HAD
 6         TAXABLE INCOME OF 27.
 7    A.   I HAVE DEPRECIATION OFF OF E-BAY, AND EVERYTHING
 8         ELSE TOO.
 9    Q.   DID YOU EARN 18,000 OF YOUR GROSS APPROXIMATELY
10         100,000?
11    A.   I MEAN THAT'S 18,000 IN SALES.  I DID ROUGHLY
12         2,300 A MONTH.  I'M A POWER SELLER, SO --
13    Q.   BUT THE QUESTION IS, YOU'RE SAYING IT'S $18,000
14         OUT OF THE HUNDRED ROUGHLY GROSS THAT YOU MADE?
15    A.   THAT'S CORRECT.  BUT THAT'S BEFORE FEES AND -- I
16         MEAN, THAT'S, YOU KNOW --
17    Q.   WHAT'S YOUR NET ON E-BAY SALES LAST YEAR?
18    A.   I DON'T HAVE MY TAX INFORMATION IN FRONT OF ME.  I
19         DON'T KNOW.  I MEAN IT'S -- YOU GUYS SHOULD BE
20         ABLE TO FIGURE THAT OUT.  YOU SELL ON E-BAY.
21    Q.   I'M HERE ASKING YOU.  IF YOU KNOW --
22    A.   I DON'T KNOW.  I MEAN, I'M ANSWERING THAT AS
23         HONESTLY AS I CAN.
24    Q.   HOW MANY ACCOUNTS DO YOU HAVE ON E-BAY?
25    A.   TWO.
```

| | | |
|---|---|---|
| 1 | Q. | WHAT ARE YOUR USER NAMES? |
| 2 | A. | THE APPLE PEOPLE AND IRURMAN. |
| 3 | Q. | AND DO YOU SELL INVENTORY THROUGH BOTH? |
| 4 | A. | I ONLY SELL INVENTORY THROUGH THE APPLE PEOPLE. |
| 5 | Q. | HOW LONG HAVE YOU HAD THAT ID? |
| 6 | A. | NINE AND A HALF YEARS.  IT'S BEEN UNDER A |
| 7 | | DIFFERENT NAME. |
| 8 | Q. | WHAT OTHER DIFFERENT NAME WAS IT? |
| 9 | A. | A-D-Z-O-O-K-S, A-D-Z-O-O-X, THINK THREE, ZOOK'S |
| 10 | | AUCTIONS, AND NOW THE APPLE PEOPLE. |
| 11 | Q. | ARE THE OTHER NAMES STILL IN USE? |
| 12 | A. | NO. |
| 13 | Q. | AND THE IRURMAN ACCOUNT, WHAT IS IT FOR? |
| 14 | A. | AS A BACKUP. |
| 15 | Q. | HAS IT EVER BEEN USED? |
| 16 | A. | YES. |
| 17 | Q. | WHY WOULD YOU NEED A BACKUP? |
| 18 | A. | IN CASE OF SUSPENSION.  OR IN CASE OF, YOU KNOW, |
| 19 | | BIDDING ON PERSONAL ITEMS THAT I DON'T NECESSARILY |
| 20 | | WANT TO BE SHOWN ON MY PUBLIC -- MY MORE PUBLIC |
| 21 | | ACCOUNT. |
| 22 | Q. | HAVE YOU EVER BEEN SUSPENDED FROM E-BAY? |
| 23 | A. | YES, I HAVE. |
| 24 | Q. | HOW MANY TIMES? |
| 25 | A. | ONCE. |

```
 1    Q.   WHEN WAS THAT?

 2    A.   FROM AUGUST TO OCTOBER OF LAST YEAR.

 3    Q.   WHAT'S THE REASON FOR THAT?

 4    A.   THERE WERE SEVERAL REASONS.  SOMEONE REPORTED ME

 5         TO THE VERO PROGRAM.  I'M NOT A HUNDRED PERCENT

 6         SURE, BUT IT COULD HAVE BEEN A BIDZIRK EMPLOYEE

 7         THAT REPORTED ME TO THE VERO PROGRAM FOR USING

 8         SOME PICTURES FROM A LAP-TOP BAG AUCTION.  I HAD

 9         CONFRONTED A BIDZIRK EMPLOYEE ABOUT THAT, AND THEY

10         HAD SAID SOMETHING TO THE EFFECT THAT THEY DIDN'T

11         KNOW THAT THAT WAS ME.

12    Q.   WHO WAS THE EMPLOYEE?

13    A.   WHAT'S THE GUY'S NAME THAT HAS THE DARK GOATEE?

14    Q.   I DON'T KNOW.

15    A.   I DON'T KNOW.  I DON'T KNOW WHAT HIS NAME IS.  I

16         THINK IT'S CHRIS.

17    Q.   WHICH STORE DID HE WORK AT?

18    A.   I NEVER REALLY WENT INTO THE STORES A LOT.  SO I

19         DON'T REALLY KNOW WHO WORKED WHERE.  I THINK IT

20         WAS BIDZIRK 102 OVER AT CHERRYDALE.

21    Q.   AND YOU USED SOME PHOTOS WITHOUT AUTHORIZATION, OR

22         WHAT WAS THE NATURE OF THE COMPLAINT?

23    A.   WELL, MR. SCHMIDT WAS NOT LIQUIDATING THE LAP-TOP

24         BAGS QUICKLY ENOUGH, OR HE WAS LISTING THEM IN TOO

25         BULK OF AN AUCTION.  AND WE WERE ONLY GETTING
```

```
 1          THREE TO $5 A BAG WHEN, YOU KNOW, WE COULD GET 18
 2          TO 20 IF WE LISTED THEM OURSELVES.  THEY WERE --
 3          IT WAS MY INVENTORY, AND I HAD SPECIFICALLY
 4          ADDRESSED WITH MR. SCHMIDT THAT PEOPLE ON E-BAY,
 5          IF YOU HAVE GOOD PICTURES, WILL TAKE YOUR PICTURES
 6          IF YOU'RE NOT CAREFUL.  AND HE DID NOT REALLY PAY
 7          ATTENTION TO THAT.  AND SO I HAD TO START LISTING
 8          THESE BAGS MYSELF, BECAUSE THINGS WERE NOT MOVING
 9          AND WE WEREN'T GETTING OUR MONEY.  AND THERE WERE
10          -- THERE WAS ANOTHER REASON.  A PERSON IN -- AND
11          THIS IS THE REAL MAIN REASON WHY I GOT SUSPENDED.
12          THERE WERE THREE REASONS.  ONE, I ALSO HAD ON MY
13          ORIGINAL JACK WHISPERS WEBSITE, I HAD LISTING OF
14          BAD E-BAYERS.  AND THOSE WERE -- I HAD THEM BY ID,
15          AND E-BAY SAID THAT I COULD NOT PUBLISH THOSE, AND
16          SO I REMOVED THEM.
17    Q.    WAS THE SUSPENSION LIFTED AFTER THAT?
18    A.    WITHIN 24 HOURS.
19    Q.    WHY DID THE SUSPENSION LAST TWO OR THREE MONTHS?
20    A.    BECAUSE I HAD AN ISSUE WITH THE FIRST ISSUE OF E-
21          BAY VERO.  AND THEIR SUSPENSIONS ARE 30 DAYS, BUT
22          THEY UNDERSTOOD AFTER THAT POINT THAT I FINALLY
23          GOT THAT RESOLVED.  AGAIN THERE WAS ANOTHER ISSUE
24          WHERE I THINK THAT SOMEBODY THAT I UPSET ON E-BAY
25          FROM CLEMSON ALSO SAID THAT I INTERFERED WITH
```

```
 1          THEIR AUCTIONS BY -- THEY WENT IN ONE NIGHT AFTER

 2          THEY RECEIVED A BAD AUCTION FROM ME AND BOUGHT

 3          THREE OF MY AUCTIONS LIKE INSTANTANEOUSLY, AND

 4          THEN E-MAILED ME AND SAID THEY WOULDN'T PAY.  AND

 5          THEY -- THEN THEY -- THEN I LEFT THEM NEGATIVE

 6          FEEDBACK IMMEDIATELY, FOR ALL THREE OF THOSE

 7          AUCTIONS.  WELL, E-BAY SAID THAT WAS LEAVING

 8          NEGATIVE FEEDBACK FOR THE PURPOSE OF LEAVING

 9          NEGATIVE FEEDBACK.  AND SO THEREFORE, THAT WAS AN

10          ISSUE THAT TOOK A WHILE TO RESOLVE.  BUT AS SOON

11          AS I RESOLVED IT WHERE I ACTUALLY PROVED THAT THAT

12          GUY WAS IN MALICE AGAINST ME, THEY LIFTED THAT,

13          AND THEN THEY LIFTED THE RESTRICTION OFF.  THEY

14          SAID IF YOU'LL CHANGE THE E-BAY PAGE, THEN YOU CAN

15          DO IT.

16     Q.   WHO WAS THE PERSON THAT YOU UPSET AT CLEMSON?

17     A.   I DON'T KNOW, KNOW HIS NAME.  I MEAN HE WAS KIND

18          OF ANONYMOUS.  I THINK HIS NAME WAS AARON MOORE.

19     Q.   WITH REGARD TO THE COMPUTER BAG ISSUE, I'M STILL

20          NOT CLEAR WHAT THE PROBLEM WAS THERE.  YOU STARTED

21          LISTING BAGS YOURSELF, AND YOU MADE USE OF

22          BIDZIRK'S PHOTOGRAPH IN YOUR LISTING?

23     A.   THAT'S CORRECT.

24     Q.   BUT I THOUGHT YOU HAD TOLD MR. SCHMIDT THAT THAT

25          WAS SOMETHING YOU HAD TO BE CAREFUL OF PEOPLE
```

```
 1          DOING.
 2     A.   THAT'S CORRECT.
 3     Q.   SO YOU DID WHAT YOU WARNED HIM --
 4     A.   THAT'S CORRECT.
 5     Q.   -- THAT OTHER PEOPLE MIGHT DO, THAT THEY SHOULDN'T
 6          DO?
 7     A.   THAT'S CORRECT.  AND I'M NOT SURE -- THEY DON'T
 8          TELL YOU WHO REPORTS YOU TO THE VERO PROGRAM.
 9          THEY JUST -- BECAUSE THE AUCTION HAD ALREADY
10          ENDED.  SO THEY DON'T TELL YOU WHO REPORTED YOU,
11          AND THEY ALSO DON'T TELL YOU FOR WHAT PARTICULAR
12          ITEM.  THEY JUST SAY -- THEY SOMETIMES SAY
13          DIFFERENT THINGS.  I MEAN, I USED TO -- YOU KNOW,
14          WHEN I LISTED MICROSOFT WINDOWS OR ADOBE PHOTO
15          SHOP, THEY WOULD SOMETIMES END YOUR AUCTION AND
16          SAY, YOU KNOW, THE ADOBE VERO PROGRAM HAS ENDED
17          YOUR AUCTION.  AND IT DOESN'T SAY WHY OR ANYTHING
18          ELSE.
19     Q.   WHAT IS THE VERO PROGRAM?
20     A.   VERO PROGRAM IS VERIFICATION FOR CERTAIN COMPANIES
21          FOR COPYRIGHTS.  IN OTHER WORDS, IF THEY HAVE --
22          IF THEY CAN LAY CLAIM TO AN IMAGE OR A PIECE OF
23          PROPERTY, THEN THEY CAN CONTACT E-BAY AND ASK THAT
24          THEY BE REMOVED.
25     Q.   SO YOU USED SOMEONE ELSE'S PHOTOGRAPHS.  IN THIS
```

```
1              CASE, BIDZIRK'S PHOTOGRAPHS FOR YOUR OWN LISTINGS.
2      A.     THEY WERE MY ITEMS.
3      Q.     DID YOU TAKE THE PHOTOGRAPHS?
4      A.     NO, I DID NOT.
5      Q.     THEY WEREN'T YOUR PHOTOGRAPHS.
6      A.     NO.  BUT THE OTHER ITEM IS THAT THOSE EXACT SAME
7              PHOTOGRAPHS ARE ON THE DELL WEBSITE.  SO IT'S HARD
8              TO DETERMINE WHETHER THEY EVEN TOOK THE PICTURES
9              OR NOT THEMSELVES, EITHER.
10     Q.     HOW DO YOU KNOW THEY'RE THE EXACT SAME
11             PHOTOGRAPHS?
12     A.     I MEAN IT'S OBVIOUS THE WAY THEY, YOU KNOW, PUT
13             THEM, AND IT SHOWS YOU ALL THE DIFFERENT VIEWS OF
14             THE BAG ON THE DELL WEBSITE.  IT'S PRETTY MUCH THE
15             SAME THING.  SO THEY PRETTY MUCH --
16     Q.     PRETTY MUCH THE SAME AND EXACTLY ARE NOT THE SAME
17             THING, ARE THEY?
18     A.     WELL, I WOULD MAKE THE CASE THAT YOU CAN'T GO INTO
19             THE LOUVE AND TAKE A PICTURE OF THE MONA LISA --
20     Q.     THERE'S ONLY ONE OF THOSE.  THERE'S LOT OF PEOPLE
21             TAKING PICTURES OF LAP-TOP BAGS, AREN'T THERE?
22     A.     YOU CAN'T LITHOGRAPH THE MONO LISA EITHER, AND
23             SELL IT.
24     Q.     WHY IS THAT?
25     A.     WITHOUT PERMISSION?
```

| | | |
|---|---|---|
| 1 | Q. | WHOSE PERMISSION DO YOU NEED? |
| 2 | A. | THE LOUVE.  I THINK THE LOUVE OWNS THAT PAINTING. |
| 3 | | I'M NOT SURE.  I DON'T KNOW.  I MEAN, I DON'T KNOW |
| 4 | | WHY THAT'S EVEN BEING ASKED. |
| 5 | Q. | DO YOU HAVE ACCOUNTS WITH OTHER INTERNET SERVICE |
| 6 | | PROVIDERS? |
| 7 | A. | WHAT DO YOU MEAN? |
| 8 | Q. | DO YOU HAVE AN AOL ACCOUNT? |
| 9 | A. | NO, I DO NOT. |
| 10 | Q. | DO YOU HAVE A HOTMAIL ACCOUNT? |
| 11 | A. | NO, I DO NOT. |
| 12 | Q. | WHAT OTHER USER NAMES DO YOU APPEAR AS ON THE |
| 13 | | INTERNET? |
| 14 | A. | JUST WHAT YOU HAVE. |
| 15 | Q. | WHO HOSTS YOUR E-MAIL? |
| 16 | A. | YAHOO. |
| 17 | **MR. ELWELL**: | |
| 18 | | MARK THAT AS 1, PLEASE. |
| 19 | **WITNESS**: | |
| 20 | | WHAT TIME FRAME ARE WE ON HERE? |
| 21 | (EXHIBIT NO. 1 MARKED, DEPOSITION NOTICE) | |
| 22 | **EXAMINATION RESUMED BY MR. ELWELL**: | |
| 23 | Q. | WHAT DO YOU MEAN? |
| 24 | A. | I MEAN HOW MUCH LONGER HAVE WE GOT HERE? |
| 25 | Q. | A LITTLE WHILE. |

1     A.   CAN YOU GIVE ME KIND OF A DEFINITIVE ANSWER?

2     Q.   NO.

3     A.   I'M DIABETIC.  SO I NEED TO EAT EVERY TWO AND A

4          HALF TO THREE HOURS.

5     Q.   WE CAN STOP TO DO THAT.  I'M NOT TRYING TO WEAR

6          YOU OUT.  IF YOU NEED TO STOP, LET ME KNOW.  I'LL

7          SHOW YOU WHAT'S BEEN MARKED AS EXHIBIT 1.  IT'S A

8          NOTICE FOR THIS DEPOSITION.  DO YOU RECOGNIZE THIS

9          DOCUMENT?

10    A.   YEAH, I GUESS.

11    Q.   IS THAT YOUR ADDRESS, 601 CLEVELAND STREET,

12         APARTMENT 5-C?

13    A.   CORRECT.

14    Q.   THIS DOCUMENT INDICATES THAT YOUR DEPOSITION IS TO

15         BEGIN TODAY AT 10 A.M., DOESN'T IT?

16    A.   YES, BUT I'M GOING TO NOTE THAT THIS IS THE FIRST

17         TIME THAT I'VE SEEN THIS.

18    Q.   AND ON THE LAST PAGE, IT INDICATES THAT THIS

19         DOCUMENT WAS SERVED BY HAND-DELIVERY ON THE 28TH

20         OF JULY TO YOU.

21    A.   I DON'T RECOGNIZE THAT, NO.

22    Q.   I'VE SUMMARIZED THE CONTENTS OF THE LAST PAGE

23         CORRECTLY, INDICATES THAT IT WAS SERVED BY HAND-

24         DELIVERY TO YOU AT YOUR ADDRESS ON THE 28TH OF

25         JULY?

```
 1    A.   I DID NOT RECEIVE IT, AND I RECEIVED NO HAND-
 2         DELIVERY IN PERSON.  I MEAN, I NEED TO ADDRESS
 3         THAT.  ARE YOU LEAVING THINGS, OR ARE YOU -- I
 4         MEAN THE ONLY THINGS THAT I'VE GOTTEN HAVE BEEN
 5         FROM YOU IN THE MAIL OR FROM THE COURT IN THE
 6         MAIL.  IF YOU'RE LEAVING THINGS, I DON'T REALLY
 7         KNOW -- I'VE GOTTEN SOME OF THEM, THAT YOU'VE
 8         LEFT, BUT I DEFINITELY DIDN'T GET THIS.  I WOULD
 9         NOT BE LATE TO A COURT DATE.  I'VE ALWAYS BEEN
10         EARLIER.  IF YOU'VE NOTICED FROM MY PAST COURT
11         EXPERIENCE, I'VE ALWAYS BEEN EARLY.  IN FACT, I'VE
12         BEEN 30 MINUTES BEFORE YOU GUYS HAVE GOTTEN THERE.
13    Q.   THIS ISN'T A COURT DATE.
14    A.   THIS IS A COURT RELATED DATE.  I'M NEVER LATE.
15    Q.   WE STARTED AT ABOUT 10:40 TODAY, RIGHT?
16    A.   OKAY.
17    Q.   WHO ARE YOUR NEIGHBORS AT THE CONDO?
18    A.   MY UPSTAIRS NEIGHBOR IS GAVIN CHRISTIANSON.  MY
19         DOWNSTAIRS NEIGHBOR IS A RENTER I DON'T KNOW.  I
20         DON'T HAVE ANOTHER UPSTAIRS NEIGHBOR.  I ONLY KNOW
21         THE NEXT DOOR NEIGHBOR BY THEIR NAME, BECAUSE
22         THEY'VE MOVED IN SINCE I'VE REALLY BEEN GONE.  THE
23         OTHER DOWNSTAIRS NEIGHBOR IS NAMED ANDY KLEE.
24    Q.   AND HAVE ANY OF YOUR NEIGHBORS INDICATED TO YOU
25         THAT THEY THINK YOU'RE IN SOME KIND OF TROUBLE?
```

1     A.   YES.

2     Q.   WHO IS THAT?

3     A.   ANDY KLEE AND GAVIN CHRISTIANSON.

4     Q.   WHAT DID MR. KLEE SAY TO YOU?

5     A.   MS. KLEE SAID THAT IT'S FUNNY HOW I'M GETTING ALL

6          THIS LEGAL PAPERWORK.

7     Q.   HOW DID SHE KNOW IT WAS LEGAL PAPERWORK?

8     A.   YOU'RE AN ATTORNEY AND YOU HAVE KEVIN ELWELL,

9          ATTORNEY, ON YOUR ENVELOPES.

10    Q.   SO SHE'S LOOKED AT YOUR ENVELOPES?

11    A.   YES.

12    Q.   WHY WOULD SHE HAVE OCCASION TO DO THAT?  DO YOU

13         KNOW?

14    A.   I MEAN, WE DON'T GET ALONG VERY WELL.  BUT THAT'S

15         -- YOU KNOW.

16    Q.   WHY DON'T YOU GET ALONG WITH MS. KLEE?

17    A.   MAINLY FOR THE FACT SHE'S BEEN ARRESTED THREE

18         TIMES WHILE SHE'S BEEN AT THE CONDO.  SHE'S ALSO A

19         MARIJUANA SMOKER, AND EVERYTHING ELSE.  BUT,

20         STILL, IT CAUSES ANIMOSITY AMONGST THE CONDO

21         COMPLEX.

22    Q.   IS THERE LIKE A HOMEOWNERS' ASSOCIATION AT THE

23         CONDO COMPLEX?

24    A.   YES.

25    Q.   HOW MANY CONDOMINIUMS ARE THERE?

```
 1     A.    I THINK 64.

 2     Q.    ARE YOU A MEMBER OF THAT?

 3     A.    I MEAN I'M A HOMEOWNER.

 4     Q.    DO YOU ATTEND THE MEETINGS?  DO YOU PAY DUES?

 5     A.    I DO PAY A REGIME FEE, AND I DO ATTEND SOME OF THE

 6           MEETINGS.  I MISSED THE LAST ONE.

 7     Q.    ARE YOU AN OFFICER IN THE HOA?

 8     A.    I'M NOT.

 9     Q.    HAVE YOU EVER BEEN?

10     A.    NO.

11     Q.    HAVE YOU EVER SPOKEN OUT AGAINST MS. KLEE AT A

12           MEETING?

13     A.    YES.

14     Q.    WHAT DID YOU SAY ABOUT HER?

15     A.    SAID THAT YOU COULD SMELL MARIJUANA SMOKE COMING

16           FROM THE GENERAL AREA OF HER CONDO, ALSO THAT SHE

17           DOESN'T CURB HER DOGS.  THEY OFTEN CURB IN THE

18           HALLWAY.

19     Q.    WHEN SHE SAID IT'S FUNNY THAT YOU'RE GETTING ALL

20           THESE LEGAL PAPERS, DID YOU ASK HER WHAT SHE WAS

21           DOING READING YOUR MAIL OR LOOKING AT YOUR MAIL?

22     A.    I TOLD HER TO STOP THAT, YES.

23     Q.    WHAT DID MR. CHRISTIANSON SAY?

24     A.    HE GOES, "WHAT WAS ALL THAT?  WHAT WAS THAT BIG

25           BOX IN FRONT OF YOUR DOOR THE OTHER DAY?"  AND I
```

```
 1            SAID IT'S A BUNCH OF BS PAPERWORK FROM AN ATTORNEY
 2            THAT SEEMS TO THINK THAT I DON'T HAVE ANY
 3            CONSTITUTIONAL RIGHTS.
 4       Q.   SO MR. CHRISTIANSON LEARNED OF THE NATURE OF THE
 5            DELIVERY BECAUSE YOU TOLD HIM, NOT BECAUSE HE
 6            LOOKED AT THE BOX?
 7       A.   THAT'S CORRECT.  BUT HE IS ALSO A FRIEND OF MINE.
 8            AND, YOU KNOW, WE'VE DISCUSSED IT.  HE CAN SEE HOW
 9            MUCH OF THIS COMES IN.  I MEAN, OUR MAILBOX IS AN
10            OPEN MAILBOX.  IT'S NOT A COVERED MAILBOX.  SO YOU
11            CAN SEE IT ANYWAY.  AND YOU'VE DELIVERED SO MUCH
12            PAPERWORK THAT IT OBVIOUSLY MAKES PEOPLE
13            INQUISITIVE.
14       Q.   YOU UNDERSTAND THAT I'M OBLIGATED UNDER THE
15            FEDERAL RULES TO DELIVER EVERYTHING THAT GETS
16            FILED BY A COPY TO YOU?
17       A.   I DO UNDERSTAND THAT.  BUT MOST OF THE PAPERWORK,
18            ESPECIALLY THE BOX, IS UNNECESSARY.  I DON'T NEED
19            A PRINT-OUT OF MY WEBSITE.
20       Q.   YOU UNDERSTAND THAT IF I FILE SOMETHING, I'M
21            SUPPOSED TO SEND YOU A COPY WHETHER YOU HAVE IT
22            ALREADY OR NOT?
23       A.   OKAY, THAT'S FINE.  IT HAS BEEN UNNECESSARY
24            PAPERWORK, EVEN ACCORDING TO THE CLERK OF COURT.
25            SO --
```

```
 1    Q.   WHY DO YOU SAY THAT?
 2    A.   I ASKED IF THIS WAS AN ABUNDANCE OF PAPERWORK.
 3         AND SHE SAID IT'S UNUSUALLY HIGH, YES, FOR THE
 4         MATTER AT HAND.
 5    Q.   WHEN DID YOU SPEAK TO THE CLERK ABOUT THAT?
 6    A.   SOMETIME IN MAY.
 7    Q.   WHEN IS THE LAST TIME YOU RECEIVED ANYTHING
 8         RELATED TO THIS CASE?
 9    A.   I RECEIVED A NOTICE THAT YOU WERE GOING TO BE LATE
10         WITH THE DISCOVERY A COUPLE DAYS BACK, LIKE MAYBE
11         TWO WEEKS BACK.
12    Q.   LATE WITH THE DISCOVERY OF WHAT?
13    A.   YEAH, YOU ASKED FOR AN EXTENSION FOR THE DISCOVERY
14         FROM THE COURT.  THERE WAS SOME LETTER THAT YOU
15         SENT TO THE COURT SAYING THAT YOU WERE LATE WITH
16         SOMETHING, AND SO YOU WANTED TO MAKE AN EXTENSION.
17         THAT WAS THE LAST THING THAT I RECEIVED.  THAT
18         WOULD HAVE COME AFTER THIS, BECAUSE I DIDN'T -- I
19         MEAN, I GOT NOTHING AT THE END OF JULY.
20    Q.   I'LL REPRESENT TO YOU I HAVEN'T FILED ANYTHING
21         SINCE THESE WERE SERVED, THIS DISCOVERY WAS
22         SERVED.
23    A.   AND I'LL TAKE -- THEN I'LL HAVE TO --
24    Q.   I DON'T KNOW WHAT YOU'RE TALKING ABOUT.
25    A.   I'LL HAVE TO LOOK THAT UP, BECAUSE I'VE GOT THE
```

1       LAST ONE SITTING ON MY DESK.

2    MR. ELWELL:

3       MARK THAT AS 2, PLEASE.

4    WITNESS:

5       YOU GUYS, THIS IS UNREASONABLE, AND YOU'RE RUINING

6       MY LIFE.

7    MR. ELWELL:

8       JUST ANSWER QUESTIONS TODAY, PLEASE.

9    (EXHIBIT NO. 2 MARKED, INTERROGATORIES)

10   EXAMINATION RESUMED BY MR. ELWELL:

11   Q.   I'M GOING TO SHOW YOU WHAT'S BEEN MARKED AS

12        EXHIBIT 2.

13   A.   I'M HERE TOO.  SO I CAN SAY WHAT I WANT TO SAY.

14   Q.   NO, THIS IS MY RECORD.  SO YOU CAN TAKE YOUR OWN

15        DEPOSITION, IF YOU WANT TO.  I'LL SHOW YOU WHAT'S

16        BEEN MARKED AS EXHIBIT 2, ASK IF YOU'VE SEEN THAT

17        DOCUMENT BEFORE.

18   A.   WAS THIS SERVED ON THE SAME DAY AS THIS?

19   Q.   YES.

20   A.   OKAY, I DIDN'T RECEIVE -- THIS IS THE FIRST TIME I

21        WOULD HAVE SEEN THIS THEN, IF THIS WAS PART OF

22        THAT HAND-DELIVERY.  AND YOU DIDN'T ASK ME ALL

23        THESE QUESTIONS HERE.

24   Q.   I'M SORRY?

25   A.   YOU DID NOT ASK ME ALL OF THESE QUESTIONS HERE,

1    THAT YOU HAVE IN HERE.

2    Q.   THESE ARE QUESTIONS THAT ARE BEING ASKED TO YOU

3         VIA THIS PAPER.

4    A.   OKAY, YOU DID NOT ASK ME, "IDENTIFY ALL MATERIALS

5         THAT YOU HAVE PUBLISHED ON ANY MEDIA RELATING TO

6         ANY MATTER TO PLAINTIFFS.  AND FOR EACH SUCH

7         PUBLICATION STATE WHERE IT WAS PUBLISHED, WHEN IT

8         WAS PUBLISHED, SUMMARY OF ITS CONTENTS, WHETHER IT

9         REMAINS POSTED, OR WHATEVER WAS REMOVED."  YOU

10        DIDN'T ASK ME THAT QUESTION.

11   Q.   WHEN WOULD I HAVE ASKED YOU THAT?

12   A.   YOU'RE HANDING ME SOMETHING SAYING HAVE I ANSWERED

13        AND HAVE I FULLY ACCEPTED THIS PIECE OF PAPERWORK

14        HERE.  AND THIS HAS GOT THINGS THAT I'VE NEVER

15        SEEN BEFORE.  SO YOU'RE SAYING THAT I'M ACCEPTING

16        STUFF RIGHT NOW THAT I'VE NEVER EVEN SEEN.  AND

17        I'M NOT A SPEED READER.  I CAN'T GO THROUGH ALL

18        THIS STUFF AND SAY THAT I'M ACCEPTING THIS LIKE

19        YOU'VE ASKED IT TO ME, OR THAT I'VE EVER SEEN IT

20        BEFORE.

21   Q.   HAVE YOU EVER ANSWERED WRITTEN DISCOVERY IN A

22        CIVIL CASE?

23   A.   NO.

24   Q.   DO YOU UNDERSTAND THAT THESE ARE QUESTIONS THAT

25        ARE BEING POSED TO YOU BY DELIVERY OF THIS PAPER?

```
 1   A.   TODAY?
 2   Q.   NO, THEY WERE SERVED ON YOU, ON THE 28TH OF
 3        JULY --
 4   A.   I DIDN'T RECEIVE THOSE.
 5   Q.   -- PER THE CERTIFICATE OF SERVICE.
 6   A.   I DID NOT RECEIVE THOSE.
 7   Q.   AND IS THAT GOING TO BE YOUR STRATEGY THROUGHOUT
 8        THIS CASE, IS THAT WHEN YOU'RE FAILING TO RESPOND
 9        TO SOMETHING YOU'LL SIMPLY SAY YOU DIDN'T GET IT?
10   A.   NO.  I HAVE ANSWERED EVERY SINGLE THING THAT
11        YOU'VE SENT ME SO FAR, AND I'VE ANSWERED THE COURT
12        THOROUGHLY SO FAR, EVERYTHING THAT THEY HAVE SENT
13        ME.  I DID NOT GET YOUR THING ON THE 28TH OF JULY.
14   Q.   WERE YOU IN GREENVILLE ON THE 28TH OF JULY?
15   A.   I CAN'T SAY WHERE I WAS THAT DAY.
16   Q.   BECAUSE YOU DON'T KNOW, OR YOU'RE NOT --
17   A.   I DON'T KNOW RIGHT NOW, I MEAN, I DON'T HAVE MY
18        RECORDS IN FRONT OF ME.
19   Q.   DO YOU KEEP RECORDS OF WHERE YOU ARE ON A
20        PARTICULAR DAY?  DO YOU HAVE A DIARY?
21   A.   IN GENERAL, YES.
22   Q.   WERE YOU ON VACATION ON THE 28TH OF JULY?
23   A.   I DO NOT THINK SO.
24   Q.   WERE YOU OUT OF TOWN FOR SOME OTHER PURPOSE?
25   A.   I CAN'T SAY.
```

1    Q.    WHEN DO YOU GENERALLY CHECK THE MAIL AT YOUR

2          CONDOMINIUM?

3    A.    ONCE A WEEK.

4    Q.    IS THERE A PARTICULAR DAY YOU GO EACH WEEK?

5    A.    DIFFERENT DAYS.

6    Q.    AND THIS 28TH OF JULY TIME FRAME WOULD HAVE BEEN

7          THE TIME WHEN YOU ACTUALLY DIDN'T LIVE IN THIS

8          CONDO, RIGHT?

9    A.    NOT RESIDING THERE, YES.

10   Q.    SO YOUR CLAIM IS THAT YOU HAVE NOT SEEN THESE

11         QUESTIONS?

12   A.    IT'S NOT A CLAIM.  IT'S A FACT.  I'VE NEVER SEEN

13         THIS EVER BEFORE.  I HAD NO IDEA OF THIS DATE

14         TODAY.

15   (EXHIBIT NO. 3 MARKED, REQUEST FOR PRODUCTION OF

16   DOCUMENTS)

17   **WITNESS**:

18        I'M GOING TO NEED TO TAKE A BREAK HERE.  I'VE GOT

19        TO CALL A CUSTOMER.  I WAS SUPPOSED TO MEET THEM,

20        A SECOND CUSTOMER AT NOON.

21   **MR. ELWELL**:

22        YOU WON'T MAKE THAT EITHER.

23   **WITNESS**:

24        OKAY, WELL, I'VE GOT TO TAKE A BREAK AND CALL THAT

25        CUSTOMER.

1    **MR. ELWELL:**

2        OKAY.

3    **WITNESS:**

4        THANK YOU.

5    (OFF THE RECORD; BRIEF RECESS)

6    **EXAMINATION RESUMED BY MR. ELWELL:**

7    Q.    WE'RE BACK ON THE RECORD AFTER A SHORT BREAK.   MR.

8          SMITH HAS INDICATED THAT HE WILL BE LEAVING AT

9          12:30 TODAY.   AND SO I TAKE IT YOU'RE REFUSING TO

10         STAY PAST THAT?

11   A.    I HAVE DIETARY ISSUES AND I HAVE CUSTOMERS.   THIS

12         SHOULD NOT HAVE TAKEN ANY MORE THAN TWO AND A HALF

13         HOURS ANYWAY.

14   Q.    I'M SORRY IF YOU THINK THAT IT SHOULD BE DONE IN A

15         PARTICULAR AMOUNT OF TIME AND IT'S NOT GOING TO BE

16         FINISHED IN THAT AMOUNT OF TIME.   WE CAN CERTAINLY

17         DEAL WITH --

18   A.    I WOULD APPRECIATE SOME RESPECT TO MY DIETARY

19         NEEDS.   THANK YOU.

20   Q.    I HAVE NO PROBLEM GIVING YOU BREAKS AS YOU NEED

21         THEM TO DEAL WITH THAT ISSUE.   I CERTAINLY DON'T

22         WANT YOU TO GET SICK.   I THINK WE'VE JUST COME

23         FROM A BREAK WHERE YOU DID HAVE SOMETHING TO EAT.

24   A.    YES.

25   Q.    DO YOU HAVE NUMBER 3 IN FRONT OF YOU, THE REQUEST

```
 1              FOR PRODUCTION OF DOCUMENTS?  I TAKE IT YOUR
 2              POSITION WILL BE THAT YOU NEVER RECEIVED THESE
 3              EITHER.
 4        A.    I HAVEN'T RECEIVED ANYTHING THAT YOU'VE SERVED TO
 5              ME BY HAND ON JULY 28TH, IF THAT'S WHAT THIS WAS.
 6              AND I ALSO WANT IT NOTED ON THE RECORD THAT YOU
 7              ARE NOT ASKING ME THESE QUESTIONS.  YOU SEEM TO BE
 8              ASKING THEM FROM SOMETHING ELSE, OR YOU'RE
 9              SKIPPING QUESTIONS.  SO I'M NOT DENYING THAT I --
10              I MEAN I'M NOT SAYING THAT I HAVEN'T ANSWERED
11              THESE QUESTIONS, BECAUSE I EITHER HAVEN'T OR I
12              HAVE.
13        Q.    THIS DOCUMENT, THESE ARE A REQUEST FOR PRODUCTION
14              OF DOCUMENTS.  YOU UNDERSTAND THAT THIS DOCUMENT
15              IS POSING REQUESTS THAT YOU PRODUCE CERTAIN
16              DOCUMENTS AND THINGS, AND THAT THIS ISN'T SOME
17              SORT OF OUTLINE THAT I HAVE TO GO BY HERE TODAY?
18        A.    RIGHT, AND I'M GOING TO NEED TO FILE WITH THE
19              COURT THAT A LOT OF THESE ARE IRRELEVANT OR THAT
20              THEY ARE PROPRIETARY BUSINESS INFORMATION.  AND
21              SOME OF THEM SEEM TO BE JUST DOWNRIGHT DEMEANING,
22              I MEAN, IN THEIR QUESTIONING.
23        Q.    WHICH ONES DO YOU FIND DEMEANING?
24        A.    "PRODUCE IN MACHINE READABLE FORM THE DATA
25              CONTENTS OF THE PERSONAL COMPUTER UPON WHICH YOU
```

1      WRITE FOR ANY WEBSITE."  I MEAN, CAN YOU BE

2      SERIOUS ABOUT THAT?

3  Q.  WHY DOES THAT DEMEAN YOU?

4  A.  THE DATA CONTENT OF THE PERSONAL COMPUTER UPON

5      WHICH I WRITE FROM MY WEBSITE?

6  Q.  WE'LL PROVIDE YOU WITH AN EXTERNAL HARD DRIVE IF

7      YOU WANT TO COPY THAT DATA TO SOMETHING SO THAT IT

8      DOESN'T COST YOU ANYTHING.

9  A.  NO.  NO, I'M NOT SAYING THE COST.  THE COST IS

10     NEGLIGIBLE.  THAT YOU WANT THE DATA CONTENTS.  IN

11     OTHER WORDS, EVERYTHING THAT I HAVE ON MY

12     COMPUTER?

13 Q.  IF IT'S THE ONE THAT YOU USE TO WRITE WEB COPY.

14 A.  NO, THAT'S MY PERSONAL COMPUTER.  AND NO

15     JOURNALIST, BLOGGER, SANE PERSON WOULD GIVE YOU A

16     COPY OF THEIR HARD DRIVE UNLESS IT WERE A --

17     UNLESS I WERE CONVICTED OF A SEX CRIME OR TERROR

18     AGAINST THE STATE, OR SOMETHING LIKE THAT.

19 Q.  HAVE YOU CONSULTED THE FEDERAL RULES DURING THE

20     PENDENCY OF THIS CASE?

21 A.  I'VE READ OVER QUITE A BIT OF STUFF, YES.

22 Q.  DO YOU KNOW WHETHER YOU'VE READ OVER THE FEDERAL

23     RULES?

24 A.  CAN'T SAY THAT I HAVE.  DON'T KNOW WHETHER I HAVE

25     OR NOT.

```
 1    Q.   ARE YOU FAMILIAR WITH THE FEDERAL RULE THAT
 2         INDICATES THAT YOU HAVE WAIVED OBJECTIONS TO
 3         INTERROGATORIES AND REQUEST FOR PRODUCTION OF
 4         DOCUMENTS IF THEY'RE NOT OBJECTED TO WITHIN THE
 5         TIME FOR ORIGINAL RESPONSE TIME?
 6    A.   AGAIN I'M GOING TO SUBMIT TO THE COURT TODAY, OR
 7         SOMETIME WITHIN THE NEXT COUPLE OF DAYS, THAT I'VE
 8         NEVER SEEN WHAT YOU'RE SHOWING ME HERE.
 9    (EXHIBIT NO. 4 MARKED, REQUEST FOR ADMISSIONS)
10    WITNESS:
11         AND, I MEAN, AND THE THINGS ABOUT MY INTELLIGENCE,
12         DO I CONSIDER MYSELF OF SUPERIOR INTELLIGENCE OR
13         WHATEVER.
14    EXAMINATION RESUMED BY MR. ELWELL:
15    Q.   YOU REPRESENTED IN OPEN COURT THAT YOU HAVE AN
16         EXTREMELY HIGH IQ, DID YOU NOT?
17    A.   THAT'S JUST A DEMEANING QUESTION AND IT'S
18         IRRELEVANT.
19    Q.   DID YOU NOT?
20    A.   YES, I DID.
21    Q.   WELL, YOU EVIDENTLY CONSIDER YOURSELF AN
22         INTELLIGENT PERSON.
23    A.   DO YOU NOT?  YOU DON'T CONSIDER YOURSELF
24         INTELLIGENT?
25    Q.   IF I DO, THAT'S NOT SOMETHING I GO AROUND
```

```
 1              DECLARING.  EXHIBIT NUMBER 4, THESE ARE REQUEST
 2              FOR ADMISSIONS UNDER RULE 36 OF THE FEDERAL RULES.
 3              THIS IS A COPY OF WHAT WAS SERVED ON YOU ON JULY
 4              28TH, 2006.  YOU AGAIN INDICATE OR WOULD STATE
 5              THAT YOU HAVEN'T SEEN THESE BEFORE EITHER?
 6        A.    THAT IS CORRECT.  I MEAN, IS THIS WHAT YOU'RE
 7              SHOWING ME RIGHT NOW?
 8        Q.    I WANT YOU TO LOOK OFF EXHIBIT NUMBER 4.  DON'T
 9              WORRY ABOUT WHAT I'VE GOT IN FRONT OF ME.
10        A.    CAN -- I MEAN, REALLY, IF YOU WANT THIS TO
11              CONTINUE, PLEASE STOP TALKING TO ME IN A DEMEANING
12              WAY.  YOU'RE AN ATTORNEY.  YOU CAN HANDLE -- YOU
13              KNOW YOU CAN HANDLE A PROFESSIONAL CONVERSATION.
14              I DON'T LIKE THE DEMEANING COMMENTS OUT IN THE
15              HALLWAY, "THE DOOR WHICH YOU CAME IN," AND THE
16              FACT THAT YOU'RE DEMEANING MY NEED TO EAT AND
17              HANDLE MY CUSTOMERS.  YOU WERE LATE WITH THIS --
18        Q.    JUST A SECOND.  NOBODY'S DEMEANED YOUR NEED TO
19              EAT.  THE IDEA BEHIND TAKING YOUR DEPOSITION IS
20              NOT TO STICK YOU IN A ROOM WITHOUT FOOD SO THAT
21              YOU BECOME ILL.  THAT'S KIND OF AN OUTLANDISH
22              THING FOR YOU TO TRY AND SAY.
23        A.    WELL, I THINK IT IS.
24        Q.    I'VE TOLD YOU MORE THAN ONCE THAT --
25        A.    AGAIN, WE NEED TO CONTINUE.
```

```
 1    Q.   -- WE CAN TAKE BREAKS.
 2    A.   WE NEED TO CONTINUE.
 3    Q.   CAN YOU ANSWER MY QUESTION CONCERNING WHETHER
 4         YOU'VE SEEN EXHIBIT NUMBER 4?
 5    A.   I HAVE -- YOU KNOW, YOU'VE SENT ME SO MUCH, I
 6         DON'T THINK THAT I'VE SEEN THIS.  IF THIS CAME
 7         WITH THE 28TH THING, I HAVEN'T SEEN IT.  I MEAN,
 8         I'VE SEEN SOME OF THE THINGS THAT IT SAYS IN HERE,
 9         BUT IT SEEMS LIKE THAT IT'S JUST REDUNDANT STUFF.
10         SO I DON'T KNOW WHETHER -- I'VE NEVER BEEN ASKED
11         THESE QUESTIONS.
12    Q.   OTHER THAN IN THIS PAPER, RIGHT?
13    A.   THAT I'VE EVER SEEN BEFORE.  I'VE NEVER SEEN THESE
14         QUESTIONS POSED TO ME ON PAPER FORM BEFORE.
15    Q.   AND YOU HAVE NOT RESPONDED TO THEM, OBVIOUSLY.
16         YOU HAVE FILED NO DISCOVERY RESPONSES OR SERVED
17         DISCOVERY RESPONSES IN THIS CASE?
18    A.   NEVER SEEN THEM.
19    Q.   SO THAT'S NO?
20    A.   THAT'S NO, THAT I HAVEN'T RESPONDED -- I MEAN THAT
21         I HAVEN'T RESPONDED BECAUSE I HAVEN'T SEEN THEM.
22         SO ARE WE SKIPPING OVER THESE QUESTIONS BECAUSE --
23    Q.   YOU HAVEN'T ANSWERED --
24    A.   "ADMIT THAT YOUR PURPOSE IN PUBLISHING THE POSTING
25         WAS TO INJURE AND DEFAME BIDZIRK AND ITS
```

```
 1              PRINCIPALS."  YOU KNOW, I'VE ALREADY ANSWERED THAT
 2              IN COURT SEVERAL TIMES.  AND, I MEAN, I DON'T KNOW
 3              WHY YOU'D WANT TO ASK THAT.
 4      Q.      DO YOU UNDERSTAND THAT THE REQUEST FOR ADMISSIONS
 5              ARE A DISCOVERY DEVICE THAT YOU'RE REQUIRED TO
 6              SUBMIT SEPARATE WRITTEN ANSWERS TO?
 7      A.      OKAY, I WILL, THEN.
 8      Q.      HAVE YOU CONSULTED RULE 36 DURING THE PENDENCY OF
 9              THIS CASE?  ARE YOU FAMILIAR WITH RULE 36?
10      A.      I HAVEN'T SEEN THIS.  SO I HAVEN'T HAD A CHANCE TO
11              RESPOND.
12      Q.      DO YOU HAVE ANY UNDERSTANDING THAT MATTERS THAT
13              ARE REQUESTED TO BE ADMITTED IN REQUEST FOR
14              ADMISSION UNDER THE FEDERAL RULES ARE DEEMED
15              ADMITTED IF THEY'RE NOT RESPONDED TO IN THE
16              ALLOWED 30-DAY RESPONSE TIME?
17      A.      AGAIN, YOU KNOW, YOU'LL HAVE TO BE ABLE TO PROVE
18              THAT I RECEIVED THEM, BECAUSE I DIDN'T RECEIVE
19              THEM.  SO, I MEAN --
20      Q.      SO THAT'S YOUR STORY FROM NOW IN COURT, IS GOING
21              TO BE --
22      A.      IT'S NOT MY STORY.
23      Q.      -- I DIDN'T GET WHATEVER I DIDN'T RESPOND TO?
24      A.      ALL RIGHT, I'M GOING TO GIVE YOU ONE LAST CHANCE.
25              THIS IS THE LAST CHANCE.  I'VE ASKED YOU THREE
```

```
 1        TIMES NICELY.  PLEASE DO NOT TALK TO ME IN A
 2        DEMEANING WAY.  PLEASE STOP SAYING THINGS THAT --
 3        I MEAN, IF I HAD AN ATTORNEY PRESENT, YOU WOULDN'T
 4        BE ACTING LIKE THIS.
 5    Q.  I WOULD BE DOING EXACTLY THE SAME THING, LET ME
 6        ASSURE YOU.  AND I'M SORRY IF YOU FEEL DEMEANED.
 7        I THINK MANY SUPERIOR PEOPLE --
 8    A.  WHATEVER.
 9    Q.  -- DO FEEL DEMEANED EASILY.
10    (EXHIBIT NO. 5 MARKED, RESPONSE TO COMPLAINT)
11    EXAMINATION RESUMED BY MR. ELWELL:
12    Q.  I'LL ASK YOU IF YOU CAN TAKE A LOOK AT NUMBER 5.
13    A.  OKAY, NOW THIS I RECOGNIZE.
14    Q.  PLEASE IDENTIFY WHAT THIS IS.
15    A.  THIS IS A -- I GUESS THIS IS A RESPONSE THAT I
16        SENT TO YOU THE DAY AFTER YOU SERVED ME AND MY
17        FRIEND IMPROPERLY.
18    Q.  WHAT WERE YOU SERVED IMPROPERLY?
19    A.  I WASN'T SERVED IMPROPERLY, I DON'T GUESS.  BUT
20        CERTAINLY DAVID BUZZELL WAS.  HE HAD NO
21        CONJUNCTION WITH THIS WHATSOEVER.
22    Q.  YOU'RE TALKING ABOUT THE DEMAND LETTER THAT YOU
23        REMOVED REFERENCED TO BIDZIRK THAT WAS SENT OUT
24        PRIOR TO THE LAWSUIT BEING FILED?
25    A.  YES, I GUESS.  ISN'T THAT WHEN THIS IS FROM?
```

```
 1    Q.   I DON'T KNOW.  THIS ISN'T DATED.
 2    A.   YES, THIS IS PRETTY MUCH LIKE THE WEEK AFTER YOU
 3         SENT YOUR CEASE AND DESIST LETTER TO ME.
 4    Q.   UNDER ITEM NUMBER ONE, YOU INDICATE THAT YOU'RE
 5         KNOWLEDGEABLE OF YOUR CONSTITUTIONAL RIGHTS AND
 6         YOUR LEGAL RESPONSIBILITIES CONCERNING REPORTING.
 7    A.   YES.
 8    Q.   WHAT ARE YOUR LEGAL RESPONSIBILITIES CONCERNING
 9         REPORTING?
10    A.   MY LEGAL RESPONSIBILITIES ARE TO BE WITHIN THE LAW
11         OF AND TO FOLLOW THE CONSTITUTION.  THE
12         CONSTITUTION IS CLARIFIED BY THE LANHAM ACT, WHICH
13         I AM VERY FAMILIAR WITH BECAUSE I CONSULT
14         REGULARLY ON THE LANHAM ACT WITH IPOD AND IPOD
15         APPLE INDUSTRY NEWS ASSOCIATES AND BLOGGERS AND
16         PRODUCT MANUFACTURERS.
17    Q.   YOU SAID THAT YOUR LEGAL RESPONSIBILITIES ARE TO
18         BE WITHIN THE LAW.  THAT'S SORT OF CIRCULAR.  IS
19         THERE SOME RESPONSIBILITY THAT YOU HAVE THAT
20         YOU'RE AWARE OF OTHER THAN TO NOT BREAK THE LAW?
21    A.   IF YOU'RE REFERRING TO THE SVJ CODE OF ETHICS,
22         THAT IS A VOLUNTARY CODE OF ETHICS.  SO, I MEAN --
23    Q.   NO, NOT I'M NOT REFERRING TO THAT.
24    A.   OKAY, WELL, I MEAN, MY LEGAL RESPONSIBILITIES
25         CONCERNING REPORTING ARE TO FOLLOW THE
```

```
 1          CONSTITUTION AS IT'S BEEN CLARIFIED THROUGH THE
 2          LANHAM ACT.
 3     Q.   AND WHAT'S YOUR UNDERSTANDING ABOUT WHAT THE
 4          CONSTITUTION SAYS ABOUT REPORTING?
 5     A.   THAT WE HAVE THE FREEDOM OF SPEECH AND THAT RIGHT
 6          SHALL NOT BE ABRIDGED; AND THAT, FURTHERMORE, THE
 7          LANHAM ACT CLARIFIES THAT ALL NEWS AND NEWS
 8          REPORTING ARE COVERED UNDER FREE SPEECH.
 9     Q.   YOU INDICATE ALSO THAT YOU HAVE CONSULTED ON
10          INTELLECTUAL PROPERTY WITH DOZENS OF COMPANIES.
11     A.   UH-HUH (AFFIRMATIVE).
12     Q.   CAN YOU TELL ME WHO YOU'VE CONSULTED WITH?
13     A.   SURE.  GRIFFIN TECHNOLOGY, DLO, ELKIN, KENSINGTON,
14          EXTREME MAC, MAC MICE.
15     Q.   THAT'S HALF A DOZEN.  ARE THERE MORE?
16     A.   I'M SURE THERE ARE.  I MEAN THAT'S THE ONES THAT
17          COME OFF MY HEAD.
18     Q.   WHEN DID YOU LAST CONSULT FOR GRIFFIN
19          TECHNOLOGIES?
20     A.   NOT THIS APRIL, BUT LAST APRIL.
21     Q.   OF 2005?
22     A.   YES.
23     Q.   AND WHAT DID YOU CONSULT WITH THEM ABOUT?
24     A.   IPOD ACCESSORIES.
25     Q.   AND WERE YOU REQUESTED BY THEM TO ADVISE THEM ON
```

```
 1            INTELLECTUAL PROPERTY ISSUES?
 2    A.    YES, IT WAS KIND OF CO -- YOU KNOW, CO-CONSULTING
 3          ON A PRODUCT.
 4    Q.    WHAT WAS THE PRODUCT?
 5    A.    THAT'S PROPRIETARY INFORMATION.  IT HASN'T COME TO
 6          MARKET YET.  THE NAME IN AND OF ITSELF IS
 7          PROPRIETARY, BECAUSE IT GIVES IT AWAY.  THE SAME
 8          WITH ALL THOSE OTHER COMPANIES THERE, EXCEPT FOR
 9          MAC MICE WHICH I CONSULTED ON VARIOUS ASPECTS OF
10          PUBLISHING ON RUMORS WEBSITES AND THINGS LIKE
11          THAT.
12    Q.    WHO IS YOUR CONTACT AT GRIFFIN TECHNOLOGIES?
13    A.    PAUL GRIFFIN.
14    Q.    WHERE IS THAT COMPANY LOCATED?
15    A.    NASHVILLE, TENNESSEE.
16    Q.    HOW MANY TIMES HAVE YOU CONSULTED FOR THEM?
17    A.    TWO OR THREE.
18    Q.    DO YOU CHARGE AN HOURLY RATE TO THEM, TO CONSULT?
19    A.    NO, WE'RE CO-CONSULTING ON A PRODUCT TOGETHER.
20    Q.    AND SO ULTIMATELY THERE'S A --
21    A.    I HAVE SEVERAL PATENTS OF MY OWN.  AND I
22          UNDERSTAND THE PATENT PROCESS, AND I ALSO ASSIST
23          WITH PRODUCT DEVELOPMENT.  SO, YOU KNOW, AGAIN MY
24          JOB IS NOT NECESSARILY PAID IN CASH.
25    Q.    GRIFFIN TECHNOLOGIES IS IN A CO-CONSULTING ROLE
```

```
 1            WITH YOU FOR --
 2      A.    NOT FORMALLY, NO.
 3      Q.    BUT YOU'RE WORKING WITH THEM ON THE SAME PROJECT
 4            FOR SOME THIRD COMPANY; IS THAT RIGHT?
 5      A.    NO, FOR THEM.  THEY ARE A PRODUCER OF GOODS.
 6      Q.    AND SO WHAT ARE YOU GETTING OUT OF THAT
 7            CONSULTING?
 8      A.    THE POTENTIAL TO HAVE THIS PRODUCT MADE.
 9      Q.    AND HOW MANY PATENTS DO YOU HOLD?
10      A.    TWO.
11      Q.    WHEN WERE THEY GRANTED TO YOU?
12      A.    ONE IN 2001 AND ONE IN 2004.
13      Q.    WHAT'S THE 2001 PATENT FOR?
14      A.    A SOFTWARE FOR THE MAC 02 TO ALLOW YOU TO HAVE TWO
15            MICE ON THE SAME SCREEN, TWO POINTING DEVICES ON
16            THE SAME SCREEN.
17      Q.    AND HAS THAT PATENT BEEN REGISTERED AND --
18      A.    YES, IT HAS.
19      Q.    DO YOU HAVE SOME PAPERWORK ABOUT THAT?
20      A.    YES, I DO.
21      Q.    HAVE YOU LICENSED ANY OF THAT TECHNOLOGY?
22      A.    NO, I HAVE NOT.
23      Q.    IS THAT WHAT YOU'RE WORKING ON WITH GRIFFIN
24            TECHNOLOGIES?
25      A.    NO, IT IS NOT.
```

```
 1    Q.   DO YOU HAVE ANY BUSINESS DEALINGS IN THE WORKS TO
 2         MARKET THAT PRODUCT?
 3    A.   THERE'S ONGOING DEVELOPMENT WITH THAT, YES.
 4    Q.   WHO IS THAT WITH?
 5    A.   IT'S A CONSORTIUM CALLED DREAM -- MYDREAMAP.COM.
 6    Q.   AND WHERE IS THAT BASED?
 7    A.   I DON'T KNOW.
 8    Q.   WHAT'S THE NATURE OF YOUR RELATIONSHIP WITH
 9         MYDREAMAP.COM?
10    A.   THEY'RE A WEBSITE THAT PRODUCES YOUR FAVORITE
11         APPLICATION.
12    Q.   AND IS THERE SOMETHING RUMINATIVE ABOUT THAT
13         RELATIONSHIP?  DO YOU RECEIVE MONEY?
14    A.   NO, BUT IF THEY PUBLISH THE SOFTWARE, YOU KNOW,
15         YOU'LL GET 15 PERCENT OF THE ROYALTIES FROM THE
16         SOFTWARE.
17    Q.   IS THERE A DATE THAT THE SOFTWARE IS SUPPOSED TO
18         COME OUT?
19    A.   NO.
20    Q.   WHEN WAS THE SECOND PATENT GIVEN?
21    A.   2004.
22    Q.   WHAT'S IT FOR?
23    A.   THAT'S -- I CAN'T DISCUSS THE NAME OR THE NATURE
24         OF THAT PRODUCT, BUT IT'S --
25    Q.   THOSE ARE PUBLIC RECORDS.
```

```
1    A.   I STILL --
2    Q.   I CAN GET ON THE INTERNET NOW AND LOOK UP ANY
3         PATENT THAT'S EVER BEEN GRANTED.
4    A.   OKAY.
5    Q.   SO WHAT IS THE NAME OF THE PRODUCT AND WHAT IS THE
6         PATENT FOR?
7    A.   WE'RE GOING TO REFUSE TO ANSWER THAT ONE AS WELL.
8         THANK YOU.
9    Q.   IS THAT WHAT YOU'RE WORKING WITH --
10   A.   IT'S AN IPOD DEVICE.
11   Q.   -- GRIFFIN TECHNOLOGIES?
12   A.   YES, AND ALL THOSE OTHER COMPANIES TOO EXCEPT FOR
13        MAC MICE.
14   Q.   AND WHAT'S THE NATURE OF THE IPOD DEVICE?
15   A.   I CAN'T DESCRIBE IT.  THE PATENT IS ALSO WORDED
16        ENOUGH TO RECEIVE THE PATENT, BUT NOT TO DESCRIBE
17        FULL FUNCTIONALITY OF THE PRODUCT.  JUST AS APPLE
18        COMPUTER DOES WITH JUST ABOUT ANY DEVICE THAT THEY
19        PUBLISH OR PATENT, THEY SOMETIMES SKEW OR CONFUSE
20        THE ACTUAL PATENT AND COMBINE OTHER PATENTS
21        TOGETHER TO FORM A TECHNOLOGY.
22   Q.   IS THIS A PROCESS PATENT OR A NEW TECHNOLOGY?
23   A.   THIS IS A NEW TECHNOLOGY, BUT IT'S A COMBINATION
24        OF EXISTING TECHNOLOGIES.
25   Q.   WHO PROSECUTED THE PATENT APPLICATION FOR YOU?
```

```
 1    A.   I HAD A PATENT ATTORNEY FROM ATLANTA DO THAT.

 2    Q.   WHAT IS THAT PERSON'S NAME?

 3    A.   STEVE WERNER.

 4    Q.   WHAT FIRM IS HE WITH?

 5    A.   WERNER -- I DON'T KNOW.

 6    Q.   AND WAS THAT THE SAME WITH THE FIRST PATENT?

 7    A.   YES.  ACTUALLY, EXCUSE ME, I FILED THE FIRST

 8         PATENT WITH CONSULTATION FROM SEVERAL PEOPLE TO

 9         WRITE PATENTS.  SO THAT'S --

10    Q.   WHO DID YOU CONSULT WITH ON THE FIRST PATENT?

11    A.   GRIFFIN, DLO, ET CETERA, LEARNING HOW TO WRITE

12         PATENTS.

13    Q.   IS THE FIRST PATENT SOMETHING THAT GRIFFIN HAS AN

14         INTEREST IN?

15    A.   NO.

16    Q.   WHAT IS DLO?

17    A.   DLO IS ALSO AN IPOD MANUFACTURING COMPANY.

18    Q.   WHERE ARE THEY LOCATED?

19    A.   CHARLESTON, SOUTH CAROLINA.

20    Q.   LET'S GO BACK TO GRIFFIN TECHNOLOGIES.  WHAT HAVE

21         YOU CONSULTED WITH THEM ABOUT THAT RELATES TO

22         INTELLECTUAL PROPERTY?

23    A.   AN IPOD ACCESSORY.

24    Q.   AND SPECIFICALLY WHAT WAS THE INTELLECTUAL

25         PROPERTY ISSUE WITH RESPECT TO THAT?
```

1    A.   THEY'RE MORE FAMILIAR WITH NAMING AND HOW APPLE
2         WILL COME DOWN ON YOU FOR NAMING OF PRODUCTS.
3         THEY'RE MORE FAMILIAR WITH THE TECHNOLOGY BECAUSE
4         THEY PRODUCE IPOD TECHNOLOGY IN HOUSE.  SO I CO-
5         CONSULTED WITH THEM ABOUT A PRODUCT TO BE MADE FOR
6         THE IPOD.
7    Q.   SO THE CONSULTING THAT YOU DID WITH THEM HAS TO DO
8         WITH BRANDING THAT PRODUCT IN A WAY THAT WON'T
9         RESULT IN APPLE BRINGING ACTION?
10   A.   CORRECT, AND BECAUSE THEY'RE THE LEADING
11        TECHNOLOGY PROVIDER IN THAT FIELD.  THEY SELL
12        ALMOST 60 PERCENT OF ALL IPOD ACCESSORIES.
13   Q.   SO THAT CONSULTING THAT YOU DID WAS NOT --
14   A.   NOT PAID.
15   Q.   GRIFFIN DIDN'T CALL YOU UP AND SAY WE HAVE A
16        QUESTION WE NEED TO ASK YOU?
17   A.   NO.
18   Q.   WHAT TYPE OF INTELLECTUAL PROPERTY CONSULTING DID
19        YOU DO FOR DLO?
20   A.   SAME THING.
21   Q.   EXACTLY THE SAME THING?
22   A.   UH-HUH (AFFIRMATIVE).
23   Q.   WHY DID YOU DO IT WITH TWO DIFFERENT COMPANIES?
24   A.   BECAUSE THEY'RE COMPETITORS AND BECAUSE I ALWAYS
25        CHECK OUT WHAT MY BEST OPTIONS ARE.

| | | |
|---|---|---|
| 1 | Q. | WHEN DID YOU LAST CONSULT WITH DLO? |
| 2 | A. | MARCH OF THIS YEAR. |
| 3 | Q. | AND WHAT WAS THE NATURE OF THAT CONSULTATION? |
| 4 | A. | SAME THING AS GRIFFIN, IPOD ACCESSORY.  AND IT'S |
| 5 | | THE EXACT SAME THING. |
| 6 | Q. | THEY'RE ALSO NOT CALLING YOU AND SAYING, HEY, WE |
| 7 | | HAVE A QUESTION WE NEED TO ASK YOU ABOUT? |
| 8 | A. | THAT IS CORRECT. |
| 9 | Q. | AND HOW ABOUT WITH BELCON?  WHEN DID YOU LAST |
| 10 | | CONSULT WITH BELCON? |
| 11 | A. | I WOULD SAY SPRING OF 2005. |
| 12 | Q. | WHAT WAS THE REASON FOR THAT? |
| 13 | A. | SAME THING.  IT'S THE SAME THING FOR ALL OF THEM |
| 14 | | EXCEPT FOR MAC MICE. |
| 15 | Q. | KENSINGTON AND EXTREME MAC AS WELL? |
| 16 | A. | YES. |
| 17 | Q. | SO THIS IS YOU SHOPPING A NEW PRODUCT TO THESE |
| 18 | | DIFFERENT COMPANIES? |
| 19 | A. | THAT IS CORRECT, AND RECEIVING CONSULTATION OVER |
| 20 | | PATENT AND LEGAL ISSUES SURROUNDING THE PRODUCT. |
| 21 | Q. | SO NONE OF THESE FIVE -- GRIFFIN TECHNOLOGIES, |
| 22 | | DLO, BELCON, KENSINGTON, OR EXTREME MAC WERE THIRD |
| 23 | | PARTIES THAT CALLED YOU UP FOR ADVICE.  YOU WERE |
| 24 | | SHOPPING A PRODUCT TO THEM. |
| 25 | A. | GRIFFIN HAS CALLED ME UP IN THE PAST FOR ADVICE. |

1    Q.    WHAT HAVE THEY CALLED YOU ABOUT?

2    A.    CONCERNING JACK CAMPBELL.

3    Q.    WHAT ABOUT JACK CAMPBELL?

4    A.    JACK CAMPBELL IS THE OWNER OF MAC MICE, WHICH IS

5          THE LAST ONE WHOM YOU HAVE CONTACTED.  AND JACK

6          CAMPBELL HAD A NUMBER OF PATENT ISSUES, PATENT

7          PROBLEMS, COPYRIGHT ISSUES, COPYRIGHT PROBLEMS

8          WHICH I HAVE THOROUGHLY DISCUSSED IN AN ARTICLE ON

9          MY WEBSITE.  AND GRIFFIN, PAUL GRIFFIN, CALLED ME,

10         SPECIFICALLY TO TALK TO ME AND CONSULT OVER THOSE

11         ISSUES OF WHETHER IT WAS ILLEGAL OR NOT FOR HIM TO

12         DO THE THINGS THAT HE WAS DOING AND WHAT HE THINKS

13         THAT MY -- THAT HIS REMEDIES WERE FOR THAT

14         SITUATION.

15   Q.    AND WHAT WAS MR. CAMPBELL DOING THAT WAS CAUSING

16         GRIFFIN SOME HEARTBURN?

17   A.    HE WAS STEALING INTELLECTUAL PROPERTY AND

18         PRODUCING IT HIMSELF.

19   Q.    WHAT DID HE STEAL?

20   A.    VARIOUS STANDS FOR COMPUTERS, IPOD TRANSMISSION

21         UNITS.  AND ALSO HE WAS DEPICTING GRIFFIN PRODUCTS

22         ON HIS PACKAGING WITHOUT PERMISSION.

23   Q.    IS MR. CAMPBELL THE FELLOW WHO WENT TO JAIL FOR A

24         WHILE?

25   A.    YES, HE IS.

```
 1    Q.   WHAT DID HE GO TO JAIL FOR?

 2    A.   I'M NOT A HUNDRED PERCENT SURE, BUT IT'S KIND OF

 3         CONFUSING.  BUT I THINK HE WENT TO JAIL FOR REAL

 4         ESTATE FRAUD.

 5    Q.   WHO'S YOUR CONTACT AT DLO?

 6    A.   JEFF GRADY, ANDREW GREEN.

 7    Q.   WHERE ARE THEY OUT OF AGAIN?

 8    A.   CHARLESTON.

 9    Q.   AND WHO'S YOUR CONTACT AT BELCON?

10    A.   I'D HAVE TO GET THAT FOR YOU, AND KENSINGTON TOO.

11         EXTREME MAC -- I'D HAVE TO GET ALL THOSE.  I

12         HAVEN'T SPOKEN WITH THEM IN A WHILE.

13    Q.   WHAT'S YOUR CONSULTING RELATIONSHIP WITH MAC MICE?

14    A.   AFTER THE COLLAPSE OF ANOTHER BUSINESS THAT MAC

15         MICE OWNED, I HELPED JACK CAMPBELL SHOP HIS

16         COMPANY TO ANOTHER COMPANY IN CALIFORNIA TO SELL

17         OFF THE RIGHTS AND OBTAIN KIND OF PEACE BETWEEN

18         THE OTHER COMPANIES, GRIFFIN AND DLO, THAT HE HAD.

19    Q.   WHAT WAS THE OTHER COMPANY IN CALIFORNIA?

20    A.   MAC PRO SYSTEMS.

21    Q.   AND WHAT WAS THE PRODUCT THAT THEY WERE GOING TO

22         BUY?

23    A.   MAC MICE LINE.  HE PRODUCED ALL KINDS OF THINGS.

24    Q.   AND THESE ARE LITERALLY MICE FOR MACINTOSH USERS?

25    A.   MICE, FM TRANSMITTERS, YOU KNOW, APPLE COMPUTER
```

1          PERIPHERALS.

2     Q.   AND WHAT WAS THE INTELLECTUAL PROPERTY THAT YOU

3          CONSULTED ABOUT?

4     A.   I'M NOT SURE WHAT YOU MEAN.

5     Q.   DID YOU CONSULT ABOUT INTELLECTUAL PROPERTY ISSUES

6          WITH MAC MICE, OR WERE YOU BROKERING A DEAL?

7     A.   YES, I DID.  I MEAN, I ALWAYS -- THROUGHOUT AN

8          ADVERSARIAL RELATIONSHIP AND A FRIENDSHIP, I HAVE

9          BEEN ABLE TO ADVISE JACK CAMPBELL, WHICH IS MAC

10         MICE BASICALLY, ON ISSUES TO HELP HIM GET ALONG

11         WITH THE OTHER PEOPLE.  HE HAD AN ADVERSARIAL

12         RELATIONSHIP WITH GRIFFIN AND DLO.

13    Q.   WHAT KIND OF INTELLECTUAL PROPERTY ISSUES DID YOU

14         ADVISE HIM ABOUT?

15    A.   WHETHER OR NOT THE FM SIGNAL WAS TOO HIGH COMING

16         OUT OF HIS DEVICES, WHETHER IT COMPLIED WITH FCC

17         REGULATIONS, WHETHER OR NOT BELCON HELD A PATENT

18         ON A GOOSE NECK FM TRANSMITTER, WHETHER OR NOT THE

19         DESIGN OF HIS CURRENT MOUSE IS BETTER THAN HIS

20         CURRENT MOUSE -- OR HIS PREVIOUS MOUSE, BECAUSE HE

21         GOT, YOU KNOW, CUSTOMER SERVICE ISSUES OUT OF HIS

22         PREVIOUS MICE.

23    Q.   SO THAT'S PRODUCT EVALUATION TYPE OF ADVICE?

24    A.   I SUPPOSE, WHATEVER YOU WANT TO CALL IT.

25    Q.   I MEAN YOU DIDN'T GIVE HIM ADVICE ABOUT TRADEMARK

```
 1           INFRINGEMENT?
 2    A.     I GAVE THAT IN MY ARTICLE.  I'M SURE YOU'VE READ
 3           IT.  THAT'S HOW YOU CONTACTED HIM.
 4    Q.     WERE YOU PAID FOR ANYTHING THAT YOU DID FOR MAC
 5           MICE?
 6    A.     NO.
 7    Q.     HOW WERE YOU COMPENSATED?
 8    A.     THROUGH KARMA.
 9    Q.     THROUGH KARMA?
10    A.     UH-HUH (AFFIRMATIVE), THROUGH WELL BEING.  I DON'T
11           -- YOU KNOW, AGAIN, EVERYTHING'S NOT MONEY.
12    Q.     WHERE IS MR. CAMPBELL?
13    A.     HE IS CURRENTLY IN KENYA, AFRICA.
14    Q.     WHERE DOES HE LIVE?
15    A.     IN KENYA, AFRICA.
16    Q.     YOU ALSO SAY ON THIS EXHIBIT 5, "AS A CONSUMER
17           ADVOCATE, I'VE ASSISTED MANY ASSOCIATES IN COURT
18           AND THEIR LEGAL COUNSEL."  YOU'VE APPEARED IN
19           COURT AS LIKE AN EXPERT WITNESS?
20    A.     I SPOKE WITH A MR. PATTERSON OF GRIFFIN
21           TECHNOLOGY, WHO JACK CAMPBELL TRIED TO HIRE AS AN
22           ATTORNEY.  I KNEW A LOT ABOUT JACK CAMPBELL AND I
23           ASSISTED HIM IN FINDING OUT INFORMATION ABOUT JACK
24           CAMPBELL FOR GRIFFIN'S LEGAL COUNSEL.
25    Q.     THIS IS IN COURT, THOUGH.  WHO IS GRIFFIN'S LEGAL
```

```
 1          COUNSEL?
 2     A.   I DON'T KNOW HIS FIRST NAME.  HIS LAST NAME IS
 3          PATTERSON.  PATTERSON, WADLEY AND -- AGAIN IT'S IN
 4          THAT STORY.  AND WHEN I SAY IN COURT, THEY
 5          ACTUALLY TAKE HIM TO COURT.  I DIDN'T APPEAR IN
 6          COURT.  BUT, I MEAN, IF YOU WANT TO DRAW
 7          SEMANTICS, WE CAN DRAW SEMANTICS HERE.
 8     Q.   JUST GOING BACK, YOU SAY YOU'VE CONSULTED ON
 9          INTELLECTUAL PROPERTY WITH DOZENS OF COMPANIES.
10          YOU NAMED SIX.  CAN YOU NAME ANY MORE?
11     A.   CAN WE PLEASE GET THIS MOVING?  I MEAN, I AM
12          LEAVING AT 12:30.  SO, I MEAN, REALLY, WE'VE
13          DISCUSSED THIS ENOUGH FOR ANY RELEVANT DISCOVERY
14          THAT I CAN SEE.
15     Q.   THIS WILL GO FASTER IF YOU JUST ANSWER THE
16          QUESTION.
17     A.   NO, IT WILL GO FASTER IF YOU START ANSWERING -- IF
18          WE DO THIS ONE MORE TIME, I'M LEAVING.  ALL RIGHT,
19          THANK YOU.  GOOD DAY.
20     Q.   YOU'RE REFUSING TO STAY?
21     A.   I'M REFUSING TO STAY.  I CAN'T STAY AND -- YOU
22          KNOW, WE HAVE A CHANCE HERE RIGHT NOW TO ANSWER
23          ALL THESE QUESTIONS THAT YOU WANT ANSWERED.  AND
24          YOU'RE HARPING ON SEMANTIC ISSUES TO TRY --
25     Q.   I TRIED TO POSE --
```

```
 1    A.   -- TO MAKE ME MAD, TO TRY TO GET ME TO LEAVE THIS
 2         INTERVIEW.
 3    Q.   I TRIED TO POSE QUESTIONS TO YOU, AND YOU REFUSE
 4         TO ANSWER THEM.  AND I TOLD YOU IT WOULD BE FASTER
 5         IF YOU JUST ANSWERED THE QUESTIONS.  AND NOW
 6         YOU'RE --
 7    A.   I'VE ANSWERED THE QUESTIONS IN FULL.  DO YOU WANT
 8         ME TO STAY?
 9    Q.   I ASKED YOU IF YOU COULD NAME --
10    A.   ALL RIGHT, ONE LAST TIME.
11    Q.   -- COMPANIES THAT WOULD ADD UP TO DOZENS, BECAUSE
12         THAT'S WHAT YOU INDICATED IN THIS THING, PAPER,
13         THAT YOU FILED WITH THE COURT.
14    A.   I DON'T KNOW IF YOU TALKED BACK TO YOUR MOM OR
15         YOUR DAD WHEN YOU WERE A KID, OR SOMETHING LIKE
16         THAT.  BUT I DON'T KNOW WHY YOU'RE TALKING BACK TO
17         ME.  I MEAN THERE'S NO REASON TO TALK BACK TO ME.
18    Q.   I'M TRYING TO MAKE A RECORD OF --
19    A.   I WILL STAY IF YOU WILL --
20    Q.   -- WHAT YOU KNOW.
21    A.   I WILL STAY IF YOU WILL DIRECT THESE QUESTIONS IN
22         A MORE PROFESSIONAL MANNER.  I'VE ANSWERED
23         THOSE -- I'VE ANSWERED THIS PARTICULAR ISSUE
24         ENOUGH.  THIS HAS BEEN --
25    Q.   IF YOU ANSWERED IT, I MISSED THAT.  YOU SAID YOU
```

```
 1              CONSULTED WITH DOZENS OF COMPANIES.  CAN YOU NAME
 2              THE --
 3    A.    I'VE LISTED YOU SOME.
 4    Q.    -- OTHER COMPANIES?  YOU NAMED SIX COMPANIES.
 5    A.    I CAN'T THINK OF THEM OFF THE TOP OF MY HEAD.  I'M
 6          A LITTLE BIT NERVOUS, I'M A LITTLE BIT UNFED, AND
 7          I NEED TO MOVE THIS ON.
 8    Q.    DO YOU NEED TO STOP AND EAT?
 9    A.    I'M A LITTLE BIT PERTURBED ALSO THAT I'M MISSING
10          CUSTOMERS.  I'VE MISSED THREE NOW.  I DON'T MAKE
11          VERY MUCH MONEY, OBVIOUSLY BY WHAT I TOLD YOU IN
12          PREVIOUS TESTIMONY.  SO EVERY CUSTOMER IS
13          IMPORTANT TO ME.
14    Q.    YOU WERE SERVED A NOTICE OF THIS DEPOSITION OVER A
15          MONTH AGO.
16    A.    I DID NOT RECEIVE IT.
17    Q.    I REALIZE THAT'S YOUR STORY.
18    A.    OKAY, GOOD DAY.  THANK YOU.
19    Q.    YOU'RE ATTACHED TO A MIC.  ARE YOU REFUSING TO
20          STAY FOR THE DEPOSITION?
21    A.    YEAH.
22    (WITNESS EXITS WITH EXHIBITS IN HAND)
23    MR. ELWELL:
24          LET THE RECORD REFLECT THAT MR. SMITH IS LEAVING
25          THE ROOM AND EVIDENTLY DOES NOT INTEND TO FINISH
```

1          THE DEPOSITION TODAY.  SO WE WILL SECURE AN ORDER

2          FROM THE COURT REQUIRING HIM TO APPEAR AGAIN.

3          OFFICIALLY THE DEPOSITION THEN WILL BE ADJOURNED

4          AT THIS TIME AND NOT CONCLUDED.

5      (DEPOSITION SUSPENDED AT 12:16 P.M.)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION
C.A. #6-06-CV-00109-HMH


BIDZIRK, LLC, DANIEL G.
SCHMIDT, III, AND JILL
PATTERSON,

     Plaintiffs

vs.

PHILIP J. SMITH,

     Defendant.

_____/

### CERTIFICATE OF REPORTER

I, KAREN BELANGER, A NOTARY PUBLIC FOR THE STATE
OF SOUTH CAROLINA, DULY COMMISSIONED AND QUALIFIED AS
SUCH, DO HEREBY CERTIFY THAT THE FOREGOING **76** PAGES
REPRESENT A TRUE AND ACCURATE TRANSCRIPT OF THE
FOREGOING DEPOSITION OF **PHILIP J. SMITH** TAKEN BY ME ON
THE 14TH DAY OF SEPTEMBER, 2006.

THAT THE DEPONENT WAS DULY PLACED UNDER OATH AND
ADMONISHED TO SPEAK THE WHOLE TRUTH.  THAT THE ORAL
TESTIMONY WAS DULY TAKEN AND TRANSCRIBED AS TO THE
QUESTIONS PROPOUNDED AND THE ANSWERS GIVEN.

THAT ALL OFFERED EXHIBITS, STIPULATIONS AND
OBJECTIONS, IF ANY, INVOLVED IN THIS CAUSE ARE DULY
ATTACHED OR INCLUDED HEREIN.

IN WITNESS WHEREOF, I HAVE SET MY HAND AND
OFFICIAL SEAL THIS 23RD DAY OF SEPTEMBER, 2006.

_____
KAREN BELANGER, CVR
NOTARY PUBLIC FOR SOUTH CAROLINA
MY COMMISSION EXPIRES:  04/18/2013