```
                IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF SOUTH CAROLINA
                      GREENVILLE DIVISION
                   C.A. #6-06-CV-00109-HMH


    BIDZIRK, LLC, DANIEL G.
    SCHMIDT, III, AND JILL
    PATTERSON,

          Plaintiffs
    vs.
    PHILIP J. SMITH,
          Defendant.
    _____/
    _____
    _

              VIDEOTAPED & STENOGRAPHIC

            DEPOSITION OF PHILIP J. SMITH
    _____
    _

         PURSUANT TO THE NOTICE OF DEPOSITION AND/OR

    AGREEMENTS IN THE ABOVE-ENTITLED CASE, THE DEPOSITION OF

    PHILIP J. SMITH WAS TAKEN ON FRIDAY, DECEMBER 29TH,

    2006, COMMENCING AT 1:06 P.M., AT THE OFFICES OF KEVIN M.

    ELWELL, ESQUIRE, 111 EAST NORTH STREET, GREENVILLE, SOUTH

    CAROLINA.



                     KAREN BELANGER
             CERTIFIED VERBATIM REPORTER
    _____

           FOOTHILLS COURT REPORTING
    _____

              SERVING THE UPSTATE OF SOUTH CAROLINA
                    (864) 836-2290
```

Page 2

APPEARANCES:

FOR THE PLAINTIFF:

    KEVIN M. ELWELL, Esquire

    111 EAST NORTH STREET

    GREENVILLE, SOUTH CAROLINA  29601

FOR THE DEFENDANT:

    PHILIP J. SMITH, APPEARING PRO SE

VIDEOGRAPHER: JACK M. MARKS

             THREE POINT OH!

             306 RIDGELAND DRIVE

             GREENVILLE, SOUTH CAROLINA  29601

ALSO PRESENT: DANIEL G. SCHMIDT

             WILLIAM AUSTIN

STIPULATIONS:  THE DEPOSITION WAS TAKEN PURSUANT TO THE

FEDERAL RULES OF CIVIL PROCEDURE.

NONWAIVER:  EXAMINATION AND READING OF THE DEPOSITION

ARE RESERVED BY THE WITNESS AND BY THE PARTIES.

Exhibit 6, p. 000002

INDEX

PAGE

EXAMINATION BY MR. ELWELL ..................... 5
CERTIFICATE OF REPORTER ...................... 164


PLAINTIFF'S EXHIBITS
(EXHIBITS 1-5 MARKED IN 9/14/06 DEPOSITION)


EXHIBIT NO. 1  (DEPOSITION NOTICE)
EXHIBIT NO. 2  (INTERROGATORIES)
EXHIBIT NO. 3  (REQUEST FOR PRODUCTION OF
               DOCUMENTS)


EXHIBIT NO. 4  (REQUEST FOR ADMISSIONS)


EXHIBIT NO. 5  (RESPONSE TO COMPLAINT)


EXHIBIT NO. 6  (1/4/06 BETTER BUSINESS BUREAU
               LETTER) ...................... 46
EXHIBIT NO. 7  (DEFENDANT'S RESPONSE TO
               COMPLAINT) ................... 59


EXHIBIT NO. 8  (DEFENDANT'S AMENDMENTS,
               CLARIFICATIONS AND EXTENSIONS)  70


EXHIBIT NO. 9  (DEFENDANT'S REQUEST FOR
               DISMISSAL) ................... 74


EXHIBIT NO. 10 (7/7/06 POSTING FROM
               RIPOFFREPORT.COM) ............ 93

PLAINTIFF'S EXHIBITS CONTINUED

EXHIBIT NO. 11 (COVER SHEET FOR AFFIDAVITS) ...  96

EXHIBIT NO. 12 (COVER SHEET AND LANE LETTER) ..  99

EXHIBIT NO. 13 (COVER SHEET AND BUZZELL
                STATEMENT) ....................  103


EXHIBIT NO. 14 (7/6/06 COURT FILING) .........  108


EXHIBIT NO. 15 (EXCERPTS FROM EBAY) ...........  130

\* \* \* \* \* \*

Page 5

1      THE WITNESS WAS DULY SWORN TO TELL THE TRUTH, THE

2   WHOLE TRUTH AND NOTHING BUT THE TRUTH CONCERNING THE

3   MATTER HEREIN:

4                    PHILIP J. SMITH,

5   BEING FIRST DULY SWORN, TESTIFIED UNDER OATH AS

6   FOLLOWS:

7   EXAMINATION BY MR. ELWELL:

8   Q.   MR. SMITH, WE'RE BACK FOR YOUR DEPOSITION PURSUANT

9        TO THE COURT'S ORDER COMPELLING YOU TO RETURN

10       AFTER LEAVING THE LAST ONE IN SEPTEMBER.  ARE YOU

11       STILL RECOLLECTING ALL OF THE SORT OF GROUND RULES

12       AND PROCEDURES THAT GOVERN GIVING A DEPOSITION?

13  A.   YES, AND I HAVE CONSULTED WITH OTHER ATTORNEYS

14       ABOUT WHAT I CAN AND CAN'T ANSWER.

15  Q.   WHO HAVE YOU CONSULTED WITH?

16  A.   I'VE CONSULTED WITH MULTIPLE ATTORNEYS.

17  Q.   WHAT ARE THE NAMES OF THE ATTORNEYS YOU'VE

18       CONSULTED WITH?

19  A.   THEY'RE OF NO CONSEQUENCE.

20  Q.   THIS IS A DISCOVERY DEPOSITION, AND THAT'S NOT

21       PRIVILEGED INFORMATION.  SO TELL ME WHAT THE NAMES

22       OF THE ATTORNEYS THAT YOU'VE CONSULTED WITH ARE.

23  A.   THE CARPENTER LAW FIRM.

24  Q.   WHO SPECIFICALLY THERE?

25  A.   MR. CARPENTER.

Page 6

1    Q.    WHERE ARE THEY LOCATED?

2    A.    ON CHURCH STREET.

3    Q.    WHO ELSE HAVE YOU DISCUSSED THE CASE WITH?

4    A.    THAT'S ALL AT THIS TIME CONCERNING THIS MATTER.

5          THEY'RE NOT REPRESENTING ME.  SO I JUST WANT TO

6          MAKE SURE THAT'S CLEAR.

7    Q.    IS ANYONE REPRESENTING YOU?

8    A.    NO, I'M PRO SE AT THIS TIME.

9    Q.    YOU BROUGHT WITH YOU SOME ORIGINAL EXHIBITS THAT

10         YOU HAD TAKEN WHEN YOU LEFT THE LAST DEPOSITION.

11         EXHIBIT 2 I'LL PASS BACK TO YOU.  IT'S A COPY OF

12         PLAINTIFF'S INTERROGATORIES IN THIS CASE.  JUST

13         FOR THE RECORD, THAT'S THE DOCUMENT THAT YOU'VE

14         BROUGHT WITH YOU TODAY?

15   A.    YES.

16   Q.    AND SINCE YOU LEFT THIS OFFICE IN SEPTEMBER WITH

17         THAT DOCUMENT, HAVE YOU ALTERED IT IN ANY WAY?

18   A.    NO, I HAVE NOT.

19   Q.    AND YOU HAVE HAD CUSTODY OF IT SINCE YOU LEFT?

20   A.    YES, I HAVE.

21   Q.    AND HAS IT BEEN IN YOUR HOME?

22   A.    YES, IT HAS.

23   Q.    THE ENTIRE TIME SINCE YOU LEFT?

24   A.    I HAVE SHOWN IT TO AN ATTORNEY, YES.

25   Q.    DIFFERENT THAN MR. CARPENTER?

Page 7

1    A.    NO.

2    Q.    I'LL SHOW YOU EXHIBIT 3.  THIS IS A COPY OF

3          PLAINTIFF'S REQUEST FOR PRODUCTION OF DOCUMENTS.

4          THE SAME SET OF QUESTIONS.  THAT IS THE DOCUMENT

5          THAT YOU RETURNED HERE WITH TODAY?

6    A.    YES, IT IS.

7    Q.    AND YOU HAVE NOT ALTERED THAT DOCUMENT IN ANY WAY

8          SINCE YOU TOOK IT WITH YOU?

9    A.    NO, SIR.

10   Q.    AND IT HAS BEEN EITHER AT YOUR HOUSE OR BEING

11         TRANSPORTED BY YOU TO AN ATTORNEY'S OFFICE SINCE

12         SEPTEMBER?

13   A.    YES, SIR.

14   Q.    AND THE SAME QUESTION WITH NUMBER 4.  THIS IS A

15         COPY OF PLAINTIFF'S REQUEST FOR ADMISSION.  THAT

16         IS THE DOCUMENT THAT YOU BROUGHT WITH YOU TODAY?

17   A.    YES, SIR.

18   Q.    AND YOU HAVE HAD POSSESSION OF THAT DOCUMENT SINCE

19         YOU LEFT HERE IN SEPTEMBER?

20   A.    YES, SIR.

21   Q.    AND YOU HAVE NOT ALTERED THAT DOCUMENT IN ANY WAY

22         SINCE LEAVING HERE IN SEPTEMBER?

23   A.    NO, SIR.

24   Q.    HAVE YOU SERVED RESPONSES TO ANY OF THOSE

25         DISCOVERY REQUESTS?

Page 8

```
 1   A.   TO THE COURT?

 2   Q.   TO ME OR TO THE COURT.

 3   A.   I DO NOT FEEL THAT I HAVE OTHER THAN WHAT WE'VE

 4        ALREADY TAKEN, THE DEPOSITION.

 5   Q.   HAVE YOU PREPARED ANY WRITTEN RESPONSES TO ANY OF

 6        THOSE EXHIBITS -- 2, 3, OR 4?

 7   A.   NO, I HAVE NOT.  I FEEL THAT THE MAJORITY OF THESE

 8        QUESTIONS HAVE ALREADY BEEN ANSWERED TO THE COURT

 9        AND TO YOU THROUGH INFORMATION PROVIDED ALREADY.

10        SO THAT'S WHY I HAVEN'T DONE SO.  AND I HAVE

11        MOTION TO THE COURT THAT I HAVE RESPONDED ON EACH

12        OF THESE ISSUES THAT I -- THAT WERE RELEVANT TO

13        THE COURT.

14   Q.   WHEN HAVE YOU FILED ANY MOTIONS CONCERNING THAT?

15   A.   I SENT YOU A COPY BACK AT THE END OF NOVEMBER.

16   Q.   WHAT WAS YOUR MOTION ENTITLED?

17   A.   IT WAS SEVERAL MOTIONS TO THE COURT SAYING THAT I

18        HAD RESPONDED AND -- THAT I HAD A MOTION FOR

19        DISMISSAL IN THERE.  AND THAT'S ALL THAT I KNOW.

20   Q.   DO YOU STILL HAVE A COPY OF EXHIBIT NUMBER 5?

21   A.   THESE ARE THE ONLY -- THESE ARE THE ONLY ONES I

22        HAD WITH ME.

23   Q.   I THINK THE COURT REPORTER'S GOT ONE.  ALL RIGHT,

24        LET ME SHOW YOU WHAT WAS MARKED PREVIOUSLY AS

25        EXHIBIT NUMBER 5 AND ASK IF YOU'VE SEEN THAT
```

Page 9

1        DOCUMENT BEFORE.

2   A.   IS THIS MY LETTER TO YOU?

3   Q.   IT'S ONE OF SEVERAL THINGS THAT YOU'VE WRITTEN.

4   A.   THIS WAS MY FIRST LETTER TO YOU; IS THAT CORRECT?

5   Q.   I DON'T KNOW.

6   A.   OKAY, YES, BUT THESE WERE NOT ATTACHED HERE.  I

7        MEAN TO THIS LETTER.  SO I DON'T KNOW IF YOU'RE

8        PRESENTING THIS AS THE SAME PIECE OF EVIDENCE.

9   Q.   JUST FOR THE RECORD, THE LAST FEW PAGES, WHICH ARE

10       USER I.D. HISTORIES FROM E-BAY, WERE NOT PART OF

11       THIS LETTER ORIGINALLY.

12  A.   I DON'T THINK SO, BUT I DON'T KNOW.

13  Q.   YOU MAY RECALL THAT WHEN YOU GOT UP AND LEFT LAST

14       TIME, WE WERE DISCUSSING YOUR CONSULTING ON

15       INTELLECTUAL PROPERTY WITH, AS YOU PUT IT IN HERE,

16       DOZENS OF COMPANIES.

17  A.   YES.

18  Q.   HAVE YOU CONSULTED FOR A FEE ON INTELLECTUAL

19       PROPERTY ISSUES?

20  A.   NO, BECAUSE THEY'RE MY INTELLECTUAL PROPERTY.

21  Q.   I THINK WE ESTABLISHED THAT YOUR CONSULTING

22       EXPERIENCE CONSISTS OF ATTEMPTING TO MARKET

23       INTELLECTUAL PROPERTY TO COMPANIES THAT PERHAPS

24       MAY MANUFACTURE A PRODUCT THAT YOU ENVISIONED?

25  A.   YES.

Page 10

1    Q.    AND I THINK WE GOT FIVE OR SIX COMPANIES' NAMES.

2          ARE YOU AGREEING THAT IT'S NOT ACTUALLY DOZENS, AS

3          YOU INDICATED IN THIS LETTER?

4    A.    YOU KNOW, I HAVE SPOKEN TO DOZENS, AND IT'S A

5          MATTER OF EXPOS AND, YOU KNOW, ONE-ON-ONE TALKS AT

6          EXPOS AND EVERYTHING ELSE.   THOSE ARE THE MAIN

7          COMPANIES.   THAT'S PLENTY ENOUGH FOR THAT ANSWER.

8    Q.    DO YOU KNOW WHETHER IT'S DOZENS, AND CAN YOU NAME

9          DOZENS?

10   A.    I COULD NAME DOZENS.

11   Q.    WILL YOU PLEASE DO SO?

12   A.    THAT'S ENOUGH.   I MEAN, REALLY, IT'S THE GENERAL

13         MARKET THAT THOSE COMPANIES ARE IN.   YOU KNOW, IF

14         I WERE TO SIT DOWN AND BE COMPELLED BY THE COURT

15         TO WRITE THOSE DOWN -- THOSE ARE IMMATERIAL TO

16         THIS POINT IN THE TRIAL.   WE ARE NOT IN A PENALTY

17         PHASE OF THE TRIAL, NOR ARE WE IN A DISCOVERY

18         POINT FOR MY INCOME OR MY ABILITY TO PAY.   WE'RE

19         HERE FOR A DEPOSITION ON A COURT ISSUE OF WHETHER

20         I'VE HAD TRADEMARK INFRINGEMENT.   THAT IS THE

21         CURRENT MATTER BEFORE THE COURT.   WE ARE NOT IN A

22         PENALTY PHASE.   YOU WOULD HAVE TO FILE A SEPARATE

23         TRIAL FOR THAT, OR HAVE THE COURT'S -- THE COURT

24         ANSWER THAT AND SAY, YOU KNOW, WE NEED TO SET A

25         PENALTY PHASE TRIAL.   WE'RE NOT IN THAT PART OF

Page 11

1         THE COURT CASE YET.  SO IT HAS NO RELEVANCE TO THE
2         MATTER AT HAND.
3    Q.   I GUESS A COUPLE OF THINGS.  THIS IS A DISCOVERY
4         DEPOSITION.  AND SO YOUR ASSESSMENT OF WHAT'S
5         RELEVANT AND WHAT IS NOT ISN'T THE ISSUE.  AND
6         ALSO --
7    A.   IF I HAD AN ATTORNEY HERE, THEY HAVE TOLD ME THAT
8         I DON'T HAVE TO ANSWER THAT QUESTION.  I'VE GIVEN
9         YOU THE BEST ANSWER ALREADY.  I'VE GIVEN YOU AN
10        ANSWER THAT THE COURT WOULD BE SATISFIED WITH.
11   Q.   BUT YOU TOLD ME IF YOU WERE CALLED ON TO DO IT,
12        YOU COULD NAME DOZENS OF COMPANIES.
13   A.   I AM NOT IN A POSITION TO BE ABLE TO GO THROUGH MY
14        RECORDS AT THIS TIME TO NAME MORE THAN I ALREADY
15        HAVE.  AND THAT IS MY HONEST ANSWER.
16   Q.   BUT YOU'VE HAD THREE AND A HALF MONTHS SINCE YOU
17        WERE HERE LAST TO CONSIDER YOUR RESPONSE TO THAT
18        QUESTION, BECAUSE I ASKED IT BEFORE, CORRECT?
19   A.   AND THAT IS -- I DID THE SAME ANSWER.
20   Q.   BECAUSE YOU WOULD AGREE WITH ME --
21   A.   BECAUSE YOU'VE CONTACTED THEM ALREADY.  SO --
22   Q.   WHY DO YOU THINK THAT?
23   A.   WELL, I DON'T -- I MEAN, I'M JUST SAYING I THINK
24        THAT YOU'VE CONTACTED AT LEAST ONE OF THOSE.
25   Q.   BASED ON WHAT?

Page 12

1   A.   THEY HAVE SOME INFORMATION THAT THEY MAY HAVE

2        REVEALED TO ME THAT YOU TRIED TO CONTACT THEM,

3        MAYBE INDIRECTLY.  THEY MAY HAVE FOUND OUT ABOUT

4        IT ANOTHER WAY.  THAT'S WHY IT'S CONFUSING.  IT'S

5        IRRELEVANT.

6   Q.   IT'S ALSO INCORRECT.  I HAVEN'T CONTACTED ANYBODY

7        THAT YOU'VE TRIED TO SELL ANYTHING TO.  YOU WOULD

8        AGREE THAT THE CONTEXT OF THIS PARAGRAPH INDICATES

9        THAT YOU'RE EXPRESSING SOME EXPERTISE IN THE AREA

10       OF INTELLECTUAL PROPERTY BECAUSE YOU HAVE

11       CONSULTED ON INTELLECTUAL PROPERTY WITH DOZENS OF

12       COMPANIES, PER THIS LETTER?

13   A.   YES, I WOULD AGREE WITH THAT.

14   Q.   BUT YOU'VE INDICATED THAT THIS --

15   A.   AND I'M WELL RESPECTED BY THE COMPANIES THAT I'VE

16       GIVEN YOU FOR THOSE MATTERS.

17   Q.   WHO WOULD INDICATE TO US THAT YOU WERE WELL

18       RESPECTED --

19   A.   GRIFFIN TECHNOLOGY.  PAUL GRIFFIN OF GRIFFIN

20       TECHNOLOGY.

21   Q.   DID THEY BUY YOUR PRODUCT?

22   A.   JACK CAMPBELL OF MAC MICE.

23   Q.   DID ANYBODY IN ANY OF THESE COMPANIES BUY YOUR

24       PRODUCT?

25   A.   IT'S NOT REALLY A BUY-A-PRODUCT ISSUE.

Page 13

1    Q.    OR OFFER TO HELP YOU MANUFACTURE IT?

2    A.    I'VE HAD SEVERAL NEGOTIATIONS WITH GRIFFIN.  I

3          MEAN THAT'S AN ONGOING PRODUCT.  I MEAN THAT'S AN

4          ONGOING DISCUSSION.

5    Q.    THIS IS THE TWO-POINTING DEVICE IDEA, CORRECT?

6    A.    NO.

7    Q.    TWO CURSORS ON THE SAME SCREEN?

8    A.    NO.

9    Q.    WELL, WHAT IS THE DEVICE?

10   A.    THAT IS IMMATERIAL.  I --

11   Q.    AGAIN, YOUR ASSESSMENT OF WHAT IS MATERIAL AND

12         WHAT IS NOT IS ITSELF IRRELEVANT IN A DISCOVERY

13         DEPOSITION.

14   A.    IF I HAVE A PATENT APPLICATION THAT IS --

15   Q.    THAT IS OF PUBLIC RECORD.

16   A.    HOLD ON.  THAT HAS NOT BEEN REVEALED TO THE PUBLIC

17         THROUGH THE USPTO, I DO NOT HAVE TO ANSWER THAT

18         QUESTION.  THAT IS A MATTER OF TRADE SECRET.  YOU

19         REALLY SHOULD READ UP ON THAT, BECAUSE YOU

20         BATTERED ME AND BELITTLED ME LAST TIME OVER THIS.

21   MR. ELWELL:

22         LET'S GO OFF THE RECORD FOR A SECOND.

23   (DISCUSSION OFF THE RECORD)

24   WITNESS:

25         YOU JUST CALLED ME A TURD, AND YOU ALSO CALLED ME

Page 14

1         NARCISSISTIC.  YOU SAID YOU WILL GO AGAINST MY

2         HEALTH WISHES AND BETTER WISHES OF KEEPING ME HERE

3         ALL DAY UNTIL I'M TIRED AND CAN'T STAND IT

4         ANYMORE.

5    EXAMINATION RESUMED BY MR. ELWELL:

6    Q.   FOR THE RECORD, NONE OF THAT WAS A THREAT.  AND IF

7         YOU CONTINUE TO NOT RESPOND TO QUESTIONS, WHAT I

8         SAID IS YOU'LL BE HERE UNTIL YOU'RE VERY TIRED

9         BECAUSE I'M GOING TO KEEP YOU HERE UNTIL YOU

10        ANSWER MY QUESTIONS.  AND THE COURT'S ORDERED YOU

11        TO STAY HERE UNTIL YOU'VE ANSWERED MY QUESTIONS.

12   A.   OKAY.

13   MR. ELWELL:

14        I GUESS THE RECORD SHOULD REFLECT ALSO THAT MR.

15        SMITH HAS BROUGHT HIS OWN RECORDING DEVICE HERE,

16        AND IS PURPORTEDLY TAKING DOWN THE DEPOSITION

17        HIMSELF ON A COMPUTER.

18   EXAMINATION RESUMED BY MR. ELWELL:

19   Q.   SO YOU'RE REFUSING TO ANSWER ANY QUESTIONS

20        CONCERNING THE INTELLECTUAL PROPERTY THAT YOU'VE

21        ATTEMPTED TO SELL?

22   A.   I HAVEN'T REFUSED.  I'VE ANSWERED THE QUESTIONS TO

23        THE BEST OF MY ABILITY.

24   Q.   WHAT IS THE DEVICE THAT YOU TRIED TO SELL TO

25        GRIFFIN TECHNOLOGIES?

Page 15

1    A.    AN IPOD ADAPTER.

2    Q.    AND IT ADAPTS TO WHAT?

3    A.    THAT'S GOOD ENOUGH.  COME ON, MR. ELWELL.  REALLY.

4    Q.    AGAIN --

5    A.    I CANNOT REVEAL THAT.  THAT IS A MATTER OF TRADE

6          SECRET.  IT IS NOT PUBLISHED AT THE USPTO WEBSITE,

7          PERIOD.  IT'S A PATENT APPROVE -- IT'S A PATENT

8          PENDING.  EXCUSE ME.

9    Q.    SO YOU'RE REFUSING TO ANSWER THAT QUESTION?

10   A.    I'M NOT REFUSING TO ANSWER THE QUESTION.

11   Q.    THEN ANSWER IT.

12   A.    I'VE ANSWERED THE QUESTION.

13   Q.    YOU HAVE NOT ANSWERED THE QUESTION.

14   A.    OKAY, I REFUSE TO ANSWER THE QUESTION.

15   Q.    WHAT DOES THE DEVICE ADAPT TO?  YOU REFUSE TO

16         ANSWER?

17   A.    I REFUSE TO ANSWER THE QUESTION.  I REFUSE TO

18         ANSWER THAT QUESTION.

19   Q.    JUST TO BE CLEAR THOUGH, YOUR CONSULTATION ON

20         INTELLECTUAL PROPERTY WITH DOZENS OF COMPANIES

21         CONSISTS OF ATTEMPTING TO SELL A PRODUCT TO THEM

22         OR PARTNER WITH THEM IN SOME SORT OF VENTURE, AND

23         NOT --

24   A.    IN SOME ASPECTS, YES.  WITH JACK CAMPBELL, IT WAS

25         TO MAKE HIM BECOME LEGAL WITH APPLE NAMING POLICY,

Page 16

1          TO CONSULT WITH HIM ON NAMES OF PRODUCTS, TO

2          DISCUSS POTENTIAL PRODUCT DESIGNS WITH HIM.

3    Q.    WERE YOU PAID FOR THIS?

4    A.    NO.

5    Q.    AND SO EVEN THOUGH THIS PARAGRAPH IMPLIES THAT YOU

6          ARE A CONSULTANT FOR HIRE TO INDUSTRY, THAT'S NOT

7          CORRECT?

8    A.    IT DOESN'T IMPLY THAT AT ALL.

9    Q.    I JUST WANT TO BE CLEAR ABOUT THAT.  YOU'RE NOT

10         ATTEMPTING TO IMPLY THAT?

11   A.    I WANT TO BE CLEAR THAT IT DOES NOT IMPLY THAT I'M

12         A CONSULTANT FOR HIRE ON INTELLECTUAL PROPERTY.

13   Q.    YOU ALSO INDICATE HERE THAT YOU'VE ASSISTED MANY

14         ASSOCIATES IN COURT AND THEIR LEGAL COUNSEL AS A

15         CONSUMER ADVOCATE.

16   A.    YES.

17   Q.    WHO HAVE YOU ASSISTED IN COURT AMONG YOUR

18         ASSOCIATES?

19   A.    JUST, YOU KNOW, FRIENDS.

20   Q.    WHO?

21   A.    YOU KNOW, OVER THE YEARS I'VE CONSULTED A LOT OF

22         PEOPLE ABOUT DIFFERENT THINGS.  I MEAN IT'S --

23         YOU'RE BEING PICKY TO BE PICKY.  THAT'S ALL YOU'RE

24         DOING.  YOU'RE JUST SITTING HERE BATTERING ME AND

25         JUST BATTERING ME AND BATTERING ME AND BATTERING

Page 17

1       ME, OVER AND OVER, ABOUT STUPID STUFF.

2   Q.  YOU SENT ME THIS LETTER, AND I'M TRYING TO

3       ASCERTAIN WHAT THE MEANING OF --

4   A.  WHAT RELEVANCE DOES THIS HAVE TO A PATENT -- I

5       MEAN TO A SERVICE MARK ISSUE?

6   Q.  BECAUSE YOU HAVE INCLUDED IN THIS PARAGRAPH

7       CONCERNING THAT YOU WERE KNOWLEDGEABLE OF YOUR

8       CONSTITUTIONAL RIGHTS AND YOUR LEGAL

9       RESPONSIBILITIES CONCERNING REPORTING.  ONE, THAT

10      YOU'VE CONSULTED ON INTELLECTUAL PROPERTY, WHICH

11      EVIDENTLY YOU HAVE NOT DONE IN ANY KIND OF

12      EDUCATIONAL CAPACITY AND, TWO, THAT YOU'RE A

13      CONSUMER ADVOCATE OF SOME SORT, YOU ASSIST

14      ASSOCIATES IN COURT AND LAWYERS IN COURT.  IS

15      EITHER OF THOSE THINGS TRUE?

16  A.  YES.

17  Q.  HOW MANY TIMES HAVE YOU BEEN TO COURT ON BEHALF OF

18      AN ASSOCIATE?

19  A.  I HAVEN'T BEEN TO COURT ON BEHALF OF ANYONE.

20  Q.  THIS SAYS, "I'VE ASSISTED MANY ASSOCIATES IN

21      COURT."  WOULD YOU AGREE THAT ONE COULD READ THAT

22      AND REASONABLY ASSUME THAT YOU HAVE APPEARED IN

23      COURT ALONGSIDE SOMEBODY FOR THE PURPOSE OF

24      ASSISTING THEM IN PROSECUTING OR DEFENDING A CASE?

25  A.  IF -- I MEAN, IF THAT'S HOW YOU READ IT, I'M SORRY

Page 18

1          YOU READ IT THAT WAY.

2    Q.    YOU DIDN'T INTEND FOR IT THAT WAY, BECAUSE YOU'VE

3          NEVER BEEN TO COURT TO HELP AN ASSOCIATE.

4    A.    I'VE NEVER TESTIFIED FOR SOMEBODY, NO.

5    Q.    AND WHICH LAWYERS HAVE YOU ASSISTED PROSECUTING OR

6          DEFENDING CONSUMER ADVOCACY TYPE CASES?

7    A.    I ASSISTED COUNSEL FOR COMPUTER CLINIC.

8    Q.    WHO IS THAT?

9    A.    I THINK THAT THAT WAS THE HERLONG LAW FIRM THAT

10         WAS AGAINST THEM, BUT I DON'T KNOW WHO IT WAS.  I

11         CAN'T REMEMBER THE NAME.

12   Q.    YOU DON'T KNOW HOW YOU WERE HELPING?

13   A.    I CAN'T REMEMBER THE NAME.

14   Q.    AND WHY DID YOU CONSULT WITH THEM?

15   A.    BECAUSE I'M PRETTY FAMILIAR WITH INTELLECTUAL

16         PROPERTY AND INTELLECTUAL PROPERTY RIGHTS, BECAUSE

17         I --

18   Q.    HOW IS IT THAT YOU'RE FAMILIAR WITH INTELLECTUAL

19         PROPERTY AND INTELLECTUAL PROPERTY RIGHTS?

20   A.    YOU'RE TRYING TO GET BACK TO THE SAME QUESTION

21         OVER AND OVER AND OVER AGAIN.  BECAUSE I HAVE

22         APPLIED FOR SEVERAL PATENTS.  I HAVE CONSULTED

23         WITH GRIFFIN TECHNOLOGY, WHICH IS A LEADER IN THE

24         IPOD MANUFACTURING INDUSTRY ON MY PRODUCT, ON

25         THEIR PRODUCTS.  THEY HAVE PRODUCED SEVERAL

Page 19

```
 1          PRODUCTS WHICH THEY ASK WHAT DO YOU THINK ABOUT

 2          THAT, AND I GAVE MY INPUT INTO IT.  I'VE BETA-

 3          TESTED PRODUCTS FOR THEM.  I'VE BETA-TESTED

 4          PRODUCTS FOR APPLE.  I HAVE PROVIDED MY INPUT BACK

 5          TO APPLE FOR THAT.  I CONSIDER THAT INTELLECTUAL

 6          PROPERTY CONSULTING.

 7    Q.    HOW MANY BETA TESTERS DOES APPLE HAVE REGISTERED,

 8          DO YOU THINK?

 9    A.    HUNDREDS.

10    Q.    MAYBE THOUSANDS, RIGHT?

11    A.    NO.  IF I PROVIDE TECHNOLOGICAL INPUT BEYOND USAGE

12          INPUT, I WOULD CONSIDER THAT CONSULTING.

13    Q.    SO OTHER THAN THAT ONE LAW FIRM THAT YOU CANNOT

14          RECOLLECT THE NAME OF, HAVE YOU HELPED ANYBODY

15          ELSE IN A CONSUMER ADVOCACY CASE?

16    A.    YOU KNOW, I HELP PEOPLE ALL THE TIME WITH LIKE

17          GOING TO TRAFFIC COURT AND EVERYTHING.

18    Q.    WHAT'S YOUR EXPERTISE IN TRAFFIC COURT?

19    A.    I'M PRETTY WELL READ ABOUT TRAFFIC LAWS.

20    Q.    WHY IS THAT?

21    A.    I USED TO BE A SPEEDER, AND I USED TO GO -- I USED

22          TO GET CAUGHT FOR SPEEDING.

23    Q.    AND THAT MAKES YOU AN EXPERT ON THE SUBJECT OF

24          TRAFFIC LAWS AND HOW TO AVOID BEING CONVICTED OF

25          TRAFFIC TICKETS?
```

Page 20

```
 1   A.   NO, I DIDN'T SAY GET OUT OF TRAFFIC TICKETS.  I
 2        JUST SAID, YOU KNOW, IF YOU GO TO COURT, YOU
 3        GET -- YOU CAN GET YOUR FINE REDUCED.  IF YOU WERE
 4        CAUGHT DURING A CERTAIN TIME OF DAY, THERE'S
 5        THINGS -- THERE'S PROBLEMS WITH THE RADARS, YOU
 6        KNOW.  I TALK ABOUT ALL THAT.
 7   Q.   SO PEOPLE HAVE COME UP TO YOU AND SAID, "HEY, WHAT
 8        DO I DO?  I'VE GOT A HEARING COMING UP?"  AND
 9        YOU'VE OFFERED A FEW SUGGESTIONS FROM TIME TO TIME
10        ABOUT THAT?
11   A.   THAT'S CORRECT.
12   Q.   AND THAT WOULD BE ASSISTING LEGAL COUNSEL IN COURT
13        OR ASSOCIATES IN COURT?
14   A.   THAT'S CORRECT.
15   Q.   AND THAT IS RELEVANT EXPERTISE TO YOUR KNOWLEDGE
16        OF INTELLECTUAL PROPERTY IN ANY WAY, OR NO?
17   A.   NO, AND I DON'T THINK THAT THAT CONSTRUES THAT.
18   Q.   I'M SORRY?
19   A.   I DON'T THINK THAT THAT CONSTRUES THAT OPINION
20        THAT YOU HAVE THERE.
21   Q.   YOU DON'T THINK IT CONSTRUES IT?  WHAT DOES THAT
22        MEAN?
23   A.   I GOT A DICTIONARY HERE IN MY BAG HERE, IF YOU
24        NEED IT.  I'LL LET YOU LOOK UP "CONSTRUED".
25   Q.   I KNOW WHAT THE WORD IS.  BUT IF YOU'RE USING IT
```

Page 21

1          THE WAY I THINK IT MEANS, I THINK YOU'RE MISUSING

2          THE WORD.  ARE YOU MEANING SOMETHING ELSE OTHER

3          THAN --

4    A.    I DON'T THINK THAT THAT PARAGRAPH SAYS THAT.  I

5          THINK IT SAYS I'VE CONSULTED ON INTELLECTUAL

6          PROPERTY.  I'VE ALSO HELPED PEOPLE AS A CONSUMER

7          ADVOCATE.  AND WHAT I MEAN AS CONSUMER ADVOCATE IS

8          THAT, YOU KNOW, I AM -- MY WEBSITE HAS BEEN UP

9          THERE FOR SIX YEARS, AND I HAVE TALKED ABOUT EBAY

10         DROP-OFF COMPANIES OTHER THAN YOUR OWN.  I'VE

11         TALKED ABOUT -- YOU KNOW, I'VE TALKED ABOUT

12         CHARTER CABLE.  I'VE TALKED ABOUT APPLE COMPUTER.

13         AND I'LL GIVE YOU A NAME, ROBERT AMBROGI, WHICH IS

14         AN ATTORNEY.  HE OFTEN SAYS HE READS MY BLOG AND

15         GETS INFORMATION CONCERNING HIS LAWSUITS.

16   Q.    HOW DO YOU SPELL HIS LAST NAME?

17   A.    A-M-B-R-O-G-I.

18   Q.    HE'S HERE IN TOWN?

19   A.    NO.

20   Q.    WHERE IS HE?

21   A.    I BELIEVE HE'S IN TEXAS.

22   Q.    HE READS YOUR BLOG TO ASSIST HIM IN HIS LAW

23         PRACTICE?

24   A.    UH-HUH (AFFIRMATIVE).  HE'S PART OF THE MEDIA

25         BLOGGERS ASSOCIATION.

Page 22

1    Q.   AND IN THE NEXT PARAGRAPH OF EXHIBIT NUMBER 5, YOU

2         INDICATE, "I'M HAVING ALL MY CORRESPONDENCE READ

3         BY A LEGAL REPRESENTATIVE."  WHO IS THAT?

4    A.   THAT WAS MR. CARPENTER.

5    Q.   AND WERE YOU CHARGED FOR THAT SERVICE?

6    A.   NO, HE'S A FRIEND OF MY FATHER'S.

7    Q.   WHAT TYPE OF PRACTICE DOES MR. CARPENTER HAVE?  DO

8         YOU KNOW?

9    A.   I BELIEVE HE DOES BUSINESS LAW.  I'M NOT SURE.  I

10        KNOW HE'S INVOLVED IN THE LAWSUIT AGAINST THE

11        PICKENS COUNTY SCHOOL DISTRICT.

12   Q.   THREE PARAGRAPHS DOWN FROM THAT, YOU INDICATE, "I

13        HAVE NOT RECEIVED AN OFFICIAL RESPONSE FROM THE

14        COURT AND MAY SEEK GROUNDS FOR DISMISSAL BASED ON

15        FRAUDULENT COURT ACTION."  CAN YOU TELL ME WHAT

16        YOU'RE TALKING ABOUT THERE?

17   A.   YOU SENT A LETTER TO BOTH ME AND MY ASSOCIATE, WHO

18        HAD NOTHING TO DO WITH THE ARTICLE.  YOU

19        IMPROPERLY SERVED HIM A CEASE AND DESIST, AND I --

20        YOU KNOW, YOU MENTIONED A COURT CASE IN THERE

21        WITHOUT A CIVIL ACTION NUMBER OR A -- OR THAT YOU

22        WERE ACTUALLY TAKING ME TO COURT.  IT WAS JUST --

23        IT LOOKED LIKE A TYPICAL CEASE AND DESIST THAT

24        CRUMMY ATTORNEYS SEND TO LITTLE SMALL PEOPLE TO

25        BATTER AND BELITTLE --

Page 23

1    Q.    HAVE YOU GOTTEN A LOT OF THOSE LETTERS?

2    A.    HUH?

3    Q.    HAVE YOU GOTTEN A LOT OF CEASE AND DESIST LETTERS?

4    A.    I'VE GOTTEN TWO IN THE PAST.

5    Q.    WHAT OTHER CEASE AND DESIST LETTERS HAVE YOU

6          RECEIVED?

7    A.    ONE FROM JACK CAMPBELL AND ONE FROM BILL PALMER,

8          WHO YOU'VE BEEN IN CONTACT WITH, BOTH OF THEM.

9    Q.    AND WHY DID MR. CAMPBELL SEND YOU A CEASE AND

10         DESIST LETTER?

11   A.    BECAUSE I STARTED MY WEBSITE CALLED JACKWHISPERS.

12         COM.

13   Q.    SO HE FELT YOU WERE DEFAMING HIM OR MAKING USE OF

14         HIS TRADE NAME?

15   A.    HE FELT SO.

16   Q.    AND WHAT WAS THE RESULT OF YOUR CEASE AND DESIST

17         LETTER, YOUR RECEIPT OF THAT?

18   A.    I SENT HIM A SIMILAR LETTER THAT I SENT YOU, AND

19         HE REALIZED THAT IT WAS RIDICULOUS.  HE PUT A

20         PRIVATE INVESTIGATOR ON ME FOR A LITTLE WHILE,

21         DISCOVERED THAT -- AS YOU WILL DISCOVER, THAT I AM

22         PENNILESS AND REALIZED HE COULDN'T DO ANYTHING

23         ABOUT IT.  AND NOW WE ARE PRETTY GOOD FRIENDS.

24   Q.    WHAT ABOUT MR. PALMER?  WHAT DID HE TRY TO GET YOU

25         TO STOP DOING?

Page 24

1  A.  HE SENT ME A SIMILAR LETTER.  I RESPONDED TO HIM

2      IN THE SAME WAY.  AND HE SAID THAT IT WASN'T WORTH

3      HIS TIME.  HE RESPONDED TO ME IN ANOTHER LETTER

4      THAT SAID IT WASN'T WORTH HIS TIME.

5  Q.  ON THE NEXT PAGE OF EXHIBIT 5, IN THE FIRST FULL

6      PARAGRAPH, YOU INDICATE, "RESEARCH HAS INDICATED

7      TO ME THAT MR. SCHMIDT IS POTENTIALLY BEING

8      INVESTIGATED BY THE IRS."

9  A.  UH-HUH (AFFIRMATIVE).

10  Q.  WHAT'S YOUR INFORMATION CONCERNING THAT?

11  A.  I CAN'T REVEAL THE SOURCE OF THAT INFORMATION,

12      BECAUSE IT IS PRIVATE.  BUT THE -- I HAVE A CLIENT

13      OF HIS THAT HAS INDICATED TO ME THAT THE SALE OF

14      HIS HEALTH CARE COMPANY WAS UNDER INVESTIGATION BY

15      THE IRS.

16  Q.  WHO IS THAT CLIENT?

17  A.  THAT'S THE BEST I CAN TELL YOU.  THANK YOU.  I'M

18      REFUSING TO ANSWER THAT QUESTION.  I WAS TOLD THAT

19      YOU CAN -- IF YOU THERE'S ANY QUESTION, YOU NEED

20      TO CHECK IT OFF AND YOU NEED TO COMPEL THE COURT

21      TO MAKE ME ANSWER THAT QUESTION.

22  Q.  YOU UNDERSTAND THAT YOU'RE HERE ON AN ORDER TO

23      COMPEL.  SO THAT'S ALREADY BEEN DONE ONCE.

24  A.  YOU HAVEN'T SUBMITTED THOSE QUESTIONS TO THE

25      COURT.

Page 25

1   Q.   YOU'VE BEEN ORDERED TO STAY HERE UNTIL THE
2        DEPOSITION IS COMPLETED.
3   A.   OKAY, FINE.  YOU HAVEN'T SUBMITTED THOSE QUESTIONS
4        TO THE COURT, AND THEY HAVE NOT APPROVED THOSE
5        QUESTIONS.  THEY DID NOT -- AND THEY SAID THAT I
6        AM TO ANSWER TO THE BEST OF MY ABILITY.
7   Q.   WHO SAID THAT?
8   A.   THE CLERK OF COURT.
9   Q.   WHEN?
10  A.   A COUPLE WEEKS AGO WHEN I GOT THIS.
11  Q.   IF YOU KNOW THE NAME, THEN THE BEST OF YOUR
12       ABILITY IS NOT REFUSING TO ANSWER.  IT'S TELLING
13       ME THE NAME.
14  A.   OKAY.
15  Q.   WHAT'S THE NAME?
16  A.   THAT'S WHERE I'M AT.
17  Q.   WHAT DOES THAT MEAN?
18  A.   THAT'S THE ANSWER I'M GIVING YOU.
19  Q.   YOU'RE REFUSING TO TELL ME THE NAME --
20  A.   YES.
21  Q.   -- OF HOW YOU --
22  A.   YES.
23  Q.   BUT YET YOU'VE SENT THIS LETTER OUT INDICATING
24       THAT YOU BELIEVE MR. SCHMIDT IS BEING INVESTIGATED
25       BY THE INTERNAL REVENUE SERVICE?

Page 26

1    A.    YOU SENT ME A WHOLE BUNCH OF THREATS, AND SO I

2          RESPONDED WITH A COUPLE OF THINGS IN MY

3          POCKETBOOK.

4    Q.    BUT, SEE, MINE ARE SUBSTANTIATABLE AND YOU'RE

5          REFUSING TO SUBSTANTIATE YOURS.  SO I'M TRYING TO

6          FIND OUT --

7    A.    IF IT CAME TO COURT, WHERE THAT WAS ASKED IN COURT

8          AND WAS FOUND RELEVANT IN COURT, I COULD

9          SUBSTANTIATE IT.  YOU CAN COMPEL THE COURT TO MAKE

10         ME ANSWER THAT QUESTION.  THANK YOU.

11   Q.    WHAT WAS THE NATURE OF THE INVESTIGATION THAT YOU

12         BELIEVE MR. SCHMIDT IS THE TARGET OF?

13   A.    NOT PAYING PROPER TAXES.

14   Q.    AND IS THERE ANYTHING ELSE?

15   A.    IS IT TRUE?

16   Q.    IS THERE ANYTHING ELSE YOU BELIEVE HE'S BEING

17         INVESTIGATED FOR?

18   A.    IS IT TRUE?

19   Q.    I'M SORRY?

20   A.    IS IT TRUE THAT HE'S BEING INVESTIGATED BY THE

21         IRS?

22   Q.    THIS IS A DEPOSITION OF YOU, NOT OF ME.

23   A.    OKAY.  WELL, THEN, I MEAN, IF YOU WANTED IT -- YOU

24         KNOW, IF YOU DON'T WANT THAT TO BE PUBLIC, THEN,

25         YOU KNOW, I WOULDN'T BRING THIS INTO THE RECORD.

Page 27

1    Q.    THIS IS A LETTER THAT YOU PUBLISHED IN A CASE THAT

2          ALREADY INVOLVES DEFAMATION CLAIMS.  DO YOU

3          UNDERSTAND THAT THIS SORT OF CLAIM IS DEFAMATORY

4          TO MR. SCHMIDT AND HIS BUSINESS?

5    A.    WE'RE NOT DISCUSSING THIS PARTICULAR ISSUE IN THIS

6          COURT CASE.  WE ARE DISCUSSING THE ARTICLE --

7    Q.    YOU BROUGHT IT UP IN THIS LETTER THAT YOU SENT

8          AND, AS FAR AS I KNOW, HAVE SENT TO THE COURT.

9    A.    THIS LETTER WAS SENT TO YOU AFTER YOUR DEFAMATORY

10          CHARGE.

11   Q.    THE CLOCK DOESN'T STOP.

12   A.    YOU HAVE NOT PULLED THIS IN AS EVIDENCE AS AN

13          AMENDED MOTION FOR DEFAMATION.  I MEAN, ARE YOU AN

14          ATTORNEY OR WHAT?  I MEAN THE COURT HAS --

15   MR. ELWELL:

16          OFF THE RECORD.

17   (DISCUSSION OFF THE RECORD)

18   EXAMINATION RESUMED BY MR. ELWELL:

19   Q.    ONE LAST TIME.  THE QUESTION IS, WHAT IS THE BASIS

20          OF YOUR INFORMATION THAT YOU INDICATE IN THIS

21          LETTER THAT INFORMS YOU THAT MR. SCHMIDT IS

22          POTENTIALLY BEING INVESTIGATED BY THE IRS?

23   A.    I HAVE BEEN MADE AWARE THAT HIS HEALTH CARE

24          COMPANY WENT -- AFTER IT WAS SOLD, HAD AN ISSUE

25          WITH PAYMENT OF TAXES FOR THAT MONEY.

Page 28

1   Q.   AND HOW IS IT THAT YOU CAME BY THAT INFORMATION?

2   A.   THAT INFORMATION IS PRIVY TO ME AND IS --

3   Q.   OF COURSE IT IS.  THAT'S WHY I'M ASKING YOU FOR

4        IT.  WHO TOLD YOU THAT?

5   A.   I WILL NOT DISCUSS THAT.

6   Q.   YOU'RE REFUSING TO ANSWER THE QUESTION?

7   A.   YES.

8   Q.   YOU INDICATE ALSO IN THIS PARAGRAPH THAT YOU WILL

9        MAKE THESE ITEMS PUBLIC RECORD IN A GREENVILLE

10       NEWS EDITORIAL ON THE SAME SUBJECT.  HAVE YOU

11       WRITTEN SUCH AN EDITORIAL?

12  A.   NO.

13  Q.   HAVE YOU SUBMITTED EDITORIALS TO THE GREENVILLE

14       NEWS THAT HAVE NOT BEEN PUBLISHED?

15  A.   NO.

16  Q.   THE NEXT PARAGRAPH SAYS, "I PLAN TO MAKE A

17       CONTENTION WITH THE COURT THAT BIDZIRK DOES NOT

18       HAVE A VIABLE BUSINESS PLAN AND IS THEREFORE

19       SEEKING OPERATING INCOME THROUGH LITIGATION."

20       WHAT IS YOUR BASIS FOR THAT STATEMENT?

21  A.   AMITHEONLYONE.ORG STATES THAT A VIABLE EBAY DROP-

22       OFF COMPANY MUST MAKE AT LEAST $35,000 A MONTH TO

23       REMAIN AFLOAT.  I HAVE INVESTIGATED MR. SCHMIDT'S

24       RENTAL PAYMENT ON HIS MILLS MILL STORE, HIS

25       CHERRYDALE STORE, AND THE UTILITIES FOR ALL THAT,

Page 29

1          THE AVERAGE UTILITIES FOR THOSE LOCATIONS, THE

2          PAYMENT THAT HE MAKES TO THE ACCOUNTANT, THE

3          PAYMENT THAT HE WAS MAKING TO HIS PHOTOGRAPHER,

4          THE PAYMENT TO MINIMUM WAGE BIDZIRK EMPLOYEES, THE

5          COST OF THE VAN, THE COST OF ADVERTISING.  ALL OF

6          THAT DOESN'T EVEN COME CLOSE TO PAYING EVEN ONE

7          ONE-HUNDREDTH OF HIS MONTHLY EXPENSES.

8    Q.    HOW HAVE YOU INVESTIGATED ALL THESE THINGS?

9    A.    I CALLED ALL THE COMPANIES THAT THOSE WERE

10         ASSOCIATED WITH.  I KNOW HOW MUCH IT COST TO WRAP

11         A CAR.  I KNOW HOW MUCH IT COST TO BUY A VAN.  I

12         KNOW HOW MUCH IT COSTS TO RENT THOSE LOCATIONS.

13   Q.    HOW DO YOU KNOW THAT?

14   A.    I CONTACTED THE CHERRYDALE POINT MANAGEMENT

15         COMPANY.

16   Q.    WHEN DID YOU DO THAT?

17   A.    BACK IN JULY.  I CONTACTED THE --

18   Q.    2006?

19   A.    YES.

20   Q.    WHY DID YOU DO THAT?

21   A.    BECAUSE YOU WERE SUING ME.

22   Q.    WHAT DOES THAT HAVE TO DO WITH ME SUING YOU?

23   A.    BY THE WAY, AMITHEONLYONE.ORG EXISTED WAY BEFORE

24         THAT INVESTIGATION.  SO THAT'S WHERE I GOT THAT

25         INITIAL INFORMATION, AND THEN I FOLLOWED UP.  I

Page 30

```
 1           ALSO CALLED ATLANTIC MANAGEMENT COMPANY OVER AT --
 2           WHATEVER THE WOODRUFF ROAD, THE POINT PLACE, IS
 3           CALLED.  AND THEIR RENT WAS $3,500 A MONTH.  THEY
 4           WERE NOT EVEN MAKING HALF OF THAT IN PROFIT A
 5           MONTH.
 6    Q.     DO YOU HAVE ANY INFORMATION THAT TELLS YOU WHAT
 7           BIDZIRK'S MONTHLY RECEIPTS ARE?
 8    A.     IT'S ALL UP ON EBAY.
 9    Q.     WHY IS IT ALL UP ON EBAY?
10    A.     I LOOK EVERY SINGLE DAY AND PULL THEIR AUCTIONS UP
11           FOR THE PAST 30 DAYS THAT END.
12    Q.     DO YOU KNOW IF BIDZIRK HAS ANY OTHER INCOME
13           SOURCES BESIDES EBAY?
14    A.     NOT THAT THEY PROMOTE.
15    Q.     SO THAT'S NO?
16    A.     NO, I DO NOT KNOW THAT.
17    Q.     DO YOU KNOW WHETHER BIDZIRK HAS VENTURE CAPITAL
18           FUNDING OR OTHER FUNDING TO OPERATE THE BUSINESS
19           UNTIL IT IS PROFITABLE, IF IT'S NOT PROFITABLE
20           NOW?
21    A.     ACCORDING TO AMITHEONLYONE.ORG, IT IS NOT POSSIBLE
22           FOR A LOCATION IN A SMALL CITY LESS THAN A MILLION
23           POPULATION TO SURVIVE UNLESS THEY MAKE $35,000 A
24           MONTH.  AND THAT'S SPLIT IN HALF.  $17,500 A MONTH
25           THAT YOU HAVE TO PULL IN, IN INCOME.  THESE STORES
```

Page 31

```
1          ARE GOING OUT OF BUSINESS TO THE TUNE OF TWO A

2          DAY.

3    Q.    BIDZIRK, AS FAR AS YOU KNOW, HAS NOT HAD A STORE

4          CLOSE?

5    A.    I HAVE EVIDENCE HERE IN MY LAPTOP THAT THEY ARE NO

6          LONGER A REGISTERED USER FOR TWO MONTHS ON EBAY.

7    Q.    DO YOU KNOW WHETHER THEY'RE CLOSING A STORE?

8    A.    THEY ALSO WERE OFF OF EBAY WITH THE BIDZIRK --

9    Q.    ARE YOU ANSWERING MY QUESTION, OR JUST RESPONDING

10         IN SOME KIND OF --

11   A.    I AM ANSWERING IT.

12   Q.    DO YOU KNOW IF THEY'RE CLOSING A STORE OR NOT?

13   A.    THEY HAD ON THEIR WEBSITE THAT THEY WERE OPENING

14         MULTIPLE STORES WITHIN THE NEXT YEAR, AND THOSE

15         HAVE NOT MATERIALIZED.

16   Q.    HOW MANY STORES ARE YOU AWARE OF THAT BIDZIRK HAS

17         NOW?

18   A.    THREE.  WELL, TWO AND A WAREHOUSE, I THINK, WHERE

19         THEY DO CARS OR SOME -- BE A LARGE INVENTORY.

20   Q.    AND WHAT'S THE CONTENTION THAT YOU HOPE TO MAKE

21         WITH THE COURT?  EVEN ASSUMING THAT BIDZIRK'S

22         OPERATING AT A LOSS EVERY MONTH, WHY DO YOU THINK

23         THE COURT'S INTERESTED IN THAT?

24   A.    YOU DON'T HAVE A VIABLE BUSINESS PLAN.  SO --

25   Q.    WHAT DOES THAT HAVE TO DO WITH ANYTHING INVOLVED
```

Page 32

1         IN THIS CASE?

2    A.   SO YOU'RE SUING ME TO EITHER MAKE IT LEGIT,

3         BECAUSE HE CAN'T PROVE TO HIS WIFE THAT IT WON'T

4         WORK.

5    Q.   WHAT DOES THAT MEAN?

6    A.   I MEAN -- IT MEANS WHAT IT MEANS.  YOU'RE SEEKING

7         SOME KIND OF VINDICATION OR OPERATING INCOME, OR

8         SOME KIND OF REASON WHY THIS BUSINESS IS FAILING.

9         AND YOU'RE BLAMING IT ON ME, WHEN THESE BUSINESSES

10        ARE GOING OUT OF BUSINESS TO THE TUNE OF TWO A

11        DAY.

12   Q.   AND DO YOU KNOW THAT BIDZIRK IS FAILING?

13   A.   THEY'RE NOT MAKING ENOUGH FOR OPERATING INCOME.

14   Q.   BUT YOU BASE THAT ON SOME CONJECTURE BASED ON SOME

15        OTHER WEBSITE THAT YOU'VE READ?

16   A.   BASED ON WHAT IS PUBLIC.  AND, YOU KNOW, I

17        COULD -- I GUESS IN MY DEPOSITION, I'LL ASK YOU

18        FOR YOUR TAX RECORDS AS FAR AS BIDZIRK GOES FOR

19        THE YEAR OF 2006.  I'M PRETTY SURE THAT I'LL BE

20        ABLE TO PROVE THAT.

21   Q.   AT THE TIME YOU MADE THIS STATEMENT THOUGH, YOU

22        DON'T HAVE ANY PROOF OF THAT?

23   A.   I DO HAVE REASONABLE OPINION THAT THAT'S THE

24        TRUTH.

25   Q.   YOU SAID THAT BIDZIRK IS SEEKING OPERATING INCOME

Page 33

```
 1        THROUGH LITIGATION.  WHAT DOES THAT MEAN?
 2   A.   I GUESS HE THOUGHT THAT I HAD A WHOLE BUNCH OF
 3        MONEY AND THAT I COULD --
 4   Q.   WELL, LET'S ASSUME THAT WE KNOW THAT YOU DON'T
 5        HAVE ANY.  SO WHY WOULD THIS STATEMENT BE
 6        ACCURATE?
 7   A.   YOU'RE NOT MAKING -- IF HE'S NOT MAKING ENOUGH
 8        MONEY MONTH TO MONTH, I MEAN, I GUESS HE HAS TO
 9        SAY, WELL, YOU KNOW, LET'S SUE FOR IT.
10   Q.   BUT YOU'RE BASICALLY JUDGMENT-PROOF, AREN'T YOU?
11        YOU DON'T HAVE ANYTHING TO PAY A JUDGMENT WITH?
12   A.   THAT'S CORRECT.
13   Q.   SO MR. SCHMIDT IS AWARE OF THAT.  SO WHY WOULD --
14   A.   HE WASN'T AWARE OF THAT AT THE TIME OF THIS
15        LETTER.
16   Q.   DO YOU HAVE SOME INFORMATION THAT CAUSES YOU TO
17        BELIEVE THAT MR. SCHMIDT THOUGHT YOU HAD A LOT OF
18        ASSETS PRIOR TO THE TIME THAT YOU WERE SUED?
19   A.   APPARENTLY YOU GUYS THOUGHT THAT I MADE A WHOLE
20        BUNCH OF MONEY OFF MY WEBSITE, AND THAT --
21   Q.   WHY DO YOU THINK THAT?
22   A.   BECAUSE YOU SAID SO IN COURT.  YOU SAID HE --
23   Q.   NO, I DIDN'T.
24   A.   YES, YOU DID.  I MEAN, GOD, COME ON, MAN.  GEEZ.
25   Q.   WELL, THAT WASN'T SAID.  SO --
```

Page 34

1    A.    DID YOU OR DID YOU NOT SAY THAT I MAKE AN INCOME

2          OFF OF MY WEBSITE?

3    Q.    YOUR WEBSITE DOESN'T QUALIFY FOR THE COMMERCIAL

4          EXCEPTION TO THE DILUTION RULES IN LANHAM.  THAT'S

5          WHAT I SAID, AND THE COURT AGREED.  THERE'S A CASE

6          ON POINT ABOUT IT.  IT HAS NOTHING TO DO WITH

7          WHETHER I INDICATED TO THE COURT YOU MADE ANY

8          SPECIFIC AMOUNT OF MONEY DOING SO.  THAT'S NOT THE

9          LEGAL ISSUE.

10   A.    BUT THEY ALSO RULED THAT I WAS NEWS AND NEWS

11         COMMENTARY.

12   Q.    THAT PART'S BEEN APPEALED.

13   A.    TWICE.  LOST TWICE.

14   Q.    IT'S NOT BEEN APPEALED TWICE.

15   A.    WELL, IT WAS DROPPED TO A DIFFERENT COURT, AND

16         THEN THAT COURT MADE THE DECISION, AND YOU

17         APPEALED THAT.

18   Q.    SO JUST TO GET THIS STRAIGHT, YOU DON'T HAVE ANY

19         IDEA ABOUT BIDZIRK'S BUSINESS PLAN OTHER THAN YOU

20         HAVE --

21   A.    YES, I DO.

22   Q.    -- A FIGURE IN MIND THAT BIDZIRK'S SUPPOSED TO

23         EARN, AND YOU DON'T BELIEVE THEY'RE EARNING IT,

24         BUT YOU'RE TAKING A GUESS AS TO WHETHER THEY'RE

25         EARNING IT OR NOT.

Page 35

1   A.   I'M MAKING A VERY REASONABLE ASSUMPTION BASED ON

2        MARKET RESEARCH FOR THIS AREA.  I HAVE ALSO

3        CONTACTED CHERYL BERG AND ASKED WHAT THE MARKET

4        RESEARCH FOR THIS AREA IS.  CHERYL BERG IS THE

5        OWNER OF I SOLD IT OVER ON WOODRUFF ROAD, OR THE

6        FORMER OWNER OF I SOLD IT ON WOODRUFF ROAD.  AND I

7        MADE THAT ASSUMPTION OFF OF A VERY REASONABLE

8        MARKET RESEARCH.

9   Q.   BUT AS YOU SIT HERE, YOU DON'T KNOW WHETHER

10      BIDZIRK'S MAKING A PROFIT OR NOT?

11  A.   I DO NOT.

12  Q.   AND YOU'RE ABSOLUTELY AWARE THAT BIDZIRK IS NOT

13      GOING TO EARN ANY OPERATING INCOME BY LITIGATING

14      AGAINST YOU?

15  A.   I AM AWARE OF THAT.  AND BY THE WAY, YOUR VERY

16      LINE OF QUESTIONING IS ANSWERED RIGHT AFTER THAT.

17      AND I DON'T KNOW WHY YOU'RE GOING TO ASK ME THAT.

18      AFTER ACCOUNTING FOR RENT, EMPLOYMENT, AND

19      OPERATING COSTS BETWEEN TWO LOCATIONS AND LOOKING

20      AT THE TOTAL NUMBER OF AUCTIONS OVER A 30-DAY-

21      PERIOD, IT IS IMPOSSIBLE, AS I HAVE ACCOUNTED FOR,

22      FOR BIDZIRK TO BE PROFITABLE.

23  Q.   WELL, I'M JUST ASKING YOU THE BASIS FOR THIS

24      STATEMENT.

25  A.   AND I GIVE YOU THE EVIDENCE RIGHT THERE.

Page 36

1    Q.    THAT'S NOT EVIDENCE.  THAT'S JUST MORE WRITING BY

2          YOU.

3    A.    NO.  THE TOTAL NUMBER OF AUCTIONS OVER A 30-DAY-

4          PERIOD, THE OPERATING COSTS BETWEEN TWO LOCATIONS.

5    Q.    BUT YOU'RE BASING THAT ON A TELEPHONE CALL YOU

6          MADE ABOUT WHAT'S THE RENT ON THAT SPOT, WHAT'S

7          THE RENT ON THAT LOCATION IN THAT SHOPPING CENTER?

8          OR DID YOU ASK ABOUT A DIFFERENT LOCATION THAN

9          ANYWHERE BIDZIRK ACTUALLY IS LOCATED?

10   A.    NO, I ASKED WHAT THE RENT FOR THAT PARTICULAR

11         LOCATION WAS.

12   Q.    AND WHO DID YOU SPEAK TO?

13   A.    WHOEVER THE MANAGEMENT COMPANY IS.  YOU KNOW, I

14         DON'T RECALL, BECAUSE THIS WAS WRITTEN A LONG TIME

15         AGO, YOU KNOW, BECAUSE WE -- BECAUSE YOU'VE

16         EXTENDED THE DUE PROCESS OUT SO LONG TO CONVOLUTE

17         THE ISSUE.

18   Q.    WHAT DOES THAT MEAN?

19   A.    YOU'VE MADE THIS -- YOU'VE DRAWN THIS OUT SO LONG

20         THAT THESE -- MOST OF THESE CONVERSATIONS AREN'T

21         EVEN RELEVANT ANYMORE.

22   Q.    AND HOW IS THAT --

23   A.    BECAUSE I DON'T KNOW THE NAMES.  I CAN'T REMEMBER

24         THE NAMES.

25   Q.    DID YOU CALL SOMEBODY UNDER THE PRETENSE THAT YOU

Page 37

1        WORKED FOR BIDZIRK AND YOU NEEDED TO VERIFY THE

2        RENT?

3    A.  NO.  THEY HAD A LOCATION RIGHT NEXT TO THEM, AND

4        I --

5    Q.  SO YOU DIDN'T ASK ABOUT BIDZIRK'S ACTUAL LOCATION.

6        YOU ASKED ABOUT A COMPARABLE PIECE OF SPACE?

7    A.  THAT IS CORRECT.

8    Q.  SO YOU DIDN'T CALL AND SAY, "WHAT'S BIDZIRK PAYING

9        ON THAT --

10   A.  THEY CAN'T REVEAL THAT INFORMATION TO ME.

11   Q.  THAT'S WHAT I WAS TRYING TO GET AT.

12   A.  BUT I ALSO ASKED PORT CITY JAVA, AND THEY WERE --

13       THEY DID REVEAL IT TO ME, AND ALL OF THE OTHER

14       BUSINESSES IN THERE DID REVEAL THEIR INCOME --

15       THEIR RENTAL PAYMENT TO ME.  SO I HAVE TO ASSUME

16       UNLESS MR. SCHMIDT, WHO I DON'T SEE HAD ANY

17       CONNECTIONS WITH THAT MANAGEMENT COMPANY, AS FAR

18       AS I COULD TELL, GOT THE SAME KIND OF GENERAL DEAL

19       OR MAYBE HE MADE A LONGER RENT AND GOT SLIGHTLY

20       OFF.  BUT IT'S WITHIN THE BALLPARK.

21   Q.  AND AGAIN YOU'RE JUST TAKING A GUESS ABOUT THAT?

22   A.  YES, I AM.

23   Q.  AND YOU FEEL COMFORTABLE GOING AHEAD AND

24       PUBLISHING SOME --

25   A.  YES, I DO.

Page 38

1    Q.    -- INFLAMMATORY REFERENCE ABOUT BIDZIRK'S BUSINESS

2          PLAN NOT BEING VIABLE?

3    A.    YES, I DO.

4    Q.    YOU INDICATE ALSO THAT THE WHOLE OF BIDZIRK IS

5          OPERATING ON EBAY ON FALSE PRETENSES.  WHAT DOES

6          THAT MEAN?

7    A.    THAT MIGHT BE WHY THOSE TWO ARE THERE.  ACCORDING

8          TO MY EBAY POWER REP, YOU ARE NOT ALLOWED TO HAVE

9          THESE -- YOU'RE NOT ALLOWED TO TAKE A CONSUMER

10         I.D. AND MAKE IT INTO A COMMERCIAL I.D. ON EBAY.

11   Q.    AND ARE YOU INJURED IN ANY WAY BY THAT?

12   A.    YES, BECAUSE YOU'RE SAYING THAT YOU'VE BEEN IN

13         BUSINESS ON EBAY SINCE OCTOBER 6TH, 2004, AND JULY

14         22ND, 2003, WHEN BIDZIRK ACTUALLY STARTED IN APRIL

15         OF 2005, AS FAR AS I'M AWARE.

16   Q.    EVEN ASSUMING THAT THAT'S SOMEHOW NOT KOSHER UNDER

17         EBAY'S INTERNAL RULES, DOES THAT INJURE YOU

18         PERSONALLY AT ALL?

19   A.    YES, BECAUSE IF MY -- IF SOMEONE IS SUSPECTING OF

20         PROBLEMS WITH BIDZIRK -- SAY THEY HAD A PROBLEM

21         WITH ONE OF THE ITEMS THAT THEY CONSIGNED.  THEN

22         THEY COULD SAY, WELL, YOU'VE BEEN ON EBAY SINCE

23         2003.  THAT MAKES A BIG DIFFERENCE, BECAUSE I'VE

24         BEEN ON EBAY TEN YEARS.  I GET A LOT MORE RESPECT

25         FOR WHAT I'M DOING.  BUT THEY CAN'T LEGITIMATELY

Page 39

1       SAY THAT THEY'VE BEEN ON EBAY SINCE JULY 22ND,

2       2003. THAT WAS BEFORE JILL AND TY EVER MET, I

3       THINK.

4   Q.   DOES THE FACT THAT THE I.D.'S ARE ARRANGED THE WAY

5       THEY ARE, HAS IT CAUSED ANY INJURY TO YOU

6       PERSONALLY?

7   A.   POTENTIALLY.

8   Q.   SO THAT'S NO, IT HASN'T YET?

9   A.   I'M NOT ABLE TO TELL THAT. THEY DIDN'T GET NEARLY

10      WHAT I THOUGHT THEY WOULD FOR MY AUCTIONS. AND SO

11      I DON'T KNOW WHETHER THAT HURT ME OR NOT.

12   Q.   DO YOU KNOW IF THAT HAS ANYTHING TO DO, EVEN

13      ASSUMING THAT'S TRUE, WITH HOW BIDZIRK IDENTIFIES

14      ITSELF ON EBAY?

15   A.   YES.

16   Q.   HOW DOES THE VALUE OF --

17   A.   ON REPUTATION. A MULTI-YEAR REPUTATION ON EBAY

18      MEANS A LOT TO YOUR CREDIBILITY, AS FAR AS YOU'RE

19      A SELLER.

20   Q.   BUT WHEN YOU GAVE ALL THIS INVENTORY TO BIDZIRK,

21      YOU KNEW THAT THEY HADN'T OPENED THE STORE UNTIL

22      APRIL OF 2005. SO WHY WOULD YOU TRADE IN YOUR --

23   A.   BUT I DIDN'T KNOW THIS INFORMATION TILL AFTER

24      THAT.

25   Q.   WHY WOULD YOU TRADE IN YOUR TEN YEARS' WORTH OF

Page 40

1           RESPECT ON EBAY, AS YOU PUT IT, FOR THE STATUS OF

2           A RELATIVE NEWCOMER ON EBAY?

3     A.    I'M SURE THAT THAT'S MEANT AS A CUT OR A --

4     Q.    WELL, JUST ANSWER THE QUESTION.  WHY WOULD YOU

5           SWAP REPUTATIONS IF YOU HAD SUCH A GREAT ONE OVER

6           TEN YEARS FOR SOMEBODY WHO IS NEW?

7     A.    I ENTRUSTED TY.  I ENTRUSTED TY, WHO IS A CLIENT

8           OF A CLIENT OF MINE, SO THAT I COULD SUPPORT MY

9           CLIENT.  I WOULD SUPPORT THEIR CLIENT.  AND I

10          WOULD GIVE THEM SOME INVENTORY THAT I HAD TOO MUCH

11          OF THAT I COULDN'T POSSIBLY, BETWEEN ME AND MY

12          ASSOCIATE, WHO WERE BUSY AT THE TIME, WHO ARE

13          TRYING TO SEEK OPERATING INCOME FOR SOME PROJECTS

14          THAT WE HAVE, WHICH I'VE ALREADY GIVEN YOU.  AND

15          WE WERE TRYING TO SEE OPERATING INCOME WHILE WE

16          TRAVELED THE COUNTRY TO PROMOTE THESE PRODUCTS.

17          THAT IS HOW ALL OF THIS WHOLE THING HAS HURT ME.

18          IT'S HOW EVERYTHING HAS JUST -- I MEAN --

19    Q.    BUT NONE OF THAT HAS ANYTHING TO DO WITH HOW

20          BIDZIRK IDENTIFIES ITSELF ON --

21    A.    YES, IT DOES.

22    Q.    YOU KNEW WHEN YOU DEPOSITED THE INVENTORY THERE

23          THAT THEY HAD OPENED THE STORE IN APRIL OF 2005,

24          NO MATTER HOW LONG THE I.D. HAD BEEN REGISTERED;

25          ISN'T THAT CORRECT?

Page 41

1    A.    HOLD ON JUST ONE SECOND.  I DON'T HAVE THIS EXACT

2          PAGE.  DO YOU HAVE INTERNET HERE?

3    Q.    YES, BUT I'M NOT GOING TO LET YOU ON MY ROUTER FOR

4          OBVIOUS REASONS.

5    A.    WELL, ON THIS "HOW IT WORKS" PAGE, I BELIEVE IT

6          SAYS, "WE HAVE MANY YEARS OF EXPERIENCE IN B-TO-B

7          BUSINESS."  THAT'S WHAT I BASED MY REPUTATION ON.

8    Q.    WHEN DID YOU LEARN THAT BIDZIRK OPENED IN APRIL OF

9          2005?  IS THERE ANY TIME PERTINENT TO THIS CASE

10         THAT YOU HAVEN'T KNOWN THAT?

11   A.    OKAY, IF YOUR WEBSITE SAYS "MANY YEARS OF

12         EXPERIENCE AND EXPERTISE IN B-TO-B BUSINESS," I

13         MEAN, YEAH, THAT'S WHAT I BASED IT ON.

14   Q.    HOW LONG HAVE YOU KNOWN THAT BIDZIRK OPENED IN

15         APRIL OF 2005?

16   A.    SINCE I MET TY AT BARNES AND NOBLE.

17   Q.    OKAY, THAT'S ALL, THEN.  IS SOMETHING FUNNY?

18   A.    WELL, YOU GUYS WERE LAUGHING AT THE LAST

19         DEPOSITION.  SO --

20   Q.    IS THERE SOMETHING FUNNY GOING ON NOW?

21   A.    YEAH, IT'S PRETTY FUNNY.

22   Q.    IS IT?

23   A.    I MEAN IT'S FUNNY THAT THIS IS EVEN GOING ON.  I

24         MEAN YOU'RE THE LAUGHINGSTOCK OF THE FRICKING

25         INTERNET.

Page 42

```
 1   Q.   HOW DO YOU FIGURE THAT?

 2   A.   EVERYBODY IS SAYING THAT THAT LAWYER MUST BE

 3        CRAZY.  YOU READ IT.  I SHOWED IT TO YOU.

 4   Q.   WELL, THAT'S THE PROFESSOR?

 5   A.   UH-HUH (AFFIRMATIVE).  AND YOU SAID HE DIDN'T HAVE

 6        ALL THE EVIDENCE.

 7   Q.   I THINK I POINTED OUT TO YOU THAT HE HASN'T READ

 8        THE BRIEFS AND THE COMPLAINT.

 9   A.   I SENT HIM THE WHOLE THING.

10   Q.   DO YOU HAVE A RECORDING OF MR. SCHMIDT ALLEGEDLY

11        MAKING THREATS TO YOU IN AUGUST OF 2005?

12   A.   YES, I DO.

13   Q.   IS THAT ON YOUR LAPTOP?

14   A.   NO, IT'S PROBABLY ON A BACKUP.

15   Q.   SO YOU'RE NOT SURE WHETHER IT'S ON YOUR LAPTOP?

16   A.   I'M PRETTY SURE IT'S NOT ON MY LAPTOP.

17   Q.   CAN YOU MAKE ABSOLUTELY SURE THAT IT'S NOT?

18   A.   THIS IS MY BIDZIRK FOLDER.

19   Q.   IF YOU CAN JUST LOOK AND TELL ME, THAT'S FINE.

20        YOU'RE UNDER OATH.

21   A.   I DON'T THINK THAT'S IN HERE.  I THINK THAT'S IN A

22        BACKUP.  I'VE CHANGED LAPTOPS RECENTLY.

23   Q.   ON THE THIRD PAGE OF THIS LETTER YOU INDICATE, "I

24        WOULD LIKE MR. SCHMIDT AND MR. ELWELL TO BE ON

25        NOTICE THAT, AS OF THIS POINT, I AM TAKING
```

Page 43

1          REACTIONARY STEPS TO REMEDY THE SITUATION."  WHAT

2          DOES THAT MEAN?

3    A.    I REPORTED THAT -- THAT'S ANSWERED NEXT.  I

4          REPORTED BIDZIRK TO THE BBB, WHICH YOU SAID THAT

5          WE'RE UNDER LITIGATION.  SO YOU AVOIDED -- THAT'S

6          A SNEAKY LAWYER TRICK TO GET SOMEBODY OUT OF A BBB

7          REPORT.  SECOND LETTER I REPORTED BIDZIRK TO

8          CONSUMER AFFAIRS, WHICH IS TRUE, WHICH IS ON THE

9          CONSUMER AFFAIRS WEBSITE, THE FTC WEBSITE.  I WAS

10         PLANNING A SIDEWALK PROTEST OF BOTH BIDZIRK

11         LOCATIONS.  I DID OBTAIN THE PERMIT, BUT I DID NOT

12         DO SO.  AND LIKE I SAID, THEY'RE NOT THREATS.

13         THEY'RE RESPONSES AND MY RIGHTS.  I HAVE THE RIGHT

14         TO PROTEST ACCORDING TO FIRST AMENDMENT.  OF

15         COURSE, I HAD THE RIGHT TO PUBLISH THAT ARTICLE

16         UNDER THE FIRST AMENDMENT.  AND SO YOU DON'T

17         RESPECT THAT EITHER.

18   Q.    YOU INDICATED THAT I ENGAGED IN A SNEAKY LAWYER

19         TRICK?

20   A.    YES.

21   Q.    WHICH WAS INFORMING THE BETTER BUSINESS BUREAU

22         THAT THE CASE WAS IN LITIGATION?

23   A.    YES.

24   Q.    HOW IS THAT SNEAKY?  IS THAT ANYTHING OTHER THAN

25         TRUE?

Page 44

1    A.    THAT'S TRUE, BUT ONLY A -- I MEAN IT'S KNOWN

2          ACROSS THE BOARD THAT THAT IS A TACTIC OF LAWYERS

3          TO NOT GET A BETTER BUSINESS BUREAU REPORT.

4          WEGENER MEDIA IN COLUMBIA DID THAT WHEN I REPORTED

5          THEM TO THE BETTER BUSINESS BUREAU.

6    Q.    WHY DID YOU REPORT THEM TO THE BETTER BUSINESS

7          BUREAU?

8    A.    BECAUSE THEY TOOK $400 FROM ME FOR A PROCESSOR.

9    Q.    AND HOW MANY TIMES HAVE YOU REPORTED OR MADE

10         COMPLAINTS TO THE BETTER BUSINESS BUREAU?

11   A.    TWENTY OR 30.

12   Q.    DO YOU REMEMBER AGAINST WHOM?

13   A.    DIFFERENT BUSINESSES -- BEST BUY, SINGULAR.

14   Q.    WHY HAVE YOU DONE THAT?

15   A.    THAT IS, YOU KNOW, THE SAME THING.  YOU KNOW, IT'S

16         ALWAYS SOMEBODY TRYING TO RIP ME OFF.  THAT'S WHY

17         YOU REPORT PEOPLE TO THE BETTER BUSINESS BUREAU.

18   Q.    DO YOU KNOW ANYBODY ELSE THAT'S REPORTED 20 OR 30

19         COMPLAINTS TO THE BETTER BUSINESS BUREAU?

20   A.    I RUN A CONSUMER ADVOCACY WEBSITE.

21   Q.    SO YOU SAY.  DO YOU KNOW ANYBODY ELSE THAT'S MADE

22         20 OR 30 COMPLAINTS?

23   A.    YEAH, JUST GO TO RIPOFFREPORT.COM AND LOOK AT HOW

24         MANY PEOPLE UNDER THEIR USER ACCOUNTS HAVE

25         SUBMITTED.

Page 45

```
1    Q.   SO YOU DON'T KNOW ANYBODY?

2    A.   YOU KNOW, I DON'T KNOW MANY PEOPLE LIKE ME.  I'M

3         UNIQUE.

4    Q.   SO AGAIN, ASSUME --

5    A.   YOUR CLIENT IS LAUGHING, BY THE WAY.  SO, I MEAN,

6         IF YOU THINK SOMETHING'S FUNNY, YOU SHOULD ASK

7         HIM.

8    Q.   ASSUME FOR THE SAKE OF MY QUESTION THAT THE BETTER

9         BUSINESS BUREAU CONTACTED ME AND ASKED ME THE

10        STATUS OF THE DISPUTE BETWEEN YOU AND BIDZIRK, AND

11        I SIMPLY SAID THAT THE CASE IS BEING LITIGATED.

12        YOU'D AGREE THAT THAT WOULDN'T BE ANYTHING EXCEPT

13        TRUE?

14   A.   I AGREE THAT IT WOULD BE TRUE, BUT THE ISSUE

15        BEHIND THAT IS THAT AVOIDS A BETTER BUSINESS

16        BUREAU REPORT.  AND IF SOMEBODY GOES ON TO THE

17        BETTER BUSINESS BUREAU WEBSITE, THEY DON'T SEE ANY

18        PROBLEMS.  SO THEY MAY NOT REPORT THEIR PROBLEM

19        THEMSELVES.  BUT IF THEY DO SEE A PROBLEM, THEY

20        MAY FEEL COMPELLED TO PRODUCE THEIR PROBLEM AS

21        WELL.

22   Q.   DO YOU THINK THAT BIDZIRK OUGHT TO SUFFER FROM

23        HAVING A BETTER BUSINESS BUREAU COMPLAINT LISTED

24        UNDER ITS NAME IF, FOR INSTANCE, IT PREVAILS

25        COMPLETELY IN THIS CASE?
```

Page 46

1   A.   IT HASN'T SO FAR.

2   Q.   THAT'S NOT MY QUESTION.  WOULDN'T IT BE WRONG FOR

3        BIDZIRK TO HAVE A COMPLAINT POSTED AGAINST IT ON

4        THE BBB WEBSITE --

5   A.   NO, BECAUSE ALL THE PROBLEMS THAT I HAD WITH THEM,

6        I HAD WITH THEM.  MY BETTER BUSINESS REPORT HAD

7        NOTHING REALLY TO DO WITH THIS.  IT HAD TO DO WITH

8        MY CONTRACT WITH BIDZIRK THAT THEY VIOLATED.

9   MR. ELWELL:

10       LET'S MARK THIS AS 6, PLEASE.

11  (EXHIBIT NO. 6 MARKED [1/4/06 BETTER BUSINESS BUREAU

12  LETTER]; ATTACHED)

13  EXAMINATION RESUMED BY MR. ELWELL:

14  Q.   I'LL ASK YOU TO TAKE A LOOK AT EXHIBIT 6.  TELL ME

15       IF YOU'VE SEEN THAT DOCUMENT BEFORE.

16  A.   WAS THIS THE LETTER THAT THEY ALSO SENT ME FROM

17       THE BETTER BUSINESS BUREAU?

18  Q.   I DON'T KNOW IF YOU GOT A COPY OR NOT.

19  A.   AND WHERE IS THE RESPONSE?  DO YOU HAVE THAT?

20  Q.   THE RESPONSE?

21  A.   DID YOU MAKE A RESPONSE?

22  Q.   NOT IN A LETTER.

23  A.   OKAY.

24  Q.   UNDER SETTLEMENT --

25  A.   I GUESS -- I MEAN, I GUESS I SAW THIS.  I SUPPOSE

Page 47

1           I HAVE THIS.

2    Q.    DO YOU RECOGNIZE UNDER CUSTOMER VERSION AND

3          SETTLEMENT EXPLANATION ON THE SECOND PAGE THAT

4          THERE'S TEXT THERE THAT YOU WOULD HAVE AUTHORED OR

5          ENTERED ON TO THE MEDIUM WEBSITE?

6    A.    YES.

7    Q.    UNDER SETTLEMENT EXPLANATION, DO YOU SEE AT THE

8          END THERE IT SAYS, "I ALSO EXPECT BIDZIRK TO STOP

9          HARASSING ME CONCERNING MY CONSTITUTIONAL RIGHTS

10         TO PUBLISH MY STORY FACTUALLY ON MY WEBSITE"?

11   A.    YES.

12   Q.    WOULD YOU AGREE THEN, THAT YOU HAVE MADE THE

13         SUBJECT MATTER OF THIS CASE PART OF YOUR BETTER

14         BUSINESS BUREAU COMPLAINT?

15   A.    OKAY.

16   Q.    CONSUMER AFFAIRS IS WHERE?

17   A.    THIS IS NOT PUBLISHED.  THIS PIECE OF INFORMATION

18         IS NOT PUBLISHED ON THE BETTER BUSINESS BUREAU

19         WEBSITE.  IT'S ONLY PUBLISHED AS AN EXPLANATION,

20         LIKE A GENERAL EXPLANATION.  I DON'T KNOW IF YOU

21         KNOW HOW THE BETTER BUSINESS BUREAU WEBSITE WORKS,

22         BUT THIS IS NOT PUBLISHED EVER ON THE BETTER

23         BUSINESS BUREAU WEBSITE.

24   Q.    I'M JUST ASKING IF YOU AGREE THAT YOU MADE THAT

25         CLAIM PART OF YOUR --

Page 48

1    A.    BUT I'M NOT CLAIMING THAT THIS IS PUBLIC, THAT

2          THIS --

3    Q.    I DIDN'T ASK THAT.

4    A.    OKAY, YES.  AND I'VE ALSO SAID ON MY WEBSITE THAT

5          I REPORTED YOU TO THE BBB.

6    Q.    AND CONSUMER AFFAIRS IS THE OFFICE LOCATED WHERE?

7          IN COLUMBIA OR GREENVILLE, OR WHERE IS IT?

8    A.    I THINK THAT'S NATIONAL.  THAT'S THE FEDERAL TRADE

9          COMMISSION.

10   Q.    AND DID YOU GET ANY SORT OF INVESTIGATIVE

11         CORRESPONDENCE FROM THE FTC?

12   A.    NO, YOU DON'T GET CORRESPONDENCE.  IT SAYS ON THE

13         WEBSITE THAT THEY DON'T RESPOND.

14   Q.    SO WHAT'S THE POINT IN REPORTING ANYBODY TO

15         CONSUMER AFFAIRS?

16   A.    IF ENOUGH PEOPLE REPORT A CERTAIN BUSINESS, WHICH

17         EBAY DROP-OFFS ARE SIGNIFICANTLY REPORTED ON THE

18         FEDERAL TRADE COMMISSION WEBSITE, THEN THEY

19         INVESTIGATE.  IT'S A -- IT'S LIKE A -- IT'S ALMOST

20         LIKE A CLASS ACTION TYPE EFFORT FROM THE FEDERAL

21         TRADE COMMISSION.

22   Q.    SO TO YOUR KNOWLEDGE, NOT ENOUGH PEOPLE HAVE

23         REPORTED BIDZIRK TO FTC TO CAUSE --

24   A.    A LOT OF PEOPLE HAVE REPORTED EBAY DROP-OFFS.

25         BIDZIRK IS AN EBAY DROP-OFF.

Page 49

1   Q.   DO YOU KNOW IF OTHER PEOPLE HAVE REPORTED BIDZIRK

2        TO THE FTC?

3   A.   THAT'S NOT A -- THERE'S NO WAY FOR ME TO FIND THAT

4        OUT.  THERE'S NOT INFORMATION AVAILABLE ON THE FTC

5        WEBSITE.

6   Q.   AND WHY DID YOU NOT PHYSICALLY PROTEST BIDZIRK

7        LOCATIONS?

8   A.   ONE IS BEING OF ALL THE DEPRESSION THAT THIS HAS

9        CAUSED ME.  AND, TWO, I JUST -- I REALLY JUST

10       HAVEN'T HAD THE TIME.  I'VE JUST -- I'VE BEEN

11       REALLY MAJORLY DEPRESSED OVER THIS PAST YEAR

12       CONCERNING THIS MATTER.  IT TAKES A LOT OF COURAGE

13       TO DO THAT.

14  Q.   WHY IS THAT?

15  A.   IT TAKES A LOT OF COURAGE TO GET OUT IN FRONT OF A

16       BUSINESS AND PROTEST THEM.

17  Q.   WELL, THAT'S NOT WHAT YOU'RE DOING ON THE INTERNET

18       IN FRONT OF MANY, MANY MORE PEOPLE THAN WOULD SEE

19       YOU WALKING AROUND IN A GORILLA SUIT ON THE

20       SIDEWALK ON MILLS AVENUE?

21  A.   SURE.  BUT, I MEAN, AGAIN, YOU KNOW, I MEAN

22       IT'S -- I'VE BEEN DEPRESSED.  I'VE BEEN

23       SIGNIFICANTLY DEPRESSED OVER THIS PAST YEAR OVER

24       THIS ISSUE.

25  Q.   HAVE YOU BEEN TREATED BY ANY PHYSICIAN CONCERNING

Page 50

1       DEPRESSION?

2   A.  I'VE BEEN TO THE DOCTOR SEVERAL TIMES AND I CAN

3       PRODUCE THOSE RECORDS.

4   Q.  WHO IS YOUR PHYSICIAN?

5   A.  DR. HUNTER IN CLEMSON.

6   Q.  ARE YOU TAKING ANY MEDICATION?

7   A.  NO, I'M NOT.

8   Q.  HAVE YOU TAKEN ANY MEDICATION DURING THE PENDENCY

9       OF THIS CASE RELATED TO DEPRESSION?

10  A.  NO, NOT DEPRESSION MEDICATION.

11  Q.  HAVE YOU HAD ANY MEDICATION FOR DEPRESSION

12      PRESCRIBED TO YOU THAT YOU HAVE NOT HAD FILLED?

13  A.  NO.

14  Q.  BACK ON EXHIBIT 5, WHERE YOU HAVE THE NUMBERED

15      PARAGRAPHS THERE NEAR THE BOTTOM OF THE PAGE WE

16      WERE JUST ON --

17  A.  OKAY.

18  Q.  NUMBER 8, "SMITH IS AN AMATEUR DEALER."  AND YOU

19      SAID, "THIS IS INSULTING.  I TAUGHT EBAY AT

20      GREENVILLE TECH."

21  A.  YES.

22  Q.  WHEN DID YOU TEACH EBAY AT GREENVILLE TECH?

23  A.  2000 TO 2002, TO THE LEAP PROGRAM.

24  Q.  WHAT IS THE LEAP PROGRAM?

25  A.  IT'S THE FURTHER LEARNING, HIGHER LEARNING FOR

Page 51

1        RETIRED PEOPLE AND FOR PEOPLE THAT DON'T WANT TO

2        GET A DEGREE.  IT'S CONTINUING EDUCATION.

3    Q.  HOW MANY SEMESTERS DID YOU TEACH?

4    A.  THREE.

5    Q.  HOW LONG WAS THE PROGRAM EACH TIME?

6    A.  TWO HOURS EVERY THURSDAY NIGHT FOR SIX WEEKS.

7    Q.  AND DID YOU HAVE A TITLE WHILE YOU WERE DOING

8        THAT --

9    A.  WHAT DO YOU MEAN?

10   Q.  -- RELATED TO GREENVILLE TECH?  WERE YOU CALLED AN

11       ADJUNCT PROFESSOR OR GUEST SPEAKER, OR WHAT WAS

12       YOUR TITLE?

13   A.  I MEAN -- I DON'T KNOW.  I MEAN, I GOT -- I'LL

14       GIVE YOU THE PAY STUBS.  I DON'T THINK THEY SAY

15       ANYTHING OTHER THAN MR. PHILIP SMITH.

16   Q.  AND HOW MANY PEOPLE WERE IN A CLASS?

17   A.  THEY RANGED FROM 15 TO 40.

18   Q.  AND DID ANYBODY TEACH THE CLASS WITH YOU?

19   A.  I HAD SEVERAL, YOU KNOW, GUEST SPEAKERS COME.

20   Q.  WERE YOU HIRED ON A SEMESTER-BY-SEMESTER BASIS?

21   A.  YES.

22   Q.  AND DID YOU HAVE TO DEAL WITH THE SAME PERSON EACH

23       SEMESTER TO HAVE YOUR ARRANGEMENT RENEWED TO COME

24       BACK AND TEACH THE CLASS?

25   A.  NO, IT WAS ALL RELATED TO EBAY UNIVERSITY, RIGHT

Page 52

1        BEFORE THEY STARTED UP EBAY UNIVERSITY.

2    Q.   WHO ACTUALLY SAID, OKAY --

3    A.   A GUY NAMED DEAN DEVLIN.

4    Q.   DEAN DEVLIN?

5    A.   UH-HUH (AFFIRMATIVE)

6    Q.   IS HIS GIVEN NAME DEAN, OR IS HE DEAN AS IN THAT'S

7        HIS TITLE WITH THE SCHOOL?

8    A.   HIS GIVEN NAME IS DEAN.

9    Q.   DO YOU KNOW WHY YOUR ENGAGEMENT AT GREENVILLE TECH

10      ENDED?

11   A.   BECAUSE THEY STARTED TO REQUIRE A BACHELOR'S

12      DEGREE FOR ALL PROFESSORS TO TEACH.

13   Q.   THEY FOUND OUT THAT YOU DIDN'T HAVE A COLLEGE

14      DEGREE?

15   A.   IT'S NOT THAT THEY FOUND OUT.  THE NEW REQUIREMENT

16      STARTED IN 2003 THAT YOU COULDN'T -- YOU HAD TO

17      HAVE A BACHELOR'S DEGREE TO TEACH ANY LEVEL OF

18      EDUCATION IN SOUTH CAROLINA.

19   Q.   YOU INDICATE ON THE NEXT PAGE, UNDER NUMBER 16,

20      THAT ACCOUNTS THAT YOU LIST IN THIS LETTER ARE

21      BACKED UP BY MULTIPLE WITNESSES, ONE OF WHICH IS

22      AN OWNER OF A BUSINESS THAT SAW MR. SCHMIDT

23      VERBALLY ABUSE ME.

24   A.   UH-HUH (AFFIRMATIVE).

25   Q.   WHO IS THAT?

Page 53

1    A.    THE OWNER OF PORT CITY JAVA.

2    Q.    WHO IS THAT?

3    A.    I DON'T RECALL HIS NAME RIGHT NOW.

4    Q.    AND YOU SAID HE WILL CONTEND IN COURT THAT HE

5          LOOKED AS THOUGH HE WAS ON THE EDGE OF PHYSICALLY

6          HARMING YOU?

7    A.    BECAUSE HE OWNS SEVERAL LOCATIONS.  I MEAN, I

8          COULD FIND HIM IF IT'S NECESSARY.  WHEN HE PUT HIS

9          FINGER IN MY FACE AND ALMOST TOUCHED MY NOSE AND

10         THREATENED ME AND THEN WALKED OUT OF THE BUSINESS.

11         AND DAVE BUZZELL, MY ASSOCIATE, WAS AT THAT

12         MEETING, AND WAS APPALLED BY THAT ACTION.  SO I

13         CAN HAVE HIM BACK IT UP AS WELL.

14   Q.    AND YOU HAVE A TAPE RECORDING OF THAT MEETING?

15   A.    YES, I DO.

16   Q.    AND IS THAT ON YOUR LAPTOP?

17   A.    NO, IT'S NOT.

18   Q.    YOU'VE ASKED SEVERAL TIMES DURING THIS CASE TO

19         FIRST GRANT YOU YOUR REQUIRED MEDIATION.  WHY IS

20         IT THAT YOU THINK THAT YOU'RE ENTITLED TO A

21         MEDIATION?

22   A.    IF YOUR INTENT HERE IS TO RESOLVE THE MATTER, THEN

23         YOU SIT DOWN WITH ME AND BE REASONABLE INSTEAD OF

24         HARASSING ME LIKE YOU'VE DONE, AND GET A

25         RESOLUTION.  THERE ARE MANY, MANY RESOLUTIONS THAT

Page 54

```
 1          WE COULD HAVE COME TO THAT ARE NON-COURT THAT I'M

 2          SURE MR. SCHMIDT WOULD HAVE BEEN MUCH MORE HAPPY

 3          WITH.

 4   Q.     DO YOU THINK I'M DOING SOMETHING THAT MAKES HIM

 5          UNHAPPY RIGHT NOW?

 6   A.     YES.

 7   Q.     YOU DO?

 8   A.     YES.

 9   Q.     AND THIS IS BASED ON YOUR EXTENSIVE KNOWLEDGE OF

10          MR. SCHMIDT?

11   A.     YES.

12   Q.     I SEE.  DO YOU THINK THAT I WOULD BE HERE IF I --

13   A.     BASED ON THE LAST MEETING THAT I HAD WITH HIM AT

14          PORT CITY JAVA, AND HOW QUICK HE IS TO ANGER, AND

15          BASED ON -- AND BASED ON --

16   Q.     DO YOU THINK I'M DOING ANYTHING BUT FOLLOWING MR.

17          SCHMIDT'S INSTRUCTIONS BY TAKING YOUR DEPOSITION?

18   A.     I'M SURE YOU'RE FOLLOWING HIS INSTRUCTIONS.  I --

19   Q.     HOW ARE YOU BEING HARASSED?

20   A.     HOW AM I BEING HARASSED?  I MEAN, IS THAT A

21          RHETORICAL QUESTION?

22   Q.     NO.

23   A.     WELL, FIRST OF ALL, THERE'S NO ATTORNEY THAT I

24          HAVE SPOKEN TO -- I MEAN NO ATTORNEY THAT I'VE

25          SPOKEN TO ON LINE, NO PERSON IN BUSINESS THAT I'VE
```

Page 55

1      SPOKEN TO ON LINE, NO OWNER OF AN EBAY DROP-OFF

2      STORE THAT I'VE SPOKEN TO THAT HAS GONE OUT OF THE

3      BUSINESS THAT WOULD POSSIBLY FOLLOW THIS LINE OF

4      BELITTLEMENT, HARASSMENT.  AND THE FACT THAT

5      KNOWING THAT HE COULD HAVE HAD AN EASY RESOLUTION

6      ON THIS.

7   Q.  I ASKED YOU WHAT'S BEEN DONE TO HARASS YOU WHEN

8      YOU SAID YOU'VE BEEN --

9   A.  I'M TELLING YOU.

10  Q.  -- HARASSED.

11  A.  I'M TELLING YOU.

12  Q.  AND THAT DOESN'T ANSWER THE QUESTION, I'M HARASSED

13     BECAUSE I'VE BEEN HARASSED.

14  A.  I GET PAPERWORK, UNNECESSARY PAPERWORK ALL THE

15     TIME.

16  Q.  WHEN IS THE LAST TIME YOU GOT ANY PAPERWORK FROM

17     ME?

18  A.  A COUPLE WEEKS AGO.

19  Q.  AND WHY WAS IT UNNECESSARY?

20  A.  WELL, A LOT OF TIMES YOU CITE CASES THAT AREN'T

21     EVEN RELEVANT TO THIS ISSUE.

22  Q.  AND YOU KNOW THAT BECAUSE OF YOUR LEGAL TRAINING

23     WHERE?

24  A.  WELL, I MEAN, I THINK -- I MEAN I THINK THE COURT

25     HAS ALREADY SAID IN THE RULING, IN THE INJUNCTION

Page 56

1       RULING THAT YOU WERE -- YOU'RE NOT ACCURATE IN

2       FILING THIS INFORMATION.  SO, I MEAN, OBVIOUSLY

3       YOU'RE THE ONE THAT'S WRONG.

4    Q.  I SEE.

5    A.  IS THAT NOT TRUE?

6    Q.  IS THERE SOME WAY THAT YOU FEEL YOU'VE BEEN

7       HARASSED OTHER THAN THE FACT THAT YOU GET SERVED

8       PAPERS IN THIS CASE, AS I'M REQUIRED TO DO UNDER

9       THE FEDERAL RULES?

10   A.  YES.  I FEEL THAT THIS HAS BEEN SUCH A DRAG ON MY

11      LIFE THAT IT'S HARASSING TO ME BECAUSE OF MY

12      STATUS WITH MY FAMILY NOW.  I'VE LOST A LOT OF

13      FAVOR WITH MY FAMILY, BECAUSE THEY JUST THINK THIS

14      IS A LOT OF DRAMA AND THEY DON'T UNDERSTAND WHY

15      YOU GUYS WON'T SETTLE IT.  AND IT'S BEEN A LOT OF

16      HARASSMENT.

17   Q.  WHAT EXACTLY WOULD YOU PROPOSE BE DONE TO SETTLE

18      THE CASE?

19   A.  BEFORE ALL OF THIS STARTED, WE COULD HAVE HAD A

20      MEETING.  I COULD HAVE HAD A RESPONSE FROM MR.

21      SCHMIDT ON MY WEBSITE, AND I WOULD HAVE BEEN

22      WILLING TO -- AND THIS IS WHERE YOU'VE TRIED TO

23      CLAIM THAT I WAS ASKING FOR MONEY, FOR CHANGING MY

24      ARTICLE.

25   Q.  YOU WERE.  YOU WERE ASKING FOR $500 --

Page 57

1    A.    I DID NOT.

2    Q.    -- IF YOU WOULD TAKE THE ARTICLE DOWN.

3    A.    I'M ACTUALLY OWED $500 STILL, BUT -- YOU KNOW, I

4          WAS NEVER PAID ANY INTEREST OR ANY MONEY ON A

5          CHECK THAT WAS 14 WEEKS LATE.  BUT WE COULD HAVE

6          SAT DOWN.  WE COULD HAVE MADE A RESPONSE ON MY

7          WEBSITE.  WE COULD HAVE --

8    Q.    DON'T YOU --

9    A.    WE COULD HAVE MADE A PUBLIC RESPONSE.  HE KNEW

10         THAT DAVE AND I HAVE BEEN ON EBAY A REALLY LONG

11         TIME.  WE COULD HAVE GONE BACK IN AND SAID, LOOK

12         WE CAN HELP TRY TO CHANGE ALL THESE THINGS.  WE

13         CAN MAKE THIS BETTER.

14   Q.    SO YOUR IDEA OF A SOLUTION WOULD HAVE BEEN

15         BASICALLY FOR MR. SCHMIDT TO ALLOW YOU TO REFORM

16         HIS BUSINESS MODEL INTO SOMETHING THAT YOU FIND

17         MORE PALATABLE?  IN OTHER WORDS, IF MR. SCHMIDT --

18   A.    NO, A BUSINESS MODEL THAT WORKS.

19   Q.    -- WOULD TAKE YOUR ADVICE, THEN YOU WOULD CONSIDER

20         THE CASE RESOLVED?

21   A.    A MEDIATION IS WHERE YOU SIT DOWN AND YOU SAY

22         HERE'S WHAT WE'LL DO, HERE'S WHAT WE'LL DO.

23   Q.    AND OTHER THAN OFFERING FREE ADVICE TO MR.

24         SCHMIDT, THAT HE EVIDENTLY DIDN'T WANT, WHAT --

25   A.    OFFER HIM A CHANCE TO RESPOND.

Page 58

1    Q.    AND ISN'T IT THE CASE THAT YOU REGULARLY EDIT OUT

2          DISPARAGING COMMENTS THAT COME INTO YOUR WEBSITE

3          AND ACCUSE PEOPLE OF TROLLING EVERY TIME SOMEBODY

4          SAYS SOMETHING BAD ABOUT YOU ON YOUR OWN WEBSITE?

5    A.    BILL O'REILLY DOES THE SAME THING.  RUSH LIMBAUGH

6          DOES THE SAME THING.

7    Q.    AND YOU'RE PUTTING YOURSELF ON A PAR WITH EITHER

8          ONE OF THOSE TWO, AS FAR AS --

9    A.    YES, BECAUSE RUSH LIMBAUGH DIDN'T GRADUATE

10         COLLEGE.  HE NEVER WENT TO JOURNALISM SCHOOL.  SO,

11         YES, I DO EQUATE MYSELF WITH RUSH LIMBAUGH.

12   Q.    AND YOU'RE CONTENDING THAT WHAT RUSH LIMBAUGH DOES

13         IS JOURNALISM?

14   A.    YES.

15   Q.    YOU INDICATE THAT YOU, "PLAN TO HAVE A GREENVILLE

16         NEWS, WYFF NEWS REPORTER WITH ME TO ANY AND ALL

17         MEETINGS."  HAVE YOU CONTACTED THE GREENVILLE NEWS

18         ABOUT COMING TO YOU WITH MEETINGS, OR COMING WITH

19         YOU TO MEETINGS?

20   A.    YES, I HAVE.

21   Q.    HAVE THEY DECLINED TO COME?

22   A.    I DIDN'T HAVE ANY MEETINGS WITH YOU.

23   Q.    AND DID THEY SAY LET US KNOW WHEN THE MEETINGS

24         ARE, AND WE'LL MAKE SURE WE HAVE SOMEBODY THERE?

25   A.    TIM WALLER SAID HE WAS INTERESTED FOR THE BUYER

Page 59

1        BEWARE.

2    Q.    AND WHEN WAS THAT?

3    A.    FEBRUARY, MAYBE.  I DON'T KNOW.

4    Q.    NEARLY A YEAR AGO?

5    A.    YEAH.

6    Q.    HOW ABOUT WITH WYFF NEWS?  DID ANYBODY EXPRESS

7          INTEREST IN ATTENDING MEETINGS WITH YOU?

8    A.    TIM WALLER IS WYFF NEWS.

9    Q.    HOW ABOUT THE GREENVILLE NEWS?  THAT'S WHAT I WAS

10         ASKING ABOUT FIRST.

11   A.    NO, I DIDN'T CONTACT THE GREENVILLE NEWS.

12   Q.    YOU'VE ALSO, ISN'T IT TRUE, POSTED INFORMATION ON

13         YOUR WEBSITE CRITICIZING THE BETTER BUSINESS

14         BUREAU FOREBEARING TO PUBLISH CRITICAL REPORTS ON

15         ITS WEBSITE WHEN LITIGATION IS PENDING?

16   A.    YES, THAT'S CORRECT.  BUT SO HAVE MANY OTHER

17         WEBSITES.  RIPOFFREPORT.COM HAS THE SAME THING ON

18         THEIR WEBSITE, THAT THE BETTER BUSINESS BUREAU IS

19         PRETTY MUCH USELESS BECAUSE IT ALLOWS THINGS LIKE

20         WHAT YOU DID.

21   MR. ELWELL:

22         MARK THAT AS NUMBER 7.

23   (EXHIBIT NO. 7 MARKED [DEFENDANT'S RESPONSE TO

24   COMPLAINT]; ATTACHED)

25   EXAMINATION RESUMED BY MR. ELWELL:

Page 60

1   Q.   SO IS IT YOUR CONTENTION THEN, WHEN I WAS ASKED

2        WHAT THE STATUS OF THE DISPUTE WAS, THAT I SHOULD

3        HAVE SAID IT'S IN LITIGATION BUT WE'D STILL LIKE

4        YOU TO PUBLISH HARMFUL INFORMATION ABOUT BIDZIRK

5        ON YOUR WEBSITE?

6   A.   NO, I COMPLETELY AGREE WITH WHAT YOU DID.

7   Q.   BUT IT'S A SNEAKY LAWYER TRICK, NONETHELESS; IS

8        THAT RIGHT?

9   A.   YES, IT IS.  YOU ONLY LEARN THAT FROM HAVING TO DO

10       IT BEFORE.  SO, I MEAN --

11  Q.   HOW'S THAT?  YOU HAVE INFORMATION THAT WOULD LEAD

12       YOU TO BELIEVE THAT I HAVE EVER RESPONDED TO A

13       BETTER BUSINESS BUREAU COMPLAINT PREVIOUSLY ON

14       BEHALF OF A CLIENT?

15  A.   NO, I DO NOT.

16  Q.   SO EVIDENTLY I COULD HAVE LEARNED IT SOME OTHER

17       WAY, IF I LEARNED IT AT ALL.

18  A.   SURE YOU COULD HAVE.

19  Q.   HOW DO YOU KNOW --

20  A.   COULD HAVE LEARNED IT ON LINE FROM A WEBSITE LIKE

21       MINE.

22  Q.   HOW DO YOU KNOW THERE WAS ANY SCHEME AT ALL, OTHER

23       THAN JUST TELLING THE TRUTH TO THE PERSON ASKING

24       ME ABOUT THE STATUS OF THE COMPLAINT?

25  A.   RIPOFFREPORT.COM SAYS THE EXACT SAME THING.  IT'S

Page 61

```
 1        A SCHEME OF OPPOSING ATTORNEYS TO -- I MEAN IT'S
 2        ALMOST VERBATIM FROM THEIR WEBSITE.  IT'S A SCHEME
 3        OF OPPOSING ATTORNEYS TO REPORT THAT THERE'S
 4        LITIGATION SO THAT YOU WON'T GET A BETTER BUSINESS
 5        BUREAU REPORT.
 6   Q.   YOU DON'T HAVE ANY WAY OF KNOWING WHETHER ANYTHING
 7        ON RIPOFFREPORT.COM IS CREDIBLE OR ACCURATE, DO
 8        YOU, OTHER THAN IT'S ON THE INTERNET?
 9   A.   I BELIEVE IT TO BE MORE CREDIBLE THAN THE BETTER
10        BUSINESS BUREAU, YES.
11   Q.   JUST BASED ON YOUR OPINION?
12   A.   YES.
13   Q.   ON EXHIBIT 7, CAN YOU TAKE A LOOK AT THAT?  THIS
14        IS A PAPER THAT YOU FILED ON APRIL THE 26TH OF
15        THIS YEAR.
16   A.   OKAY.
17   Q.   IT'S YOUR COUNTER SUIT THAT HAS SINCE BEEN
18        DISMISSED.
19   A.   BECAUSE OF LACK OF JURISDICTION ONLY.  YOU HAVE A
20        FEDERAL LAWSUIT.  I -- THIS IS STATE MATTERS.
21   Q.   WHY DID YOU BRING THEM IN THIS COURT, THEN?
22   A.   I WASN'T AWARE OF THAT AT THE TIME.  I THOUGHT
23        BECAUSE OF YOUR PENDANT ISSUES, WHICH ARE PRETTY
24        MUCH SIMILAR -- BUT ONCE YOUR CASE, IF IT WERE TO
25        BE DISMISSED, YOUR PENDENS WOULD BE DISMISSED AS
```

Page 62

1      WELL.  YOU'D HAVE TO RE-FILE IN STATE COURT, AND

2      SO WOULD I.  AND I COULD FILE ALL OF THESE IN

3      STATE COURT.

4   Q.   ON PAGE TWO, THE SECTION THAT BEGINS, "PLAINTIFF

5      HOLDS THESE TRUTHS TO BE SELF-EVIDENT IN THIS

6      MATTER," WHY DID YOU WRITE THAT?

7   A.   WHERE IS THAT?

8   Q.   IN BOLD UNDER ITEM NUMBER 10.  YOUR HOMAGE TO

9      THOMAS JEFFERSON, THAT YOU HOLD THESE TRUTHS TO BE

10     SELF-EVIDENT IN THIS MATTER.

11  A.   YEAH.

12  Q.   WHY?

13  A.   BECAUSE THE TRUTH IS SELF-EVIDENT.  JACK WHISPERS

14     WEBSITE IS NOT A COMMERCIAL ENTITY.

15  Q.   NOW YOU'VE LOST ON THAT ISSUE ALREADY, RIGHT?

16  A.   THAT DOESN'T MEAN THAT I'VE LOST IN THE TRIAL AT

17     ALL.  SO, I MEAN, I CAN PROVE THAT IT'S NOT A

18     COMMERCIAL ENTITY.  I DID FILE IN THE 2005 TAX

19     YEAR, WHICH I WILL PROVIDE TO YOU IF NECESSARY, AS

20     A NON-PROFIT.  I FILED AS A 501-C-3.  IN FACT, THE

21     WEBSITE POSTED AN ANNUAL LOSS, THIS IS TRUE,

22     BECAUSE IT DID NOT MATCH HOSTING AND RESEARCH

23     RELATED COSTS INVOLVED WITH A WEBSITE.  AND WHEN I

24     SAY THAT, THAT'S SELF-EVIDENT TOO.  IT'S OBVIOUS

25     THAT I DON'T MAKE A LOT OF INCOME FROM THAT

Page 63

```
 1        WEBSITE.  I SAY IT ON A REGULAR BASIS.
 2   Q.   WHEN DID YOU SUBMIT YOUR FORM 1023 TO THE IRS?
 3   A.   IN APRIL.
 4   Q.   AND DO YOU HAVE A RESPONSE BACK FROM THE SERVICE
 5        INDICATING THAT YOU'VE BEEN ACCEPTED AS A CHARITY,
 6        A CHARITABLE ORGANIZATION?
 7   A.   I'M NOT SURE ABOUT THAT.  I'M NOT POSITIVE OF
 8        THAT.  I'M SURE THAT MY --
 9   Q.   AND YOU FILED YOUR 1023 IN APRIL, BUT FOR THE 2005
10        TAX YEAR YOU FILED AS A NON-PROFIT CORPORATION?
11   A.   YES, I FILED AGAIN FOR THIS TAX YEAR.  FOR LAST
12        TAX YEAR, YES.
13   Q.   2005?
14   A.   YES.
15   Q.   SO YOU'RE SAYING THAT YOU DIDN'T SUBMIT A 1023
16        PRIOR TO THE END OF 2005?
17   A.   THAT IS CORRECT.  I FILED FOR THE PURPOSE OF THIS
18        CASE.
19   Q.   YOU FILED AS A 501-C-3 BEFORE YOU HAD BEEN GRANTED
20        THAT STATUS BY THE SERVICE, THEN?
21   A.   WHAT, NOW?
22   Q.   DO YOU UNDERSTAND THAT YOU HAVE TO HAVE AN
23        APPROVED 1023 IN WITH THE IRS BEFORE YOU'RE --
24   A.   YES, I DO.
25   Q.   -- A 501-C-3 CORPORATION?
```

Page 64

1   A.   YES, I DO.

2   Q.   AND YET YOU FILED AS A 501-C-3 FOR YOUR 2005 TAX

3        YEAR PRIOR TO FILING A 1023 TO BECOME A 501-C-3?

4   A.   YOU KNOW, THIS IS DETAILS THAT MY ACCOUNTANT HAS

5        GOT.  AND, YOU KNOW, I CAN'T ANSWER THAT

6        LEGITIMATELY.

7   Q.   BUT WOULD YOU AGREE THAT FILING AS A CHARITY WHEN

8        YOU'RE NOT A CHARITY IS AN IMPORTANT DETAIL

9        THAT --

10  A.   YES, AND I --

11  Q.   -- MAYBE YOU SHOULD TAKE ATTENTION TO?

12  A.   YOU'RE TRYING TO CATCH ME ON A TECHNICALITY, AND I

13       DON'T KNOW THAT.  I'M SURE THAT MY ACCOUNTANT HAS

14       HANDLED THAT IN THE BEST POSSIBLE WAY.  EVERYTHING

15       THAT I'VE DONE HAS BEEN ABOVE BOARD, AS FAR AS

16       THAT GOES.

17  Q.   YOU INDICATE IN THIS PARAGRAPH, "COMMERCIAL ENTITY

18       DEFENSE ONLY APPLIES TO A COMPETING VENTURE OR A

19       DILUTION OF A NAME TO A COMPETING VENTURE."

20       WHAT'S YOUR BASIS FOR THAT STATEMENT?

21  A.   WELL, FOR ONE, I AM NOT A COMPETITOR ON MY

22       WEBSITE.

23  Q.   WHAT'S YOUR BASIS FOR THE STATEMENT THAT THAT

24       DEFENSE ONLY APPLIES TO --

25  A.   THAT'S WHAT I'M TELLING YOU.

Page 65

1    Q.    -- A COMPETING VENTURE?

2    A.    I'M TELLING YOU A COMMERCIAL ENTITY -- IT'S A -- I

3          MEAN THAT'S A STATEMENT.  THAT'S ALL I CAN TELL

4          YOU.  THAT'S THE BEST I CAN TELL YOU.

5    Q.    YOU HAVE NO BASIS THAT YOU CAN SUPPLY US WITH FOR

6          THE STATEMENT THAT, "THE COMMERCIAL ENTITY DEFENSE

7          TO TRADE MARK DILUTION ONLY APPLIES TO A COMPETING

8          VENTURE"?

9    A.    THAT'S IT.

10   Q.    YOU HAVE NO BASIS FOR THAT STATEMENT?

11   A.    NO BASIS.

12   Q.    THE SAME THING ON THE THIRD PAGE, THE SECOND FULL

13         PARAGRAPH.

14   A.    IN A MINUTE CAN WE TAKE A 15-MINUTE BREAK?

15   Q.    SURE.  WE CAN TAKE ONE NOW, IF YOU'D LIKE.

16   A.    LET'S FINISH THIS EXHIBIT.

17   Q.    THE SECOND FULL PARAGRAPH.  "THE LANHAM ACT

18         SPECIFICALLY GRANTS NEWS AND NEWS COMMENTARY OF

19         ALL FORMS TO HAVE FAIR USE OF TRADEMARKS UNLESS

20         SPECIFICALLY MEANT AS A CAMPAIGN TO DEFAME A

21         COMPETITOR."  WHAT'S YOUR BASIS FOR THAT

22         STATEMENT?

23   A.    THE LANHAM ACT, WHICH I HAVE RIGHT HERE.  "THE

24         FOLLOWING SHALL NOT BE ACTUAL UNDER THIS SECTION."

25         IT DOESN'T EXPLAIN IN ANY WAY, NOT EVEN WITH CASE

Page 66

```
 1        LAW, ALL FORMS OF NEWS AND NEWS COMMENTARY.  NON-
 2        COMMERCIAL USE OF THE MARK.  WHEN I WAS MAKING
 3        THAT STATEMENT, I DON'T THINK THAT THIS HAD BEEN
 4        RESOLVED YET.  AND I DID NOT HAVE THAT
 5        CLARIFICATION FROM THE COURT.  AND I BELIEVE THAT
 6        ALSO I'M COVERED UNDER FAIR USE OF THE MARK,
 7        BECAUSE I'M NOT A COMPETITOR OF HIS.  IN OTHER
 8        WORDS, I'M NOT AN EBAY RE-SELLER AT
 9        JACKWHISPERS.COM.
10   Q.   WHERE DOES IT SAY IN THE LANHAM ACT THAT YOU HAVE
11        TO BE A COMPETITOR IN ORDER TO INFRINGE ON ONE'S
12        TRADEMARK?
13   A.   I JUST TOLD YOU.  THAT'S WHAT -- "FAIR USE OF A
14        FAMOUS MARK BY ANOTHER PERSON IN COMPARATIVE
15        COMMERCIAL ADVERTISING OR PROMOTION TO IDENTIFY
16        THE COMPETING GOODS OR SERVICES OF THE OWNER OF
17        THE FAMOUS MARK."
18   Q.   YOU DIDN'T DO ANY OF THOSE THINGS, DID YOU?  YOU
19        DIDN'T --
20   A.   I DID HAVE FAIR USE.  I DID HAVE NON-COMMERCIAL
21        USE OF THE MARK, EVEN THOUGH YOU SAY THE COURT
22        SAID DIFFERENTLY, AND I AM ALL FORMS OF NEWS AND
23        NEWS COMMENTARY.
24   Q.   SUBPARAGRAPH "A" STATES THAT THE FAIR USE IS IN
25        COMPARATIVE ADVERTISING, CORRECT?  AND YOU DIDN'T
```

Page 67

1           ENGAGE IN ANY COMPARATIVE ADVERTISING.

2    A.     "OR PROMOTION TO IDENTIFY THE COMPETING GOODS OR

3           SERVICES OF THE OWNER OF A FAMOUS MARK."

4    Q.     YOU HAVEN'T DONE THAT.  SO THAT DEFENSE WOULDN'T

5           APPLY TO YOU, WOULD IT?

6    A.     I DID IDENTIFY THE COMPETING GOODS AND SERVICES OF

7           THE OWNER.  ALL EBAY DROP-OFFS ARE HIS

8           COMPETITORS.

9    Q.     YOU DIDN'T DO THAT BY USING BIDZIRK'S TRADEMARK,

10          DID YOU?  YOU WEREN'T ATTEMPTING TO IDENTIFY A

11          COMPETITOR USING BIDZIRK'S TRADEMARK OR SOME --

12   A.     YES.

13   Q.     -- INFRINGEMENT OF IT?

14   A.     ABSOLUTELY I WAS.  I USED THEM TO INDICATE THAT

15          THEY'RE AN EBAY DROP-OFF AND THAT THEY HAVE THE

16          FAST AND FUN WAY TO SELL ON EBAY.  AND MY STORY

17          CENTERED AROUND IT WASN'T FAST AND IT WASN'T FUN,

18          JUST LIKE THIS DEPOSITION.

19   Q.     SO IF THERE IS A BASIS TO YOUR STATEMENT THAT

20          YOU'RE PERMITTED FAIR USE OF TRADEMARKS UNLESS

21          SPECIFICALLY MEANT AS A CAMPAIGN TO DEFAME A

22          COMPETITOR, YOU FIND THAT IN SUBSECTION "A" OF THE

23          ANTI-DILUTION ACT?  THAT'S THE ONLY PLACE THAT YOU

24          FIND THAT?

25   A.     OKAY, WHATEVER YOU SAY.

Page 68

1    Q.    I'M ASKING YOU WHAT YOU SAY.  IS THERE ANY OTHER

2          BASIS FOR THAT STATEMENT OTHER THAN WHAT YOU THINK

3          YOU READ IN PARAGRAPH "A" THERE?

4    A.    I -- IN A -- HERE I HAVE -- I AM IDENTIFYING THE

5          BUSINESS BY THEIR LOGO.  THE SLOGAN "FAST AND FUN

6          WAY TO SELL ON EBAY" WAS NOT TRUE IN MY

7          EXPERIENCE.  IT IS NOT A MATTER OF WHETHER A BLOG

8          IS A PROPER OUTLET.  MY SIDE IS SPECIFICALLY SET

9          UP AS A NEWS -- AS NEWS AND NEWS COMMENTARY.  I

10         HAVE BROKEN THREE MAJOR STORIES, AND MY DAILY POST

11         IS ABOUT COMMENTING ON THE NEWS AS APPLIES TO EBAY

12         AND APPLE, WHERE I MAKE MY LIVING SERVING IN THOSE

13         TWO AREAS OF EXPERTISE.

14   Q.    WHAT THREE STORIES HAVE YOU BROKEN ON YOUR

15         WEBSITE?

16   A.    JACK CAMPBELL GOING OUT OF BUSINESS.  BILL PALMER

17         RUNNING A FAKE CONTEST.  AND I RECEIVED AN HONOR

18         FOR MY SEVEN THINGS STEVE JOBS MISLED US ABOUT IN

19         THE PAST 20 YEARS.

20   Q.    WHAT HONOR WAS THAT?

21   A.    I GOT PART OF THE BLOG 100.

22   Q.    WHICH IS WHAT, SPECIFICALLY?

23   A.    C-NET NEWS HONORS THE TOP WEBSITES, AND I WAS

24         CHOSEN AS ONE OF THE FIVE APPLE WEBSITES.

25   Q.    AND THE BILL PALMER CONTEST IS THE INCIDENT

Page 69

1          SEVERAL MONTHS AGO, WHEN HE FAILED TO SEND YOU A

2          T-SHIRT THAT YOU'D WON?

3     A.   THAT'S CORRECT.

4     Q.   OR CONTENDED THAT YOU WON.  AND THAT WAS AN

5          IMPORTANT STORY THAT YOU BROKE ON YOUR WEBSITE?

6     A.   YEAH, I GOT A LOT OF HITS.

7     Q.   LATER ON THIS PAGE, YOU SAID, "BIDZIRK IS

8          CONTINUING FRIVOLOUS LITIGATION HOPING FOR A

9          TECHNICALITY OR A SLIP-UP IN DEFENDANT'S PRO SE

10         REPRESENTATION."

11    A.   YEAH, LET'S GO OVER THE PAST 20 MINUTES.

12    Q.   IS THAT EVEN AN ENGLISH SENTENCE?  I MEAN WHAT ARE

13         YOU SAYING THERE?

14    A.   DID YOU KNOW THAT THE FIRST FOUR PAGES OF THE "OLD

15         MAN AND THE SEA" ARE ONE SENTENCE?  I MEAN WHAT

16         DOES MY GRAMMAR HAVE TO DO WITH THIS CASE?

17    A.   I'M JUST ASKING YOU WHAT IT MEANS, WHAT THE

18         SENTENCE MEANS.  YOU'RE AN AWARD-WINNING WRITER,

19         EVIDENTLY.  SO I PRESUME THAT IF YOU WRITE A

20         SENTENCE, IT'S CORRECTLY CONSTRUCTED.

21    A.   WELL, NOT ALL GREAT WRITERS FORM GREAT SENTENCES.

22         THAT'S MY ANSWER TO THAT.  I MEAN, IF YOU CAN'T

23         UNDER --

24    Q.   WELL, ENDING WITH THE SYLLOGISM NOT ALL GREAT

25         WRITERS ARE GREAT WRITERS, I SUPPOSE I'M FINISHED

Page 70

1        WITH THAT EXHIBIT AND WE CAN TAKE OUR BREAK.

2    (OFF THE RECORD; BRIEF RECESS)

3    (EXHIBIT NO. 8 MARKED [DEFENDANT'S AMENDMENTS,

4    CLARIFICATIONS AND EXTENSIONS]; ATTACHED)

5    EXAMINATION RESUMED BY MR. ELWELL:

6    Q.    MR. SMITH, WE'LL MOVE ALONG.  I'VE PUT IN FRONT OF

7          YOU AN EXHIBIT MARKED NUMBER 8, A DOCUMENT YOU

8          FILED ON THE 17TH OF MAY.  THIS IS AN AMENDMENT, A

9          SET OF STATEMENTS CONCERNING YOUR COUNTERCLAIMS.

10   A.    YES.

11   Q.    I WANT TO DIRECT YOUR ATTENTION TO PAGE THREE, THE

12         ITEM NUMBERED 13.  IT SAYS, "TAMPERING.  NEW

13         EVIDENCE HAS INDICATED TO ME THAT BIDZIRK MAY BE

14         TAMPERING WITH GOOGLE SEARCH ENGINE RESULTS TO

15         AVOID THE ARTICLE IN QUESTION BEING SEEN.  A

16         CENSOR BOT FROM CSENTRY.COM HAS BEEN PLACED ON MY

17         ARTICLE IN THE APRIL TO MAY, 2006, TIME FRAME."

18   A.    YES.

19   Q.    JUST FOR THE RECORD, CAN YOU TELL US WHAT A CENSOR

20         BOT IS?

21   A.    A CENSOR BOT IS DEVELOPED TO PULL SEARCH ENGINE

22         RESULTS DOWN.  I GOOGLE BIDZIRK OFTEN TO SEE IF

23         THERE IS ANYTHING OTHER ABOUT THEM ON THE

24         INTERNET.  AND ONE OF THE PAGE TWO RESULTS ONE

25         TIME WHEN I CAME UP WAS FROM CSENTRY.COM, AND IT

1      HAD THE FIRST PARAGRAPH OF MY ARTICLE ON

2      CSENTRY.COM.  CSENTRY.COM MAKES A PRODUCT CALLED

3      SERMA, WHICH IS SEARCH ENGINE REPUTATION

4      MANAGEMENT.  I DON'T KNOW WHAT THE "A" -- I FORGET

5      WHAT THE "A" STANDS FOR.  BUT I JUST FIND THAT ODD

6      THAT A SEARCH ENGINE REPUTATION MANAGEMENT BOT IS

7      OUT THERE WITH MY STORY.  AND SUDDENLY MY STORY

8      WENT FROM NUMBER THREE ON GOOGLE SEARCH TO LIKE

9      PAGE TWO, LIKE AT THE BOTTOM OF PAGE TWO, LIKE THE

10     20TH RESULT ON PAGE TWO.  SO IN OTHER WORDS,

11     ALMOST 40 DOWN.  AND I JUST FOUND THAT VERY ODD.

12     AND NOT UNTIL I RE-PUBLISHED THE ARTICLE DID IT GO

13     BACK UP TO THE OTHER PAGES.  AND EVERY TIME

14     SOMEONE WOULD MENTION BIDZIRK VERSUS SMITH TRIAL

15     IN A LEGAL DISCUSSION ON THE INTERNET, THEIR

16     ARTICLE WOULD BE TOP.  AND BEFORE THAT POINT, I

17     WAS IN THE TOP OF THE SEARCH ENGINES.  SO I

18     CONTACTED CSENTRY.COM AND THEY WOULD NEITHER

19     CONFIRM NOR DENY WHETHER YOU ARE A CLIENT, BECAUSE

20     THEY DON'T DISCUSS THAT UNLESS THEY'RE SUBPOENAED.

21  Q.  AND YOU HAVE NO EVIDENCE OTHER THAN YOU SAID THE

22     PRESENCE OF A CENSOR BOT THAT ANYONE'S TAMPERED

23     WITH YOUR ARTICLE; IS THAT RIGHT?

24  A.  YOU DON'T GET ON THE CSENTRY.COM WEBSITE UNLESS

25     SOMEBODY ASKS YOU TO BE THERE.

Page 72

1    Q.   DO YOU KNOW WHO DID IT?

2    A.   I DO NOT.

3    Q.   BUT YOU INDICATED TO THE COURT THAT YOU THINK

4         BIDZIRK DID IT.

5    A.   I BELIEVE SO.

6    Q.   WHY DO YOU THINK THAT?

7    A.   IT'S SEARCH ENGINE REPUTATION MANAGEMENT.  THAT'S

8         WHAT YOU'RE GETTING ON TO ME ABOUT, IS THAT YOU'RE

9         RANKED -- ONE OF THE THINGS YOU'RE GETTING ON TO

10        ME ABOUT IS YOUR RANK IN THE SEARCH ENGINES, THAT

11        WHEN YOU -- I MEAN THAT'S THE ONLY WAY PEOPLE CAN

12        GET TO MY ARTICLE.

13   Q.   IT'S TRUE, ISN'T IT, THAT YOU GOOGLE BIDZIRK A LOT

14        BECAUSE YOU WANT TO MAKE SURE THAT YOUR ARTICLE

15        STAYS NEAR THE TOP OF THE RESULTS LIST?

16   A.   I CAN'T MAKE MY ARTICLE GO TO THE TOP OF THE

17        RESULTS LIST.

18   Q.   BUT YOU HAVE --

19   A.   I GOOGLE BIDZIRK TO SEE IF ANYBODY ELSE IS SAYING

20        ANYTHING ABOUT EBAY DROP-OFFS OR BIDZIRK, OR

21        ANYTHING ELSE.

22   Q.   BUT WHEN THE ARTICLE FELL IN THE RESULTS LIST FOR

23        WHATEVER REASON, YOU RE-PUBLISHED YOUR ARTICLE SO

24        THAT IT WOULD BE HIGHER UP IN THE RESULTS LIST,

25        CORRECT?

Page 73

```
 1   A.   THAT IS CORRECT.

 2   Q.   AND YOU'VE RECENTLY, AS LATE AS AUGUST OR SO,

 3        POSED AS A THIRD PARTY AND LINKED TO YOUR ARTICLE

 4        ON ANOTHER MESSAGE BOARD TO TRY AND GET PEOPLE TO

 5        GO TO IT?

 6   A.   I HAVE NEVER POSED AS A THIRD PARTY ON ANOTHER

 7        WEBSITE.  CAN YOU TELL ME WHAT THAT INVOLVED?

 8   Q.   WE'LL GET TO THAT.

 9   A.   WHATEVER.

10   Q.   BUT YOU HAVE NO EVIDENCE THAT BIDZIRK IS

11        RESPONSIBLE FOR PLACING A CENSOR BOT ON YOUR

12        ARTICLE?

13   A.   AND I SAID BIDZIRK MAY.  SO --

14   Q.   AND DO YOU KNOW WHETHER USE OF THE SERMA SOFTWARE

15        PRODUCT IS VIOLATIVE OF ANY LAW?

16   A.   YES, GOOGLE DOES NOT ALLOW IT ACCORDING TO GOOGLE

17        POLICY.

18   Q.   DOES IT VIOLATE ANY STATUTE THAT YOU'RE AWARE OF?

19   A.   GOOGLE DOESN'T ALLOW IT IN THEIR SEARCH ENGINES

20        EVEN THOUGH THAT'S WHAT THEY SPECIFICALLY DESIGNED

21        THE SOFTWARE FOR.

22   Q.   GOOGLE'S RULES ARE NOT STATUTES.  DO YOU KNOW IF

23        ANY LEGISLATION PROHIBITS USE OF SERMA SOFTWARE TO

24        MANIPULATE SEARCH RESULTS?

25   A.   I'M NOT SURE.
```

Page 74

1    Q.   SO EVEN IF BIDZIRK DID THAT, AND I'M CERTAINLY NOT

2         SAYING THAT IT DID, YOU DON'T KNOW OF ANY LEGAL

3         VIOLATION THAT THAT WOULD REPRESENT?

4    A.   I'M NOT SURE, BUT THERE MIGHT BE ONE.

5    Q.   BUT YOU DON'T KNOW?

6    A.   I DON'T KNOW.  BUT REMOVING MY ARTICLE FROM THE

7         SEARCH ENGINE HAS A -- YOU KNOW, HAS AN OBVIOUS

8         ADMISSION OF GUILT ON YOUR PART.

9    Q.   HOW IS THAT?

10   A.   WELL, IF IT WAS TRUE AND YOU DIDN'T WANT THE -- I

11        MEAN -- I DON'T KNOW.  I'VE ANSWERED THAT GOOD

12        ENOUGH.

13   Q.   IF I TOLD YOU THAT BIDZIRK HAD NOT DONE THAT, IS

14        THERE ANY OTHER REASONABLE POSSIBILITY THAT

15        SOMEONE ELSE DID THAT?

16   A.   THERE CERTAINLY IS A POSSIBILITY.  I DON'T KNOW

17        WHY THEY WOULD HAVE, IF THEY WEREN'T BIDZIRK.  BUT

18        -- BECAUSE I KNOW IT WASN'T ME, AND I KNOW THAT I

19        COULD POTENTIALLY SUBPOENA OR YOU COULD SUBPOENA

20        CSENTRY.COM AND FIND OUT WHO DID IT.

21   (EXHIBIT NO. 9 MARKED [DEFENDANT'S REQUEST FOR

22   DISMISSAL]; ATTACHED)

23   EXAMINATION RESUMED BY MR. ELWELL:

24   Q.   I'LL SHOW YOU EXHIBIT 9, WHICH IS A PAPER THAT YOU

25        FILED ALSO ON MAY 17TH.  THIS APPEARS TO BE A

Page 75

```
 1          STATEMENT THAT I THINK WAS TO ACCOMPANY EXHIBIT 8.

 2          YOU WRITE ON HERE, "JACKWHISPERS.COM, EDITOR

 3          PHILIP SMITH, REGULARLY POSTS ON THE TOPIC OF EBAY

 4          AND THE TECHNOLOGY INDUSTRY.  SMITH WAS IN HIS

 5          CONSTITUTIONAL RIGHT AND ETHICAL RIGHT TO PUBLISH

 6          THE STORY AS STANDS.  SMITH HAS WON MULTIPLE

 7          AWARDS FOR HIS WRITING."

 8   A.     UH-HUH (AFFIRMATIVE).

 9   Q.     WHAT HAVE YOU WON FOR YOUR WRITING?

10   A.     I WAS IN THE BLOG 100, AND I DON'T KNOW IF YOU

11          VISITED THAT PAGE.  BUT DARING FIREBALL, WHICH IS

12          WIDELY, WIDELY RESPECTED, ALSO GOT THAT HONOR.

13          AND I HAVE WON MULTIPLE AWARDS THROUGHOUT JUNIOR

14          HIGH AND HIGH SCHOOL FOR MY WRITING.  I HAVE --

15   Q.     TELL US WHAT THOSE ARE.

16   A.     I WON THE BEN ROBERTSON ESSAY CONTEST.

17   Q.     WHEN WAS THAT?

18   A.     SOMETIME IN JUNIOR HIGH.  I CAN'T REMEMBER.

19   Q.     HOW OLD ARE YOU NOW?

20   A.     THIRTY-TWO.

21   Q.     SO YOU'RE ATTEMPTING TO TRADE ON A CERTIFICATE

22          THAT YOU WON WHEN YOU WERE 12 OR 13?

23   A.     RUSH LIMBAUGH DIDN'T GRADUATE FROM COLLEGE OR HIGH

24          SCHOOL.  HE DID GRADUATE FROM HIGH SCHOOL.  SORRY.

25   Q.     YOU'RE EQUATING YOURSELF WITH RUSH LIMBAUGH?
```

1    A.   YES.

2    Q.   HOW SO?

3    A.   HE'S OFTEN SEEN AS A DIFFERING OPINION ON SOME

4         THINGS.  HE OFTEN GOES INTO DETAIL WITH A LOT OF

5         HIS STORIES.  HE IS OFTEN PANNED BY THE PEOPLE

6         THAT DO NOT LIKE HIM.  AND --

7    Q.   AND A LOT OF PEOPLE DON'T LIKE YOU AND CRITICIZE

8         YOU?

9    A.   A LOT OF PEOPLE DON'T LIKE BILL O'REILLY EITHER.

10   Q.   BUT IS THAT CORRECT, A LOT OF PEOPLE DON'T LIKE

11        YOU AND CRITICIZE YOU?

12   A.   SURE, BUT THEY DO IT TO ALL JOURNALISTS WHO WRITE

13        A STORY ABOUT THEM.

14   Q.   OTHER THAN JUNIOR HIGH SCHOOL, WHAT OTHER AWARDS

15        HAVE YOU WON FOR YOUR WRITING?  LET ME JUST ASK

16        YOU, HAVE YOU EVER WON AN AWARD FOR YOUR WRITING

17        OTHER THAN BEING LISTED IN THE BLOG 100 SINCE YOU

18        STARTED THE JACK WHISPERS BLOG, OR WHATEVER IT'S

19        PREDECESSOR WAS CALLED?

20   A.   NO, BUT I'VE BEEN CONSIDERED FOR THE WEB LOG

21        AWARDS.  I MEAN, I HAVE --

22   Q.   AND CONSIDERED MEANING THAT YOU --

23   A.   THE BLOG 100'S IS A PRETTY PRESTIGIOUS WIN.  I

24        MEAN, THAT MEANS THE TOP 100 BLOGS EVER.

25   Q.   HOW IS THAT PICKED?

Page 77

1    A.    THROUGH READER SUGGESTIONS, AND THEN THE STAFF OF

2          C-NET REVIEWS THOSE.

3    Q.    DO YOU KNOW WHO NOMINATED YOUR BLOG ORIGINALLY?

4    A.    I MEAN IT HAS TO COME FROM MULTIPLE NOMINATIONS.

5    Q.    YOU PUT YOUR NAME IN THOUGH, DIDN'T YOU?

6    A.    I'M SURE I DID.  BUT THEY DON'T JUST PUBLISH

7          ANYBODY'S.  I MEAN EVERY SINGLE APPLE BLOG OUT

8          THERE PUT THEIR NAME IN.  AND IT SAYS MULTIPLE

9          SUBMISSIONS FROM THE SAME IP WILL NOT BE

10         CONSIDERED.  SO IT HAD TO BE AROUND THE SAME

11         AMOUNT AS DARING FIREBALL GOT, AND THAT WEBSITE

12         GETS AROUND TWO MILLION HITS A MONTH.

13   Q.    DO YOU KNOW HOW MANY HITS YOUR WEBSITE GETS A

14         MONTH?

15   A.    YES.

16   Q.    BASED ON WHAT?

17   A.    GOOGLE IMPRESSIONS AND MY OWN SERVING ACCOUNT.  I

18         HAVE A DOMAIN NAME THAT SERVES SOME OF THE

19         PICTURES FOR THAT WEBSITE, AND IT SERVES THE

20         PICTURE ON THE MAIN -- ONE OF THE PICTURES ON THE

21         MAIN PAGE.  AND I CAN SEE HOW MANY PEOPLE HAVE

22         LOADED THAT IMAGE.

23   Q.    AND WHAT IS THAT DOMAIN?

24   A.    WHAT DO YOU MEAN?  JACKWHISPERS.COM AND

25         FIXYOURTHINKING.COM.

Page 78

1   Q.   WHEN WERE YOU NAMED IN THE BLOG 100?

2   A.   I'M NOT SURE.

3   Q.   IT WASN'T 2005?

4   A.   I DON'T THINK SO.  I THINK IT'S 2004, LATE 2004.

5   Q.   AND PRIOR TO THAT, WHEN WAS THE LAST AWARD THAT

6        YOU WON FOR YOUR WRITING?  HIGH SCHOOL?

7   A.   ON MY WEBSITE?  I MEAN, I CAN'T THINK OF ANYTHING

8        ELSE.  BUT, YOU KNOW, I PUBLISHED ARTICLES FOR MAC

9        CENTRAL AND MAC MINUTE.

10  Q.   WHEN WAS THAT?

11  A.   YOU KNOW, SINCE 2000.

12  Q.   DID THOSE WIN ANY AWARDS?

13  A.   NO, BUT THEY DIDN'T ASK ME NOT TO WRITE FOR THEM

14       ANYMORE.

15  Q.   OKAY, I'M JUST TALKING ABOUT THIS STATEMENT YOU

16       MADE IN HERE.  "SMITH HAS WON MULTIPLE AWARDS FOR

17       HIS WRITING."  I MEAN YOU'RE CREATING THE

18       IMPRESSION THAT YOU ARE AMASSING AWARDS AS WE

19       SPEAK.

20  A.   YES, I AM.

21  Q.   AND THIS ISN'T MUCH DIFFERENT THAN ME SAYING I WON

22       THE KICK BALL CONTEST IN KINDERGARTEN, SO I SHOULD

23       BE WORKING FOR THE SEAHAWKS KICKING FIELD GOALS,

24       RIGHT?

25  A.   OKAY.

Page 79

1   Q.   YOU'RE TRYING TO CREATE AN IMPRESSION BASED ON A

2        RATHER LONG HISTORY THAT DOESN'T NECESSARILY

3        CONTINUE THROUGH THE PRESENT.

4   A.   WHATEVER YOU SAY.

5   Q.   WELL, I MEAN, WOULD YOU AGREE OR DISAGREE?  YOU

6        WON A CERTIFICATE FOR AN ESSAY YOU WROTE WHEN YOU

7        WERE 12.  DO YOU THINK THAT'S RELEVANT TO A COURT

8        FILING WHEN --

9   A.   SURE IT DOES.

10  Q.   -- YOU'RE 32?

11  A.   I'VE ALWAYS WANTED TO WRITE, AND I HAVE A HISTORY

12       OF WRITING, AND I DO SO NOW.

13  Q.   WHAT DOES THAT HAVE TO DO WITH YOU TELLING A COURT

14       THAT YOU'VE WON MULTIPLE AWARDS FOR YOUR WRITING?

15       LET ME BACK UP.  WOULD YOU AGREE THAT CREATES THE

16       IMPRESSION THAT YOU ARE --

17  A.   ANYONE IN MY FAMILY, ANY ONE OF MY FRIENDS WOULD

18       AGREE WITH THAT AS WELL.

19  Q.   THAT YOU'VE WON MULTIPLE AWARDS FOR YOUR WRITING?

20  A.   YES.  AND I CAN'T -- I JUST -- I MEAN IT'S NOT

21       COMING TO THE TOP OF MY HEAD, BECAUSE I DON'T LIVE

22       IN THE GLORY OF MY KICK BALL AWARDS, LIKE YOU

23       SAID.

24  Q.   BUT YOU'RE LIVING IN THE GLORY OF YOUR JUNIOR HIGH

25       SCHOOL ESSAY CONTEST WIN, EVIDENTLY; IS THAT

Page 80

```
 1        RIGHT?
 2   A.   I SUPPOSE SO, MR. ELWELL.
 3   Q.   YOU INDICATE HERE, "THIS CASE WITH THE LEGAL
 4        PAPERWORK AND THE PROCEDURAL BUREAUCRACY ARE AN
 5        IMMENSE FINANCIAL AND SOCIAL BURDEN UPON ME."
 6        WHAT IS THE FINANCIAL BURDEN THAT YOU'VE SUFFERED
 7        FROM THIS CASE?
 8   A.   I'VE HAD TO PAY SOME CONSULTING FEES.  I'VE HAD TO
 9        PAY FOR A LOT OF PHONE CALLS.  I'VE LOST
10        CONTRACTS.  I HAVE LOST -- I LOST MY JOB AT THE
11        COMPUTER CLINIC BASED ON THIS.
12   Q.   WHAT HAVE YOU PAID FOR IN CONSULTING FEES?
13   A.   ROUGHLY A THOUSAND.
14   Q.   AND WHO HAVE YOU PAID THAT TO?
15   A.   TO CARPENTER, TO LEGALZOOM.COM, TO SEVERAL -- YOU
16        KNOW, SEVERAL WEBSITES FOR ATTORNEYS' ADVICE.
17   Q.   YOU'VE ESSENTIALLY GOTTEN E-MAIL ADVICE FROM
18        ATTORNEYS FOR A FEE?
19   A.   YES.
20   Q.   HOW MANY TIMES HAVE YOU DONE THAT?
21   A.   THREE OR FOUR.
22   Q.   SO IS IT FAIR TO SAY THAT EACH OF THE
23        CONSULTATIONS THAT YOU'VE HAD WERE $200 TO $250,
24        IF YOU SPENT $1,000 ON ALL OF IT?
25   A.   YES.
```

Page 81

```
 1   Q.   AND WHY WOULD YOU NOT BUY AN HOUR OF A LOCAL
 2        ATTORNEY'S TIME AND GO SIT WITH HIM OR HER IN HIS
 3        OR HER OFFICE TO DISCUSS YOUR CASE AS OPPOSED TO
 4        SENDING E-MAILS AROUND?
 5   A.   FOR ONE, THIS ISSUE IS SO COMPLICATED AND
 6        CONVOLUTED THAT NO ATTORNEY EVEN REMOTELY
 7        UNDERSTANDS IT, UNLESS YOU GET DOWN TO THE PURE
 8        PARTS OF THE LAW, LIKE YOUR -- FOR INSTANCE, WHEN
 9        YOU DID THAT LIS PENDENS, THAT WAS A -- I'M LOSING
10        MY TRAIN OF THOUGHT.  A DEFAMATION OF TITLE.  I
11        CAN'T REMEMBER WHAT IT'S CALLED.
12   Q.   THIS IS A COMPLEX CASE AND LAWYERS DON'T
13        UNDERSTAND IT, BUT YOU THINK THAT YOU UNDERSTAND
14        IT; IS THAT RIGHT?
15   A.   I WAS INVOLVED IN IT.  SO I GUESS I UNDERSTAND IT,
16        DON'T I?
17   Q.   I HAVEN'T SEEN ANY EVIDENCE OF THAT.  BUT I'M
18        ASKING YOU IF YOU THINK YOU UNDERSTAND THE LEGAL
19        PRINCIPLES THAT WORK IN THIS CASE BETTER THAN A
20        LAWYER WOULD THAT YOU CONSULT WITH LOCALLY.
21   A.   WELL, APPARENTLY YOU DON'T EVEN UNDERSTAND IT,
22        BECAUSE THEY -- YOU LOST THE INJUNCTION HEARING.
23        AND YOU'RE MOST LIKELY GOING TO LOSE THE FEDERAL
24        APPEAL.
25   Q.   WHY DO YOU THINK THAT?
```

Page 82

1    A.   EVERY ATTORNEY THAT I'VE SPOKEN TO THROUGH E-MAIL,

2         THROUGH -- AND MR. CARPENTER -- HAVE SAID IT'S

3         UNFATHOMABLE WHY YOU'RE CONTINUING THIS ACTION.

4         AND THAT IF, ON THE REMOTE CHANCE THAT YOU DO WIN,

5         WE JUST FILE AN APPEAL AND GET AN ATTORNEY.

6    Q.   WHY HAVEN'T YOU DONE THAT YET, THEN?

7    A.   BECAUSE I DON'T HAVE THE MONEY.

8    Q.   WELL, WHY WILL YOU HAVE THE MONEY IF YOU LOSE AT

9         THE FOURTH CIRCUIT?

10   A.   I -- YOU KNOW, I'LL FIND A WAY.

11   Q.   WHY HAVEN'T YOU FOUND A WAY NOW?

12   A.   I HAVEN'T NEEDED IT.

13   Q.   SO THE IMMENSE FINANCIAL BURDEN IS A THOUSAND

14        DOLLARS.  IS THERE ANYTHING ELSE?

15   A.   THAT'S A LOT TO ME.  PLUS I LOST MY JOB AT

16        COMPUTER CLINIC BASED ON THIS ACTION.

17   Q.   WERE YOU AN EMPLOYEE THERE?

18   A.   I WAS A CONTRACT CUSTOMER FOR ALL THEIR APPLE

19        WORK.

20   Q.   HOW MUCH DID YOU EARN WORKING THERE A YEAR?

21   A.   ROUGHLY 1,400 TO 1,800 A MONTH.

22   Q.   AND YOU LOST THAT JOB BECAUSE OF THIS CASE?

23   A.   YES.  YOU RECEIVED THAT AFFIDAVIT FROM MIKE LANE

24        AT COMPUTER CLINIC.

25   Q.   WHO DRAFTED THAT AFFIDAVIT?

Page 83

```
 1   A.   HE DID.

 2   Q.   YOU DIDN'T PRESENT IT TO HIM AND SAY, "PLEASE TAKE

 3        A LOOK AT THIS AND SIGN IT"?

 4   A.   NO.

 5   Q.   AND DO YOU KNOW WHY YOU DIDN'T HAVE YOUR CONTRACT

 6        RENEWED?

 7   A.   ONE OF THE THINGS IS THEY WERE CONCERNED ABOUT

 8        THIS LAWSUIT AND THIS LITIGATION.  ALSO BECAUSE

 9        HERLONG LAW FIRM WAS INVOLVED IN AN OPPOSING CASE

10        AGAINST THEM AS WELL.

11   Q.   WHAT DOES THAT HAVE TO DO WITH ANYTHING?

12   A.   THE HERLONG LAW FIRM WAS INVOLVED IN ANOTHER CASE

13        THAT THEY WERE CURRENTLY TRYING, AND THEY THOUGHT

14        THAT THIS MIGHT HAVE AN IMPACT ON THEM AS FAR AS

15        THEIR CASE WENT.

16   Q.   DO YOU KNOW WHY THAT IS?

17   A.   I MEAN THAT'S WHAT MIKE LANE SAID, AND THAT'S WHAT

18        MIKE'S ATTORNEY SAID.

19   Q.   BUT YOU DON'T KNOW WHAT THE CONNECTION WOULD BE OR

20        COULD BE?

21   A.   THEIR CASE WAS A SIMILAR ISSUE.  THEY HAVE A

22        PATENT ON A PIECE OF SOFTWARE, AND THE HERLONG LAW

23        FIRM IS REPRESENTING THE PEOPLE WHO ARE SUING THEM

24        OVER IT.

25   Q.   DO YOU KNOW WHAT THE STATUS OF THAT CASE IS?
```

Page 84

1   A.   I BELIEVE IT'S BEEN SETTLED AT THIS POINT, BUT IT

2        WAS JUST RECENTLY.  I'M NOT SURE.  I REALLY DON'T

3        KNOW.  I BELIEVE IT'S BEEN SETTLED.

4   Q.   AND SO YOU DON'T ACTUALLY KNOW WHAT ABOUT THAT

5        CASE WOULD HAVE IMPACTED THIS CASE, OR VICE-VERSA?

6   A.   THE DAILY DRAG THAT THIS HAD ON ME OF HAVING TO

7        RESPOND TO ALL THIS STUFF, HAVING TO CONCENTRATE

8        ON ALL THIS STUFF, HAVING TO DO ALL THE RESEARCH

9        FOR THIS STUFF TOOK A DRAG ON MY CONTRACT WORK

10       WITH THEM.  AND THEY COULD NO LONGER RELY ON ME AS

11       A FULL-TIME CONTRACTOR.

12  Q.   YOU HAVEN'T RESPONDED TO EVERYTHING THAT'S BEEN

13       SERVED TO YOU, RIGHT?

14  A.   I BELIEVE I RESPONDED TO THE BEST OF MY ABILITY.

15  Q.   AND HAVE YOU CITED ANY CASES AT ALL IN ANYTHING

16       THAT YOU'VE FILED?

17  A.   YES, TUCKER MAX.

18  Q.   IS THAT A REPORTED CASE, TO YOUR KNOWLEDGE?

19  A.   YES.

20  Q.   AND WHAT RESEARCH DID YOU HAVE TO DO TO FIND THE

21       NAME OF THAT CASE, OR ANYTHING ABOUT THAT?

22  A.   IT WAS PRETTY POPULAR ON THE INTERNET.

23  Q.   SO YOU KNEW ABOUT IT ALREADY.  I'M TRYING TO GET

24       AT WHAT'S ALL THIS RESEARCH THAT YOU'VE HAD TO DO

25       THAT BASICALLY DOMINATED YOUR ATTENTION AND CAUSED

Page 85

1          YOU TO LOSE YOUR JOB.

2     A.   WELL, YOU'VE SENT ME -- I MEAN, I DIDN'T BRING THE

3          FOUR FILE FOLDERS FULL OF STUFF THAT YOU'VE SENT

4          ME ALONE, AND THEN THE COURT SENDS ME A LOT OF

5          INFORMATION AS WELL.  THEY USUALLY SEND REDUNDANT

6          COPIES OF WHATEVER YOU'VE SENT THEM BECAUSE I'M

7          PRO SE.  AND SO, YOU KNOW, IT TAKES A WHILE TO GO

8          OVER THAT PAPERWORK.  AND I HAVE TO GOOGLE CERTAIN

9          TERMS AND LOOK THAT UP.  AND I HAVE TO MAKE PHONE

10         CALLS AND THINGS LIKE THAT.  SO IT TAKES A LOT OF

11         MY TIME.

12    Q.   WHAT KIND OF PHONE CALLS?

13    A.   TO FRIENDS, FAMILY.

14    Q.   HOW OFTEN?  HOW MANY HOURS A DAY DO YOU SPEND ON

15         THIS CASE?

16    A.   ONE TO TWO.

17    Q.   AND WHAT ARE YOU DOING DURING ONE TO TWO HOURS A

18         DAY?

19    A.   I'M PREPARING MY RESPONSES.

20    Q.   WHEN IS THE LAST TIME YOU FILED A RESPONSE TO

21         ANYTHING?

22    A.   THE LAST TIME YOU GOT PAPERWORK.

23    Q.   SEVERAL MONTHS AGO?

24    A.   NO, YOU GOT SOME PAPERWORK AT THE END OF NOVEMBER.

25    Q.   WHICH WAS WHAT?

Page 86

1    A.    I CAN'T EVEN REMEMBER NOW.  SORRY.

2    Q.    THE LAST PARAGRAPH OF THIS EXHIBIT, NUMBER 9, YOU

3          ASK THAT YOU BE, "GRANTED AN INJUNCTION AGAINST

4          BIDZIRK FOR CONTACTING OTHER NON-RELEVANT SUBJECTS

5          OF ARTICLES I HAVE DONE AND CONTINUED TO POST ON

6          MY WEBSITE."  WHO ARE THESE NON-RELEVANT SUBJECTS

7          OF ARTICLES?

8    A.    BILL PALMER AND JACK CAMPBELL.  THEY ARE BOTH

9          HIGHLY MENTALLY UNSTABLE PERSONS.

10   Q.    WHY DO YOU SAY THAT?

11   A.    JACK CAMPBELL HAS BEEN TREATED FOR CLINICAL

12         SCHIZOPHRENIA.  AND, I MEAN, FOR YOU TO JEOPARDIZE

13         THE RELATIONSHIP THAT I HAVE WITH HIM, WHICH IS A

14         VERY, VERY UNIQUE ONE, HAS CAUSED ME A LOT OF

15         STRESS WITH HIM.  BECAUSE NOW, YOU KNOW, HE'S --

16         I'M SURE HE'S JUST LIKE GRINNING AND THINKING,

17         WOW, THAT'S GREAT WHEN HE'S, YOU KNOW, TELLING ME

18         OTHERWISE.  BILL PALMER IS --

19   Q.    I THOUGHT YOU SAID HE WAS A GOOD FRIEND OF YOURS,

20         JACK CAMPBELL.

21   A.    HE IS A GOOD FRIEND OF MINE.

22   Q.    BUT YOU THINK HE'S GRINNING THAT SOME TROUBLE'S

23         BEING CAUSED YOU, OR HE THINK YOU'RE BEING CAUSED

24         TROUBLE?

25   A.    LEX LUTHOR WAS A GOOD FRIEND OF SUPERMAN.

Page 87

1    Q.    LEX LUTHOR'S A COMIC BOOK CHARACTER.

2    A.    OKAY.

3    Q.    SO YOU CONSIDER HIM --

4    A.    PEOPLE HAVE A LOT OF RELATIONSHIPS LIKE THAT.

5          STEVE JOBS AND BILL GATES.  BILL GATES HATES STEVE

6          JOBS.  I MEAN IT'S A KNOWN FACT.  IT'S A KNOWN

7          FACT THAT THEY HATE EACH OTHER, BUT THEY GET

8          ALONG.  THEY GO TO EACH OTHER'S SUMMER HOMES

9          TOGETHER TO TALK.  THERE'S A REAL LIVE CASE FOR

10         YOU.

11   Q.    SO YOU AND JACK CAMPBELL ARE IN A RELATIONSHIP

12         WHERE YOU HATE EACH OTHER, BUT YOU'RE FRIENDS?

13   A.    I WOULDN'T SAY I HATE HIM.

14   Q.    BUT HE HATES YOU, AS FAR AS YOU KNOW?

15   A.    I WOULDN'T SAY HE HATES ME.  I SAID IT WAS

16         ADVERSARIAL.

17   Q.    BUT HE GRINS IF HE THINKS YOU'RE BEING CAUSED SOME

18         KIND OF PAIN?

19   A.    SURE.  SURE, AND I'M SURE BILL PALMER DOES TOO.

20   Q.    AND WHY DO YOU THINK BILL PALMER IS MENTALLY

21         UNSTABLE?

22   A.    HE'S TALKED ABOUT ALL OVER THE INTERNET AS WELL.

23         AND HE'S A PATHOLOGICAL LIAR.

24   Q.    BILL CAMPBELL IS?

25   A.    BILL PALMER IS.

Page 88

```
 1   Q.   BILL PALMER.  EXCUSE ME.

 2   A.   BILL PALMER IS A PATHOLOGICAL LIAR.  I MEAN THAT'S

 3        A PROVEN FACT.

 4   Q.   DOES ANYBODY ON THE INTERNET, THAT YOU'RE AWARE

 5        OF, CONSIDER YOU TO BE MENTALLY UNSTABLE OR A

 6        LIAR, OR PSYCHOLOGICALLY --

 7   A.   I'M SURE PEOPLE POST THAT, BUT THEY POST THAT

 8        ABOUT --

 9   Q.   -- COMPROMISED?

10   A.   -- BILL O'REILLY AND RUSH LIMBAUGH, TOO.

11   Q.   YOU AND BILL AND RUSH ARE THREE OF A KIND, AREN'T

12        YOU?

13   A.   I LIKE THEM BOTH, GOOD GUYS.

14   Q.   "THE NICHE I COVER IN MY REPORTING TENDS TO LEAN

15        TOWARDS REPORTING ON SOME OF THE LESS MENTALLY

16        STABLE PERSONS IN THE TECH INDUSTRY."

17   A.   YES.

18   Q.   IS THAT ANYBODY OTHER THAN JACK CAMPBELL AND BILL

19        PALMER?

20   A.   YOU KNOW, DAVE WEGENER FROM WEGENER MEDIA.

21   Q.   AND YOU FILED A BBB COMPLAINT AGAINST HIS COMPANY?

22   A.   YES, THAT'S CORRECT.

23   Q.   BECAUSE YOU THINK HE TOOK $400 FROM YOU, AND IN

24        YOUR VIEW THAT MAKES HIM MENTALLY UNSTABLE?

25   A.   WELL, HE -- I MEAN IF YOU LOOK AT HIS BETTER
```

Page 89

1         BUSINESS BUREAU REPORT, IT SAYS -- AND YOU LOOK AT

2         MULTIPLE POSTS ALL OVER THE INTERNET, THEY SAY

3         THAT HE JUST LIES TO YOU AND THAT HE SAYS ONE

4         THING AND THEN DOESN'T DO IT.

5    Q.   WHAT'S YOUR OPINION OF MR. SCHMIDT'S MENTAL

6         STABILITY?

7    A.   IT WASN'T TOO GREAT DURING OUR LAST MEETING WHERE

8         HE GOT UP AND PUT HIS FINGER IN MY FACE AND SAID,

9         "I'LL SUE YOU."

10   Q.   ARE YOU ANY SORT OF AUTHORITY ON MENTAL HEALTH

11        ISSUES?

12   A.   NO.

13   Q.   YOU DON'T HAVE ANY EDUCATION THAT WOULD ALLOW YOU

14        TO IDENTIFY OR DIAGNOSE MENTAL DISABILITY?

15   A.   NO, SIR.

16   Q.   HAS YOUR OPINION OF MR. SCHMIDT'S MENTAL STABILITY

17        CHANGED DURING THE PENDENCY OF THIS CASE?

18   A.   I DON'T THINK HE'S VERY MENTALLY STABLE.

19   Q.   WHY IS THAT?

20   A.   YOU KNOW, NO ONE IN THEIR RIGHT MIND WOULD

21        CONTINUE TO BATTER ME LIKE THIS KNOWING THAT

22        THEY'RE NOT GOING TO GET ANYTHING OUT OF IT.

23   Q.   WOULD YOU AGREE THAT REASONABLE PEOPLE CAN --

24   A.   AND NO ONE WOULD PAY AN ATTORNEY THE FEES THAT

25        THEY'VE GIVEN YOU AND JUST -- I MEAN, I JUST DON'T

Page 90

1       UNDERSTAND IT.  NOT A CHRISTIAN WOULD, I DON'T

2       THINK.

3   Q.  JUST BECAUSE YOU DON'T UNDERSTAND IT DOESN'T MEAN

4       IT'S THE PRODUCT OF A MENTALLY UNSTABLE MIND, DOES

5       IT?

6   A.  YOU KNOW, I DON'T KNOW.  I HAVEN'T INTERVIEWED

7       ANYBODY ELSE.  I PROBABLY COULD, THOUGH.

8   Q.  AND YOU SAY, "I'M BEING DEFAMED OVER BIDZIRK'S

9       ACTIONS IN SEVERAL FORMS AROUND THE INTERNET BY

10      THOSE WHO OPPOSE MY EDITORIALS."  WHERE ARE YOU

11      BEING DEFAMED IN THE INTERNET?

12  A.  YOU KNOW, THOSE COMMENTS THAT YOU MENTION ON MY

13      WEBSITE.  YOU KNOW, WHENEVER I POST ABOUT THIS,

14      THEY SAY, "HA, HA, HA.  YOU'RE GETTING SUED.  GOOD

15      LUCK."

16  Q.  BUT YOU JUST ERASE THOSE AND CALL THEM TROLLS,

17      RIGHT?

18  A.  NOT NECESSARILY.  SOMETIMES I DO.  SOMETIMES I

19      DON'T.  IT DEPENDS ON WHETHER THEY'RE WORTHY OF

20      COMMENTING ON.  AND I'M NOT SO SURE IF THAT'S NOT

21      YOU AND TY, OR JILL OR SOMEBODY, POSTING THOSE

22      ANYWAY.

23  Q.  AND AGAIN YOU HAVE NO EVIDENCE WHATSOEVER THAT

24      ANYBODY HAS --

25  A.  WELL, I COULD BE ABLE TO COMPARE IP ADDRESSES.

Page 91

1   Q.   HAVE YOU DONE THAT?

2   A.   NO, BUT I MIGHT.

3   Q.   AND SO DON'T YOU THINK THAT PERHAPS YOU SHOULD DO

4        THAT, AND FIND OUT THAT IT IS SOMEONE THAT YOU

5        KNOW POSTING UNDER A PARTICULAR NAME LIKE

6        ANONYMOUS?

7   A.   I DON'T CARE.  I DON'T CARE WHO'S SAYING THAT.

8   Q.   THEN WHY WOULD YOU DO IT?

9   A.   BECAUSE THEY'RE TROLLS, JUST LIKE YOU SAID.  BILL

10       O'REILLY DOESN'T RESPOND TO PEOPLE LIKE THAT.

11       RUSH LIMBAUGH CUTS PEOPLE OFF THAT START DOING

12       THAT.

13  Q.   DON'T YOU THINK BILL O'REILLY PROBABLY GETS MANY

14       THOUSANDS OF TIMES AS MANY COMMENTS AS YOU DO A

15       DAY, AND MAYBE HE CAN'T GET TO ALL OF THEM?

16  A.   I GET A LOT OF POSITIVE COMMENTS.  I GET A LOT OF

17       POSITIVE COMMENTS ON MY WEBSITE.

18  Q.   WELL, I LOOK AT YOUR WEBSITE EVERY DAY TO SEE WHO

19       ELSE YOU MIGHT BE DEFAMING, AND MANY OF YOUR

20       STORIES HAVE ZERO COMMENTS ON THEM.  AND IF

21       THERE'S EVER EVEN A NUMBER OF COMMENTS, IT'S

22       BECAUSE YOU ALWAYS COMMENT BACK TO SOMEBODY WHO'S

23       COMMENTED; ISN'T THAT RIGHT?

24  A.   LOOK AT MY STORY, THE SEVEN THINGS THAT STEVE JOBS

25       HAS MISLED US ABOUT.  THERE ARE 48 COMMENTS.

Page 92

1   Q.   ABOUT THREE MONTHS AGO?

2   A.   YES.  ALSO I DID A STORY ABOUT TERRI SCHIAVO TWO

3        YEARS AGO, AND THAT STORY HAD ALMOST 70 COMMENTS

4        ON IT.

5   Q.   YOU'D AGREE THAT BOTH OF THOSE ARE ABERRANT

6        COMPARED TO THE AMOUNT OF COMMENTARY THAT YOU

7        NORMALLY RECEIVE?

8   A.   I'M NOT CLAIMING THAT EVERY STORY THAT I WRITE IS

9        SOME MASTERPIECE.  AND IT'S OBVIOUS THAT I DO

10       FEATURE STORES ON THE TUNE OF ONCE A MONTH.  BUT I

11       HAVEN'T FELT VERY WELL IN THE PAST COUPLE MONTHS,

12       SO I HAVEN'T BEEN DOING THAT ON A REGULAR BASIS.

13  Q.   IS THERE ANY OTHER DEFAMATION ON THE INTERNET THAT

14       YOU CLAIM YOU'VE BEEN A VICTIM OF?

15  A.   IT'S PRETTY EMBARRASSING THAT, YOU KNOW, ALL THE

16       TECHNOLOGY LAW WEBSITES ARE TALKING ABOUT ME.

17  Q.   WHY IS THAT?

18  A.   I JUST THINK IT'S EMBARRASSING.

19  Q.   WELL, ACCORDING TO YOU --

20  A.   BECAUSE THEY CONTACT ME, BECAUSE THEY FIGURE OUT

21       WHO I AM, BECAUSE MOST OF THOSE ARE ATTORNEYS WHO

22       RUN THOSE.  AND THEY ASK ME ABOUT THE CASE AND

23       EVERYTHING ELSE.

24  Q.   AND WHY ARE YOU EMBARRASSED BY THAT?  IF IT'S

25       SOMETHING THAT WOULD MAKE ME, FOR INSTANCE, INTO A

Page 93

1        LAUGHINGSTOCK AND YOU OBVIOUSLY ABLE TO DISCUSS ON

2        YOUR --

3   A.   I DON'T ENJOY MAKING YOU A LAUGHINGSTOCK.  I DON'T

4        ENJOY --

5   Q.   WELL, YOU HAVEN'T DONE THAT.

6   A.   NOBODY SEEMS TO UNDERSTAND AN ATTORNEY THAT WOULD

7        REPRESENT THIS CASE.  SO I DON'T SEE WHY YOU'RE

8        NOT.  SO -- AND BY THE WAY, THIS ONE THAT YOU

9        TALKED ABOUT HERE, I HAVE RECEIVED -- I HAVE

10       ALREADY RECEIVED E-MAIL THREATS.  I HAVE THAT --

11  Q.   WHOSE THREATENED YOU?

12  A.   -- BILL PALMER THREATENED ME WITH LITIGATION IF

13       THIS COMES THROUGH.

14  Q.   IF WHAT COMES THROUGH?

15  A.   YOUR SUIT.

16  Q.   WHAT DOES THAT MEAN?

17  A.   IN OTHER WORDS, IF YOUR SUIT GETS -- IF YOU WIN A

18       JUDGMENT AGAINST ME, HE SAID, "WELL, I'LL FILE

19       TOO."

20  Q.   WHAT WOULD HE BE FILING ABOUT?

21  A.   ABOUT WHAT I WROTE ABOUT HIM ABOUT HIS ILLEGIT

22       CONTEST.

23  (EXHIBIT NO. 10 MARKED [7/7/06 POSTING FROM

24  RIPOFFREPORT.COM]; ATTACHED)

25  EXAMINATION RESUMED BY MR. ELWELL:

Page 94

1   Q.   I'D LIKE YOU TO TAKE A LOOK AT EXHIBIT 10.  THIS

2        IS A PRINT-OFF OF A PAGE FROM THE RIPOFFREPORT.COM

3        WEBSITE.  CAN YOU TAKE A LOOK AT THIS COMPLAINT

4        AND TELL ME IF THIS IS A COMPLAINT THAT YOU

5        POSTED?

6   A.   YES.

7   Q.   YOU INDICATE HERE THAT YOU TOOK $45,000 WORTH OF

8        TECHNOLOGY INVENTORY TO BIDZIRK.

9   A.   YES.

10  Q.   WHO DID THIS APPRAISAL?

11  A.   A TECHNOLOGY APPRAISER FROM FLUOR DANIEL.  I CAN'T

12       REMEMBER HIS NAME.  I HAVE THAT DOCUMENT, THOUGH.

13  Q.   WHEN WAS THIS APPRAISAL DONE?

14  A.   I WANT TO SAY DECEMBER OF 2004.

15  Q.   WAS THERE A FEE PAID FOR THE APPRAISAL?

16  A.   NO.  HE WAS A FRIEND OF FRANK WATTS, THE OWNER OF

17       THE INVENTORY.

18  Q.   DID THE PERSON GO AND LOOK AT ANY OF THE

19       INVENTORY, OR DID HE JUST LOOK AT A LIST OF WHAT

20       WAS --

21  A.   NO, HE WENT -- HE THOROUGHLY WENT THROUGH EACH

22       WAREHOUSE.

23  Q.   AND YOU DON'T KNOW THE PERSON'S NAME?

24  A.   I CAN'T REMEMBER IT, NO.

25  Q.   DO YOU KNOW, FROM YOUR EXPERIENCE, HOW MANY

Page 95

1       REGISTERED USERS EBAY HAS?

2   A.  PROBABLY A HUNDRED MILLION.  I DON'T KNOW.

3   Q.  IF WE ASSUME IT'S A HUNDRED MILLION, WOULD YOU

4       AGREE THAT IF A HUNDRED MILLION PEOPLE SAY THAT AN

5       ITEM IS WORTH A CERTAIN PRICE, THAT THAT'S A

6       PRETTY GOOD GAUGE OF WHAT IT REALLY IS WORTH IN

7       THE MARKET?  I MEAN DO A HUNDRED MILLION PEOPLE

8       MAKE ITS OWN MARKET?

9   A.  NO, I DISAGREE, BECAUSE I -- IN MY ARTICLE I GIVE

10      A SPECIFIC EXAMPLE WHERE THEY LISTED A STAR WARS

11      FIGURE, AND I LISTED THE IDENTICAL STAR WARS

12      FIGURE.  I GOT DOUBLE WHAT THEY GOT.  I CAN

13      TYPICALLY GET MORE FOR AN AUCTION THAN THE AVERAGE

14      PERSON ON EBAY.  SO I DO SAY THAT EBAY IS THE

15      GAUGE OF WHAT AN ITEM IS WORTH, BUT SOME PEOPLE

16      CAN GET MORE FOR ITEMS THAN OTHERS.  AND THEIR OWN

17      -- YOUR OWN ADVERTISING FOR BIDZIRK SAYS, "WE GET

18      TOP DOLLAR FOR YOUR ITEMS ON EBAY."  AND YOU DON'T

19      GET TOP DOLLAR.  I CAN GET MORE THAN YOU, AND I'M

20      SUPPOSEDLY THIS AMATEUR EBAYER.

21  Q.  IF YOU CAN DO IT BETTER THAN BIDZIRK, WHY DIDN'T

22      YOU JUST DO IT?

23  A.  IT WAS TOO MUCH INVENTORY.  I EXPLAINED THAT IN

24      THE ARTICLE.

25  Q.  BUT EVEN THOUGH IT WAS TOO MUCH FOR YOU, YOU WOULD

Page 96

1        EXPECT SOMEBODY ELSE TO TAKE THE SAME INVENTORY

2        AND GET THE SAME RESULTS THAT YOU WOULD EXPECT TO

3        GET FOR YOURSELF?

4    A.  WITH A STAFF OF SEVEN, YES, CERTAINLY.

5    Q.  AND DO YOU KNOW WHETHER, AMONG ALL OF THE SAME

6        STAR WARS FIGURE THAT WAS SOLD ON EBAY, WHETHER

7        THE PRICE YOU GOT WAS A LOT HIGHER THAN THE

8        AVERAGE OF ALL THOSE SALES?

9    A.  YES.

10   Q.  YOU DO KNOW THAT?

11   A.  YES.

12   Q.  SO IT WOULD BE THE CASE THEN, THAT BIDZIRK GOT

13       CLOSER TO THE AVERAGE GENERALLY IN THE MARKET, AND

14       PERHAPS THAT THE AMOUNT THAT YOU GOT WAS

15       ABERRANTLY HIGH?

16   A.  OH, NO.  NO, THAT'S NOT WHAT I MEANT BY THAT.

17       THEY GOT WELL BELOW AVERAGE FOR THAT PARTICULAR

18       FIGURE.  THEY GOT, I BELIEVE, $38 AND SOME CENTS.

19       AND THE AVERAGE WAS GOING FOR AROUND 60, AND I GOT

20       76.

21   Q.  AND DO YOU KNOW IF ALL THE CONDITIONS CONCERNING

22       THAT AUCTION WERE OTHERWISE EQUAL?

23   A.  I LET THEM LIST ONE AND I LISTED ONE.

24   Q.  AT THE SAME TIME?

25   A.  YES, AND SAME WITH THE POWERBOOK RAM THAT I

Page 97

1          MENTION IN THE STORY.

2    Q.   AND DO YOU KNOW IF THERE ARE OTHER FACTORS THAT

3          MAY HAVE IMPACTED BIDZIRK'S PRICE ON THAT AUCTION?

4    A.   I MEAN -- I DON'T KNOW WHAT FACTORED IN.

5    (EXHIBIT NO. 11 MARKED [COVER SHEET FOR AFFIDAVITS];

6    ATTACHED)

7    EXAMINATION RESUMED BY MR. ELWELL:

8    Q.   THE REPORTER IS SHOWING YOU WHAT WE'VE MARKED AS

9          11.  THIS WAS FILED ON JUNE 21ST BY YOU, AND

10         INDICATES --  THIS IS, I GUESS, A COVER SHEET FOR

11         SOME AFFIDAVITS THAT YOU FILED ON THE SAME DAY.

12   A.   YES, THEY ASKED ME TO DO THAT.

13   Q.   WHO ASKED YOU TO DO THAT?

14   A.   THE CLERK OF COURT, FOR JUDGE CATO.

15   Q.   IN THE THIRD PARAGRAPH YOU SAY, "I AM TRYING TO

16         APPEASE THE COURT WITH MY HONEST AND MOST SINCERE

17         INTENTION OF WHAT IS DOING RIGHT AND WHAT IS

18         REQUIRED OF ME BY LAW."

19   A.   UH-HUH (AFFIRMATIVE).

20   Q.   WHAT DOES THAT MEAN?

21   A.   I'M TRYING TO MAKE THE COURT HAPPY BY GIVING AN

22         HONEST EFFORT TO THIS BEING PRO SE.  I MEAN, I

23         JUST -- I DON'T HAVE ANY MONEY, AND THIS HAS BEEN

24         VERY DEPRESSING FOR ME.  AND IT'S BEEN HARD TO DO

25         ALL THIS AND UNDERSTAND WHAT I'VE DONE WRONG,

Page 98

1       BECAUSE I DIDN'T DO ANYTHING WRONG.

2   Q.  YOU SAY ALSO, "I BEG OF THE COURT TO TAKE SPECIAL

3       CONSIDERATION OF THIS FACT.  I ASK THAT THE COURT

4       MAKE ALL COMMUNICATION TO ME IN LAYMEN."

5   A.  UH-HUH (AFFIRMATIVE).

6   Q.  LIKE AS USING THAT LIKE IT'S A LANGUAGE, LAYMEN?

7   A.  YEAH, THAT'S A TERM FOR LAYMEN TERMINOLOGY.

8       BECAUSE YOU YOURSELF, I MEAN, YOU WORD EVERYTHING

9       SO COMPLICATED THAT NOBODY UNDERSTANDS IT.  AND SO

10      DOES THE COURT.  THE COURT --

11  Q.  WHY DO YOU THINK THAT?

12  A.  I MEAN THERE'S ATTORNEY SPEAK AND THERE'S NORMAL

13      PEOPLE SPEAK.  I MEAN THAT'S HOW THE SYSTEM WORKS,

14      I SUPPOSE.

15  Q.  IS WHAT I'M WRITING BEYOND YOUR UNDERSTANDING,

16      THEN?  IS THAT WHAT YOU MEAN?

17  A.  IT'S NOT BEYOND MY UNDERSTANDING, BUT A LOT OF IT

18      IS INCOMPREHENSIBLE FOR THE CONNECTIONS THAT YOU

19      TRY TO MAKE.  AND --

20  Q.  WHAT'S AN EXAMPLE OF THAT?

21  A.  LIKE YOU HAD A STARBUCKS COPYRIGHT INFRINGEMENT

22      CASE THAT DOESN'T EVEN REMOTELY APPLY.

23  Q.  DID YOU READ THE CASE?

24  A.  YES, I DID.  SOMEBODY NAMING THEIR BUSINESS

25      SOMETHING CLOSE TO STARBUCKS, LIKE STANBUCKS

Page 99

1        (PHONETIC), HAS NOTHING TO DO WITH WHETHER I NAMED

2        MY WEBSITE FIX YOUR THINKING, AND THEY HAVE THEIR

3        WEBSITE AS BIDZIRK.  THAT HAS NOTHING TO DO WITH

4        ONE OR THE OTHER.

5   Q.   DO YOU THINK MAYBE IT'S POSSIBLE THAT YOU DON'T

6        UNDERSTAND THE APPLICABILITY OF THAT CASE, AND

7        PERHAPS I DO, OR THAT THE COURT DOES?

8   A.   OKAY.  OBVIOUSLY THEY DIDN'T.  THEY'VE DISMISSED

9        IT.  SO, I MEAN, THEY --

10  Q.   WHAT'S BEEN DISMISSED BESIDES YOUR COUNTERCLAIMS?

11  A.   THE INJUNCTION WAS NOT GRANTED TO YOU, AND SO YOU

12       HAD TO APPEAL.  SO OBVIOUSLY NONE OF THIS STUFF

13       HAS MADE SENSE TO THE COURT SO FAR.

14  Q.   WHY DOES THE FACT THAT THE COURT DIDN'T GRANT AN

15       INJUNCTION INDICATE THAT IT DIDN'T UNDERSTAND

16       SOMETHING?

17  A.   I DON'T KNOW.

18  Q.   WHEN DID YOU ASK MR. LANE TO GIVE THIS AFFIDAVIT?

19       THIS IS ACTUALLY JUST A LETTER.

20  A.   WHEN IT'S DATED.  A COUPLE DAYS BEFORE IT WAS

21       DATED.

22  Q.   JUNE 2, 2006.

23  MR. ELWELL:

24       LET'S GO AHEAD AND MARK THIS AS 12.

25  (EXHIBIT NO. 12 MARKED [COVER SHEET AND LANE

Page 100

1    AFFIDAVIT]; ATTACHED)

2    EXAMINATION RESUMED BY MR. ELWELL:

3    Q.   MR. SMITH, YOU CAN TAKE A LOOK AT WHAT WE'VE

4         MARKED AS EXHIBIT 12.  THIS IS MR. LANE'S JUNE 2,

5         2006, LETTER.

6    A.   OKAY.

7    Q.   YOU ASKED MR. LANE TO GIVE YOU THIS LETTER JUST

8         IMMEDIATELY PRIOR TO JUNE THE 2ND?

9    A.   WITH -- YOU KNOW, WITHIN A WEEK PROBABLY.

10   Q.   AND WHAT DID YOU ASK HIM, SPECIFICALLY?

11   A.   I SAID, "MIKE, COULD YOU GIVE ME THE REASONS WHY

12        YOU CHOSE TO RESOLVE THE RELATIONSHIP BETWEEN US

13        IN RELATIONSHIP TO THE BIDZIRK TRIAL?"

14   Q.   AND HE SAYS IN THE SECOND PARAGRAPH THAT YOUR

15        COMPANY, ADZOOX, AND COMPUTER CLINIC HAD DISSOLVED

16        THEIR WORKING RELATIONSHIP, AND THAT THIS ACTION

17        WAS DUE TO SEVERAL FACTORS, NOT THE LEAST OF WHICH

18        WAS THE HIGH-PROFILE LITIGATION IN WHICH ADZOOX

19        WAS INVOLVED.  DO YOU KNOW WHAT THE OTHER FACTORS

20        ARE THAT WERE PART OF THE SEVERAL FACTORS THAT MR.

21        LANE MENTIONS HERE?

22   A.   MY DEPRESSION OVER THIS ISSUE.  AND MY CONSTANT

23        NEED TO DEVOTE ATTENTION TO IT TOOK AWAY FROM MY

24        TIME TO DEVOTE TO THE APPLE CUSTOMERS THAT WERE

25        COMING IN.  I COULDN'T KEEP UP.

Page 101

1   Q.   HAVE YOU EVER BEEN TREATED FOR DEPRESSION BEFORE?

2   A.   NO.

3   Q.   HAVE YOU EVER BEEN DIAGNOSED WITH DEPRESSION?

4   A.   NO.

5   Q.   HAVE YOU EVER HAD ANYBODY TELL YOU YOU SHOULD BE

6        TREATED FOR DEPRESSION?

7   A.   NO.  THAT HAS NO BEARING ON THIS, THOUGH.

8   Q.   ARE YOUR ANSWERS TRUTHFUL OR NOT?  HAS SOMEBODY

9        EVER TOLD YOU YOU SHOULD BE TREATED FOR

10       DEPRESSION?

11  A.   NO.

12  Q.   MR. LANE MAILED THIS BACK TO YOU, THIS LETTER?

13  A.   BECAUSE WE DISSOLVED OUR RELATIONSHIP DOESN'T MEAN

14       IT WAS UNAMICABLE.  I MEAN HE -- WE HAD TALKED A

15       COUPLE WEEKS BEFORE ABOUT, YOU KNOW, RENEWING MY

16       CONTRACT.  AND HE FOLLOWS THIS UP IN THE SECOND --

17       OR THE THIRD PARAGRAPH AND SAYS, "IT IS ACCURATE

18       TO SAY THAT HAD THIS LAWSUIT NOT BEEN INSTIGATED,

19       WE WOULD MOST LIKELY STILL BE IN A WORKING

20       RELATIONSHIP."

21  Q.   I'M ASKING HOW YOU GOT THE LETTER.  DID HE MAIL IT

22       BACK TO YOU?

23  A.   NO, I WENT AND PICKED IT UP.

24  Q.   AND YOU WOULD AGREE THIS IS SIMPLY A LETTER.  IT'S

25       NOT A SWORN STATEMENT.  IT'S NOT NOTARIZED.

Page 102

1    A.    IT'S HIS AFFIDAVIT.

2    Q.    DO YOU UNDERSTAND WHAT AN AFFIDAVIT IS --

3    A.    YES, I DO.

4    Q.    -- COMPARED TO A NORMAL LETTER?

5    A.    YES, I DO.

6    Q.    WHAT'S THE DIFFERENCE BETWEEN AN AFFIDAVIT AND A

7          REGULAR PIECE OF CORRESPONDENCE?

8    A.    AN AFFIDAVIT IS A SWORN STATEMENT BEFORE THE COURT

9          TO MAKE A STATEMENT.  AND I GUESS THERE SHOULD

10         HAVE BEEN SOME PAPERWORK WITH THIS.  BUT AS PRO

11         SE, THIS SUFFICED AS FAR AS THE CLERK OF COURT

12         TOLD ME.  I PRESENTED THIS TO THE CLERK OF COURT

13         AS SUCH, AND SHE SAID THAT IS ACCEPTABLE AS PRO SE

14         LITIGANT.

15   Q.    YOU'RE AWARE OF SOME RULE THAT ALLOWS PRO SE

16         LITIGANTS TO SUBMIT HEARSAY DOCUMENTS TO THE COURT

17         FOR CONSIDERATION THAT AREN'T SWORN?

18   A.    HE WOULD BE WILLING TO TESTIFY TO THAT FACT.  THAT

19         WOULDN'T BE HEARSAY.

20   Q.    BUT HE HASN'T DONE SO HERE BY THIS DOCUMENT,

21         THOUGH.  THIS IS NOT A SWORN DOCUMENT.

22   A.    OKAY, WHATEVER.

23   Q.    IS THAT ACCURATE?

24   A.    I GUESS.  WHATEVER, YES.

25   Q.    AND YOU INDICATED THAT IN YOUR KNOWLEDGE

Page 103

1          AFFIDAVITS ARE SWORN STATEMENTS.  SO THIS WOULD

2          NOT BE AN AFFIDAVIT; IS THAT RIGHT?

3    A.    OKAY.

4    (EXHIBIT NO. 13 MARKED [COVER SHEET AND BUZZELL

5    STATEMENT]; ATTACHED)

6    EXAMINATION RESUMED BY MR. ELWELL:

7    Q.    LET'S LOOK AT WHAT WE'VE MARKED AS NUMBER 13.  AND

8          THIS IS A STATEMENT MADE BY -- IS IT BUZZELL?

9    A.    YES.

10   Q.    AND MR. BUZZELL IS A FRIEND OF YOURS?

11   A.    YES.

12   Q.    DID YOU DRAFT THIS STATEMENT FOR MR. BUZZELL?

13   A.    NO.

14   Q.    HOW DID YOU COME TO ASK HIM FOR IT?

15   A.    I ASKED HIM THE SAME, AN AFFIDAVIT THAT RELATED TO

16         A -- THE MATTERS BEHIND BIDZIRK AS HE SAW THEM.

17         THAT'S ALL THAT I SAID.

18   Q.    HE INDICATES IN HERE THAT IT WAS PART OF YOUR PLAN

19         TO SELL THIS INVENTORY AND TAKE THE MONEY THAT YOU

20         GOT AND USE IT TO TRAVEL THE COUNTRY AND SELL SOME

21         PRODUCT.

22   A.    YES.

23   Q.    AND THE PRODUCT WAS WHAT?

24   A.    THE IPOD ADAPTER.

25   Q.    AND THAT WAS YOUR SCHEME FOR MARKETING THE

Page 104

1      PROJECT, WAS TO SELL SOMETHING ELSE AND FUND YOUR

2      MARKETING TRIP; IS THAT RIGHT?

3   A.  WHAT DO YOU MEAN BY SCHEME?

4   Q.  THAT WAS YOUR PLAN, WAS TO GENERATE MONEY --

5   A.  THAT WAS THE PLAN.

6   Q.  -- BY SELLING OLD INVENTORY AND FUND A MARKETING

7      TRIP WITH IT?

8   A.  THAT'S CORRECT.

9   Q.  WHERE WERE YOU GOING TO GO?

10  A.  OHIO, CALIFORNIA, NEW YORK, TENNESSEE, FLORIDA.

11  Q.  AND DID YOU HAVE APPOINTMENTS SCHEDULED THERE?

12  A.  YES.

13  Q.  WHO WITH?  DID YOU HAVE AN ITINERARY?

14  A.  WITH THE OWNERS OF THOSE BUSINESSES.  LIKE PAUL

15      GRIFFIN WOULD HAVE BEEN IN TENNESSEE.  JACK

16      CAMPBELL WOULD HAVE BEEN IN TENNESSEE.

17  Q.  SO YOU WANT TO GO DO BUSINESS WITH JACK CAMPBELL

18      EVEN THOUGH HE'S MENTALLY UNSTABLE?

19  A.  HE'S A VERY TALENTED MARKETING PERSON.

20  Q.  THERE'S NOTHING ABOUT THIS STATEMENT THAT

21      INDICATES THAT IT IS A SWORN STATEMENT EITHER, IS

22      THERE?

23  A.  IF YOU SAY NOT.

24  Q.  WELL, I'M ASKING YOU.  DO YOU SEE ANYTHING ABOUT

25      THIS STATEMENT THAT INDICATES THAT IT IS MADE

1       UNDER OATH?

2   A.  I MEAN ALL THESE PEOPLE WOULD BE WILLING TO

3       TESTIFY TO THE SAME.

4   Q.  I DIDN'T ASK WHETHER THEY'D BE WILLING TO TESTIFY.

5       I'M ASKING IF YOU SEE ANYTHING ON THIS STATEMENT

6       THAT INDICATES THAT THESE PEOPLE WERE MAKING A

7       STATEMENT UNDER OATH.

8   A.  NO.  LIKE I'VE SAID, YOU'RE MAKING EVERY EFFORT TO

9       CATCH ME ON A TECHNICALITY AS BEST YOU CAN.  SO I

10      UNDERSTAND.  YOU'RE NOT TRYING TO WIN THIS CASE

11      BASED ON ANY MERIT.  YOU'RE TRYING TO WIN IT ON

12      TECHNICALITY.

13  Q.  WHY DO YOU THINK THAT?

14  A.  I MEAN OBVIOUSLY BY THIS.  THIS IS OBVIOUS THAT IT

15      WAS WRITTEN BY THESE PEOPLE.  I'M HERE, A SWORN

16      STATEMENT.  I'M A CHRISTIAN.  I HAVE NO MOTIVATION

17      TO LIE.  SO THERE'S OBVIOUS -- THIS IS AN OBVIOUS

18      STATEMENT.  I SAY THAT THE PEOPLE CAN TESTIFY TO

19      THIS FACT.  AND FROM WHAT I CAN TELL, YOU'RE

20      PROBABLY GOING TO TRY TO GET THESE DISMISSED AS

21      STATEMENTS SO THAT THERE WON'T -- THEY WON'T BE

22      EVIDENCE IN COURT BECAUSE THEY'RE NOT SWORN

23      AFFIDAVITS.

24  Q.  AND DO YOU THINK THAT THE RULES OF EVIDENCE ARE

25      JUST A TECHNICALITY THAT CLEVER PEOPLE USE TO

Page 106

1        OUTWIT LESS CLEVER PEOPLE?

2   A.   THAT'S WHY O.J. GOT OFF.

3   Q.   CAN YOU JUST ANSWER MY QUESTION?

4   A.   YES, THAT'S MY ANSWER.  THAT'S WHY O.J. GOT OFF.

5        O.J. GOT OFF ON -- BECAUSE OF TECHNICALITIES.

6        MURDER.  PEOPLE ON MURDER ROW -- OR PEOPLE THAT

7        HAVE MURDERED PEOPLE ON MURDER ROW GET OFF BECAUSE

8        THE GOVERNOR WAS TOO LATE TO SIGN SOMETHING OR

9        MISSED IT ON HIS DESK OR SOMETHING.  THAT'S A

10       LEGAL TECHNICALITY.  BECAUSE SOMEONE ISN'T READ

11       THEIR MIRANDA RIGHTS IN A MULTIPLE HOMICIDE --

12  Q.   DO YOU KNOW WHETHER O.J. WAS NOT PROPERLY

13       MIRANDIZED AND THAT'S WHY HE WAS NOT CONVICTED?

14  A.   NO.  ACTUALLY HERE IS --

15  Q.   HE WAS ACQUITTED BY A JURY, RIGHT?

16  A.   BUT HE WAS CONVICTED OF IT IN A CIVIL CASE.  SO HE

17       LOST THE EXACT SAME CASE, JUST IN A DIFFERENT

18       COURT.

19  Q.   DO YOU UNDERSTAND THAT THERE'S A DIFFERENCE IN

20       BURDENS OF PROOF BETWEEN CIVIL CASES AND CRIMINAL

21       CASES?

22  A.   YES, I DO.

23  Q.   AND THAT THE SAME EVIDENCE, GIVEN THE SAME WEIGHT,

24       COULD RESULT IN TWO DIFFERENT OUTCOMES IN THE TWO

25       DIFFERENT TYPES OF CASES?

Page 107

1   A.   OKAY.

2   Q.   BACK TO THIS AFFIDAVIT, OR STATEMENT.  YOU DON'T

3        SEE ANYTHING ON HERE THAT INDICATES THAT IT'S A

4        SWORN STATEMENT, DO YOU?

5   A.   NO, I DO NOT.

6   Q.   WERE YOU PRESENT WITH MR. BUZZELL WHEN HE SIGNED

7        THIS STATEMENT?

8   A.   YES.

9   Q.   WHERE WAS IT SIGNED?

10  A.   AT HIS OFFICE.

11  Q.   IS MR. BUZZELL UNDER ANY KIND OF DISABILITY?  IS

12       HE ACTUALLY RIGHT-HANDED AND HE SIGNED IT WITH HIS

13       LEFT HAND, OR ANYTHING?

14  A.   NO, BUT I'LL RELAY THAT MESSAGE TO HIM.

15  Q.   IT KIND OF LOOKS LIKE HE WAS SIGNING IT IN A

16       MOVING CAR OR SOMETHING.  DO YOU KNOW IF HE WAS --

17  A.   I DON'T -- I CAN'T REMEMBER.  I MEAN I REMEMBER

18       THAT HE SIGNED IT AT HIS OFFICE.  I'LL RELAY THAT

19       MESSAGE TO HIM, THAT YOU THINK HE'S DISABLED.

20  Q.   I'M ASKING YOU IF HE HAS ANY ISSUE WITH HIS

21       HANDWRITING.  THAT'S ALL.

22  A.   YOU KNOW, I DON'T KNOW IF YOU'RE AN ARTIST WITH

23       YOUR HANDWRITING OR NOT.

24  Q.   SO THAT'S A NO?  YOU DON'T KNOW OF ANY --

25  A.   THAT'S HIS HANDWRITING.  I MEAN, I SAW HIM SIGN

Page 108

1       IT.

2   Q.  YOU RECOGNIZE THIS AS HIS HANDWRITING, AS HIS

3       REGULAR HANDWRITING?

4   A.  YES.  AND I'LL RELAY THE MESSAGE THAT YOU THINK

5       HE'S DISABLED.

6   Q.  THAT WOULD BE INCORRECT.  I'M JUST ASKING YOU IF

7       HE WAS UNDER SOME SORT OF -- SUFFERING FROM SOME

8       DIFFICULTY WHEN HE WAS WRITING HIS NAME, BECAUSE

9       IT LOOKS KIND OF SLOPPY, LIKE MAYBE IT'S NOT HIS

10      REGULAR HAND.

11  A.  I MEAN I DON'T KNOW WHAT THE CIRCUMSTANCES BEHIND

12      THAT ARE.  I KNOW HE HAS BAD HANDWRITING.

13  (EXHIBIT NO. 14 MARKED [7/6/06 COURT FILING]; ATTACHED)

14  EXAMINATION RESUMED BY MR. ELWELL:

15  Q.  I'LL SHOW YOU WHAT WE'VE MARKED AS 14.  THIS IS A

16      DOCUMENT THAT YOU FILED ON JULY THE 6TH.  WHAT'S

17      THE REASON FOR FILING THIS?

18  A.  JUST TO NOTIFY THE COURT.  SINCE THE COURT HAS NOT

19      GRANTED ME A STATUS HEARING, I HAVE NO IDEA WHAT'S

20      GOING ON.  AND YOU SEND SO MANY AMENDMENTS AND

21      REDUNDANT CLAIMS AND UNNECESSARY PAPERWORK TO THE

22      COURTS AND TO MY FRONT DOOR THAT IT'S HARD TO KNOW

23      WHAT I'VE RESPONDED TO AND WHAT I HAVEN'T.  SO I'M

24      SAYING HERE PLEASE ALLOW ME SOME LEEWAY.

25  Q.  YOU INDICATE HERE IN THE FIRST FULL PARAGRAPH,

Page 109

1        "SCHMIDT/ELWELL ARE ACCUSTOMED TO HARASSING

2        DEFENDANTS IN LARGE DRAWN OUT COURT CASES."  WHAT

3        IS THAT IN REFERENCE TO?

4   A.   THE GIRL THAT EMBEZZLED MONEY.

5   Q.   THAT STOLE $300,000 FROM MR. SCHMIDT?  THAT WAS

6        HARASSMENT?

7   A.   I READ THAT YOU WOULD NOT SETTLE IN ANY

8        CIRCUMSTANCE WHATSOEVER, THAT SHE OFFERED SEVERAL

9        SETTLEMENTS TO YOU.

10  Q.   WHERE DID YOU READ THAT?

11  A.   IN THE GREENVILLE NEWS.  IT SAID THAT SEVERAL

12       SETTLEMENTS WERE OFFERED, AND THAT YOU CHOSE NOT

13       TO ACCEPT THEM.

14  Q.   AND DO YOU KNOW WHAT THOSE SETTLEMENTS WERE?

15  A.   NO.

16  Q.   DO YOU WHETHER THEY WERE ANYTHING CLOSE TO BEING A

17       REASONABLE AMOUNT?

18  A.   I'M NOT SURE.

19  Q.   AND YET YOU FEEL PERFECTLY COMFORTABLE MAKING A --

20  A.   YES, I DO.

21  Q.   -- BLANKET STATEMENT LIKE THIS, THAT MR. SCHMIDT

22       AND I ARE ACCUSTOMED TO HARASSING DEFENDANTS IN

23       LARGE DRAWN OUT COURT CASES.

24  A.   BUT THERE WERE NO ATTEMPTS BY OPPOSING COUNSEL

25       TO --

Page 110

1   Q.   HOW DO YOU KNOW THAT?

2   A.   -- MAKE A SETTLEMENT OFFER.

3   Q.   HOW DO YOU KNOW THAT?

4   A.   I JUST -- OKAY.

5   Q.   DO YOU OR DO YOU NOT KNOW THAT?

6   A.   YES, I KNOW THAT.

7   Q.   HOW IS IT THAT YOU KNOW THAT, THAT THERE WAS NO

8        ATTEMPT MADE TO SETTLE ANYTHING BY MR. SCHMIDT IN

9        THE LAUDERDALE CASE?

10  A.   IT CAME OUT IN THE COURT CASE THAT -- AND SHE SAID

11       THAT SEVERAL TIMES.

12  Q.   AND SHE'S IN JAIL FOR WHAT?

13  A.   I DON'T CARE WHY SHE'S IN JAIL.

14  Q.   SHE'S IN JAIL FOR BEING A THIEF AND BEING

15       DISHONEST, ISN'T SHE?

16  A.   BUT SHE WAS ALSO A MOTHER AND A WIFE AND --

17  Q.   AND YOU THINK THAT EXCUSES HER FROM STEALING

18       MONEY?

19  A.   NO, I DO NOT.  I THINK SHE WAS WRONG.  IT WAS

20       STILL DRAWN OUT.

21  Q.   AND DO YOU KNOW WHY IT WAS DRAWN OUT?

22  A.   I DON'T CARE WHY IT WAS DRAWN OUT.  I KNOW IT WAS

23       DRAWN OUT.

24  Q.   DO YOU KNOW WHOSE DOING IT WAS, THAT IT WAS DRAWN

25       OUT?

Page 111

1    A.    I DON'T CARE.  I JUST KNOW THAT IT WAS DRAWN OUT.

2    Q.    YOU EVIDENTLY CARED TO BLAME MR. SCHMIDT FOR IT

3          AND TO BLAME ME FOR IT.

4    A.    YEAH.

5    Q.    I DON'T SEE THE STATEMENT READING CHRIS AND GWEN

6          LAUDERDALE ARE ACCUSTOMED TO DRAWING OUT COURT

7          CASES IN WHICH THEY'RE DEFENDANTS.  COULD THAT NOT

8          ALSO BE TRUE?

9    A.    I'M SORRY THAT OFFENDED YOU.

10   Q.    YOU KNOW, WHAT OFFENDS ME IS YOU MAKING BLANKET

11         STATEMENTS ABOUT SOMETHING YOU REALLY DON'T KNOW

12         ABOUT, WHICH JUST SEEMS TO BE A HABIT WITH YOU.

13   A.    WELL, WHAT OFFENDS ME IS THAT YOU SUBMIT ALL THIS

14         INFORMATION THAT I'M A LIAR, A CHEAT, EVERYTHING

15         TO THE COURT, WHEN I --

16   Q.    WHEN IS THAT?

17   A.    -- DO BUSINESS WITH A LOT OF PEOPLE IN THE COURT.

18   Q.    WHEN HAVE I SAID THAT YOU WERE A LIAR TO THE

19         COURT?

20   A.    OBVIOUSLY YOU'RE SAYING THAT I'VE LIED IN MY

21         STATEMENTS AND EVERYTHING IN MY ARTICLE.

22   Q.    WHAT STATEMENTS?

23   A.    YOU SAID THAT THEY'RE UNTRUE IN YOUR INITIAL

24         FILING, THAT THE STATEMENTS THAT I MAKE ARE UNTRUE

25         AND DEFAMATORY.  THAT'S CALLING ME A LIAR.  LOOK

Page 112

1       UP THE DEFINITION FOR "LIAR" AND IT SAYS A PERSON

2       WHO SAYS THINGS THAT ARE UNTRUE.

3  Q.  AND WHERE HAVE YOU BEEN CALLED A CHEAT?

4  A.  THAT WAS A CURSORY TERM.

5  Q.  CURSORY TERM?  WHAT DOES THAT MEAN?

6  A.  I'M GOING TO WAIT FOR YOU TO MOVE ON.

7  Q.  WHAT DO YOU MEAN BY "THAT'S A CURSORY TERM"?

8  A.  I JUST -- I SAID THAT AS A, YOU KNOW, YOU'VE

9       CALLED ME EVERY NAME IN THE BOOK THAT I CAN THINK

10      OF KIND OF WAY.  AND FRANKLY, I THINK YOU'RE A

11      DICK.  I MEAN THIS IS -- WE'RE NOW AT WHAT?  TWO

12      AND A HALF HOURS, THREE HOURS.

13  Q.  I DON'T KNOW.  THE VIDEOGRAPHER COULD TELL US WHAT

14      HIS CLOCK SHOWS.  WHY IS IT THAT YOU THINK THAT?

15  A.  I MEAN, AGAIN, I'LL RELATE TO THE TECHNOLOGY LAW

16      BLOG WHERE HE SAYS, "I JUST CAN'T FATHOM WHY THIS

17      ATTORNEY IS POSSIBLY HEADING ON THIS LAWSUIT.  IT

18      DOESN'T MAKE ANY SENSE."

19  Q.  THIS AGAIN IS THIS PROFESSOR IN CALIFORNIA THAT

20      HASN'T READ THE PLEADINGS IN THE CASE?

21  A.  HE'S READ EVERYTHING THAT I KNOW OF.

22  Q.  HOW DO YOU KNOW THAT?

23  A.  BECAUSE I'VE SENT IT TO HIM.

24  Q.  WELL, THAT DOESN'T MEAN HE'S READ IT, DOES IT?

25  A.  WELL, OKAY.

Page 113

1    Q.   DO YOU THINK IT'S POSSIBLE THAT THIS LAW PROFESSOR

2         MIGHT BE COMING FROM THE POINT OF VIEW THIS SEEMS

3         AWFULLY EXPENSIVE, AN AWFULLY EXPENSIVE WAY TO

4         VINDICATE ONE'S PRINCIPLES IF YOU'RE MR. SCHMIDT?

5    A.   HE SAID THAT'S A POSSIBILITY, BUT HE DOESN'T SEE

6         IT THAT WAY.

7    Q.   YOU SAY A MATTER OF PUBLIC RECORD -- WE'RE STILL

8         IN EXHIBIT 14.  "A MATTER OF PUBLIC RECORD

9         INDICATES THAT A RECENT TRIAL WAS PROTRACTED

10        RELENTLESSLY UNTIL THE OPPOSING PARTY COULD STAND

11        NO LONGER."  YOU'RE REFERRING TO THE SAME CASE?

12   A.   SHE WAS -- YES.

13   Q.   WHAT TRIAL ARE YOU REFERRING TO?

14   A.   THE TRIAL FOR HER, WHERE SHE -- I MEAN YOU FINALLY

15        WENT TO TRIAL.

16   Q.   HER CRIMINAL CASE?

17   A.   YES.

18   Q.   AND THE MATTER OF PUBLIC RECORD THAT YOU'RE

19        REFERRING TO IS WHAT?

20   A.   IS THAT CASE WHERE SHE STATES THAT YOU -- THERE

21        WAS -- SHE STATED IN THAT CASE THAT SHE TRIED TO

22        MAKE A LOT OF SETTLEMENTS AND THAT THERE WAS JUST

23        NO SETTLEMENT OFFER, NO NEGOTIATIONS THAT WERE

24        REASONABLE.  AND I'M NOT BACKING HER UP.  I'M JUST

25        -- I JUST KNOW THAT YOU'RE A PARTY TO PROTRACTED

Page 114

```
 1        LAWSUITS, BECAUSE IT COULD HAVE BEEN SETTLED A LOT
 2        SOONER FROM WHAT I CAN TELL.
 3   Q.   IF SOMEBODY STOLE $100,000 FROM YOU AND THEN CAME
 4        BACK TO YOU AND SAID, "I'LL TELL YOU WHAT.  I'LL
 5        GIVE YOU 40,000 OF IT," WOULD YOU SAY THAT THAT'S
 6        FINE, I DON'T WANT TO PROTRACT THIS LITIGATION?
 7   A.   NO, BUT I WOULD SAY, "LET'S DO 40,000 AND DOCK
 8        YOUR PAY FOR THE NEXT WHILE.  I THINK WE'LL WORK
 9        OUT A CASE WHERE YOU HAVE HOUSE ARREST."
10   Q.   DO YOU KNOW THAT MR. SCHMIDT DID OR DIDN'T DO
11        SOMETHING SIMILAR TO THAT BY --
12   A.   I DON'T CARE.
13   Q.   -- WAY OF COUNTER OFFER?
14   A.   I DON'T CARE.
15   Q.   YOU DON'T CARE, BECAUSE IT'S MUCH EASIER FOR YOU
16        JUST TO TAKE ADVANTAGE OF HALF TRUTHS AND PUBLISH
17        THOSE TO THE COURT THAN IT IS TO INVESTIGATE
18        SOMETHING FULLY AND --
19   A.   THERE'S NO SUCH THING AS A HALF TRUTH.  IT'S
20        EITHER TRUE OR NOT.
21   Q.   WELL, OKAY, THEN THIS IS FALSE, AND YOU'RE MORE
22        COMFORTABLE PUBLISHING THAT, RIGHT?
23   A.   I DIDN'T PUBLISH THIS.
24   Q.   YOU DID PUBLISH IT.  YOU FILED IT WITH THE COURT.
25        IT'S A PUBLIC DOCUMENT.  WHY DO YOU SAY THE RECENT
```

Page 115

1           TRIAL WAS PROTRACTED RELENTLESSLY?  WHAT DOES THAT

2           MEAN?

3     A.    I THINK IT WENT ON TOO LONG.  THAT'S MY OPINION.

4     Q.    DO YOU KNOW HOW LONG IT WENT ON?

5     A.    I CAN'T -- I DON'T REMEMBER THE DETAILS NOW.

6     Q.    AND, "UNTIL THE OPPOSING PARTY COULD STAND NO

7           LONGER."  WHAT DOES THAT MEAN?

8     A.    JUST, I MEAN, SHE FINALLY JUST GAVE UP.

9     Q.    AND SAID GO AHEAD AND CONVICT ME AND SEND ME TO

10          JAIL, OR --

11    A.    THAT'S PRETTY MUCH --

12    Q.    -- WHAT DID SHE SAY?

13    A.    PRETTY MUCH.

14    Q.    DO YOU KNOW WHETHER MS. LAUDERDALE WAS CONVICTED

15          BY A JURY?

16    A.    I CAN'T REMEMBER THAT DETAIL EITHER.  THIS WAS

17          WRITTEN A LONG TIME AGO.

18    Q.    "OPPOSING PARTY HAD OFFERED ON SEVERAL OCCASIONS

19          TO SETTLE WITH FULL RESTITUTION, WITH INTEREST,

20          YET SCHMIDT INSISTED ON A COURT VERDICT."  WHAT IS

21          YOUR BASIS FOR SAYING THAT ANYBODY IN THE

22          LAUDERDALE CASE OFFERED TO SETTLE WITH FULL

23          RESTITUTION?

24    A.    THE WYFF COVERAGE OF THAT INDICATED THAT TO ME.

25    Q.    AND WHAT DID THAT COVERAGE SAY?

Page 116

1    A.    THAT SHE HAD OFFERED ON SEVERAL OCCASIONS TO

2          SETTLE.

3    Q.    DO YOU KNOW WHAT FULL RESTITUTION MEANS?

4    A.    THE ACTUAL AMOUNT THAT SHE STOLE WITH INTEREST.

5    Q.    AND DO YOU KNOW YOURSELF THAT SHE EVER OFFERED TO

6          DO THAT?

7    A.    I MEAN, THAT'S WHAT THE YFF INVESTIGATION TOLD ME.

8    Q.    AND THIS IS A TV REPORT?

9    A.    YES.

10   Q.    AND YOU WATCHED HOW MANY SEGMENTS ABOUT THIS

11         PARTICULAR CASE?

12   A.    I FOLLOWED IT VERY, VERY CLOSELY.

13   Q.    EVIDENTLY NOT.

14   A.    OKAY.

15   Q.    AND DO YOU UNDERSTAND THAT ONCE THE DISTRICT

16         ATTORNEY IS PROSECUTING A CASE, THAT THE STATE IS

17         THE ONE PROSECUTING IT AND NOT MR. SCHMIDT?

18   A.    OKAY.

19   Q.    DID YOU UNDERSTAND THAT BEFORE I JUST SAID THAT?

20   A.    NO.

21   Q.    YOU SAY NEXT, "EVEN AN EXPERIENCED ATTORNEY WOULD

22         NOT BE ABLE TO UNDERSTAND OR COMPREHEND THE NON-

23         SEQUITUR ARGUMENTS PLAINTIFF'S ATTORNEY, ELWELL,

24         MAKES."  WHAT ARE YOU REFERRING TO THERE?

25   A.    LIKE, FOR INSTANCE, I GAVE YOU THAT STANBUCKS

Page 117

```
 1         VERSUS STARBUCKS.  THAT MAKES NO SENSE TO THIS
 2         CASE WHATSOEVER.  THAT WAS A COMPANY THAT WAS A
 3         COMPETITOR USING THE SAME -- SELLING THE EXACT
 4         SAME PRODUCT WITH A VERY, VERY SIMILAR NAME.  AND
 5         I'M NOT DOING THAT.  THEY LOST THAT CASE BECAUSE
 6         THEY'RE ONE LETTER DIFFERENT.
 7    Q.   DO YOU KNOW HOW MANY CASES BIDZIRK HAS CITED IN
 8         ITS PAPERS TO THE COURT TO SUPPORT ITS ARGUMENTS?
 9    A.   A LOT, AND YOU'VE LOST THE INJUNCTION HEARING.
10    Q.   MANY MORE THAN JUST A STARBUCKS CASE, CORRECT?
11    A.   SURE.
12    Q.   YOU HAVE NO LEGAL TRAINING, DO YOU?
13    A.   NO.
14    Q.   SO YOU'RE NOT REPRESENTING THAT YOU CAN READ A
15         CASE --
16    A.   YOU'VE MADE A LOT OF NON-SEQUITUR ARGUMENTS,
17         THOUGH.
18    Q.   DO YOU KNOW WHAT THAT MEANS, NON-SEQUITUR?  DO YOU
19         KNOW WHAT THE TERM MEANS?
20    A.   YEAH, IT DOESN'T FIT TOGETHER.
21    Q.   AND THAT'S IN YOUR JUDGMENT AS SOMEBODY WITH NO
22         LEGAL TRAINING, IS THAT RIGHT, THAT YOU WOULD --
23    A.   YOU KNOW, AGAIN --
24    Q.   -- AS NON-SEQUITUR ARGUMENTS?
25    A.   THE STRATEGIC LAW INSTITUTE SAYS THE EXACT SAME
```

Page 118

```
1        THING, THAT THERE SEEM TO BE A LOT OF NON-SEQUITUR

2        ARGUMENTS RELATING TO SERVICE MARK INFRINGEMENT IN

3        THIS CASE.

4   Q.   AND THE STRATEGIC LAW INSTITUTE BEING A WEBSITE?

5   A.   YES, WRITTEN BY ATTORNEYS.

6   Q.   WHEN HAVE THEY PUBLISHED ANYTHING ABOUT THIS CASE?

7   A.   YOU KNOW, JUST GOOGLE FOR IT.

8   Q.   YOU SAY, "THE CONTINUED DISTORTION OF THE LAW AND

9        PUBLIC RECORD." WHAT DOES THAT MEAN? HOW CAN YOU

10       DISTORT PUBLIC RECORD?

11  A.   I WILL GO BACK TO THE STARBUCKS AND STANBUCKS

12       CASE. THAT IS A TOTAL DISTORTION OF THE LAW. IT

13       HAS NOTHING TO DO WITH THIS CASE WHATSOEVER, YET

14       YOU MADE ARGUMENTS THAT IT DID.

15  Q.   DO YOU HAVE ANY MORE EXAMPLES BESIDES THAT?

16  A.   THAT'S MY MAIN EXAMPLE. I PROBABLY DO, BUT I

17       DON'T HAVE THAT INFORMATION IN FRONT OF YOU, IN

18       FRONT OF ME.

19  Q.   AND WHERE IS IT THAT YOU RECOLLECT A STARBUCKS

20       CASE WAS CITED?

21  A.   YOU CITED THE STARBUCKS VERSUS STANBUCKS CASE

22       AS -- BECAUSE IT WAS A COPYRIGHT AND SERVICE MARK

23       INFRINGEMENT CASE. AND SAID THAT, YOU KNOW,

24       STANBUCKS LOST AND HAD TO CHANGE THEIR NAME. AND

25       THEREFORE -- YOU KNOW, I DON'T KNOW HOW YOU
```

Page 119

1       RELATED IT, BUT YOU DID.

2   MR. ELWELL:

3       LET'S GO OFF THE RECORD FOR A MOMENT.

4   (OFF THE RECORD; BRIEF RECESS)

5   EXAMINATION RESUMED BY MR. ELWELL:

6   Q.   MR. SMITH, WE'RE STILL TALKING ABOUT EXHIBIT 14.

7        I'LL REPRESENT TO YOU ON THE RECORD THAT DURING

8        THE BREAK I HAVE CHECKED MY FILE AND CANNOT LOCATE

9        IN ANY BRIEF THAT I FILED WITH THE COURT IN THIS

10       CASE ANY REFERENCE TO ANY CASE INVOLVING

11       STARBUCKS.  SO BASED ON THAT, I'LL ASK YOU IF IT'S

12       POSSIBLE THAT YOU'RE THINKING OF SOME OTHER MATTER

13       AND NOT THIS CASE --

14  A.   MUST BE.

15  Q.   -- WHEN YOU HAVE REFERRED TO ANY STARBUCKS CASE.

16  A.   I'M SORRY I GOT THAT INACCURATE.

17  Q.   IS THERE ANY OTHER REFERENCE THAT YOU CAN MAKE TO

18       SOMETHING THAT YOU WOULD CONSIDER TO BE A NON-

19       SEQUITUR ARGUMENT IN ANY WRITTEN SUBMISSIONS BY

20       THIS PARTY TO THE COURT IN THIS CASE?

21  A.   THIS WAS ALL FILED SO LONG AGO THAT I CAN'T

22       REMEMBER AT THIS TIME.

23  Q.   NEAR THE BOTTOM OF THIS PAGE YOU INDICATE,

24       "OPPOSING ATTORNEY ELWELL HAS FILED A MOTION THAT

25       I RETYPE AND RE-WORD MY ARGUMENTS IN MY COUNTER

Page 120

```
 1        SUIT AND DOCUMENTS FILED THUS FAR."  YOU'RE

 2        REFERRING TO THE MOTION TO STRIKE THAT WE FILED IN

 3        THIS CASE?

 4   A.   NO.  YOU SAID THE EXACT SAME THING, THAT I WAS

 5        MAKING RIDICULOUS -- I THINK YOU USED

 6        "UNINTELLIGIBLE STATEMENTS" TO THE COURT, AND YOU

 7        REQUESTED THAT I RETYPE MY --

 8   Q.   YOU DISAGREE THAT A LOT OF WHAT YOU SENT TO THE

 9        COURT DOESN'T MAKE ANY SENSE?

10   A.   I DISAGREE WITH THAT, YEAH.

11   Q.   AND YOU DISAGREE THAT A LOT OF WHAT YOU SENT TO

12        THE COURT AREN'T EVEN PROPER ENGLISH SENTENCES?

13   A.   IT'S GOOD ENOUGH.

14   Q.   GOOD ENOUGH MEANING WHAT, THAT THEY ARE OR THEY

15        AREN'T PROPER ENGLISH SENTENCES?

16   A.   I AGREE THAT THEY ARE GOOD ENOUGH.  I MEAN YOU'VE

17        MADE A COUPLE GRAMMATICAL MISTAKES, GRAMMAR

18        MISTAKES TOO, I'M SURE.

19   Q.   BUT CAN YOU NAME ONE NOW THAT I'VE MADE IN THIS

20        CASE?

21   A.   YES.  IN FACT, I HAVE AN EXAMPLE OF ONE, A

22        DOCUMENT THAT YOU PRESENTED TO THE COURT THAT WAS

23        NOT ACCURATE.  WHERE WAS MY PAPERWORK?  (REVIEWING

24        DOCUMENTS).  THERE YOU GO.

25   Q.   WHAT'S THIS?
```

Page 121

1    A.    THAT'S WHERE YOU SENT ITEMS TO ME FOR THE FIRST

2          THREE MONTHS OF ALL THIS LITIGATION.

3    Q.    TO THE INCORRECT ADDRESS?

4    A.    TO THE INCORRECT ADDRESS.  IT TOTALLY CONFUSED THE

5          COURT AND EVERYTHING ELSE, BECAUSE THEY WERE

6          SENDING IT TO THE WRONG ADDRESS AS WELL.

7    Q.    AND THAT'S A GRAMMATICAL MISTAKE WHY?

8    A.    YEAH, BECAUSE I DON'T LIVE AT 5-B AND I DON'T LIVE

9          AT 600 CLEVELAND STREET.  THIS IS ATTACHED TO ALL

10         YOUR ARGUMENTS.

11   Q.    WHAT PART OF A TYPED ADDRESS IMPLICATES ANY

12         GRAMMAR RULES?

13   A.    THAT IT REPRESENTS POOR FACT CHECKING ON YOUR

14         PART.

15   Q.    IS THAT THE ONLY EXAMPLE YOU CAN STATE AT THIS

16         TIME?

17   A.    THAT'S A REALLY GOOD EXAMPLE THAT I HAVE.  ALSO,

18         MY NAME IS SPELLED PHILIP WITH ONE "L", NOT PHILIP

19         WITH TWO L'S.

20   Q.    AND IS IT YOUR CONTENTION THAT THIS OFFICE

21         GENERATED THAT COVER SHEET?

22   A.    YES.

23   Q.    I'LL REPRESENT TO YOU THAT IT DID NOT.

24   A.    THIS WAS SENT TO ME FROM THE COURT, BUT YOUR ITEMS

25         WERE LIKE THIS TOO.

Page 122

1    Q.    I DON'T SUPPLY THE COURT WITH THOSE COVER SHEETS.

2    A.    OKAY.  YOU WERE SENDING IT TO THE SAME ADDRESS,

3          BECAUSE THEY GOT -- MY FIRST FEW GOT BOUNCED.

4    Q.    YOU INDICATE ALSO HERE, "I AM A PROFESSIONAL

5          WRITER WITH MANY AWARDS."

6    A.    WE'VE ALREADY COVERED THAT.

7    Q.    THESE ARE THE SAME AWARDS THAT YOU WERE --

8    A.    YES.

9    Q.    -- REFERRING TO EARLIER THAT YOU WON IN JUNIOR

10         HIGH SCHOOL?

11   A.    THAT'S MY KICK BALL AWARDS.

12   Q.    "MY ARGUMENTS, WHILE POSSIBLY MORE EMOTIONAL THAN,

13         QUOTE, "LEGALESE", END QUOTE, ARE CONCISE AND ALSO

14         HAVE PHYSICAL AFFIDAVIT AND ACTUAL CIRCUMSTANCE TO

15         BACK IT UP AS PREVIOUSLY PRESENTED."  WHAT DOES

16         THAT MEAN?

17   A.    I SUBMITTED THOSE STATEMENTS, AND MY CIRCUMSTANCE

18         -- THAT MEANS THAT I BACKED UP EVERYTHING THAT I

19         HAVE IN THE ARTICLE, BECAUSE IT REALLY HAPPENED.

20   Q.    THAT'S WHAT THAT MEANS?

21   A.    YEAH, EVERYTHING IN THE ARTICLE IS BACKED UP

22         BECAUSE IT REALLY HAPPENED.  AND I HAVE SEVERAL

23         PEOPLE THAT CAN PROVE IT.  DAVID BUZZELL CAN PROVE

24         IT, AND MIKE LANE CAN PROVE IT, AND TY SHOULD

25         ADMIT IT.

Page 123

1   Q.   WELL, MAYBE WE'LL JUST TAKE THOSE FOLKS'

2        DEPOSITIONS AND SEE WHAT THEY REMEMBER.

3   A.   YEAH, I'M SURE YOU WILL.

4   Q.   YOU SAY IN HERE ALSO, "PROOF EXISTS THAT SCHMIDT

5        HIRED A REPUTATION MANAGEMENT FIRM CALLED

6        CONVERSEON TO BURY MY ARTICLES WITHIN SEARCH

7        ENGINES EVEN THOUGH THE COURT RULED AGAINST THE

8        REMOVAL AND AN INJUNCTION HEARING."  WHAT'S YOUR

9        BASIS FOR SAYING THAT MR. SCHMIDT HIRED A FIRM

10       CALLED CONVERSEON?

11  A.   WHO ELSE WOULD HIRE CONVERSEON TO BURY THE

12       ARTICLE?  THAT DOESN'T MAKE ANY SENSE.

13  Q.   WHERE IS CONVERSEON LOCATED?

14  A.   I THINK THEY'RE IN VIRGINIA.

15  Q.   AND HOW DO YOU KNOW THAT THEY WERE HIRED?  ARE

16       THEY THE ONES THAT PUT OUT THOSE BOTS?

17  A.   CENSOR BOT, YES, AND MADE A GATEWAY PAGE FROM MY

18       PAGE.

19  Q.   YOU SAY, "PROOF EXISTS THAT SCHMIDT HIRED THIS

20       FIRM."  WHAT PROOF EXISTS?

21  A.   I HAVE THE ACTUAL PAGE WHERE MY GATEWAY PAGE WAS,

22       AND I HAVE -- I DON'T UNDERSTAND SEARCH ENGINE

23       REPUTATION MANAGEMENT.  I MEAN, WHO ELSE WOULD DO

24       THAT FOR THAT ARTICLE?  THAT WAS THE ONLY ARTICLE

25       ON CONVERSEON AND IT'S ODD THAT THAT CAME JUST

Page 124

1          AFTER THE INJUNCTION RULING.

2     Q.   BUT YOU DON'T KNOW WHETHER MR. SCHMIDT HIRED THAT

3          FIRM?

4     A.   I DO NOT.  I COULD FIND OUT.

5     Q.   YET YOU FEEL COMFORTABLE REPRESENTING THAT TO THE

6          COURT IN THIS DOCUMENT?

7     A.   YES, I DO.

8     Q.   ARE YOU FAMILIAR WITH RULE 11 AT ALL UNDER FEDERAL

9          RULES THAT INDICATES THAT IF YOU SIGN A PAPER

10         FILED WITH THE COURT, YOU'RE TO HAVE A GOOD FAITH

11         BASIS FOR ANYTHING THAT YOU SAY IN THE PAPER?

12    A.   I ALSO KNOW THAT I'M PRO SE.

13    Q.   THAT DOESN'T MEAN THAT THE FEDERAL RULES DON'T

14         APPLY TO YOU.  DO YOU UNDERSTAND THAT?

15    A.   I UNDERSTAND THAT.

16    Q.   YOU WOULD AGREE THEN, THAT YOU LACK A GOOD FAITH

17         BASIS FOR MAKING THE STATEMENT THAT MR. SCHMIDT

18         HIRED --

19    A.   AND THE COURT WOULD AGREE --

20    Q.   -- THE FIRM?

21    A.   THE COURT WOULD AGREE ALSO THAT THIS IS A NON-

22         ISSUE TO A SERVICE MARK CASE.

23    Q.   IT'S AN ISSUE THAT YOU BROUGHT UP IN THIS FILING,

24         NOT BIDZIRK, CORRECT?

25    A.   OKAY.

Page 125

1  Q.  THIS IS YOUR FILING?

2  A.  YES.

3  Q.  YOU WOULD AGREE THAT YOU HAVE NO GOOD FAITH BASIS

4      FOR STATING THAT MR. SCHMIDT HIRED CONVERSEON TO

5      DO ANYTHING --

6  A.  NO.  I BELIEVE THAT I DO HAVE A GOOD, A

7      REASONABLE --

8  Q.  WHAT'S YOUR GOOD FAITH BASIS, OTHER THAN SAYING

9      WHO ELSE COULD IT BE?

10 A.  THAT'S MY GOOD FAITH.

11 Q.  DO YOU HAVE ANY OTHER EVIDENCE THAT YOU THINK

12     INDICATES THAT MR. SCHMIDT HIRED CONVERSEON OTHER

13     THAN YOUR GENERAL FEELING THAT IT MUST BE HIM?

14 A.  WELL, FIRST OF ALL, I'VE BEEN WRITING ON MY

15     WEBSITE FOR A VERY, VERY LONG TIME.  FIVE YEARS.

16     I HAVE NEVER EVEN REMOTELY HEARD OF SEARCH ENGINE

17     REPUTATION MANAGEMENT UNTIL THIS CAME UP.  AND

18     THEN ONE DAY I GOOGLED FOR BIDZIRK AND MY ARTICLE

19     DIDN'T COME UP ANYMORE.  AND SO I STARTED DOING

20     RESULTS THAT WERE OMITTED, AND THAT PAGE CAME UP

21     FOR CONVERSEON.  SO I CONTACTED THEM, AND I WILL

22     SHOW YOU HOW I CONTACTED THEM.

23 Q.  REGARDLESS, DID ANYBODY AT CONVERSEON SAY, "OH, WE

24     WERE HIRED BY BIDZIRK, OR WE WERE HIRED BY TY

25     SCHMIDT"?

Page 126

1    A.    LIKE I SAID, I WILL HAVE TO SUBPOENA THAT

2          INFORMATION.  THEY CAN'T GIVE OUT INFORMATION

3          ABOUT THEIR CLIENTS.

4    Q.    SO YOU DON'T HAVE ANY EVIDENCE THAT MR. SCHMIDT

5          HIRED CONVERSEON TO DO ANYTHING, WHETHER BIDZIRK

6          HIRED CONVERSEON TO DO ANYTHING?

7    A.    A REASONABLE --

8    Q.    YOU HAVE A SUSPICION?

9    A.    YES.

10   Q.    YOU HAVE NOTHING ELSE BUT YOUR PERSONAL SUSPICION?

11   A.    YES, AND THAT'S GOOD FAITH FOR ME.

12   Q.    GOOD FAITH FOR YOU?

13   A.    YES.

14   Q.    WHY IS THAT GOOD FAITH FOR YOU?

15   A.    I'VE NEVER HAD IT HAPPEN ON ANY OF MY OTHER

16         ARTICLES.  AND I'VE WRITTEN, YOU KNOW, A LOT MORE

17         DETAILED ARTICLES ABOUT OTHER THINGS.  AND NO ONE

18         HAS EVER DONE THAT BEFORE.  AND I THINK THAT THEY

19         HAVE THE -- I THINK THAT JACK CAMPBELL WOULD HAVE

20         HAD THE ACUMEN TO DO THAT, DO SOMETHING LIKE THAT.

21         I'VE WRITTEN A LOT MORE STUFF ABOUT HIM.

22   Q.    YOU ALSO INDICATED THAT HE'S UNSTABLE, RIGHT?  SO

23         MAYBE HE DOESN'T --

24   A.    TY SCHMIDT WAS UNSTABLE WITH ME ON THE DAY THAT WE

25         HAD OUR LAST MEETING.

Page 127

1    Q.   WHY DO YOU THINK THAT ANYBODY THAT MIGHT GET UPSET

2         WITH YOU MUST BE UNSTABLE?

3    A.   NOBODY GETS UP AND SHAKES THEIR FINGER AND ALMOST

4         HITS SOMEBODY'S NOSE AND SAYS, "WELL, YOU JUST DO

5         THAT, THEN.  SUE US, IF YOU WANT THE MONEY."

6    Q.   DID YOU MAKE ANY POSTING ABOUT YOUR EXPERIENCE

7         WITH THE WEGENER COMPANY?

8    A.   YES.

9    Q.   AND THAT WAS IN FEBRUARY OF THIS YEAR?

10   A.   YES.

11   Q.   AND IT'S TRUE, ISN'T IT, THAT YOU INDICATED IN

12        THOSE POSTINGS THAT PEOPLE SHOULD GATHER AROUND

13        WITH THEIR PITCHFORKS AND TORCHES AND MARCH ON

14        WEGENER LIKE THEY DO IN HORROR MOVIES, AND THAT

15        THEY SHOULD TAKE MOLATOV COCKTAILS WITH THEM, TOO?

16        DID YOU WRITE THAT?

17   A.   I WAS MAKING -- AND THAT WAS NOT PUBLISHED IN

18        FEBRUARY.  THAT MIGHT HAVE BEEN RE-PUBLISHED IN

19        FEBRUARY.  IT WAS PUBLISHED IN OCTOBER OF LAST

20        YEAR.

21   Q.   WELL, REGARDLESS OF WHEN IT WAS PUBLISHED OR RE-

22        PUBLISHED --

23   A.   THAT WAS A -- THAT WAS ALSO A ALLEGORY TALE WHERE

24        I TALKED ABOUT ATTACK OF THE WAYGONER.  THAT WAS A

25        -- THAT WAS MEANT TO BE FUNNY, NOT TO BE TAKEN

Page 128

1          SERIOUSLY.  AND NO ONE WOULD TAKE THAT SERIOUSLY.

2     Q.   NO ONE WOULD?

3     A.   NO ONE.

4     Q.   DO YOU THINK THAT MR. WEGENER READ THAT AND HEARD

5          THAT YOU WERE CALLING FOR HIM TO BE MARCHED UPON

6          AND PEOPLE TO BRING MOLATOV COCKTAILS, AND THAT HE

7          MIGHT NOT --

8     A.   I DON'T CARE WHAT MR. WEGENER THINKS.

9     Q.   YOU DON'T?  YOU DON'T CARE IF YOU WOULD HAVE

10         ALARMED HIM?  AND YOU DON'T THINK IT'S A BIT

11         UNBALANCED FOR SOMEBODY TO SUGGEST THAT PEOPLE

12         SHOULD GO AFTER SOMEBODY WITH PITCHFORKS AND

13         MOLATOV COCKTAILS BECAUSE HE DIDN'T GIVE YOU $400

14         YOU THOUGHT YOU WERE DUE?

15    A.   THAT HAS NOTHING TO DO WITH THE BIDZIRK ARTICLE.

16    Q.   I'M NOT ASKING ABOUT THE BIDZIRK ARTICLE.  I'M

17         ASKING ABOUT THE --

18    A.   I KNOW YOU'RE NOT.

19    Q.   -- WEGENER ARTICLE.

20    A.   SO YOU NEED TO MOVE ON.

21    Q.   NO, YOU NEED TO ANSWER MY QUESTIONS.

22    A.   I'VE ANSWERED YOUR QUESTION GOOD ENOUGH.

23    Q.   NO, YOU HAVEN'T.

24    A.   OKAY, THEN I'LL JUST SIT HERE.

25    Q.   DO YOU THINK THAT THAT'S UNBALANCED AT ALL FOR

Page 129

1        SOMEBODY TO SUGGEST THAT --

2   A.   NO, I DON'T.  IT WAS -- I SAID IT WAS SATIRE.

3   Q.   WHERE DID YOU SAY IT WAS SATIRE?  JUST HERE TODAY?

4   A.   I SAID IT WAS SATIRE.

5   Q.   AND HOW IS IT THAT ANYBODY WOULD KNOW FROM READING

6        THE ARTICLE THAT IT WAS SATIRE?

7   A.   BECAUSE IT'S NOT SERIOUS, TO EVEN START WITH.

8   Q.   EXCEPT THAT YOU WERE ABSOLUTELY ANGRY AT WEGENER

9        COMPANY FOR NOT GIVING YOU THE MONEY.

10  A.   I WASN'T ANGRY.

11  Q.   YOU WEREN'T?

12  A.   I DON'T GET ANGRY LIKE THAT.  I DON'T TAKE

13       REVENGE.

14  Q.   YOU DON'T?

15  A.   NO.

16  Q.   BUT YOU MADE A BETTER BUSINESS BUREAU COMPLAINT

17       ABOUT WEGENER?

18  A.   SURE.  THAT'S NOT VENGEFUL.  YOU KNOW, YOU STAND

19       UP FOR CONSUMER RIGHTS.  WHEN A BUSINESS DOESN'T

20       DO THEIR JOB AND THEY REFUSE TO DO THEIR JOB, YOU

21       TAKE THEM TO THE BETTER BUSINESS BUREAU.

22  Q.   WHAT WAS THIS $400?  WHY WERE YOU OWED $400 BY

23       THEM?

24  A.   IT WAS OVER A PROCESSOR.  AND IF YOU READ THE

25       COMMENTS, THAT'S HAPPENED MORE THAN TEN OR 15

Page 130

1        TIMES WITH DIFFERENT OTHER PEOPLE.  IF YOU READ

2        ALL AROUND THE INTERNET, THERE'S WHOLE OTHER

3        WEBSITES ALL ABOUT DAVID WEGENER AND HOW HE'S

4        CHEATED THEM.  IN FACT, THERE'S A WHOLE WEBSITE

5        JUST DEDICATED JUST TO HIM.

6   Q.   BUT IT'S YOUR TESTIMONY THEN, THAT IF YOU PUT ON

7        YOUR WEBSITE FOR THE WORLD TO LOOK AT, THAT THEY

8        OUGHT TO TAKE A MOLATOV COCKTAIL AND GO VISIT MR.

9        WEGENER?

10  A.   THAT IS NOT MY STATEMENT AT ALL.

11  Q.   IT'S NOT?  THAT'S NOT WHAT YOU WROTE?

12  A.   THAT IS WHAT I WROTE.  I WROTE IT AS SATIRE.

13  (EXHIBIT NO. 15 MARKED [EXCERPTS FROM EBAY]; ATTACHED)

14  EXAMINATION RESUMED BY MR. ELWELL:

15  Q.   I'LL SHOW YOU EXHIBIT 15 AND ASK YOU IF YOU

16       RECOGNIZE THIS DOCUMENT.  IT'S A COLLECTION OF

17       PRINTED POSTINGS FROM AN EBAY FORUM.

18  A.   YES.

19  Q.   AND I'LL ASK YOU IF YOU'VE SEEN THIS BEFORE.

20  A.   YES, AND I'M FAMILIAR THAT THIS HAS BEEN TAKEN

21       DOWN FROM EBAY.

22  Q.   DO YOU KNOW WHY THAT WAS?

23  A.   I DO NOT KNOW.  I HAVE A SUSPICION THAT IT WAS

24       YOURS, YOUR DOING.

25  Q.   WHY IS THAT?

Page 131

1    A.    IT DOESN'T -- THINGS DON'T GET REMOVED FROM EBAY

2          UNLESS YOU HAVE A COURT ORDER OR AN ATTORNEY.  AND

3          THEY CAN'T ANSWER THAT QUESTION UNLESS I SUBPOENA

4          THEM.

5    Q.    THIS IS ANOTHER ONE OF YOUR GOOD FAITH

6          SUPPOSITIONS?

7    A.    THERE'S GOT TO BE A REASON WHY IT WAS TAKEN OFF.

8    Q.    WHY WOULD WE WANT THIS TAKEN OFF?  YOU LOOK LIKE

9          AN ASS IN THIS PIECE.  WHY WOULD I NOT WANT THIS

10         TO STAY ON?

11   A.    BUT I DON'T KNOW WHETHER THAT'S -- YOU KNOW,

12         THAT'S SOMEBODY RELATED TO BIDZIRK RESPONDING

13         THROUGH SOME OF THESE OR NOT.

14   Q.    LET'S JUST START AT THE BEGINNING HERE.  YOU SEE

15         HOW THESE ARE ALL BORDERED BY LITTLE SQUARES.

16         THIS FIRST SQUARE --

17   A.    YES.

18   Q.    -- IT SAYS, "A TERRIBLE EBAY DROP-OFF STORE

19         EXPERIENCE," AND IT'S POSTED BY SOMEBODY CALLED

20         WHISPERSTG.  DO YOU SEE THAT?

21   A.    YES.

22   Q.    IS THAT AN ALTERNATE IDENTITY THAT YOU USE?

23   A.    NO, IT'S NOT.  BUT SOMEBODY TRIED TO MAKE THAT

24         CONNECTION.  I'VE HAD THIS STORY PRINTED -- OR

25         THIS FORUM PRINTED OUT AS WELL.  SOMEBODY TRIED TO

Page 132

```
 1        MAKE THAT CONNECTION DOWN AT THE BOTTOM.  AND
 2        BROWSATORIUM, WHICH IS THIS ONE, WHO IS SOMEBODY
 3        THAT'S AGAINST ME, HAD A BAD EXPERIENCE WITH ME ON
 4        EBAY.  ARNOLD TRADING IS RELATED TO BROWSATORIUM,
 5        AND I CAN PROVE ALL OF THAT.  I CAN PROVE THAT I
 6        HAD A BAD EXPERIENCE.  THEY ACTUALLY BOUGHT
 7        SOMETHING FROM ME, BROWSATORIUM, AND HAD A BAD
 8        EXPERIENCE WITH ME.
 9   Q.   WHICH WAS WHAT?
10   A.   THEY BOUGHT A -- I THINK AN ETHERNET ADAPTER FROM
11        ME, AND IT WAS A BAD EXPERIENCE.  IT RESULTED IN A
12        PAYPAL DISPUTE AND --
13   Q.   WHEN YOU SAY IT WAS A BAD EXPERIENCE, WHAT?  IT
14        WAS BROKEN?  IT DIDN'T GET SHIPPED ON TIME?  WHAT
15        HAPPENED?
16   A.   THEY COULDN'T MAKE IT WORK.  AND I KNEW THAT IT
17        WORKED.  AND I SHIPPED THEM ANOTHER ONE, AND THEY
18        SAID IT STILL DIDN'T WORK.  AND I SELL, YOU KNOW,
19        A COUPLE DOZEN OF THOSE A MONTH.  AND I KNOW THAT
20        IT WORKS.  IF I SHIPPED THEM ANOTHER ONE AND I
21        TESTED IT, I KNOW THAT IT WORKS.  AND ARNOLD
22        TRADING IS ACTUALLY RELATED TO THEM.  IF YOU LOOK
23        AT THEIR ID'S, THEY'RE IN THE SAME GENERAL AREA.
24        YOU KNOW, I KNOW THERE'S A WHOLE BUNCH OF PEOPLE
25        ON EBAY, BUT IT'S KIND OF FUNNY THAT THOSE TWO
```

Page 133

```
 1        WERE GOING BACK AND FORTH WITH EACH OTHER.

 2   Q.   BUT YOU DON'T KNOW THAT THEY'RE RELATED.  YOU JUST

 3        ARE AWARE THAT THEY'RE PHYSICALLY CLOSE TOGETHER.

 4   A.   I DON'T KNOW THAT 100 PERCENT, BUT BROWSATORIUM

 5        AND ARNOLD TRADING ALSO SELL THE SAME GENERAL KIND

 6        OF ITEMS.  SO THERE'S A LOT OF CONNECTIONS THAT

 7        COULD BE MADE THERE, TOO.

 8   Q.   SO YOU PRESUME THAT THEY'RE SOMETHING OTHER THAN

 9        COMPETITORS?

10   A.   YES.  AND SOME OF THESE ARE ALSO EBAY DROP-OFF

11        STORES THAT ARE COMPLAINING.  AND THEY DON'T WANT

12        ANYTHING BAD ABOUT THEM, ABOUT EBAY DROP-OFF

13        STORES ON THE INTERNET.

14   Q.   HOW IS IT THAT YOU CAME TO BE AWARE OF THIS

15        MESSAGE BOARD BEFORE YOU --

16   A.   OH, THIS WAS IN A SEARCH FOR EBAY DROP-OFF STORES.

17        AND IF YOU LOOK, LIKE ARNOLD TRADING IS SAYING,

18        "BUT BASICALLY BIASED AGAINST A SELLER ASSISTANT,

19        TRADING ASSISTANT."  WELL, I MEAN, THAT'S

20        OBVIOUSLY MEANING THAT HE'S A TRADING ASSISTANT OR

21        SELLER ASSISTANT --

22   Q.   WHY?

23   A.   -- BECAUSE THIS WAS A TRADING ASSISTANT BOARD, FOR

24        ONE.  IF YOU LOOK UP HERE AT THE TOP, IT'S A

25        TRADING ASSISTANT BOARD.  SO EVERYBODY THAT'S
```

Page 134

```
 1        GOING TO BE RESPONDING TO THIS IS GOING TO BE
 2        BIASED AGAINST THAT ARTICLE.  AND AGAIN, I WILL
 3        STATE TO YOU, ALL YOU HAVE TO DO IS GO TO A FORUM
 4        ON BILLOREILLY.COM AND FIND OUT ALL THE STUFF THAT
 5        HE GETS CRITICIZED ABOUT.  EVEN IF HE SAYS
 6        SOMETHING THAT IS FORGIVING TO THE DEMOCRATIC
 7        PARTY, THEY STILL JUMP ALL OVER HIM.  SO, I MEAN,
 8        THIS HAS NOTHING TO DO WITH THE CREDIBILITY OF MY
 9        ARTICLE, BECAUSE SOME OTHER PEOPLE ARE TALKING
10        ABOUT IT.  BECAUSE I DELETE ALL COMMENTS THAT COME
11        IN ON THAT BIDZIRK ARTICLE, PERIOD.  I DELETE THEM
12        ALL, EVEN IF THEY'RE POSITIVE.
13   Q.   WHY?
14   A.   BECAUSE I DON'T WANT ANY DISCUSSION ABOUT IT.
15   Q.   WHY IS THAT?
16   A.   I JUST DON'T WANT ANY DISCUSSION ABOUT IT.
17   Q.   WHY?
18   A.   MY DECISION.
19   Q.   I'M ASKING YOU WHY.
20   A.   I'M TELLING YOU WHY.
21   Q.   NO, YOU'RE NOT.  I MEAN YOU'RE SAYING BECAUSE,
22        ESSENTIALLY, WHICH IS NOT A REASON.  WHY DO YOU
23        NOT WANT IT DISCUSSED?
24   A.   MY REASON IS I JUST DON'T WANT A DISCUSSION ABOUT
25        IT.  I'VE DISCUSSED IT ENOUGH.  AND
```

Page 135

1      AMITHEONLYONE.ORG DISCUSSES IT A HECK OF A LOT

2      MORE THAN I DO, AND I WOULD RATHER THE DISCUSSION

3      BE THERE IN THEIR FORUMS.

4    Q.    YOU SEE ON THE SECOND PAGE OF THIS THERE'S

5      SOMEBODY THAT'S CALLED LEGALPRO-CDS.  IT SAYS, "I

6      AM EMBARRASSED TO SAY THAT I STUCK IT OUT FOR TWO-

7      THIRDS OF THE QUOTE, "ARTICLE," END QUOTE.  I'LL

8      SAVE OTHERS THE TROUBLE."

9    A.    OKAY.

10   Q.    "THIS AUTHOR/LEGAL SCHOLAR/EBAY GURU/COMPUTER

11     HARDWARE EXPERT/ADVERTISING EXECUTIVE, AND ALL

12     AROUND GOOD GUY HIRES A TA TO SELL A WAREHOUSE

13     FULL OF GOODS AND COMPLAINS ABOUT EVERY ASPECT OF

14     THE OPERATION, INCLUDING PERSONAL TRAITS OF ALL

15     INVOLVED.  IN THE END, HE COULD HAVE DONE IT ALL

16     BETTER, FASTER, SMARTER, AND MADE MORE MONEY, BUT

17     HE THOUGHT HIS TIME WOULD BE BETTER SPENT

18     CRITIQUING IN A BLOVIATING BLOG."

19   A.    OKAY, AND WHAT AUTHORITY DOES HE HAVE ON MY

20     ARTICLES?  AND YOU READ IT WRONG, TOO.  HE HAS

21     "FATSER" INSTEAD OF "FASTER".

22   Q.    WELL, HE DID MAKE A TYPO.  I STAND CORRECTED.

23   A.    SO WHAT AUTHORITY DOES THAT HAVE?  AND HOW DO I

24     KNOW THAT WASN'T TY OR SOMEBODY AT BIDZIRK, OR

25     SOME --

Page 136

```
 1   Q.   CAN'T YOU GO LOOK UP THE PROFILE?

 2   A.   I'M SURE YOU CAN.

 3   Q.   WHY WOULD IT NECESSARILY BE THE CASE THAT SOMEBODY

 4        WHO'S CRITICAL OF YOU WOULD HAVE TO, FOR INSTANCE,

 5        BE SUING YOU OR --

 6   A.   NO, THEY DON'T HAVE TO BE.

 7   Q.   -- BE AWARE OF YOU PERSONALLY AND --

 8   A.   THEY DON'T HAVE TO BE.  BUT THIS GUY IS OBVIOUSLY

 9        NOT AN AUTHOR HIMSELF, OR HE -- YOU KNOW.

10   Q.   WHY IS THAT?

11   A.   WELL, HE DID -- YOU KNOW, HE MADE SOME TYPOS.  AND

12        THAT FIRST -- IF YOU CAN TELL ME THAT THAT FIRST

13        THING IS A SENTENCE, THEN -- "SPECIAL BONUS.  HE

14        TELLS CUSTOMERS HOW TO PROTECT THEMSELVES SINCE

15        THEY'RE NOT AUTHORS, LEGAL SCHOLARS, HARDWARE," --

16        AND THAT'S EXACTLY WHAT THE COURT SAID THAT WAS IN

17        MY FAVOR, BY THE WAY.

18   Q.   WHAT?

19   A.   THAT SAID, "SPECIAL BONUS.  HE TELLS CUSTOMERS HOW

20        TO PROTECT THEMSELVES."  I GAVE -- IT SAYS,

21        "BECAUSE SMITH GAVE A LIST OF WAYS TO USE EBAY

22        SELLERS, I FIND THIS ARTICLE NEWS AND NEWS

23        COMMENTARY AND AFFIRMATIVE."

24   Q.   YOU DON'T KNOW WHO LEGALPRO-CDS IS?  YOU NEVER

25        POSTED WITH THAT PERSON BEFORE?
```

Page 137

1    A.    NO, I DON'T KNOW WHO THAT IS.

2    Q.    DO YOU SEE THE NEXT PERSON ON PAGE THREE?  TOMART,

3          T-O-M-A-R-T, 2000?

4    A.    OKAY.

5    Q.    IT SAYS, "WHILE I SHOULD HAVE JUST STUCK TO THE

6          SUMMARY PROVIDED ABOVE FOR A JOURNALIST/GURU/GEEK,

7          WHATEVER, HE SURE WRITES LIKE A PSYCHOTIC.  LIKED

8          THE DITTOHEAD LEGAL DIGRESSIONS.  IF THIS GUY'S A

9          JOURNALIST, I'D LIKE TO MEET HIS EDITOR."

10   A.    OKAY, THESE ARE NOT PROFESSIONAL OPINIONS.

11   Q.    "THE MAN MUST BE AS SERENE AS THE DALAI LAMA.

12         MOST FASCINATING WAS THE ACCOUNT OF THE MEETING

13         WHERE HE TOLD HIS ERSTWHILE TRADING ASSISTANT HOW

14         HE SHOULD RUN HIS BUSINESS."

15   A.    OKAY.  I DON'T KNOW WHETHER THAT WAS YOU OR TY, OR

16         SOMEBODY THAT WORKS AT BIDZIRK, OR A FAMILY

17         MEMBER, OR SOMEBODY WITH TY, OR A FAMILY MEMBER OF

18         JILL'S.

19   Q.    IT WASN'T ANY OF US.  DO YOU KNOW WHO THIS PERSON

20         IS?

21   A.    BUT YOU DON'T KNOW WHO IT IS EITHER.  SO WHY DO

22         THESE OPINIONS MATTER?  IF THESE OPINIONS EXIST ON

23         EVERY WEBSITE OUT THERE, THAT ARE CRITICAL OF

24         EVERY ARTICLE OF EVERYTHING ON THE INTERNET, WHY

25         DO THESE MATTER IN ANY WAY?  AND BESIDES, THIS HAS

Page 138

1          BEEN REMOVED FROM EBAY.

2    Q.    BUT YOU DON'T KNOW WHY THAT IS?

3    A.    I IMAGINE IT'S BECAUSE IT'S IN LITIGATION AND

4          SOMEBODY ALERTED THEM TO THAT FACT.  OR MAYBE EBAY

5          THEMSELVES WENT TO THE ARTICLE AND FOUND THAT IT

6          WAS IN LITIGATION AND TOOK IT OFF.  I DON'T KNOW

7          AND EITHER DO YOU, UNLESS YOU DID IT.

8    Q.    BUT YOU'RE NOT CONTENDING THAT BIDZIRK TOOK THE

9          ARTICLE DOWN?

10   A.    I'M NOT SAYING THAT THEY DIDN'T.  I'M NOT SAYING

11         THAT YOU DIDN'T HAVE ANY INVOLVEMENT IN IT, NO.  I

12         MEAN I'M SAYING THAT YOU COULD HAVE, BUT I DON'T

13         KNOW.  THESE ARE NOT PROFESSIONAL OPINIONS.

14   Q.    WHY ARE THEY NOT PROFESSIONAL OPINIONS?

15   A.    THEY'RE JUST FORUM PEOPLE.  THEY'RE ONE OF THE

16         HUNDRED MILLION PEOPLE THAT ARE ON EBAY.

17   Q.    AND WHY IS THAT DIFFERENT THAN YOUR OPINION?

18   A.    I'VE BEEN ON EBAY TEN YEARS.

19   Q.    HOW DO YOU KNOW NONE OF THESE PEOPLE HAVE?

20   A.    A HUNDRED AND 12 FEEDBACK?  NO.  TWO FEEDBACK?

21         NO.  TWENTY-NINE FEEDBACK?  NO.

22   Q.    WELL, HOW ABOUT THE GUY ON PAGE TWO THAT HAS 2,776

23         FEEDBACKS?  HOW ABOUT THE GUY ON PAGE THREE THAT

24         HAS 2,779 FEEDBACK?

25   A.    OKAY.

Page 139

1    Q.    THAT'S MORE THAN YOU HAVE.  YOURS HAS 2,641,

2          RIGHT?  YOU'RE THE APPLE PEOPLE, AREN'T YOU?

3    A.    OKAY, YES.

4    Q.    SO BASICALLY THE GIST OF SEVERAL OF THESE POSTS --

5    A.    AND HOW DID YOU FIND THIS?

6    Q.    CAN I FINISH MY QUESTION, PLEASE?

7    A.    BECAUSE YOU MUST HAVE BEEN LOOKING FOR IT, OR YOU

8          POSTED IT YOURSELF.

9    Q.    CAN I FINISH MY QUESTION?

10   A.    YES.

11   Q.    THE GIST OF SEVERAL OF THESE POSTS IS THAT

12         BASICALLY YOU ASKED SOMEBODY ELSE TO DO SOMETHING

13         FOR YOU, AND THEN TURNED AROUND AND CRITICIZED

14         EVERY SINGLE ASPECT OF HOW THEY DID IT.

15   A.    OKAY.

16   Q.    AND DECIDED TO PUBLISH SOMETHING ABOUT HOW YOU

17         COULD HAVE DONE IT A LOT BETTER.

18   A.    YEAH, I GOT CHEATED.  BUT I DIDN'T -- I MEAN IT'S

19         OBVIOUS THAT I DIDN'T DO IT OUT OF REVENGE, AND

20         THAT'S WHAT THE COURT HAS SAID.

21   Q.    WHY IS IT OBVIOUS THAT YOU DIDN'T DO IT OUT OF

22         REVENGE?

23   A.    BECAUSE I GAVE A CHECK LIST FOR PEOPLE TO USE EBAY

24         DROP-OFF STORES.  AND BESIDES, BIDZIRK IS DOING

25         BETTER THAN THEY'VE EVER DONE AS FAR AS I CAN SEE

Page 140

1        ON EBAY.

2   Q.   I THOUGHT THAT YOU INDICATED THAT THEY WERE IN NO

3        WAY PROFITABLE BASED ON YOUR KNOWLEDGE OF WHAT

4        THEY MUST DO AS FAR AS THEIR BUSINESS GOAL.

5   A.   I DIDN'T SAY THEY WERE PROFITABLE.  I JUST SAID

6        THAT THEY'RE -- BY THEIR EBAY SALES, THEY'RE

7        SELLING MORE THAN THEY'VE EVER SOLD.

8   Q.   BUT IS IT NOT YOUR TESTIMONY TODAY THAT YOU'RE

9        SAYING BIDZIRK HAS NOT SOLD ENOUGH TO COVER THEIR

10       OVERHEAD?

11  A.   THE DROP-OFF MODEL IS FLAWED.

12  Q.   ARE YOU SAYING THAT BIDZIRK IS NOT SELLING ENOUGH

13       TO COVER ITS OVERHEAD?

14  A.   I'M NOT SAYING THAT.  FROM MY OBSERVATION AND MY

15       MARKET RESEARCH ON EBAY DROP-OFF STORES, AND FROM

16       MY CONSULTATIONS WITH THE ATTORNEY FOR

17       AMITHEONLYONE.ORG, AND MY -- AND YOU CAN CATCH ME

18       ON THE SEMANTICS OF WHETHER I'M SAYING THAT RIGHT.

19       BUT I'VE HAD DISCUSSIONS WITH THE ATTORNEY FOR

20       AMITHEONLYONE.ORG WHO IS SUING ALL THE I SOLD IT

21       CHAIN.  IT'S NOT --

22  Q.   WHO IS THAT ATTORNEY?

23  A.   A GUY OUT OF ATLANTA.  I CAN'T REMEMBER HIS NAME

24       EITHER.  SORRY.  I WILL GET THAT INFORMATION FOR

25       YOU.  IF YOU CAN SEND ME ANY INFORMATION THAT YOU

Page 141

1       WANT THAT I COULD NOT REMEMBER THE INFORMATION, I

2       WILL GET IT FOR YOU.

3   Q.  YOU SAY IN HERE ON SEPTEMBER THE 1ST, THIS IS PAGE

4       NINE, YOUR POST, IT SAYS, "APPARENTLY NONE OF YOU

5       ACTUALLY READ THE ARTICLE, AND IT SEEMS SOME OF

6       YOU ARE TROLLING."

7   A.  YES.

8   Q.  THE WORD "TROLLING", JUST FOR THE RECORD, MEANS

9       WHAT?

10  A.  SOMEONE WHO IS DIRECTLY RELATED TO THE ISSUE AND

11      IS BIASED AGAINST THE ISSUE.  I MEAN THAT'S WHAT

12      THE DEFINITION OF A TROLL IS.  WHEN SOMEBODY

13      TROLLS LIKE A MAC ARTICLE THAT I DO, THAT I --

14      WHERE IF I CRITICIZE APPLE COMPUTER, YOU ALWAYS

15      GET SOMEBODY THAT COMES IN AND SAYS, "HOW COULD

16      YOU SAY SOMETHING BAD ABOUT APPLE COMPUTER?"

17      THESE ARE TRADING ASSISTANTS, MOST OF THEM.  AND

18      THEY'RE ALL BIASED AS TRADING ASSISTANTS.  BUT,

19      YOU KNOW, I MEAN, THEY HAVE THE RIGHT TO CRITICIZE

20      MY ARTICLE.

21  Q.  ARE YOU NOT DOING THE SAME THING WHEN YOU JUMP IN

22      AND SAY, "I'M THE AUTHOR AND YOU GUYS DON'T

23      UNDERSTAND MY ARTICLE"?

24  A.  SURE I AM.

25  Q.  ARE YOU TROLLING AS WELL?

Page 142

1    A.    SURE I AM.  THERE'S NOTHING WRONG WITH THAT.  BUT,

2          YOU KNOW, AGAIN, HOW AM I TO KNOW THAT, YOU KNOW,

3          YOU OR SOMEBODY RELATED TO BIDZIRK WASN'T THE ONE

4          THAT STARTED THAT?

5    Q.    ASSUME FOR THE SAKE OF MY QUESTION THAT THAT ISN'T

6          THE CASE.  NOW WHAT DIFFERENCE DOES THAT MAKE?

7    A.    IT MAKES A BIG DIFFERENCE IF YOU STARTED THE

8          ARTICLE, IF YOU STARTED THE FORUM.

9    Q.    THIS, WHERE IT SAYS, "ANYONE SEE THIS ARTICLE"?

10   A.    YEAH, MAKES A BIG DIFFERENCE.

11   Q.    WHAT BENEFIT WOULD MY CLIENT SEE BY STARTING A

12         FORUM ABOUT THAT?

13   A.    WELL, FOR ONE, IT -- YOU'RE RIGHT, IT IS

14         SUSPICIOUS THAT SOMEBODY STARTED UP A BRAND NEW

15         ID.  THAT WAS A BRAND NEW ID THAT WAS LITERALLY

16         MAYBE A MONTH OLD, THAT WHISPERSTG.  AND THAT'S

17         VERY, VERY SUSPICIOUS.  OR THAT MIGHT HAVE JUST

18         BEEN A TRADING ASSISTANT THAT DIDN'T LIKE MY

19         ARTICLE EITHER AND STARTED UP AN EBAY ID SO THEY

20         COULD START THIS FORUM.  I MEAN YOU CAN SUBPOENA

21         EBAY AND GET THE IP ADDRESS THAT STARTED UP ALL

22         THESE ID'S.  SO, I MEAN, THAT'S THE WAY YOU'D FIND

23         THAT.

24   Q.    YOU SAY AT THE BOTTOM OF YOUR POST, ON PAGE NINE,

25         "THANKS FOR ALL YOUR CRITIQUE AND COMMENTS, NO

Page 143

1          MATTER HOW MANY OF THEM ARE VERY SUSPICIOUSLY

2          ASININE."

3     A.    YES.

4     Q.    WHY DO YOU SAY THAT?

5     A.    I THINK THAT THIS FORUM IS VERY SUSPICIOUS.  AND I

6          ALSO THINK IT'S VERY SUSPICIOUS THAT SOMEONE'S HAD

7          NO RELATION TO THE WHISPERS MOTIF EITHER.  I JUST

8          THINK THAT'S REALLY SUSPICIOUS.  AND THAT MADE ME

9          THINK THAT EITHER THEY WERE BIASED IN THEIR

10         REPORTING, OR IT WAS SOMEBODY RELATED TO BIDZIRK,

11         OR YOU.

12    Q.    DO YOU THINK THAT IT'S INTERESTING THAT IN YOUR

13         OWN BLOG YOU MISUSED THE WORD "MOTIF" ABOUT TWO OR

14         THREE DAYS BEFORE THIS STARTED?

15    A.    OKAY.

16    Q.    YOU DON'T THINK THAT'S AN INTERESTING COINCIDENCE,

17         TOO?

18    A.    WHAT I THINK IS INTERESTING, IS THAT YOU

19         APPARENTLY COMMENT ON MY BLOG REGULARLY ABOUT

20         THINGS LIKE THAT.

21    Q.    WHY DO YOU THINK THAT?

22    A.    IF THAT -- I MEAN I CAN FIND YOUR IP ADDRESS, I

23         GUESS.

24    Q.    LOOK ALL YOU WANT.

25    A.    BUT SOMEBODY IS --

Page 144

1    Q.    HAVE YOU FOUND MY IP ADDRESS?

2    A.    I HAVEN'T LOOKED.

3    Q.    WELL, I'LL REPRESENT TO YOU THAT YOU WON'T SEE IT

4          AS A COMMENT ON YOUR BLOG.

5    A.    OKAY.

6    Q.    SO I DON'T KNOW WHAT SORT OF COMMENTS YOU ARE

7          ATTRIBUTING TO ME.

8    A.    I'LL TAKE YOUR WORD.

9    Q.    WHAT SORT OF COMMENTS ARE YOU ATTRIBUTING TO ME

10         THAT ARE ON YOUR BLOG?

11   A.    YOU KNOW, EVERY NOW AND THEN THERE'S A LITTLE

12         CRUMMY COMMENT.

13   Q.    THEY'RE ALL CRUMMY IF THEY'RE CRITICAL OF YOU,

14         RIGHT?

15   A.    NO.  I RESPOND TO A LOT OF CRITICAL COMMENTS.

16   Q.    SO TELL ME AGAIN WHY --

17   A.    A LOT OF THEM DO SEEM SET-UPS, THOUGH.

18   Q.    OTHER THAN BEING SUSPICIOUS, WHAT MAKES THE OTHER

19         PEOPLE'S COMMENTS ASININE ON THIS FORUM?

20   A.    THEY'RE BIASED.  THEY'RE ALL TRADING ASSISTANTS,

21         WHICH MEANS THAT THEY'RE EBAY DROP-OFF OR

22         SOMETHING SIMILAR.  THAT'S WHAT A TRADING

23         ASSISTANT DOES.  AND THEY'RE ALL BIASED.  AND

24         WHAT, YOU KNOW, MY CRITIQUE OF WHAT MY STORY WOULD

25         BE, THAT SOUNDS LIKE A REALLY SERIOUSLY BAD ISSUE.

Page 145

1        WHAT CAN WE DO TO REMEDY THAT AS AN EBAY DROP-OFF?

2        I MEAN THAT'S A GOOD CRITICISM.  AND, YOU KNOW, I

3        WILL ADMIT I THINK IT'S TOO LONG.  I THINK THE

4        STORY IS TOO LONG.  BUT IT HAD TO BE DETAILED IN

5        ORDER TO GIVE ALL THE DETAILS OF HOW I WAS

6        THOROUGHLY CHEATED.

7   Q.   WHEN DID YOU MAKE THE DECISION IN YOUR MIND, I'M

8        GOING TO WRITE A STORY ABOUT THIS EXPERIENCE THAT

9        I HAD?

10  A.   YOU IMPLY MALICE IN THAT.

11  Q.   NO, WITH BIDZIRK.  I'M NOT TRYING TO IMPLY MALICE

12       AT ALL.  WHEN DID YOU MAKE THE DECISION I'M GOING

13       TO DO A FEATURE ABOUT THIS ON MY BLOG?

14  A.   YOU'RE -- AGAIN, YOUR TONE IMPLIES MALICE.  I

15       DECIDED THAT AS A PART OF MY BECOMING

16       FIXYOURTHINKING.COM, WHICH WAS TO MOVE INTO ACTUAL

17       MAKING MONEY ON MY BLOG, IF I COULD, WOULD BE TO

18       START A FEATURE STORY ONCE A MONTH OR ONCE A

19       QUARTER.  AND THIS WAS A GOOD PERSONAL EXPERIENCE.

20       I HAVE USED PERSONAL EXPERIENCES FOR A VERY LONG

21       TIME IN DISCUSSING STORIES ON MY BLOG.  AND I

22       THOUGHT THIS WOULD BE A GOOD PERSONAL EXPERIENCE

23       SO THAT PEOPLE WOULDN'T GET INTO THE SAME ISSUE

24       THAT I WOULD, AND THAT THEY WOULD HAVE A POSITIVE

25       EXPERIENCE WITH EBAY DROP-OFFS.

Page 146

1    Q.    WHEN DID YOU ARRIVE AT THAT CONCLUSION, THAT YOU

2          WERE GOING TO WRITE ABOUT IT?

3    A.    A COUPLE DAYS AFTER THE LAST MEETING WITH TY.

4    Q.    SO IT'S THE CASE THAT AT THE TIME YOU BEGAN THE

5          RELATIONSHIP WITH MR. SCHMIDT, YOUR PURPOSE WAS

6          JUST TO SELL INVENTORY?

7    A.    THAT IS CORRECT.

8    Q.    AND MAKE MONEY, RIGHT?

9    A.    YES, TO CONSIGN THE INVENTORY TO HIM AND GET AT

10         LEAST HALF OF THE EBAY VALUE.

11   Q.    ON PAGE 11 OF THIS FORUM, THIS LEGALPRO-CDS ALSO

12         SAYS, "YOU COME IN HERE IN THE SPIRIT OF SELF-

13         PROMOTION, LINKING TO SOME ARTICLE, PRETENDING

14         THAT IT IS WRITTEN BY A THIRD PARTY."

15   A.    YES, I SAW THAT TOO.

16   Q.    "THE ARTICLE IS AN 8,000-PLUS WORD, POORLY

17         CONSTRUCTED DIATRIBE WHERE YOU GO BACK AND FORTH

18         BETWEEN CONGRATULATING YOURSELF FOR BEING SO

19         SMART, PARENTHESIS, I WON'T WASTE THE BOARD'S TIME

20         WITH DECONSTRUCTING THE LANHAM ACT, QUOTE

21         "ANALYSIS", END QUOTE, AND DENIGRATING THE SELLER

22         BOTH PERSONALLY AND PROFESSIONALLY." THEN, "YOU

23         LIMP BACK IN UNDER YOUR REAL NAME AND DEFEND THE

24         ARTICLE AS AN ATTEMPT TO EDUCATE WOULD-BE

25         CUSTOMERS."

Page 147

1    A.    OKAY.

2    Q.    LET ME JUST GET THIS STRAIGHT.

3    A.    LEGALPRO-CDS IS OBVIOUSLY A NEWLY REGISTERED ID,

4          AND IT COULD BE ANOTHER ONE OF THESE PEOPLE ON THE

5          BOARD.  IF YOU ALSO LOOK, THIS FORUM WAS STARTED

6          ON AUGUST 20TH.  AND THAT WAS -- LEGALPRO-CDS --

7    Q.    THE POST I JUST READ IS POSTED SEPTEMBER 1ST.

8    A.    YES, BUT WHAT I'M SAYING IS THAT WAS SIGNIFICANTLY

9          AFTER --

10   Q.    TEN DAYS AFTER, RIGHT?

11   A.    YES.  I HAVEN'T DONE THE RESEARCH TO SEE WHO

12         POSTED THESE.  AGAIN, YOU KNOW, IT COULD HAVE BEEN

13         YOU, IT COULD HAVE BEEN TY, COULD HAVE BEEN JOHN,

14         COULD HAVE BEEN TAMARA, COULD HAVE BEEN ANYBODY

15         THAT DISLIKED ME.  COULD HAVE BEEN BILL PALMER,

16         FOR ALL I CARE.

17   Q.    WHAT OTHER WEBSITES ARE YOU AWARE OF WHERE THE

18         ARTICLE THAT YOU WROTE HAS BEEN DISCUSSED?

19   A.    AMITHEONLYONE.ORG.

20   Q.    AND WHAT IS THE PURPOSE OF THAT WEBSITE?

21   A.    THEY ARE IN A CLASS-ACTION.  THE OWNERS OF THAT

22         WEBSITE ARE IN A CLASS-ACTION LAWSUIT AGAINST THE

23         I SOLD IT CHAIN AND THE AUCTION DROP CHAIN.

24   Q.    DO YOU KNOW WHAT THE BASIS OF THAT CLAIM IS?

25   A.    FALSE FRANCHISING CONTRACTS, YOU KNOW, CONTRACT

Page 148

```
1         DISPUTES AMONG FRANCHISERS.
2    Q.   THIS IS PEOPLE THAT OWN I SOLD IT FRANCHISES?
3    A.   THEY -- WELL, THEY WERE.  THEY OWN AN I SOLD IT IN
4         ATLANTA, AND FOUND OUT THAT, YOU KNOW, YOU HAD TO
5         MAKE AN UNREASONABLE AMOUNT OF MONEY IN ORDER TO
6         EVEN KEEP IT AFLOAT.  AND THAT, YOU KNOW, THEIR
7         STATISTICS ON THEIR WEBSITE INDICATE THAT ROUGHLY
8         TWO A DAY GO OUT OF BUSINESS.
9    Q.   WHAT OTHER WEBSITES HAVE DISCUSSED YOUR ARTICLE
10        THAT YOU'RE AWARE OF?
11   A.   THE STRATEGIC OUTLOOK INSTITUTE.  THE TECHNOLOGY
12        LAW BLOG.  I CAN'T THINK OF ANY OTHERS.
13   Q.   ARE YOU INVOLVED IN ANY OTHER LITIGATION NOW?
14   A.   NO.
15   Q.   HAVE YOU EVER SUED ANYONE PREVIOUSLY?
16   A.   WHAT DO YOU MEAN BY THAT?
17   Q.   HAVE YOU EVER FILED A LAWSUIT?
18   A.   YES.
19   Q.   WHEN DID YOU DO THAT?
20   A.   THREE YEARS AGO.
21   Q.   AND WHO WAS IT AGAINST?
22   A.   MY CONDO COMPLEX.
23   Q.   IS THIS RELATED TO THE POT SMOKING AND ALL THAT,
24        THAT YOU REFERENCED AT THE LAST DEPOSITION?
25   A.   NO.
```

1   Q.   WHAT WAS IT ABOUT?

2   A.   IT WAS ABOUT A WATER LEAK IN MY CONDO THAT THEY

3        WANTED ME TO PAY FOR.

4   Q.   WHAT WAS THE RESULT OF THAT CASE?

5   A.   IT GOT DISMISSED.  I GOT -- I GUESS THAT'S IT.

6   Q.   IT WAS DISMISSED?

7   A.   WELL, IT WAS RULED THAT IT WAS NOBODY'S ISSUE.

8   Q.   YOU LOST?

9   A.   NO, I DIDN'T LOSE.  THE CONDO COMPLEX HAD TO PAY.

10  Q.   SO THEY PAID FOR THE LEAK, AND YOU DID NOT?

11  A.   RIGHT.  IT FLOODED THE CONDO BENEATH ME, AND IT

12       WAS IN THE WALLS.  SO IT WAS THEIR FAULT,

13       ACCORDING TO THE REGIME RULES.

14  Q.   THIS IS THE CONDOMINIUM THAT YOU LIVE IN NOW?

15  A.   YES.

16  Q.   AND YOU INDICATED AT YOUR LAST DEPOSITION THAT YOU

17       WERE THE OWNER OF THAT CONDOMINIUM; IS THAT RIGHT?

18  A.   AND THAT WAS NOT CORRECT.

19  Q.   WHY IS IT NOT CORRECT?

20  A.   BECAUSE IT HAS A LIEN ON IT.

21  Q.   DO YOU UNDERSTAND THAT I CAN, OR YOU CAN, OWN

22       SOMETHING THAT HAS A LIEN AGAINST IT AND THAT

23       DOESN'T NECESSARILY DEPRIVE YOU OF THE OWNERSHIP?

24       YOU STILL HAVE IT.

25  A.   BUT SOMEONE HAS A LIEN ON IT, SO --

Page 150

```
 1   Q.   WELL, WE'RE TALKING ABOUT OWNERSHIP OF THE CONDO.

 2        THE DEED HAS YOUR NAME ON IT?  IT'S NOT OWNED BY

 3        YOUR FATHER?

 4   A.   THE DEED THAT HE HAS -- THE COPY OF THE DEED THAT

 5        HE HAS HAS HIM AS THE FIRST LIENHOLDER.

 6   Q.   WHO IS THE GRANTEE ON THAT DEED?  WHEN THE

 7        CONDOMINIUM WAS PURCHASED, IT WAS DEEDED TO YOU;

 8        IS THAT RIGHT?

 9   A.   I GUESS.  I DON'T KNOW.  I DON'T HOLD THE DEED.  I

10        LIVE THERE AND I GIVE MY FATHER $500 A MONTH.

11   Q.   AND HAVE YOU RECEIVED TAX BILLS FOR PROPERTY TAXES

12        AT THAT CONDO?

13   A.   YES, THOSE ARE ESCROWED.

14   Q.   BUT THE TAX BILLS, DO THEY COME TO YOU ADDRESSED

15        TO YOU, OR TO YOUR FATHER?

16   A.   TO MY FATHER.

17   Q.   AT YOUR HOUSE?  AT YOUR CONDO?

18   A.   NO, AT 814 BELL SHOALS ROAD.

19   Q.   WHERE IS THAT?

20   A.   SIX MILE.

21   Q.   SO IF I LOOKED UP YOUR CONDO ADDRESS IN THE

22        GREENVILLE COUNTY TAX ROLLS AND YOU WERE LISTED AS

23        THE ONLY OWNER, THAT WOULD BE INCORRECT SOMEHOW?

24   A.   HE -- I MEAN, AS FAR AS I KNOW, HE GETS THE TAX

25        BILL.  I MAY GET IT.  I DON'T KNOW.  I CAN'T
```

Page 151

```
 1          REMEMBER THAT.

 2     Q.   YOU DON'T KNOW WHO THE RECORD OWNER OF YOUR

 3          CONDOMINIUM IS, WHETHER IT'S YOU --

 4     A.   I DO NOT.

 5     Q.   -- OR YOUR FATHER?

 6     A.   I DO NOT.  I MEAN THAT'S --

 7     Q.   SO IT'S YOUR TESTIMONY THAT YOU DON'T KNOW, NOT

 8          THAT YOU ARE NOT THE OWNER?

 9     A.   I HONESTLY DO NOT KNOW.  BUT I KNOW THAT HE'S TOLD

10          ME THAT HE HAS A LIEN ON MY CONDO AND THAT IT IS

11          NOT MINE, THAT I PAY RENT.

12     Q.   AND WITH REGARD TO THE LIS PENDENS THAT WAS FILED

13          AGAINST THE CONDOMINIUM, IS IT YOUR CONTENTION

14          THAT THAT'S INVALID IN SOME WAY?

15     A.   YES.

16     Q.   WHY?

17     A.   BECAUSE HE -- ON HIS COPY OF THE DEED, IT DOES SAY

18          HIS NAME AS FIRST LIENHOLDER.

19     Q.   DO YOU UNDERSTAND THE DIFFERENCE BETWEEN OWNING

20          SOMETHING AND HAVING A LIEN AGAINST SOMETHING?

21     A.   YES, AND I HAVE A LOAN OUT WITH HIM FOR IT.  I

22          HAVE A LEGAL --

23     Q.   LET ME ASK YOU IF THIS IS WHAT HAPPENED.  YOU

24          BOUGHT THE CONDOMINIUM IN YOUR NAME WITH MONEY

25          THAT YOUR FATHER LOANED YOU, RIGHT?
```

Page 152

```
 1   A.   NO.

 2   Q.   HOW DID YOU BUY THE CONDOMINIUM INITIALLY?

 3   A.   I DIDN'T.  MY -- I WENT TO MY DAD AND SAID, "I'D

 4        RATHER LIVE IN A CONDOMINIUM THAN AN APARTMENT."

 5        AND HE SAID, "OKAY, WELL, I'LL GET SOMETHING AND

 6        YOU CAN JUST PAY ME BACK MONTH TO MONTH."

 7   Q.   WHEN THE CONDOMINIUM WAS PURCHASED -- WELL, LET'S

 8        BACK UP.  WHEN WAS THAT?  WHEN WAS IT PURCHASED?

 9   A.   2000.

10   Q.   DID YOU GO TO THE CLOSING?

11   A.   NO.

12   Q.   DID YOU GIVE YOUR DAD POWER-OF-ATTORNEY?

13   A.   HE HAS POWER-OF-ATTORNEY.

14   Q.   SO YOU DID GIVE IT TO HIM AT SOME POINT?

15   A.   I'M SURE I DID.

16   Q.   AND DID YOU EVER SEE THE DEED AFTER THE CLOSING?

17   A.   NO, I ONLY SAW IT RECENTLY.

18   Q.   WHEN YOU SAW IT RECENTLY, YOUR FATHER MIGHT BE

19        LISTED AS THE HOLDER OF A FIRST MORTGAGE AGAINST

20        THAT PROPERTY, BUT IT'S THE CASE THAT YOU'RE

21        LISTED AS THE RECORD OWNER OF THE PROPERTY, RIGHT?

22        YOU CAN MARKET THE PROPERTY YOURSELF?

23   A.   I DON'T -- I GUESS IT IS.  I MEAN, I SAW HIM AS

24        LIENHOLDER.

25   Q.   ARE THERE ANY OTHER MORTGAGES AGAINST THE PROPERTY
```

Page 153

1        OTHER THAN THE ONE YOUR FATHER HAS AGAINST IT?

2    A.    NO.

3    Q.    DO YOU OWN YOUR CAR?

4    A.    NO.

5    Q.    WHO OWNS THE CAR?

6    A.    HE DOES.

7    Q.    AND IS IT OWNED FREE AND CLEAR?

8    A.    WHAT DO YOU MEAN?  DOES HE HAVE A LOAN ON IT?

9    Q.    IS HE MAKING PAYMENTS ON IT?

10   A.    NO.  BUT IT'S ALSO -- IT WAS TOTALLED IN JULY OF

11         LAST YEAR, AND I HAVE A JUNKED TITLE.  USAA PAID

12         ME OUT SOME MONEY AND THEY JUNKED THE CAR.  BUT

13         THEY SAID, YOU KNOW, SINCE IT'S NOT DAMAGED ON THE

14         PHYSICAL SIDE, YOU CAN CONTINUE TO DRIVE THE CAR.

15         YOU JUST WON'T BE ABLE TO SELL IT.  YOU'LL ONLY BE

16         ABLE TO SELL IT FOR SCRAP.

17   Q.    AND HOW MUCH COMPUTER EQUIPMENT DO YOU HAVE THAT

18         BELONGS TO YOU?

19   A.    LESS THAN 1,500. I MEAN --

20   Q.    THE LAPTOP THAT YOU HAD IN HERE EARLIER, HOW MUCH

21         IS THAT WORTH?

22   A.    ABOUT A THOUSAND.

23   Q.    SO YOUR TESTIMONY IS YOU ONLY HAVE $500 OF OTHER

24         COMPUTER EQUIPMENT?

25   A.    THAT'S CORRECT.

Page 154

1   Q.   DO YOU HAVE COMPUTER EQUIPMENT THAT SOMEBODY ELSE

2        OWNS?

3   A.   NO.

4   Q.   WHAT OTHER COMPUTER EQUIPMENT DO YOU HAVE?

5   A.   THAT'S -- JUST MY LAPTOP.

6   Q.   AND DO YOU HAVE ANY MONITORS OR ANYTHING LIKE

7        THAT?

8   A.   NO.

9   Q.   YOU HAVE NO PERIPHERALS AT YOUR HOUSE?

10  A.   NO.

11  Q.   NO PRINTERS?

12  A.   I HAVE SOME PRINTERS.

13  Q.   NO DIGITAL CAMERAS?

14  A.   I HAVE A DIGITAL CAMERA.

15  Q.   AND WHAT ARE YOU DOING FOR INCOME NOW?

16  A.   RIGHT NOW, PRETTY MUCH JUST DOING THE APPLE

17       CONSULTING AND SELLING ON EBAY.  AND, I MEAN, A

18       LOT OF THAT'S FIZZLED OUT.  I'M PROBABLY GOING TO

19       HAVE TO GO BACK AND LIVE WITH MY DAD.

20  Q.   WHERE DO YOU GET INVENTORY TO SELL ON EBAY?

21  A.   FROM, YOU KNOW, PROCUREMENT SOURCES.

22  Q.   WHAT ARE THOSE?

23  A.   I'M NOT DISCLOSING THAT.  I WAS ADVISED THAT I

24       DON'T HAVE TO DO THAT SINCE YOU ARE A COMPETING

25       BUSINESS THAT YOU WOULD GET EBAY INVENTORY FOR.  I

Page 155

1          CAN'T DO THAT.

2     Q.    WHO ADVISED YOU THAT?

3     A.    MR. CARPENTER.

4     Q.    BUT HE'S NOT REPRESENTING YOU?

5     A.    NO.

6     Q.    DO YOU KNOW WHY HE'S NOT REPRESENTING YOU?

7     A.    HE SAID I DON'T NEED AN ATTORNEY RIGHT NOW.  HE

8           SAID THIS IS SO BOGUS, THIS IS THE MOST BOGUS

9           LITIGATION HE'S EVER SEEN IN HIS WHOLE LIFE.

10    Q.    AND HE'S A FRIEND OF YOUR DAD'S?

11    A.    YES.

12    Q.    DO YOU HAVE ANY OTHER ASSETS BESIDES THE COMPUTER

13          EQUIPMENT THAT YOU OWN?

14    A.    NO, I DO NOT.

15    Q.    ARE YOU PLANNING TO MOVE SOMETIME SOON?

16    A.    I MAY HAVE TO MOVE BACK IN WITH MY DAD.

17    Q.    WHY IS THAT?

18    A.    BECAUSE ALL THIS HAS PRETTY MUCH RUINED MY WHOLE

19          LIFE.

20    Q.    WHY IS THAT?

21    A.    I LOST MY JOB AT THE COMPUTER CLINIC.  I'VE BEEN

22          TOO DEPRESSED TO REALLY KEEP UP WITH MY APPLE

23          CUSTOMERS.  I'VE BEEN TOO DEPRESSED TO REALLY

24          WRITE ON MY WEBSITE VERY MUCH.  I AM PRETTY MUCH

25          OUT OF INVENTORY FOR EBAY.

Page 156

```
 1   Q.   BUT YOU INDICATE OR YOU'VE ARGUED MANY TIMES THAT
 2        YOU DON'T MAKE ANY MONEY ON YOUR BLOG, RIGHT?
 3   A.   THAT'S CORRECT, BUT I WAS PLANNING ON THAT AT THE
 4        BEGINNING OF THE YEAR.
 5   Q.   HOW WERE YOU GOING TO MAKE MONEY ON YOUR BLOG?
 6   A.   DARING FIREBALL POSTED AN ANALYSIS OF WHAT HE
 7        COULD DO TO STOP HIS JOB, AND HE SAID THAT HE
 8        COULD MAKE ROUGHLY $35,000 A YEAR.  HE EXCEEDED
 9        THAT.  AND I THOUGHT THAT I MIGHT BE ABLE TO DO
10        THE SAME.
11   Q.   DOING WHAT?  SELLING CLICK-THROUGH ADS?
12   A.   NOT SELLING CLICK-THROUGH ADS, BUT PEOPLE THAT --
13   Q.   ALLOWING THEM TO BE USED ON YOUR WEBSITE?
14   A.   AFFILIATED INCOME, YES.
15   Q.   SO YOU HAVEN'T DONE THAT?
16   A.   NO, BECAUSE I HAVEN'T WRITTEN ENOUGH ARTICLES TO
17        KEEP IT UP.
18   Q.   AND YOU HAVEN'T BEEN TO ANY PHYSICIAN OR
19        PSYCHOLOGIST OR PSYCHIATRIST ABOUT DEPRESSION,
20        RIGHT?  YOU'RE NOT SEEKING ANY TREATMENT FOR THAT
21        NOW?
22   A.   NO, BECAUSE I'M PRETTY HEALTHY.  BUT IT'S STILL
23        DEPRESSING.  AND THAT DOESN'T MEAN THAT I'M NOT
24        GOING.  MY FATHER IS INTERESTED IN POSSIBLY TAKING
25        ME, BUT --
```

Page 157

1   Q.   AND YOU HAVEN'T SOUGHT OTHER EMPLOYMENT?

2   A.   NO.

3   MR. ELWELL:

4        I'M PROBABLY JUST ABOUT THROUGH.  WHY DON'T WE

5        TAKE ABOUT FIVE MINUTES?

6   (OFF THE RECORD; BRIEF RECESS)

7   EXAMINATION RESUMED BY MR. ELWELL:

8   Q.   WE'RE BACK ON THE RECORD, MR. SMITH.  I JUST HAVE

9        A COUPLE OTHER QUESTIONS.  I THINK YOU INDICATED

10       THAT YOUR DAD'S NAME IS JUNIOR?

11  A.   JUNIUS.

12  Q.   JUNIUS?  J-U-N-I-U-S?

13  A.   YES.

14  Q.   AND WHAT'S HIS COMPLETE ADDRESS?

15  A.   814 BELL SHOALS ROAD, PICKENS, SOUTH CAROLINA,

16       29671.

17  Q.   AND HAVE YOU MADE ANY MOTION TO THE COURT

18       CONCERNING OBTAINING FREE USE OF A COURT REPORTER,

19       OR FUNDS OR SOMETHING FOR A COURT REPORTER?

20  A.   I HAVEN'T YET, BUT I AM.

21  Q.   WHEN DO YOU PLAN TO DO THAT?

22  A.   SOON.  I'M NOT GOING TO BE ABLE TO MAKE THAT DATE

23       FOR THE JANUARY 5TH.  I'M GOING TO HAVE TO HAVE

24       ANOTHER LATER DATE IN JANUARY.

25  Q.   YOU INDICATED YOU'RE GOING OUT OF TOWN SOMEWHERE

Page 158

1        IN JANUARY?

2    A.    POSSIBLY.  I DON'T KNOW YET.

3    Q.    WHERE WOULD YOU BE GOING?

4    A.    MAC WORLD EXPO IN SAN FRANCISCO.

5    Q.    AND HOW ARE YOU GOING TO FUND THAT?

6    A.    TWO OF MY CUSTOMERS ARE SPONSORING ME.

7    Q.    WHO IS THAT?

8    A.    TWO OF MY CUSTOMERS.

9    Q.    WHO IS GIVING YOU THE MONEY?

10   A.    AARDVARK STUDIOS AND TAMARA HERD.

11   Q.    AND TAMARA HERD IS AN INDIVIDUAL?

12   A.    YES.

13   Q.    WHAT SORT OF LINE OF BUSINESS IS SHE IN?

14   A.    GRAPHICS AND DESIGN.

15   Q.    HERE IN GREENVILLE?

16   A.    YES.

17   Q.    AND AARDVARK STUDIOS IS WHERE?

18   A.    PELHAM ROAD.

19   Q.    YOU INDICATED THAT YOU MAY BE GOING UNDER

20         TREATMENT FOR DEPRESSION.

21   A.    MY DAD IS LOOKING INTO THAT FOR ME.

22   Q.    AND YOU HAVE STATED THAT YOU THINK THAT THIS CASE

23         IS THE REASON THAT YOU'RE DEPRESSED.

24   A.    YES.

25   Q.    IS IT POSSIBLE THAT MAYBE YOU'RE DEPRESSED BECAUSE

Page 159

1       YOU'RE 32 AND LIVE IN A $30,000 CONDO AND DON'T

2       MAKE MUCH MONEY, AND DRIVE A JUNK CAR, AND AREN'T

3       MARRIED, AND ANYTHING ELSE THAT MIGHT BE

4       DEPRESSING TO SOMEBODY YOUR AGE?

5   A.  THANK YOU FOR WORSENING IT, BUT, NO, I DON'T.

6       IT'S BEEN THIS ISSUE SOLELY.

7   Q.  AND HOW IS IT THAT YOU KNOW THAT?

8   A.  BECAUSE I HAVEN'T BEEN LIKE THIS BEFORE.  AND MY

9       PLAN WAS TO GO INTO A MORE -- LIKE A GREATER ROLE

10      ON THE INTERNET, AND I WASN'T ABLE TO DO THAT

11      BECAUSE OF THIS CASE.

12  Q.  AND HOW MUCH DO YOU THINK YOU STOOD TO MAKE

13      INDIVIDUALLY ON THE EBAY INVENTORY IF IT SOLD FOR

14      THE PRICES THAT YOU THINK IT SHOULD HAVE SOLD FOR?

15  A.  THAT I CONSIGNED TO BIDZIRK?

16  Q.  RIGHT.

17  A.  26,000.

18  Q.  PERSONALLY?

19  A.  YEAH.

20  Q.  TO BE SPLIT BETWEEN YOU AND MR. BUZZELL?

21  A.  NO, THAT WAS WHAT TY SHOULD HAVE GOTTEN FOR OUR

22      INVENTORY.

23  Q.  HE SHOULD HAVE GOTTEN 26,000 FOR IT?

24  A.  YES.  AND THEN SPLIT THAT, AT MINIMUM, 50/50, EVEN

25      THOUGH THE MAXIMUM THAT IT SAYS ON THEIR WEBSITE

Page 160

1          IS 43.15.

2    Q.    EVEN IF WE ASSUME THAT IT'S 50/50, THAT'S 13,000,

3          AND THEN YOU AND MR. BUZZELL WOULD DIVIDE THAT?

4    A.    NO.  I WOULD, IN TURN, DIVIDE THAT INTO 50/50 WITH

5          FRANK WATTS AND THEN 50/50 WITH DAVE BUZZELL.

6          THAT'S EXPLAINED IN THE ARTICLE.

7    Q.    SO FROM 26, THEN YOU WOULD HAVE, AFTER YOU PAID

8          MR. SCHMIDT OR BIDZIRK, YOU'D HAVE 13.  YOU'D GIVE

9          6,500 TO MR. WATTS AND THEN --

10   A.    ROUGHLY 3,000 A PIECE.

11   Q.    -- YOU AND MR. BUZZELL WOULD SPLIT $6,500?

12   A.    THAT'S CORRECT.  BUT AT THE SAME TIME, WE ALSO

13         WERE GOING TO HAVE AN ONGOING RELATIONSHIP WITH

14         TY, HAD THINGS WORKED OUT AND HAD HE GOTTEN US THE

15         RIGHT AMOUNTS FOR THINGS.  AND WE WOULD HAVE HAD

16         CONTINUING INVENTORY, BUT THE OWNER OF THE

17         INVENTORY HAD TO DROP ALL OF THAT INVENTORY

18         BECAUSE WE JUST WEREN'T ABLE TO MOVE ANY.  HE HAD

19         TO GET RID OF IT BECAUSE IT WAS COSTING TOO MUCH

20         MONEY IN OVERHEAD FOR THE RENTAL OF THE PLACES.

21   Q.    AND SO IT'S YOUR TESTIMONY THAT THIS $3,250 THAT

22         YOU THOUGHT YOU WERE GOING TO REALIZE WAS A LIFE

23         CHANGING AMOUNT OF MONEY AND WOULD HAVE MADE A BIG

24         DIFFERENCE IN YOUR BUSINESS DEALINGS TODAY?

25   A.    YES, BUT THERE ALSO COULD BE MORE MONEY INVOLVED

Page 161

1         IN THAT.

2    Q.   AND IS IT THE CASE THAT SOME OF THE INVENTORY THAT

3         YOU WERE CONSIGNING INCLUDED CRT MONITORS?

4    A.   THAT'S CORRECT.

5    Q.   AND WHAT DO YOU THINK THE STREET VALUE OF A CRT

6         MONITOR IS TODAY?

7    A.   THEY -- IF THEY'RE VIEW SONIC OR NEC, OR SONY

8         MONITORS, THEY GET ROUGHLY $120 TO $150 ON EBAY.

9    Q.   WHY WOULD I PAY A HUNDRED BUCKS FOR A CRT MONITOR

10        WHEN I CAN PAY NOT MUCH MORE THAN THAT FOR

11        SOMETHING FLAT SCREEN, OR BUY A SYSTEM AND GET IT

12        THROWN IN?

13   A.   THE COLOR SEPARATION ON A CRT IS MUCH BETTER FOR

14        GRAPHIC DESIGNERS.  YOU CAN GET BILLIONS OF COLORS

15        ON A CRT WHERE YOU CAN ONLY GET HALF OF THAT ON AN

16        LCD.  LCD'S ALSO HAVE A REALLY HIGH RESPONSE TIME.

17        SO THEY'RE NOT GOOD FOR GAMING.

18   Q.   SO IT'S YOUR CONTENTION THAT CRT MONITORS ARE

19        ACTUALLY SUPERIOR TO LCD MONITORS OR OTHER FLAT

20        SCREEN MONITORS?

21   A.   YES.  NOT ALL LCD'S.  THERE ARE SOME HIGH END

22        LCD'S THAT ARE GOOD.

23   Q.   AND SO WHEN IS THE MAC WORLD EXPO?

24   A.   I WOULD LEAVE JANUARY 5TH AND COME BACK THE 11TH.

25   Q.   WHAT WOULD BE YOUR REASON FOR GOING?

Page 162

1    A.    BECAUSE THEY ARE MOST LIKELY TO INTRODUCE AN APPLE

2          PHONE.

3    Q.    IS YOUR PRESENCE REQUIRED FOR THAT, FOR SOME

4          REASON?

5    A.    NO.  I FOLLOW THAT REALLY CLOSELY, AND I HAVE --

6          I'VE SEEN THE BETA PROTOTYPE AND I WANT TO SEE

7          THEM INTRODUCE THAT.

8    Q.    WHY IS THAT?

9    A.    BECAUSE MY LIFE REVOLVES AROUND APPLE COMPUTER.  I

10         LOVE APPLE COMPUTER AND I LOVE EVERYTHING THAT

11         THEY DO.

12   Q.    HOW MUCH DOES IT COST TO GO TO THE MAC WORLD EXPO?

13   A.    I GOT A HOTEL STAY AND PLANE TICKET WAITING FOR ME

14         IF I WANT TO GO, OTHERWISE TAMARA'S GOING TO GO,

15         FOR $234.  IT'S PRETTY AWESOME, A GREAT DEAL.

16   Q.    AND DOES IT COST TO ENTER THE SHOW?

17   A.    NO, I'VE GOT FRIENDS AT APPLE THAT WILL LET ME IN.

18   Q.    AND HAVE YOU ASKED THE COURT TO GIVE YOU ANY KIND

19         OF LEAVE OF ABSENCE FROM THIS CASE WHILE YOU'RE

20         GONE DURING THAT WEEK?

21   A.    NO, I HAVE NOT.  BUT THEY WOULD -- THEY WERE

22         SUPPOSED TO NOTIFY ME OF ANY IMPORTANT DATES.  SO

23         I'M SURE THAT THEY WILL DO THAT.  I'M NOT BOUND TO

24         THIS STATE DURING THIS TRIAL.

25   MR. ELWELL:

1          I DON'T HAVE ANYTHING FURTHER.

2       (THERE BEING NO FURTHER QUESTIONS, THIS DEPOSITION WAS

3       CONCLUDED AT 4:55 P.M.)

Page 164

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION
C.A. #6-06-CV-00109-HMH

BIDZIRK, LLC, DANIEL G.
SCHMIDT, III, AND JILL
PATTERSON,
    Plaintiffs
vs.

PHILIP J. SMITH,

    Defendant.
_____/
_____
_

CERTIFICATE OF REPORTER
_____
_

    I, Karen A. Belanger, a Notary Public for the
State of South Carolina, duly commissioned and
qualified as such, do hereby certify that the foregoing
162 pages represent a true and accurate transcript of
the foregoing deposition of PHILIP J. SMITH taken by
me on the 29th day of December, 2006.
    That the deponent was duly placed under oath and
admonished to speak the whole truth.  Oral testimony
was duly taken and transcribed as to the questions
propounded and the answers given.

    All offered exhibits, stipulations, and
objections, if any, in this cause are duly attached or
included herein.

    IN WITNESS WHEREOF, I have set my hand and
official seal on this 5th day of January, 2007.

_____
KAREN BELANGER, CVR
NOTARY PUBLIC FOR SOUTH CAROLINA
MY COMMISSION EXPIRES:  04/18/2013

Exhibit 6, p. 000165