IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| BIDZIRK, LLC, DANIEL G. SCHMIDT, III, and JILL PATTERSON, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 6:06-CV-00109-HMH |
| PHILIP J. SMITH, | ) ) | RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |
| Defendant. | ) | |

COMES NOW BidZirk, LLC ("BidZirk"), Daniel G. Schmidt ("Schmidt") and Jill Patterson ("Patterson"), Plaintiffs in the above-captioned action, and make and file this their response to Defendant's motion for summary judgment, and show the Court as follows:

<u>INTRODUCTION</u>

Plaintiffs filed their complaint on January 10, 2006, alleging a Lanham Act violation, defamation and invasion of privacy. <u>See</u> Doc. 1. On February 13, 2006, Plaintiffs filed their motion for preliminary injunction. <u>See</u> Doc. 6. By order dated April 10, 2006, the Court denied Plaintiffs' request for a preliminary injunction. <u>See</u> Doc. 32. Plaintiffs timely noticed an appeal to the United States Court of Appeals for the Fourth Circuit. <u>See</u> Doc. 35. The Fourth Circuit ultimately affirmed the Court's denial of Plaintiffs' request for preliminary injunction, by order entered March 6, 2007. <u>See</u> Doc. 79.

While the injunction was being considered on appeal, discovery in the case continued. Plaintiffs served their interrogatories, requests for production of documents and requests for admission on July 28, 2006. See Doc. 104. Defendant failed to respond to Plaintiffs' discovery requests. Defendant's deposition was noticed and convened on September 14, 2006. Prior to completion of the deposition, Defendant, evidently angry at being required to give testimony, left the proceeding. Plaintiffs noticed Defendant's deposition again, for October 24, 2006, but he refused to appear. Plaintiffs then filed a motion to compel Defendant's attendance at his deposition. See Doc. 67. The Court granted Plaintiffs' motion, requiring Defendant to appear and complete his deposition. See Doc. 71. Despite the fact that on September 14, 2006, Defendant quit his first deposition taking the original marked exhibits with him, which consisted of Plaintiffs' discovery requests, Defendant never served responses to those requests.

Plaintiffs were required to file a second motion to compel discovery in order to secure Defendant's responses to discovery requests. See Doc. 104. The Court granted Plaintiffs' motion to compel. See Doc. 112. The Court's order provided Defendant through August 28, 2007 in which to provide complete responses to certain of Plaintiffs' discovery requests. Id. On August 29, Defendant filed a motion seeking additional time to respond. See Doc. 114. The Court provided Defendant through September 10, 2007 to provide the responses as previously ordered. See Doc. 117. The Court's order provides "No further extensions will be given, and if the [defendant][1] does not timely respond, he will be sanctioned. Id. Despite this admonition, on September 10, 2007, Defendant filed a paper denominated a "grievance" against Magistrate

---

[1] This word is "plaintiff" in the original, which is evidently a scrivener's error.

Judge Catoe, in which Defendant stated "I deny and defy" the Court's prior discovery order, among other statements that bespoke disrespect for the Court. See Doc. 119.

Defendant initially failed to file any pleadings responsive to Plaintiffs' complaint. Plaintiffs filed a motion for default judgment. See Doc. 8. The Court permitted Defendant an opportunity to answer after default was entered. Plaintiffs filed a motion for judgment on the pleadings on July 21, 2006, contending that Defendant admitted in his answer certain conduct that established liability for defamation and invasion of privacy. See Doc. 33. Plaintiffs filed a supplemental motion for judgment on the pleadings, based on Defendant's filing of a 10-count "counterclaim," over which Plaintiffs argued the Court should not exercise supplemental jurisdiction. See Doc. 46. The Court, by order entered November 7, 2006, granted, inter alia, Plaintiffs' second motion for judgment on the pleadings, and held in abeyance a ruling on Plaintiffs' first motion for judgment on the pleadings. See Doc. 68. On January 15, 2007, Plaintiffs filed a motion for summary judgment, contending that Defendant had admitted sufficient facts to establish liability for all of Plaintiffs' stated causes of action. See Doc. 73. Plaintiffs pointed out in their reply on this motion for summary judgment that Defendant had failed to adhere to procedural rules in this action and that, even while pro se, was not immune from their impact. See Doc. 86. Nevertheless, the Court ultimately denied Plaintiffs' motion. The second, third and fourth chances granted to Defendant are outlined in Magistrate Judge Catoe's report and recommendation. See Doc. 92.

At present, pending before the Court are Plaintiffs' causes of action for trademark infringement under the Lanham Act, 15 U.S.C. § 1125(c); defamation and invasion of privacy.

The Court's deadline for filing of dispositive motions expired on July 13, 2007.  See Doc. 99.
The Court held a status conference on September 17, 2007.  During that conference, the Court
permitted Defendant orally to file a motion for summary judgment regarding all of Plaintiffs'
claims in this case.  See Doc. 123.  Plaintiffs' second motion to amend their complaint, see Doc.
55, remains pending.[2]

<u>ARGUMENT</u>

The phrase "freedom of speech" connotes a number of treasured concepts, including
patriotism, democracy and the uninhibited exchange of ideas.  Because in this case Defendant
has many times lamented Plaintiffs' alleged attempts to curtail his "First Amendment Rights," it
is critical to understand what Plaintiffs' claims <u>are</u>, and what those claims are <u>not</u>.  Plaintiffs
assert claims for trademark dilution, defamation, and invasion of privacy.  These are claims
intended to address damage to intellectual property, reputation and personal feelings.  Plaintiffs
make no claim that may fairly be described as an effort to prevent Defendant from saying,
writing or publishing what he likes.  However, the law has always recognized that "free" speech
is not absolute, and case law has developed over 200 years to balance the singularly American
concept of freedom of speech with the equally American values of respect for citizens' rights to
their property and individual dignity.

---

[2] Plaintiffs' amended complaint would add a single count (Count V) which seeks additional damages for
Defendant's publication of material on his web sites, after Plaintiffs' complaint was filed, as part of which
Defendant contends that Plaintiffs improperly manipulated search engine results in an attempt to conceal
Defendant's postings about BidZirk, Schmidt and Patterson.  These allegations are absolutely false, and further
defame Schmidt and Patterson.

As shown below, BidZirk's trademark dilution claim is cognizable not for the ideas contained within Defendant's internet postings, but <u>only</u> for Defendant's unauthorized use of BidZirk's property (its trademarks and service marks), which infringement is not excused by any statutorily-provided defense or privilege. Defendant's right to publish must be preserved under the law in a manner that does not sacrifice BidZirk's right to exclusive use of its trademarks. It is <u>this relief</u>, and <u>not</u> the suppression of Defendant's opinions (however abhorrent those may be to Schmidt and Patterson) that BidZirk seeks in Count I of Plaintiffs' complaint. This is <u>not</u> a First Amendment case; it is a trademark infringement case.

Similarly, Schmidt's claims for defamation reference time-tested notions of the rights of individuals to conduct their business free from injurious falsehoods published by others. The law has long recognized that, as alleged in the instant action, the imputation of incompetence, ineptitude or duplicity in one's conduct of his business carries with it a <u>legal presumption</u> of damages to reputation. Under this framework, it cannot reasonably be said that Schmidt's assertion of claims for libel <u>per se</u> impinges Defendant's rights under the Constitution to publish what he wishes to publish.

Claims by Schmidt and Patterson for invasion of privacy are also not advanced in this action for the purpose of muzzling or censoring Defendant. As analyzed below, the Court (applying South Carolina law) should recognize the tort of false light invasion of privacy under the circumstances presented. Defendant's posting of material made public by Schmidt and Patterson, in a context that presents them to the public in a false light, should be actionable. As

recognized in a majority of jurisdictions that have considered the question, upholding Plaintiffs' rights to privacy in this case would not unfairly inhibit Defendant's right to air his opinions.

With these considerations in place, Plaintiffs below show the Court support for each of the claims asserted in this case, in response to Defendant's oral motion for summary judgment:

I.     Lanham Act claim.

BidZirk's claim for trademark dilution under the federal Lanham Act, 15 U.S.C. § 1125(c), is outlined in Plaintiffs' motion for preliminary injunction. See Doc. 6. For ease of reference, portions of BidZirk's trademark dilution analysis are excerpted below:

The Federal Trademark Dilution Act ("FTDA") is codified at 15 U.S.C. § 1125(c). The FTDA provides, in pertinent part:

> The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection . . . In an action brought under this subsection, the owner of the famous mark shall be entitled only to injunctive relief as set forth in [15 U.S.C. § 1116] unless the person against whom the injunction is sought willfully intended to trade on the owner's reputation or to cause dilution of the famous mark. If such willful intent is proven, the owner of the famous mark shall also be entitled to the remedies set forth in [15 U.S.C. §§ 1117(a) and 1118], subject to the discretion of the court and the principles of equity.

See 15 U.S.C. § 1125(c)(1)-(2). Damages available under 15 U.S.C. § 1117(a) for willful violations of 15 U.S.C. § 1125(c) include (1) the defendant's profits; (2) any damages sustained by the plaintiff, which may be trebled; and (3) costs of the action. In addition, the Court may "in

exceptional cases award reasonable attorney fees to the prevailing party." <u>See</u> 15 U.S.C. § 1117(a).[3]

"Dilution" is a defined term within the Lanham Act: it means "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of (1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake or deception." <u>See</u> 15 U.S.C. § 1127. The Supreme Court of the United States has held that the FTDA requires proof of "actual dilution," rather than a mere likelihood of dilution. <u>See</u> <u>Mosely v. V Secret Catalogue, Inc.</u>, 537 U.S. 418, 433 (2003). The "actual dilution" requirement is satisfied where a defendant uses a mark identical to the plaintiff's mark, as opposed to a mark that merely approximates the plaintiff's mark. <u>See</u> <u>7-Eleven, Inc. v. McEvoy</u>, 300 F. Supp. 2d 352, 357 (D. Md. 2004). Dilution under the FTDA occurs in two possible forms: blurring or tarnishment. "Blurring" concerns the use or modification of a trademark to identify the defendant's products. <u>See</u> <u>Starbuck's Corp. v. Wolfe's Borough Coffee, Inc.</u>, 2004 U.S. Dist. LEXIS 19239 at *24 (S.D.N.Y. 2004). Dilution through "blurring" is not an issue in this action.

Dilution under the FTDA also may occur through "tarnishment." In such case "a trademark is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context, with the result that the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods." <u>See</u> <u>Starbuck's</u>, 2004 U.S. Dist. LEXIS at *25 <u>citing</u> <u>Hormel Foods Corp. v. Jim Henson Prods., Inc.</u>, 73 F.3d 497, 507

---

[3] Under 15 U.S.C. § 1118, the Court may also order confiscation and destruction of infringing goods. This provision is inapplicable under the facts of the instant action.

(2d Cir. 1996). A trademark may also be tarnished if through infringement it ceases to become a "wholesome identifier of plaintiff's product." See Hormel Foods, 73 F.3d at 507.

The FTDA also expressly provides three defenses to an action for trademark dilution: (1) fair use in comparative advertising; (2) noncommercial use of a mark; and (3) use of a mark in "news reporting and news commentary." Defendant's jackwhispers.com web site[4] is not involved in comparative advertising. The Fourth Circuit has held that any connection between the infringing use of a plaintiff's mark and the offering of goods and services deprives a defendant of the "noncommercial use" defense. See People for the Ethical Treatment of Animals v. Doughney, 263 F.3d 359, 366 (4th Cir. 2001) ("PETA"), attached as Exhibit 1. The FTDA does not define "news reporting and news commentary."

Defendant initially published a single depiction of BidZirk's trademarks, identical to the actual marks used by BidZirk. After being contacted by counsel, Defendant gratuitously included five additional instances of BidZirk's trademarks on the jackwhispers.com web site, including one which essentially thumbed its nose at BidZirk and depicted the trademark for no reason at all. After a hearing on Plaintiffs' motion for preliminary injunction, Defendant removed five depictions of BidZirk's logo. Defendant's posting still includes a depiction of BidZirk's logo, and a link to a picture of BidZirk's logo. See Exhibit 2.

The FTDA provides that

The owner of a famous mark shall be entitled to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins

---

[4] Since this action was commenced, Defendant has changed the name of his web site to www.fixyourthinking.com. However, the web site can still be reached at www.jackwhispers.blogspot.com.

8

after the mark has become famous and causes dilution of the distinctive quality of
the mark.

15 U.S.C. § 1125(c)(1); Starbuck's, 2004 U.S. Dist. LEXIS 19239 at *22. Thus, BidZirk is
entitled to injunctive relief if it satisfies the Court that (1) its mark is "famous" and "distinctive,"
as those terms are defined under the FTDA; (2) Defendant's use of BidZirk's mark is
"commercial" and "in commerce" as those terms are applied to the FTDA, and occurs after
BidZirk's mark becomes "famous"; and (3) Defendant's infringement causes dilution of
BidZirk's trademark. In addition, BidZirk must demonstrate that no defense available under the
FTDA is applicable to Defendant's infringement of BidZirk's trademark. See 15 U.S.C. §
1125(c)(4)(C).

1.     BidZirk's trademark is "famous" and "distinctive," as those terms are defined in the
       FTDA.

The FTDA suggests an eight-factor test to determine whether a trademark is distinctive
and famous. These factors include (a) the degree of inherent or acquired distinctiveness of the
mark; (b) the duration and extent of use of the mark in connection with the goods or services
with which the mark is used; (c) the duration and extent of advertising and publicity of the mark;
(d) the geographical extent of the trading area in which the mark is used; (e) the channels of trade
for the goods and services with which the mark is used; (f) the degree of recognition of the mark
in trading areas and channels of trade used by the marks' owner and the person against whom the
injunction is sought; (g) the nature and extent of use of the same or similar marks by third
parties; and (h) the registration status of the mark. See 15 U.S.C. § 1125(c)(1)(A)-(H). These
factors are each considered below:

(a)     <u>Degree of inherent or acquired distinctiveness.</u>

BidZirk's trademark includes a distinctive green and purple logo, featuring a silhouette of a stylized monkey or chimpanzee, obviously in an excited state.  <u>See</u> Affidavit of Daniel G. Schmidt, III at ¶ 2 (hereinafter "Schmidt Aff., ¶ 2), attached as Exhibit 3.  In addition, the name BidZirk is a pun, making use of the notion that buyers on eBay must <u>bid</u> on items they wish to purchase (since eBay manages auctions, rather than simple retail sales of products), as well as the notion that customers may become enthralled enough with the process to attain a "berserk" enthusiasm.  BidZirk is aware of no other trademark that approximates its name or logo, whether in color combination, artwork, wordplay or any combination of these attributes.  BidZirk's trademarks are unique, and clearly distinctive.  <u>See</u> Schmidt Aff., ¶ 3.

(b)     <u>Duration and extent of use in connection with goods and services.</u>

BidZirk began operations in 2005, and its trademarks have only ever been used in connection with the company's offering of eBay auction administration services.  <u>See</u> Schmidt Aff., ¶ 3.

(c)     <u>Duration and extent of advertising and publicity of the mark.</u>

Since its inception, BidZirk has engaged an advertising agency in Greenville, South Carolina to market and publicize its image and services.  <u>See</u> Schmidt Aff., ¶ 4.  During this engagement, the agency has caused BidZirk's trademark to be placed on a number of full-sized billboards in upstate South Carolina; the company has printed thousands of tri-fold brochures and employee business cards, all of which feature the BidZirk name and logo; the company has spent many hours creating and maintaining an internet web site; and the company operates a

physical location in a high-visibility area of Greenville County (along Interstate 85 in Powdersville), which features prominent signage consistent with BidZirk's trademark green-and-purple monkey logo. <u>See</u> Schmidt Aff., ¶ 5. This campaign has permitted BidZirk's trademark to be widely disseminated and known in the communities targeted for publicity.

<u>(d)</u>    <u>Geographical extent of the trading area wherein the mark is used.</u>

BidZirk is physically located in upstate South Carolina, and operates there. However, BidZirk also operates an internet web site, <u>www.bidzirk.com</u>, which obviously has a world-wide reach. BidZirk's trademarks are published on its web site for anyone to view. The fact that BidZirk's corporate name is part of its internet domain extends the company's reach well outside South Carolina. <u>See, e.g.</u>, <u>Pinehurst, Inc. v. Wick</u>, 256 F. Supp. 2d 424, 431-2 (M.D.N.C. 2003) (noting "unique nature of domain names in electronic commerce"), attached as Exhibit 4.

<u>(e)</u>    <u>Channels of trade for the goods and services with which the mark is used.</u>

BidZirk initially operated in two physical stores, and as an internet outlet. During the pendency of this litigation, however, BidZirk has been forced to close its two stores, and concentrates now on internet sales through a single warehouse operation located in Powdersville, South Carolina. <u>See</u> Schmidt Aff., ¶ 5.

<u>(f)</u>    <u>Degree of recognition of the mark in trading areas and channels of trade used by BidZirk and Defendant.</u>

In this case, there is no confusion regarding whose goods and services are being represented by the mark published on Defendant's web site – Defendant has used BidZirk's <u>actual trademark</u>, not a close approximation. Defendant does not operate a competing service or,

11

<u>e.g.</u>, a company that utilizes an excited monkey in its logo. Any recognition of BidZirk's mark, which is extensive in the channels of trade utilized by BidZirk, is due to the distinctiveness of the mark itself, and not due to any confusion with any mark owned or used by Defendant, who has simply misappropriated BidZirk's trademark for use on the jackwhispers.com web site.

(g)    <u>Nature and extent of the same or similar marks by third parties.</u>

In aggregate, BidZirk is aware of no trademarks, service marks or logos that approximate BidZirk's trademark. <u>See</u> Schmidt Aff., ¶ 3.

(h)    <u>Registration status.</u>

BidZirk has obtained registration of its trademark from the United States Patent and Trademark Office. <u>See</u> Schmidt Aff., ¶ 3.

In aggregate, analysis of the eight factors suggested by 15 U.S.C. § 1125(c)(1)(A)-(H) militates in favor of a finding that BidZirk's trademark is both distinctive and famous, as those terms are used in the FTDA. There can be no question that BidZirk's trademarks are entitled to protection under the FTDA.

2.    <u>Defendant's infringement of BidZirk's trademarks constitutes a commercial use of the marks, in commerce, occurring at a time after BidZirk's trademarks became famous.</u>

In the Fourth Circuit, there is no practical difference between the Lanham Act's requirement that actionable trademark infringement occur "in connection with the sale … of any goods and services," <u>see</u> 15 U.S.C. § 1114, and the FTDA's requirement that trademark dilution occur in connection with "commercial use in commerce of a mark or trade name." <u>See</u> 15 U.S.C. § 1225(c); <u>Huthwaite, Inc. v. Sunrise Assisted Living, Inc.</u>, 261 F. Supp. 2d 502, 516

(E.D. Va. 2003).  Fourth Circuit law is equally clear that <u>any</u> linkage between Defendant's web

site (including BidZirk's infringed trademarks) and an offering of goods and services constitutes

commercial use, depriving Defendant of the "noncommercial" use defense.  <u>See, e.g.</u>, <u>PETA</u>, 263

F.3d at 366 (finding use of mark "in connection with" sale of goods and services where

defendant's web site included links to "more than 30 commercial operations offering goods and

services"); <u>see also</u> Note, THE PROSECUTION OF CYBERGRIPERS UNDER THE LANHAM ACT, 3

Cardozo Pub. L. Pol'y & Ethics, 269, 297 (2004) (noting that the Fourth Circuit in <u>PETA</u>

established a "bright line" rule for commercial activity in connection with dilution claims under

the FTDA). [5]

      Defendant's web site, similar to the site operated by the defendant in <u>PETA</u>, includes

links to a large number of commercial products available for purchase from third parties,

including soda, DVDs, dental appliances, and shampoo.  <u>See</u> Exhibit 2.  These "click-thru"

advertisements support and return income to Defendant's web site, a fact which Defendant has

published on the internet.  <u>See</u> Exhibit 2.  These links conclusively establish the commercial

nature of Defendant's web site for FTDA dilution claim purposes.  Further, the commercial use

of BidZirk's trademarks definitively occurred after those marks became "famous," because the

---

[5] Further, to the extent that Defendant argues that First Amendment concerns trump the provisions of the FTDA in restricting his supposed right to dilute BidZirk's trademarks and defame Plaintiffs, BidZirk notes that Defendant's web site, which unquestionably must be deemed commercial speech under <u>PETA</u>, is not subject to the full panoply of First Amendment protections.  <u>See, e.g.</u>, <u>Edge Broadcasting Co. v. United States</u>, 5 F.3d 59, 61 (4th Cir. 1992) ("A lesser degree of First Amendment protection is accorded commercial speech than other constitutionally guaranteed expression").  Commercial speech is <u>not</u> protected under the First Amendment if it is misleading, a quality inherent in speech published by Defendant which dilutes BidZirk's trademarks.  <u>See</u> <u>Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York</u>, 447 U.S. 557 (1980); <u>Burke v. City of Charleston</u>, 893 F. Supp. 589, 608 (D.S.C. 1995).

marks became "famous" in 2005, and Defendant's infringement and dilution continues through the present day.

3.      Defendant's infringement dilutes BidZirk's trademarks.

The FTDA defines "dilution" as "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of . . . (1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake or deception." See 15 U.S.C. § 1127. Under Mosely, dilution must be actual, rather than merely likely. See Mosely, 537 U.S. at 433. Proof of actual dilution does not require that the consequences of dilution, such as lost sales or diminished profits, must be proved. See Pinehurst, 256 F. Supp. 2d at 431. Actual dilution may be proved through circumstantial evidence. Id. Use of an owner's actual trademark is sufficiently reliable proof of actual dilution. See, e.g., 7-Eleven, 300 F. Supp. 2d at 357 (noting that the "obvious case" of reliable circumstantial evidence of actual dilution is use of an identical mark by the infringer). In this case, Defendant has without authorization used BidZirk's actual trademarks; accordingly, the "actual dilution" standard of Mosely and the FTDA is satisfied. Cf. Osem Food Indus., Ltd. v. Sherwood Foods, Inc., 917 F.2d 161, 165 n.8 (finding that intentional copying of trademark satisfies "likelihood of confusion" requirement for infringement action under Lanham Act).

Further, the nature of Defendant's infringement generates actual dilution of BidZirk's marks. Defendant's jackwhispers.com web site is indexed by Google and other sites, including Technorati, a web site that indexes blog sites (Defendant's site is largely a "web log," or "blog"

site).  Google, like other major-market internet search engines,[6] ranks search results returned to

users, based on a complicated algorithm that attempts to place the most relevant sites near the top

of the list, in order to maximize the user's chances of quickly locating the exact internet links and

information desired.  A search for the word "BidZirk" on Google generates a list of links to other

internet web sites which include references to BidZirk.  See Schmidt Aff., ¶ 7.  Without doubt,

persons  utilizing  the  internet  for  information  on  BidZirk  will  encounter  Defendant's

jackwhispers.com web site which, given the content of the web site, will necessarily result in

dilution of BidZirk's trademarks.  Cf.  Fairbanks Capital Corp. v. Kenney, 303 F. Supp. 2d 583,

590 (D. Md. 2003) (noting that, due to infringement via the internet, "it is highly likely that large

numbers of reasonably alert users . . . using commonly-available search engines, will land on

defendant's web site instead of [the plaintiff's]" ).

The  effects  of  Defendant's  infringement  of  BidZirk's  trademarks  also  issue  into  the

marketplace in an area far larger than South Carolina, where BidZirk's warehouse is located.

See, e.g., Johnson v. Sosebee, 2005 U.S. Dist. LEXIS 38031 at *10 n.1 (D.S.C. 2005) (noting

that  "[m]any  businesses,  especially  those  accessible  over  the  internet,  may  transcend  local

boundaries.  In such cases, this court agrees that a traditional Dawn Donut [Co. v. Hart's Food

Stores, Inc., 267 F.2d 358 (2d Cir. 1959), the seminal case on territorial limitations of trademark

protection] analysis would be inappropriate").  See Schmidt Aff., ¶ 8.

---

[6] The prevalence of Google as an internet search engine cannot be underestimated.  The success of the application of
Google's algorithm and web site indexing process produces near-instant search results.  Google's service has
attained such wide notoriety and regular use by millions of internet users that the word "google" has actually
become a verb in contemporary American English.

Further, the nature of BidZirk's business renders dilution of its trademarks by Defendant particularly widespread, harmful and obnoxious.  BidZirk administers auctions through an affiliation with eBay, a web site with over 140 <u>million</u> registered members.  <u>See</u> Schmidt Aff., ¶ 6.  Many potential buyers in the eBay community research product sellers before deciding to do business with them online – eBay provides feedback fora which allow postings by members, and if a seller, <u>e.g.</u>, fails to honor its posted price for an item, or misrepresents the quality of a purchased item, word of that fact is available for others to view online.  <u>See</u> Schmidt Aff., ¶ 6. In addition, buyers considering doing business with BidZirk can locate the company on the internet through Google or Yahoo, as indicated above.  Such searches would reveal, in addition to links to BidZirk's own web site, links to Defendant's jackwhispers.com web site, containing the infringing use of BidZirk's trademarks.  In this manner, Defendant's unauthorized use of BidZirk's trademarks in effect superimposes Defendant's web site onto a list of search results obtained by potential customers of BidZirk.  As a result, BidZirk's trademarks (including its corporate name) attain unwholesome or unsavory associations with jackwhispers.com and its defamatory and infringing content.  Such is the very essence of "dilution," as that term is defined in the FTDA.  Defendant's commercial use of BidZirk's trademarks under the circumstances presented, including BidZirk's unique business model and affiliation with eBay, as well as the prominent appearance of Defendant's jackwhispers.com web site in ranked search results from the major internet search engines, Google and Yahoo, makes clear that Defendant's infringement of BidZirk's trademarks dilutes and tarnishes those marks.

4.    Defendant's infringement is not excused by any statutory defense.

Under the FTDA, injunctive relief is not available to halt "noncommercial" use of a mark, nor may a plaintiff obtain an injunction against use of a trademark in "news reporting or news commentary." See 15 U.S.C. § 1125(c)(4)(C). Defendant may attempt to characterize himself as a journalist, see Exhibit 2, but the facts demonstrate that he is no such thing. Courts in the District of Columbia Circuit have addressed the "who is a journalist?" question without answering it. In Lee v. Department of Justice, the court found that

> [t]he proliferation of communications media in the modern world makes it impossible to construct a reasonable and useful definition of who would be a "reporter" eligible to claim protection from a newly minted common law privilege. See In re Miller, 397 F.3d [964, 967 (D.C. Cir. 2005)] (Sentelle, J., concurring) (questioning whether the definition of "reporter" should include "the stereotypical 'blogger' sitting in his pajamas at his personal computer posting on the World Wide Web"). Reporters cannot be readily identified. They do not have special courses of study of special degrees. They are not licensed. They are not subject to any form of organized oversight or discipline.

Lee v. Department of Justice, 401 F. Supp. 2d 123, 140 (D.D.C. 2005). Several states, including South Carolina, have journalist "shield" laws, which protect reporters from compulsory disclosure of news sources. See S.C. Code § 19-11-100 (2005). South Carolina's shield law, however, does not define the terms "journalist" or "reporter."

The question before the Court is discrete – if Defendant's internet postings including BidZirk's trademarks constitute "news reporting" or "news commentary," Defendant's infringement is privileged. If Defendant's infringement of BidZirk's trademarks is not in connection with publication of "news reporting and news commentary," it is actionable. BidZirk has satisfied every element for a cause of action for dilution under the FDTA; the only question

17

is whether the statutory defense provided by 15 U.S.C. § 1125(c)(4)(C) is applicable.  In its

appeal to the Fourth Circuit, BidZirk proposed a test – a manner in which the Court may analyze

and determine who is a journalist, without engaging in the undesirable practice of evaluating the

content (or "newsworthiness") of published material.  Plaintiffs incorporate those arguments

herein by reference, and urge the Court's adoption of BidZirk's proposed test.  Plaintiffs' brief is

attached hereto as Exhibit 6.  None of Defendant's submissions addresses the specific issue of

whether his internet posting constitutes "news reporting or news commentary," or privileged

infringement generally.

II.     Defamation claim.

Schmidt alleges that Defendant's postings defamed him by injuring him in his business or

trade.  See Doc. 1, ¶¶ 22-3.  In his postings, Defendant described Schmidt as a "yes man" and

implied that, despite his involvement in another internet business-to-business venture, Schmidt

was not knowledgeable about auctioning items on eBay.com.  See Exhibit 2, p. 6.  As stated by

the Supreme Court of South Carolina in Holtzscheiter v. Thomson Newspapers, Inc.:

> [The] tort of defamation allows a plaintiff to recover for injury to [his] reputation
> as the result of the defendant's communication to others of a false message about
> the plaintiff.  Slander is a spoken defamation while libel is a written defamation or
> one accomplished by actions or conduct.

Holtzscheiter v. Thomson Newspapers, Inc., 322 S.C. 502, 509 (1998) citing Wilhoit v. WCSC,

Inc., 293 S.C. 34 (Ct. App. 1987).  In the instant case, Defendant's statements were libel and

actionable per se:

> Libel is actionable per se if it involves written or printed words which tend to
> denigrate a person; that is, to reduce his character or reputation in the estimation

18

of his friends or acquaintances, or the public, or to disgrace him, or to render him odious, contemptible, or ridiculous.

Holtzscheiter, 322 S.C. at 510 (internal punctuation omitted) citing Lesesne v. Willingham, 83 F. Supp. 918, 921 (E.D.S.C. 1949).  If libel is actionable per se, a plaintiff may recover without pleading or proof of special damages.  See Holtzscheiter, 322 S.C. at 511.  It is well-established that, in cases of libel, damages are presumed.  See, e.g., Fitchette v. Sumter Hardwood Co., 145 S.C. 53 (1928).

Further, defamatory statements are not examined in isolation to determine whether they are actionable:

> The intent and meaning of an alleged defamatory statement just be gathered not only from the words singled out as libelous, but from the context; all of the parts of the publication must be considered in order to ascertain the true meaning, and words are not to be given a meaning other than that which the context would show them to have.

Jones v. Garner, 250 S.C. 479, 485 (1968).  In this case, Defendant published both direct and indirect libel.  Defendant referred to Schmidt as a "yes man," and indicated that a "yes man" is someone who "over promise[s] and under deliver[s]."  See Exhibit 2, p. 6.  An objectively reasonable interpretation of Defendant's statement is that Schmidt does less than he says he will do, or will engage in dishonesty in order to make a deal or establish a relationship with a customer.  See Schmidt Aff., ¶ 9.  Defendant's "yes man" statement is patently defamatory, and actionable per se.

Defendant also stated, "Although the owner seemed like a yes man . . . I had done my home work [sic] . . . he had owned an ecommerce B2B company called Channelinx.  Tech

savvy?  Possibly …"  <u>See</u> Exhibit 2, p. 6 (ellipses in original).  Read together with the remainder of Defendant's posting, this statement carries the clear implication that Schmidt, as someone purportedly involved in another technology-related venture, should have known more about eBay auctions than Defendant contends he did.  <u>See</u> Schmidt Aff., ¶ 10.

The overall effect of Defendant's posting on Schmidt, then, is to portray Schmidt as unprincipled, unqualified and inattentive as a business owner.  These statements were false and libeled Schmidt, and he must be permitted to proceed to trial on his claims for defamation.  <u>See</u> Schmidt Aff., ¶ 10.

<u>III.</u>    <u>Invasion of privacy claim.</u>

Schmidt and Patterson allege in their claim for invasion of privacy that Defendant "linked" a photograph of them, with a caption mentioning their recent marriage, in order to imply that Schmidt and Patterson were not able sufficiently to devote themselves to Defendant's business with BidZirk.  <u>See</u> Doc. 1, ¶¶ 29-32.  Defendant stated "He [Schmidt] explained to me how he had just gotten married and was planning his honeymoon in a week's time.  Wait!  He was getting married, going on a honeymoon, and starting a (in his own words) '<u>multi-location business that will be national in 5 years time</u>'?"  <u>See</u> Exhibit 2, p. 6 (emphasis in original). Defendant's intent in referencing Schmidt's marriage becomes clear when read with other material in Defendant's post, in which he strongly implies (if he does not state outright) that the marriage was ill-advised, since Schmidt could not adequately attend to Defendant's "level of customer."  <u>See</u> Exhibit 2, p. 6.  Schmidt Aff., ¶ 11-12; Affidavit of Jill Patterson at ¶ 2-3 (hereinafter "Patterson Aff., ¶ 2-3), attached as Exhibit 6.

20

In <u>Todd v. South Carolina Farm Bureau Mut. Ins. Co.</u>, the Supreme Court of South Carolina attempted to define an actionable invasion of the right of privacy: (1) unwarranted appropriation or exploitation of one's personality; (2) publicizing of one's private affairs with which the public has no legitimate concern; or (3) wrongful intrusion into one's private activities in such a manner as to cause mental suffering, shame or humiliation to an ordinarily-sensitive person.  <u>See</u> <u>Todd v. South Carolina Farm Bureau Mut. Ins. Co.</u>, 276 S.C. 284 (1981); <u>see also</u> <u>Meetze v. Associated Press</u>, 230 S.C. 330 (1957).  The Restatement (Second) of Torts also references false light invasion of privacy, and it is into this fourth category that the claims of Schmidt and Patterson fall.  <u>See</u> Restatement (Second) of Torts, § 625E.  The Restatement defines the tort of false light invasion of privacy thusly:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

<u>Id.</u>

False light invasion of privacy has not been expressly recognized as a separate tort in South Carolina, but neither has it been expressly rejected.  <u>See, e.g.</u>, <u>Brown v. Pearson</u>, 326 S.C. 409 (Ct. App. 1997) (noting that no South Carolina court has recognized tort of false light, but finding that the elements of the tort were lacking under the facts presented in any event); <u>see also</u> <u>Richardson v. State-Record Co., Inc.</u>, 330 S.C. 562 (Ct. App. 1998) (referencing false light claim asserted by plaintiff, but deciding case on other grounds).

21

A majority of jurisdictions addressing the issue recognize false light as a distinct cause of action. See West v. Media Gen'l Convergence, Inc., 53 S.W.3d 640 (Tenn. 2001) (collecting cases from 26 states and the District of Columbia, and recognizing cause of action in Tennessee). Among jurisdictions that have addressed the issue, and refused to recognize false light as a separate cause of action, Virginia, New York and Wisconsin did so because each codified the tort of invasion of privacy without expressly including false light as a cause of action. Id. While some states have noted apparent similarities between false light and defamation, significant differences exist:

> In defamation law only statements that are false are actionable, truth is, almost universally a defense. In privacy law, other than in false light cases, the facts published are true; indeed it is the very truth of the facts that creates the claimed invasion of privacy. Secondly, in defamation cases the interest sought to be protected is the objective one of reputation, either economic, political, or personal, in the outside world. In privacy cases the interest affected is the subjective one of injury to the inner person. Thirdly, where the issue is truth or falsity, the marketplace of ideas furnishes a forum in which the battle can be fought. In privacy cases, resort to the marketplace simply accentuates the injury.

Crump v. Beckley Newspapers, Inc., 173 W. Va. 699, 320 S.E.2d 70, 83 (1984). Further, commentators have suggested that "the information age in which we now live has created privacy concerns that courts have previously never had to address." See Breeden, FALSE LIGHT INVASION OF PRIVACY: A NEW TORT IN TOWN?, 9 S.C. Lawyer 39 (1997). This suggestion, made 10 years ago, is even more apt today, where web sites and the internet play an ever-expanding role in how Americans gather information and assimilate facts. The time is right expressly to recognize the tort of false light in South Carolina.

In jurisdictions where it is recognized, the tort of false light invasion of privacy includes the essential elements of (1) publication about an individual; (2) that places the individual in a false light before the public; (3) which is highly offensive to a reasonable person; and as to such publication the defendant (4) knew it was false or acted with reckless disregard as to its falsity. See Gannett Co. v. Anderson, 947 So. 2d 1 (Fla. Ct. App. 1st 2006). As to the first element, there can be no dispute that Defendant published information about Schmidt and Patterson. Cf. Taub v. McClatchy Newspapers, Inc., 2007 U.S. Dist. LEXIS 60037 at *17-8 (D.S.C. 2007) (finding that publication of defamation continued when an internet posting was not taken down: "Although a web site may not constitute chattel in the traditional sense, [Restatement (Second) of Torts § 577] lends credence to the Court's belief that the Defendant may have acted unreasonably and/or recklessly by failing to remove from its web site the offending article after it learned of both the article's presence and the article's inaccuracies").

There is also no question that the context of Defendant's posting placed Schmidt and Patterson in a false light. Defendant's posting links to a photograph printed originally in the Greenville Journal. The photograph also includes printed material describing BidZirk's business, as well as the then-recent marriage of Schmidt and Patterson, BidZirk's principals. While Schmidt and Patterson made the fact of their marriage part of the text of the photograph's caption, that information was presented as highlighting a commercial benefit – in this case, that Schmidt and Patterson were partners in life and business, and that BidZirk benefitted by it. See Schmidt Aff., ¶ 11-12; Patterson Aff., ¶ 2-3. Defendant's linking to the photograph was accompanied by text in his posting that portrayed Schmidt and Patterson as irresponsible and

23

overcommitted, because Defendant presumed that the marriage would take time away from Schmidt's and Patterson's service of Defendant as a customer of BidZirk. In this manner, Defendant cast Schmidt and Patterson in a false light. See Schmidt Aff., ¶ 11-12; Patterson Aff., ¶ 2-3.

That the fact of Schmidt and Patterson's marriage is true, or public, or both, is of no moment in a false light claim:

> The facts may be true in a false light claim. However, the angle from which the facts are presented, or the omission of certain material facts, results in placing the plaintiff in a false light. Literal accuracy of separate statements will not render the communication "true" where the implication of the communication as a whole was false. The question is whether [Defendant] made discrete presentations of information in a fashion which rendered the publication susceptible to inferences casting [Schmidt and Patterson] in a false light. Therefore the literal truth of the publicized facts is not a defense in a false light case.

West, 53 S.W.3d at 646 n.5 (emphasis in original, internal punctuation and citations omitted). Certainly, taking a happy event like marriage and twisting it, as Defendant did, into an example of Schmidt's and Patterson's putative flippant attitude towards their business and BidZirk's customers is objectively and reasonably offensive. See Schmidt Aff., ¶ 11-12; Patterson Aff., ¶ 2-3. Finally, Defendant was or should have been aware that the occasion of Schmidt's and Patterson's marriage was not publicized to inform the public that BidZirk, because of its overburdened principals, would not provide good customer service. That, however, is precisely the context in which Defendant published the photograph of Schmidt and Patterson. All of the traditionally-cited essential elements of the tort of false light invasion of privacy are met in this case. See Schmidt Aff., ¶ 11-12; Patterson Aff., ¶ 2-3.

No South Carolina case has enunciated any public policy that would prohibit recognition of the tort of false light invasion of privacy. Case law has in fact noted the possible existence of the tort, but failed expressly to recognize the tort on the facts presented. See, e.g., Parker v. Evening Post Publishing Co., 317 S.C. 236 (Ct. App. 1994) (treating false light claim as one for public disclosure of private facts, effectively skirting the issue of false light). Under the facts presented in the instant action, the Court should recognize the tort of false light invasion of privacy, and should permit Schmidt and Patterson to proceed to the jury with their claims.

IV.     Response to Defendant's submission of supplemental materials.

On September 26, 2007, Defendant filed with the Court a document entitled "Defendant memorandum for summary judgement [sic]." See Doc. 128. None of the arguments, contentions or allegations set forth in Defendant's submission negates any essential element of any of Plaintiffs' claims, and summary judgment is therefore inappropriate. Defendant submitted a total of 25 unnumbered pages[7] to which Plaintiffs respond below:

(a)     Page 2.

This page includes a reprint of the text of a blog authored by one Eric Goldman. Defendant has interspersed his own comments in several places. None of these comments is pertinent to Plaintiffs' claims in this action, and Defendant's comments are not evidence in any event. See Eddy v. Waffle House, Inc., 482 F.3d 674, 680 (4th Cir. 2007). The excerpts from Mr. Goldman's blog are simply hearsay documents, are not admissible, and cannot be considered

---

[7] Plaintiffs have numbered these pages for the Court's convenience. See Exhibit 7.

on a motion for summary judgment.  See Orsi v. Kirkwood, 999 F.2d 86, 92 (4th Cir. 1993); see also Washington v. City of Charlotte, 219 Fed. Appx. 273 (4th Cir. 2007) (citing Orsi).

(b)    Pages 3-4.

These pages include Defendant's allegations that this action "STOPPED me from selling my condo," as well as Defendant's outline of his alleged damages.  As with Defendant's commentary on the blog pages excerpted at Page 2 of his submission, Defendant's statements concerning the housing market in Greenville are not evidence.  Defendant avers that "I just finished coming close to a closing until the buyer saw the lis pendens (even though now removed) when doing title research."  See Exhibit 7, p. 3-4.  Defendant cannot contend that a released lis pendens caused a buyer to abort the purchase of his condominium.  The release of the lis pendens removes that reference from the title to the property, and does not indicate any impediment to the passing of good title.  Defendant's contention that this action somehow caused a prospective buyer to purchase another residence is inherently speculative, and does not support his motion for summary judgment.  Further, Defendant's comments regarding the state of the housing market in Greenville have no foundation whatsoever, as Defendant is not an expert in real estate valuation or the real estate market.  See Fed. R. Evid. 602; Oglesby v. General Motors Corp., 190 F.3d 244, 248-9 (4th Cir. 1999) (affirming exclusion of opinion of mechanical engineering expert despite qualifications, because witness' conclusions lacked adequate foundation).

(c)     Page 5.

Defendant alleges that

I walked out of the first deposition after being physically threatened. The opposing attorney refused to move on after asking me who my customers were by name. I refused to tell him and he stopped the FILMING and COURT RECORDER and hulked over me threatening me calling me a "punk." During both depositions the Plaintiff attorney and Ty Schmidt would laugh after they asked me a harassing question.

See Exhibit 7, p. 5. These allegations are completely baseless.

At no time during either deposition did counsel threaten Defendant. The record reflects that Defendant informed counsel that he was diabetic, and that counsel indicated that Defendant could take regular breaks during the deposition to eat if he needed to do so, and that counsel did not want Defendant to become ill during the deposition. See Exhibit 8, p. 52-7.

At no time did counsel ever 'hulk' over Defendant. Counsel never left his seat during either deposition. Plaintiffs have obtained the affidavits of Karen Belanger and Jack Marks, the court reporter and videographer for both depositions. These two individuals confirm that counsel's conduct during both depositions was professional and appropriate and that it was Defendant who misbehaved during the proceedings, by being obstructionist, difficult and rude. See Exhibit 9 and 10; see also Schmidt Aff., ¶ 13.

(d)     Page 6.

Defendant contends that:

I was followed for around a week or more. The Plaintiff attorney put a private investigator on me. What precedent [sic] or purpose for? This made me VERY paranoid about the lengths to which this attorney was going to go and scared many of my friends.

27

<u>See</u> Exhibit 7, p. 6. These allegations are completely fabricated, and are false. Plaintiffs and counsel state categorically that, very simply, no investigator was ever retained. Defendant's only activities that are of any interest to Plaintiffs or counsel are evidenced on his web site, which counsel and Plaintiffs can review each day if they wish from their respective desks – there would be no purpose in hiring someone to follow Defendant around town. Plaintiffs and counsel have no idea whatsoever why Defendant believes he was followed, or that Plaintiffs engaged any individual to do so.

Defendant also alleges on Page 6 of his submission that he was "forced . . . to reveal trade secret information regarding an invention of mine and also forced me to reveal many of my clients [sic] personal information." <u>See</u> Exhibit 7, p. 6. Again, none of this happened, and Plaintiffs and counsel respectfully refer the Court to the transcripts of both of Defendant's depositions as proof. <u>See</u> Exhibit 8, 11. Defendant was not forced to do anything during the depositions, and was asked legitimate questions relating to his claim of business interruption as a result of the instant action. If, <u>arguendo</u>, the Court were to determine that some sensitive information was passed, voluntarily or not, Plaintiffs would consent to entry of an order barring its dissemination.

Finally, Defendant on Page 6 also contends that counsel "insinuated during the deposition that I could not leave the state, nor did I have the financial means to travel." <u>See</u> Exhibit 7, p. 6. Again, the record indicates otherwise. Counsel asked Defendant where he might plan to travel in January 2007, and Defendant answered that he hoped to attend the Mac World Expo in San

Francisco.  See Exhibit 11, p. 158, 162.  Counsel at no time told Defendant that he could not travel during January 2007, nor was such implied.  There was no reason to attempt to restrict Defendant's travel from South Carolina, even if Plaintiffs were capable of such.

(e)     Page 7.

Defendant contends on Page 7 that counsel "purposely prolonged the depositions and therefore exponentially the expenses of obtaining records of my testimony," essentially alleging that counsel protracted the proceedings for the purpose of pricing Defendant out of the transcripts.  See Exhibit 7, p. 7.  As with Defendant's other allegations, this claim is unsupportable.  The record indicates that the first deposition was convened at 10:34 a.m. and abruptly suspended by Defendant's decision to quit the proceeding at 12:16 p.m.  The first deposition lasted one hour and 42 minutes.  See Exhibit 8, p. 1, 76.  The second deposition was convened at 1:06 p.m. and adjourned at 4:55 p.m., a period of three hours and 49 minutes.  See Exhibit 11, p. 1, 163.  The total time Defendant spent in the witness' chair for both depositions was 5 hours, 31 minutes.  Discovery rules allow for a deposition of seven hours.  See Fed. R. Civ. P. 30(d)(2).[8]  Defendant cannot claim that Plaintiffs caused the depositions to last longer than was reasonable when the total time spent was nearly 90 minutes less than the time permitted by Rule 30.

Defendant also alleges that he was "under the impression" that the "entire trial was on hold" while Plaintiffs' appeal was at the Fourth Circuit.  See Exhibit 7, p. 7.  Plaintiffs filed their

---

[8]  Fed. R. Civ. P. 30(d)(2) provides that "a deposition is limited to one day of seven hours."  However, the time limit is subject to other authorization by the Court.  In this case, the Court granted Plaintiffs' motion to compel Defendant's attendance at a second deposition, after he unjustifiably walked out of the first proceeding.  See Doc. 70.

notice of appeal on April 21, 2006.  <u>See</u> Doc. 35.  The Fourth Circuit issued its decision on

March 6, 2007, and issued its mandate to the Court on May 21, 2007.  <u>See</u> Doc. 79.  In the

interim, Defendant filed a counterclaim (<u>see</u> Doc. 39), a supplement to his counterclaim (<u>see</u>

Doc. 43), a motion to dismiss (<u>see</u> Doc. 44), his "Evidence for Dismissal" (<u>see</u> Doc. 51) and

three affidavits (<u>see</u> Doc. 52, 53, 54).  These filings are not the work of someone who was "under

the impression" that the entire case was stayed while the Fourth Circuit considered Plaintiffs'

appeal.  Further, Plaintiffs served discovery requests on Defendant on July 28, 2006, a fact which

would also indicate to Defendant that discovery was ongoing, despite Plaintiffs' appeal.  The

Court should ignore Defendant's statements regarding his putative misconception regarding

Plaintiffs' appeal and his failure to participate in discovery in this action.

(f)     Page 8.

Regarding Plaintiffs' appeal, Defendant on Page 8 of his submission attempts to make an

issue out of the fact that Plaintiffs' informal brief was handwritten:

> In an amusing fashion, the ONLY handwritten documentation submitted in this
> case by the Plaintiff was to the FEDERAL COURT of Appeals.  I showed this to
> 4 separate attorneys; each one laughed.  This handwritten submission GREATLY
> slowed the process of decision for the appeal and was actually a few days late in
> receipt . . . Please also note that Plaintiff [sic] attorney (possibly intentionally) did
> not put my correct address.  I live in 5C, not 5B, My name is spelled with (1) L,
> not two . . . my neighbor's name is also Phillip (spelled with 2 L's).

<u>See</u> Exhibit 7, p. 8.  These statements are completely irrelevant to Defendant's motion for

summary judgment, and are unworthy of the Court's serious contemplation.

The Fourth Circuit's informal brief form is designed to be submitted by hand if the

appellant chooses to do so.  Counsel contacted the Fourth Circuit's clerk on this point, and was

assured that a handwritten informal brief was acceptable. Further, as indicated, Plaintiffs followed their informal brief with a lengthy typewritten supplemental brief, outlining their arguments for injunction in greater detail than that permitted by the Fourth Circuit's informal brief form. See Exhibit 5. Defendant's statements that submission of a handwritten informal brief slowed the Fourth Circuit's decision are completely unsupported, and are nothing but ill-conceived speculation. The Court of Appeals had the case for approximately 10½ months; not an inordinate amount of time to receive a ruling from the busy Fourth Circuit. Plaintiffs note that Defendant's home address has been listed by the Court as 5B and 5C and that, if mail was sent to the incorrect apartment, such was unintentional. Plaintiffs gain nothing by failing to assure that Defendant received his service copies of papers filed in this action.

(g) Page 9-11.

On Pages 9-11 of his submission, Defendant reprints Jack Campbell's response to Plaintiffs' inquiry. See Exhibit 7, p. 9-11. This letter is not authenticated, disproves no element of any claim advanced by Plaintiffs, and is inconsequential to Defendant's motion for summary judgment. Defendant attempts to imply that counsel's contact with Mr. Campbell was somehow improper. However, Mr. Campbell is an independent third party witness, and someone who has been attacked by Defendant himself in the past. Counsel's effort to solicit the opinions of someone who has spent time as a target of Defendant, as have Plaintiffs, was not inappropriate in the slightest.

(h)    <u>Page 12-14, 18.</u>[9]

On these pages, Defendant reprints (1) an email from a Richard Esguerra of the Electronic Frontier Foundation; (2) a map indicating the distance from Greenville to Charleston; (3) contact information for the Carpenter Law Firm, with whom Defendant alleges he consulted; and (4) postage receipts. <u>See</u> Exhibit 7, p. 12-4, 18. These documents are apparently intended to bolster Defendant's claim for 'damages' in this action. However, Defendant has no claims pending, as all were dismissed by the Court's order. <u>See</u> Doc. 68. Defendant's support for his claims for 'damages' in this action have nothing whatever to do with his pending motion for summary judgment, and should be ignored by the Court.

(i)    <u>Page 19.</u>

This page of Defendant's submission includes the handwritten word "precedent," and is a reprint of an online reference to a case involving a woman named Georgette Gilbert. <u>See</u> Exhibit 7, p. 19. The actual opinion is published at <u>Gilbert v. Sykes</u>, 147 Cal. App. 4th 13 (Cal. App. 2007). <u>See</u> Exhibit 12. <u>Gilbert</u> is inapposite to the instant case. <u>Gilbert</u> involved the application of California Code of Civil Procedure § 425.16, which has no analogue under South Carolina law. The code section invoked "was enacted in 1992 to dismiss at an early stage nonmeritorious litigation meant to chill the valid exercise of the constitutional rights of freedom of speech and petition in connection with a public issue."[10] <u>See</u> <u>Gilbert</u>, 147 Cal. App. 4th at 21. <u>Gilbert</u> did

---

[9] Pages 15-17 of Defendant's submission are a copy of Plaintiffs' informal brief to the United States Court of Appeals for the Fourth Circuit, regarding which Plaintiffs refer the Court to Section IV(f).

[10] The California statute is an example of what is commonly referred to as an "Anti-SLAPP Act." These laws are intended to halt meritless suits which tend to stop legitimate public comment. The acronym "SLAPP" stands for "Strategic Lawsuit Against Public Participation."

not include infringement of a trademark, as does the instant case. Further, in <u>Gilbert</u> the party alleging that he was defamed, a Dr. Sykes, was found to be a limited purpose public figure, due to his effort to attain local notoriety as a plastic surgery expert in the Sacramento area. <u>See</u> <u>Gilbert</u>, 147 Cal. App. 4th at 24-5. No plaintiff in the instant action is a public figure, and Defendant has not alleged such.

<u>(j)</u>    <u>Page 20-21.</u>

These pages refer to the case of <u>Ford Motor Co. v. 2600 Enters.</u>, 177 F. Supp. 2d 661 (E.D. Mich. 2001), <u>see</u> Exhibit 13. The holding of <u>2600 Enters.</u> was that the use of the name of a company (in that case, Ford) in programming code to link one's web site to another's does not constitute commercial use of a trademark under the FTDA. <u>See</u> <u>2600 Enters.</u>, 177 F. Supp. 2d at 664. Use of programming code or commercial use of a mark are not at issue in the instant action. Defendant is clearly deprived of the "noncommercial use" defense under the FTDA, <u>see</u> <u>PETA</u>, 263 F.3d at 366, and is not alleged to have linked his own domain name to a web site owned by Plaintiffs, or any of them.

<u>(k)</u>    <u>Page 22-24.</u>

Pages 22-24 of Defendant's submission consist of a page from BidZirk's web site, which references the "Behind the Counter" article featuring the aforementioned photograph of Schmidt and Patterson, and a page from Defendant's web site, linking to the same photograph. As indicated above, in a false light invasion of privacy claim, the truth of the facts disclosed is not a defense. <u>See</u> <u>West</u>, 53 S.W.3d 646 n.5. The fact that BidZirk links its web site to a photograph

of Schmidt and Patterson does not excuse Defendant's linking to the same photograph, if the context of Defendant's link casts Schmidt and Patterson in a false light.

(l)    Page 25.

The final page of Defendant's submission is an inventory of computer equipment, listing in some cases prices or estimated prices.  See Exhibit 7, p. 25.  This list does not disprove any element of Plaintiffs' claims, and is at best some effort to document alleged damages from Defendant's dealings with BidZirk.  As indicated above, Defendant has no claims pending.  His list is accordingly irrelevant to any claim presented in this action, and should be disregarded.

In a motion for summary judgment, the moving party bears the burden of showing summary judgment is proper. Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof.  Celotex, 477 U.S. at 322.  Once the moving party has brought into question whether there is a genuine issue for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine issue for trial.  Fed. R. Civ. P. 56(e); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986).  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-8 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party.  Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991).  In this case, Defendant has provided absolutely no support for his motion for summary

34

judgment, relying instead on unfounded commentary and damage calculations with no pending claims upon which to base any such award.  If it is to succeed, Defendant's motion for summary judgment must negate at least one element of each of Plaintiffs' claims.  Defendant's motion and the materials submitted to supplement it fall far short of this requirement, and the motion accordingly must be denied.

<u>CONCLUSION</u>

Defendant's motion for summary judgment does not negate any portion of Plaintiffs' claims.  Plaintiffs have not merely rested on the allegations set forth in their pleadings, but have presented evidence of each element of each claim asserted in this action – trademark dilution under the FTDA, libel per se/defamation and false light invasion of privacy – and should be permitted to proceed to trial to each.

This 15th day of October, 2007.

/s/ Kevin M. Elwell
_____
KEVIN M. ELWELL
USDC Bar No. 9706

K.M. ELWELL, P.C.
111 East North Street
Greenville, South Carolina 29601
(864) 232-8060
(404) 759-2124 e-facsimile
kmelwell@kmelwell.com

Attorneys for Plaintiffs BidZirk, LLC,
Daniel G. Schmidt, III and Jill Patterson

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

BIDZIRK, LLC, DANIEL G. SCHMIDT,     )
III, and JILL PATTERSON,             )
                                     )
     Plaintiffs,                     )
                                     )
v.                                   )     Civil Action No. 6:06-CV-109-HMH
                                     )
PHILIP J. SMITH,                     )
                                     )     CERTIFICATE OF SERVICE
     Defendant.                      )
_____

     This is to certify that I have this day served a copy of the foregoing RESPONSE TO

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT upon the following parties by

depositing same in the United States Mail in a properly-addressed envelope with adequate

postage affixed to:

Philip J. Smith
601 Cleveland Street
Apartment 5-C
Greenville, South Carolina 29601

This 15th day of October, 2006.

                            /s/ Kevin M. Elwell

                            _____
                            KEVIN M. ELWELL
K.M. ELWELL, P.C.                    USDC Bar No. 9706
111 East North Street
Greenville, South Carolina 29601
(864) 232-8060
(404) 759-2124 e-facsimile
kmelwell@kmelwell.com

                            Attorneys for Plaintiffs BidZirk, LLC,
                            Daniel G. Schmidt, III and Jill Patterson