IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | |
|---|---|
| BIDZIRK, LLC, DANIEL G. SCHMIDT, III, and JILL PATTERSON, )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>PHILIP J. SMITH, )<br>)<br>Defendant. ) | <br><br><br><br><br>Civil Action No. 6:06-CV-00109-HMH<br><br><br>AFFIDAVIT OF DANIEL G. SCHMIDT, III |

State of South Carolina
County of Greenville

CAME BEFORE ME, the undersigned officer duly authorized to administer oaths, Daniel G. Schmidt, III, who, upon being sworn, deposes and states:

1.

My name is Daniel G. Schmidt, III. I am over 18 years of age and am competent in all respects to testify to the matters asserted herein. I have personal knowledge of those matters and know them to be true. This affidavit is given for any purpose lawful under the Federal Rules of Civil Procedure.

2.

I am a principal and owner of BidZirk, LLC, which operates in Greenville, South Carolina and on the internet. BidZirk resells items consigned by its customers on eBay, a company that conducts and administers online auctions of products. BidZirk's logo and

Exhibit 3                                                               dockets.Justia.com

trademarks include a depiction of a monkey or chimpanzee, posed in such a manner as to indicate excitement. A copy of BidZirk's logo is attached to my affidavit. I have reviewed and am familiar with Defendant's postings on his web site concerning BidZirk. The logo published on Defendant's web site is a copy of BidZirk's actual logo, and not merely an approximation.

3.

I am aware of no other corporate logo or trademark that approximates BidZirk's marks. BidZirk's marks are registered with the United States Patent and Trademark Office (Registration No. 3109847). BidZirk's logo was first used in commerce on June 1, 2005, and has been in continuous commercial use since that date.

4.

Since the time that BidZirk began operations, it has retained the services of Schafer Marketing & Advertising ("Schafer") in Greenville to promote its logo and its brand. Schafer's design and marketing services for BidZirk include development of BidZirk's web site, purchase of media advertising including billboards and design of signage. BidZirk also owns and operates a company van, which is wrapped with BidZirk's monkey logo in the company's colors. In general, all of BidZirk's marketing and promotional efforts include the company's logo and trademarks.

5.

BidZirk operates a very visible location along Interstate 85 in Powdersville, South Carolina. BidZirk's location features prominent signage, including BidZirk's logo and purple and green color scheme. During the pendency of this case, BidZirk was forced to close two retail locations in Greenville, due to decreased foot traffic in those stores.

6.

Due to my position with BidZirk, and the company's regular dealings with eBay, I am personally familiar with eBay, its business model and its market penetration. There are approximately 140 million registered eBay users, any of whom are potential customers of BidZirk. Potential merchandise buyers can search eBay's web site for information on product sellers. Buyers are permitted and encourage to post "feedback" on sellers, which eBay compiles. Sellers on eBay carefully guard their feedback ratings, if good, because favorable feedback ratings can encourage buyers to do business with a well-regarded seller. On the other hand, bad feedback is also reviewable by potential buyers, and can dissuade a potential customer from doing business with a seller.

7.

Following the publication of Defendant's internet postings about BidZirk, results on major search engines began to display Defendant's postings. As of October 15, 2007, (nearly two years after Defendant initially published about Bidzirk) the top 10 results on google.com for the search term "BidZirk" include 4 references to Defendant's postings (ranked 3, 4, 5 and 10 on the list); the top 10 results on yahoo.com for the search term "BidZirk" include 4 references to Defendant's postings (ranked 2, 3, 6 and 7 on the list); and the web site technorati.com lists 6 results, all of them referencing Defendant's postings. These search results indicate that Defendant's postings on BidZirk continue to be available to potential customers searching for information on the company.

8.

The fact that potential customers tend to encounter Defendant's postings when searching for information on BidZirk has been extremely damaging to the company.

Exhibit 3

Defendant's infringement of BidZirk's trademarks has resulted in numerous inquiries to the company regarding its alleged business practices, and BidZirk was required to consolidate its operations, and shut down two retail storefronts, following the publication of Defendant's postings. The association of BidZirk's trademarks with Defendant's internet postings has been unfavorable to say the least, and the company has suffered, both financially and reputationally, for its connection with Defendant's publications. I believe that potential customers are likely to associate BidZirk's logo and trademarks with Defendant's postings as much as with BidZirk's business itself.

9.

Defendant's postings also defamed me personally. Defendant referred to me as a "yes man," a term which indicates a willingness on my part to say whatever I have to say to make a deal. Defendant's postings also indicated that, as a "yes man," I was apt to promise more than I would deliver in business. These statements are false, and demean me in the pursuit of my business or trade. The implication that I am dishonest or do not perform my part of agreements with business associates I find deeply offending and upsetting. No one, including me, wants to be regarding as someone who is not trustworthy in business, and such a reputation is necessarily hurtful to my existing and potential business relationships.

10.

Defendant's posting also referenced my involvement in another company called ChanneLinx. Defendant's posting initially mentioned my involvement with ChanneLinx, a business-to-business company that performs services for companies seeking to increase productivity through use of the internet, including a description of me as questionably

"savvy" about technology. However, Defendant linked this reference to a story regarding ChanneLinx's bankruptcy, with the implication that I evidently did not know anything about technology, since my other technology venture (ChanneLinx) had gone broke. This is false. In fact, I was part of a team of investors and managers that purchased ChanneLinx when that company was in bankruptcy, and I continue to operate the company since its emergence from bankruptcy. I was not involved with ChanneLinx when the company filed its bankruptcy petition. It was only when my counsel contacted Defendant regarding this obvious contextual error that Defendant agreed to remove the link to the ChanneLinx bankruptcy story. The text questioning whether I was "savvy" about technology remained, however. The implication that I did not know what I was doing regarding eBay auctions or operating BidZirk is still in Defendant's posting, and further damages my reputation, by creating a false impression that I am unqualified to operate an eBay auction business.

11.

Shortly after BidZirk began operations, I arranged to purchase advertising space in a printed supplement to the Greenville Journal called Behind the Counter. As part of this advertisement, my wife and I were photographed in one of BidZirk's locations. This photograph appeared in a full-page advertisement in Behind the Counter that included a few paragraphs about BidZirk and mine and my wife's establishment of the business. The tenor of the story was that my wife and I had opened BidZirk at the approximate time that we married, that we were partners in life and in business, and that BidZirk was the beneficiary of our close relationship.

5

Exhibit 3

12.

Defendant's postings linked to the Behind the Counter feature on BidZirk. However, Defendant's link was accompanied by text in which Defendant questioned the propriety of my marriage, at a time when Defendant and his associates were sending inventory to BidZirk for sale on eBay. Referencing my marriage, Defendant stated "He [meaning me] explained to me how he had just gotten married and was planning his honeymoon in a week's time. Wait! He was getting married, going on a honeymoon, and starting a (in his own words) 'multi-location business that will be national in 5 years time'?" My wife and I purchased advertising in Behind the Counter to promote BidZirk, clearly intending to link BidZirk and our marriage in a positive manner. Defendant's posting took the fact of our marriage, and of the business relationship my wife and I have together, and twisted it into something that allegedly indicated my disregard for BidZirk's customers, my inability to commit myself properly to the venture of BidZirk's business and an unwillingness to provide good service to BidZirk's customers. In this manner, Defendant's linking to the Behind the Counter story publicly portrayed my wife and me in a false light. Defendant knew or recklessly disregarded the original context of the advertisement in Behind the Counter, and sought to alter that context in a manner that injured me. The implication that the timing of my marriage was irresponsible and evidence of my lack of commitment to BidZirk's business and customers I find offensive and deeply upsetting.

13.

I was physically present at the depositions of Defendant on September 14, 2006 and December 29, 2006. I have reviewed Defendant's allegations that my counsel

physically threatened Defendant during these depositions. These allegations are completely false. Mr. Elwell attempted to accommodate Defendant's diabetes, by telling Defendant that he could take breaks to eat as needed. Mr. Elwell specifically told Defendant that he did not want Defendant to become ill during the deposition. During both depositions, Defendant's attitude was generally rude and uncooperative. Mr. Elwell did the best he could to move through his examination, but was often waylaid by Defendant's refusal to answer simple, uncontroversial questions. I have also reviewed Defendant's allegations that Mr. Elwell and I laughed at Defendant during the depositions. These allegations are also untrue. Defendant's conduct made both proceedings rather tense and unpleasant affairs, and I found nothing about either deposition amusing. There is no truth to Defendant's allegations that Mr. Elwell or I behaved inappropriately at any time during either deposition.

FURTHER AFFIANT SAYETH NAUGHT.

_____
DANIEL G. SCHMIDT, III

Sworn to and subscribed
before me this 15th day
of October, 2007.

_____
NOTARY PUBLIC
My Commission Expires
March 21, 2012